**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ANNIE LUCAS BROWN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Case Number 2:07-cv-841-MHT** |
| | § | |
| **ALABAMA PUBLIC LIBRARY** | § | |
| **SERVICE,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant, The Alabama Public Library Service ("the APLS"), and hereby moves this Court to enter an order granting it summary judgment on all claims in the Plaintiff's Complaint. As grounds, the APLS states that there are no issues of material fact and that it is entitled to summary judgment in its favor as a matter of law. In support of this Motion, the APLS submits its separately filed Memorandum Brief, and the following exhibits:

1. Affidavit of Rebecca Mitchell, Exhibit A hereto;

2. Excerpts from the deposition of Annie L. Brown, Exhibit B hereto;

3. Excerpts from the deposition of Rebecca Mitchell, Exhibit C hereto;

4. Affidavit of Cheryl Fondon, Exhibit D hereto;

5. Excerpts from the Progressive Discipline Manual, Ex. E hereto;

6. Employment Manual, Ex. F hereto;

7. August 9, 2006 letter; Exhibit G hereto;

8.   August 11, 2006 Letter, Exhibit H hereto;

9.   EEOC Charge, Exhibit I hereto;

10. EEOC Finding, Exhibit J hereto;

11. EEOC Right to Sue Letter, Exhibit K hereto;

12. Brown Interrogatory Responses, Exhibit L hereto;

13. Rule 670-x-19.01(2), State Personnel Board Rules, Exhibit M hereto;

14. Judith Shepard Reprimand, Exhibit N hereto; and

15. Judith Shepard Performance Appraisal, Exhibit O hereto;

WHEREFORE, the Alabama Public Library Service respectfully requests the entry of summary judgment in its favor.


/s/ Austin Huffaker
R. AUSTIN HUFFAKER, JR.
      (ASB-3422-F55R)

/s/ Grant Sexton
T. GRANT SEXTON, JR. (ASB-0915-S40S)

Attorneys for Defendant
Alabama Public Library Service

**OF COUNSEL:**
RUSHTON, STAKELY, JOHNSTON &
   & GARRETT, P.A.
Post Office  Box 270
Montgomery, AL 36101
(334) 206-3100 Telephone
(334) 481-0815

## **"670CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Deborah H. Biggers, Esq.
113 East Rosa Parks Ave.
Tuskegee, AL 36083

/s/ Austin Huffaker
OF COUNSEL

## AFFIDAVIT OF REBECCA MITCHELL

STATE OF ALABAMA     )

COUNTY OF MONTGOMERY  )

Before me, the undersigned Notary Public in and for said state and county, personally appeared Rebecca Mitchell, who is known to me, and who being by me first duly sworn, deposes and states as follows:

I am Rebecca Mitchell. I currently am employed as the Director of the Alabama Public Library Service ("the APLS"). I have held this position since January 2002. All facts set forth herein are facts of which I have personal knowledge. I give this Affidavit in the action styled *Annie Lucas Brown v. The Alabama Public Library Service,* pending in the United States District Court for the Middle District of Alabama.

The APLS is an agency of the State of Alabama charged with the responsibility of, among others, assisting and consulting with public libraries throughout the State to maximize their library resources and services to all Alabamians. The APLS currently employs approximately 50 individuals.

When I arrived as the Director of the APLS in January 2002, Annie L. Brown was employed as a "Consultant" (Classification No. 30520) as defined by the Alabama Personnel Department. In 2002, Ms. Brown applied for the position of "Library Operations Manager" (Classification No. 30515) as defined by the Alabama Personnel Department. A vacancy in that position became available in February 2002. There were six total applicants for the position, three of whom were African-American and three Caucasian. I selected Ms. Brown over the other applicants. Ms. Brown started the position of "Library Operations Manager" on or about May 4, 2002, and her salary and step levels were adjusted accordingly.

On July 25, 2006, I issued a written reprimand to Ms. Brown concerning her conduct in connection with a phone call made to the Governor's Office. Attached hereto as **Exhibit 1** is a copy of the reprimand. My decision to issue the reprimand was based upon numerous factors, including statements made by Tonya Moore about what had happened, the statements made by Ms. Moore in a memorandum that she provided me, statements made by Cheryl Fondon of the Governor's Office about what happened, statements made by Ms. Fondon in a memorandum that she provided to me, my conversation with Ms. Brown, and my consultation with the State Personnel Department and its attorney, Alice Ann

EXHIBIT

A

Blumberg No. 5119

Byrne.  Attached hereto as **Exhibits 2** and **3** are the memorandums that were provided to me by Ms. Moore and Ms. Fondon and upon which I relied.

In particular, after I learned from Tonya Moore that Ms. Brown had called the Governor's Office without any notice to me or Ms. Moore, I spoke with Ms. Brown and asked her whether she had called the Governor's Office rather than going through the proper channels.  Ms. Brown denied calling the Governor's Office.  I then asked her, how else would the Governor's Office know that she had an issue with her travel reimbursement?  Ms. Brown again denied calling the Governor's Office.  After questioning Ms. Brown once again, she admitted that "she made a call", but she refused to tell me whom she called.  She told me that she "had her sources", and she would not tell me who her sources were despite my directive for her to do so.

I also spoke with Cheryl Fondon at the Governor's Office about Ms. Brown's phone call.  After speaking with Ms. Fondon, I asked her to put together a memorandum setting forth the events surrounding Ms. Brown's phone call.  **Exhibit 3** is a copy of the memorandum that Ms. Fondon provided and upon which I relied in issuing the reprimand.

As required by the rules governing state employees, the APLS was required to complete annual Performance Reviews of Ms. Brown.  Attached hereto as **Exhibits 4, 5, 6** and **7** are the Performance Reviews I performed on Ms. Brown in the years preceding 2006.

The Performance Review period during which the Reprimand was issued, was from September 1, 2005 to September 1, 2006.  Attached hereto as **Exhibit 8** is a true and correct copy of the Performance Review I completed on August 31, 2006 on Ms. Brown.  As shown in the Performance Review, I gave her a responsibility score of 20.00.  This responsibility score was the result of a number of performance-related factors and complaints that I received in the preceding twelve months.  Some of these included the following:

(1) Performance issues surrounding the July 25, 2006 reprimand, as set out above and in the attached exhibits.

(2) Performance issues concerning a post-Katrina project in Bayou La Batre, Alabama, including a complaint voiced by another co-worker, Mary Payne, about Ms. Brown's cooperation on the project.  Attached hereto as **Exhibit 9** is a true and correct copy of a memorandum that I drafted on November 16, 2005 concerning Ms. Payne's complaint about Ms. Brown's cooperation.  This memorandum accurately reflects what Ms. Payne told me.

(3) Also, in connection with the Bayou La Batre project, I was required to remove Ms. Brown from coordinating the project because, in my opinion, Ms. Brown was not fully participating in the project to the extent expected of a

project coordinator. Attached hereto as **Exhibit 10** is a true and correct copy of a memorandum I issued to Ms. Brown concerning the project.

(4) Performance issues concerning another complaint voiced by Mary Payne about Ms. Brown in which Ms. Brown complained about the fact that a new consultant received a new computer when Ms. Brown did not.

(5) A complaint made by the Director of the St. Clair Library System concerning a workshop that Ms. Brown and another employee coordinated and put together. Attached hereto as **Exhibit 11** is a true and correct copy of an email I received from the Director of that library about the workshop.

(6) A complaint made by Sheila Fulmer, the Personnel Assistant at the APLS and the coordinator for training classes, about Ms. Brown stepping out of the chain of command and calling the State Personnel Department to determine if Ms. Fulmer had in fact enrolled Ms. Brown in a training class as Ms. Fulmer had already told Ms. Brown that she had done. Attached hereto as **Exhibit 12** is a true and correct copy of a memorandum that I received from Ms. Fulmer about this. Attached hereto as **Exhibit 13** is a true and correct copy of an email I received from Norma Taylor at the State Personnel Department about Ms. Brown's contact with them.

(7) A complaint by Tonya Moore about Ms. Brown's coordination of a continuing education sub-committee meeting on July 27, 2006 during which Ms. Brown decided not to order lunches for the committee members even though one member was diabetic. Attached hereto as **Exhibit 14** is a copy of the memorandum provided to me by Ms. Moore about the events concerning the meeting.

(8) A complaint made by Ms. Moore about a comment made by Ms. Brown on May 16, 2006 in which Ms. Brown stated "I better not find out that you all are not doing the same for me as what you do for the white people." The statement was made in response to a request by Ms. Moore that Ms. Brown provide her with the days she would take on annual leave for purposes of completing a travel request form. Attached hereto as **Exhibit 15** is a copy of a memorandum that Ms. Moore sent to me about this conversation.

(9) In 2006, Ms. Brown committed APLS funds to the Alabama Humanities Foundation without full documentation and authorization. This resulted in a claim made by the Alabama Humanities Foundation which the APLS had to submit to the Board of Adjustment.

Since I have been the Director of the APLS, I have made extensive efforts to reconfigure the APLS and make it a more efficient agency while also maximizing its resources in providing assistance to the public libraries throughout the State. In furtherance of this goal, I gave several employees at the

APLS, including myself, consultant assignments for specific library districts. Attached hereto as **Exhibit 16** is a copy of a memorandum that I distributed to APLS employees in connection with this assignment. As can be seen from the memorandum, consultant assignments were given to me, Hulen Bivens (the Assistant Director, Caucasian), and other Library Operations Managers, including Ms. Brown. Attached hereto as **Exhibit 17** is a memorandum that I issued to the public libraries concerning the appointment of APLS employees to serve as consultants for their districts. While these employees were given consultant assignments, they were not demoted from their job positions or classifications to a "Consultant", Class No. 30520.

REBECCA MITCHELL

SWORN TO AND SUBSCRIBED before me this _____ 7th _____ day of May, 2008.

Notary Public
My Commission Expires: _11/30/10_

EXHIBIT

1

# MEMORANDUM

July 25, 2006

**TO:**  Annie Brown

**FROM:**  Rebecca S. Mitchell, Director

**Subject:**  Written Reprimand

Ms. Brown,

I am informing you that effectively immediately, you are removed from any and all supervisory responsibilities of your current position.

You refused to accept that my Executive Secretary was working on your travel problem with the Governor's office and took matters into your own hands by contacting Joan, a secretary in the Speaker of the House's office, who then contacted Cheryl Fondon head of the Governor's travel office. These actions were taken without notice to me, or my Executive Secretary and I consider them to be a gross breach of trust, management responsibility, and professional courtesy to the point of insubordination.

I have since contacted the Governor's travel office and discovered that you did in fact contact another individual, who along with you contacted the Governor's office and she stayed on the phone line while you talked to the Governor's representative. Ms. Fondon was unaware until part of the way into the conversation that Joan was still on the line. She felt this was not professional on your part not to let her know that Joan was staying on the phone. Then I emailed you that you could pick up the amended travel form from the Capital, but you replied that you never agreed or asked to pick up the form. Ms. Fondon emphasized to me in a conversation I had with her that you did tell her you wanted to pick up the form. In effect, you have misled, evaded, and lied to me on this matter.

I am taking this action as a direct result of your gross insubordination, and disruptive conduct undermining my authority. Your actions have shown that you have a problem submitting to authority, have intentionally made a false accusation on staff competency, and through your demeanor and words created an environment of personal and professional embarrassment for this agency and me. As Director of this agency, I have strived hard to develop goodwill and a positive working relationship with the Governor's office and members of the legislature and I will not allow you to harm that any farther. Additionally, you have also created a serious breach of trust both within and outside of this agency. I cannot, nor will I, condone your behavior and as a senior management official working under my direction since I can no longer rely upon your judgment, leadership, or loyalty.

I am also informing you that I am continuing to investigate this incident and there is the possibility of more serious disciplinary actions that may be taken up to and including termination of employment with the this agency and the State of Alabama.

Rebecca S. Mitchell

Rebecca S. Mitchell
Director

Pursuant to ALA. CODE § 36-26-27.1 (2000 CUM. SUPP.), you are being notified that this reprimand and accompanying information will be placed in your personnel file. You have a right to file a written response to this reprimand which will also be placed in your personnel file.

_Employee_

7-26-06

Date

_Witness_

7/26/06

Date

Signature denotes receipt of notification that reprimand will be placed in the employee's disciplinary file and that there is a right to file a written response to same



TO:        Rebecca S. Mitchell, Director

FROM:      Tonya Moore, Executive Secretary

DATE:      July 24, 2006

SUBJECT:   Travel reimbursement for Annie Brown's trip to New Orleans, LA

Complications surrounding Mrs. Brown travel reimbursement form were brought to my attention on July 11, 2006. Personnel from the Business Office notified me of a $225 increase in the "Registration Fee" from the travel request form originally submitted for approval by Governor Riley and the actual reimbursement amount. I informed the Business Office and subsequently Mrs. Brown that I would have to submit an amended request for out-of-state travel to the Governor's office for approval before her reimbursement could be processed. On July 11, I prepared an amended request for out-of-state travel form and on July 12, I prepared a cover memo to accompany the amendment.

I spoke with Cheryl Fondon in the Governor's office on July 21, 2006. Cheryl said that she was sure it had been signed and was on its way back to us. Monday, July 24, 2006, Mrs. Brown called me to ask what the status of her travel was. I told Mrs. Brown that I had talked to Cheryl and that she felt sure it was on its way to us, but that she would check and call me back. Mrs. Brown asked me to put in a reminder call for her to make sure. A little later this morning I received a call from our Personnel Assistant, Sheila Fulmer, telling me that someone named Phil from the Governor's office had left her a voice mail stating that Mrs. Brown had called him inquiring about her travel request, he informed her that it was about to go out in the mail and she said she would pick it up. Sheila does not in any way handle travel requests or reimbursements, so she gave me Phil's number to call him back. When I called Phil back he told me that really did not need anything further, Mrs. Brown had called to tell him she would be picking up the signed travel request form.

OFFICE OF THE GOVERNOR



STATE CAPITOL
MONTGOMERY, ALABAMA 36130

BOB RILEY
GOVERNOR

(334) 242-7100
FAX: (334) 242-0937

## STATE OF ALABAMA

# MEMORANDUM



EXHIBIT
3

July 25, 2006

To: Rebecca Mitchell
    Executive Director, AL Public Library Service

From: Cheryl Fondren
    Director, Administrative Services; Governor's Office

Re: Out-of-State Travel
    Ms. Annie Brown

---

Ms. Mitchell,

I appreciate your staff's willingness and understanding of our process for handling out-of-state travel pre-approval forms. It appears there was some confusion among your staff and my office in regards to travel for Ms. Annie Brown.

As you requested, below is a summary of my recollection of the phone conversation with Ms. Brown

On Monday morning July 24, I received a transfer call from JoAnn in the Speaker's Office asking if I were the person responsible for the Governor's out-of-state pre-approval forms required from state agencies. I replied I was and she said she had Ms. Annie Brown from AL Public Library on the line to transfer to me.
Ms. Brown spoke up and proceeded to explain she had an amended travel needing approval. I indicated that all travel had been signed as of Friday and was ready for pick up in our mailroom or had been returned via handmail.

She began stating she did not have hers and it was taking too long to get it back and my office needed to understand most of her $1000+ charges were on her credit card and she needs her paperwork in order to get reimbursed. I indicated I was aware of the

reimbursement procedures and to assist I process amended travel with a greater amount of urgency.

She also stated she didn't understand why her travel had to be amended because of the registration fee difference but overall her travel expenses were cheaper than on the original approved travel. I explained several times the criteria of travel expenses were based on categories of transportation, lodging, meals, etc and not overall expenses. When the amount of money is excessive in one or more category and/or dates of travel and/or mode of transportation changes an amended form is required.

In my opinion, I'm not sure she quite understood the concept or process because after several explanations and examples she continue to inform me that this was not right to do this to her because she needed her reimbursement ASAP.
On this point she gets JoAnn to agree with her and I realize JoAnn has stayed on the phone line rather than transferring and hanging up.

I also informed Ms. Brown when her amended travel arrived in our office it was in need of some additional information to clarify the changes so I contacted Tonya at APL to assist me. Ms. Brown indicated Tonya may not have handled her travel properly, may not have done it correctly and implied there were problems in Tonya's office that was holding up her ability to get reimbursement.

I stated in my opinion Tonya and I handled the travel correctly and we had it taken care of as quickly as possible. I indicated I have had a good working relationship with Tonya and have not had problems with other APL out-of-state travel in the past.

I explained our process was to deal directly with the one or two contact persons the director has placed in charge of travel so my office dealt with the same person consistently rather than the many individual employees in each agency.

Ms. Brown asked if she could personally come and pick up her travel which I replied yes. I called her back in 5 minutes to say her travel was located in the pick up box located in our mailroom and gave directions. I expected to see her shortly thereafter in the morning but instead she arrived about 4:00 Monday afternoon and picked it up.

I appreciate your response and follow up to my call. I make every effort to assist employees with their out-of-state travel forms in a timely manner. Due to such a large volume from all state agencies, boards and commissions our office prefers to stay with our traditional practice of dealing with one or two contact person or persons assigned by the director in handling travel so I am not placed in a position to be contacting each and every individual within an agency. This also helps individual agencies apply their own procedures for processing travel before it is sent to the Governor's Office.

Again, thank you for assistance and I look forward to continue working with you and your agency

EXHIBIT
4

# Form 13F    EMPLOYEE PROBATIONARY PERFORMANCE APPRAISAL
Revised (6/1/1998)

### STATE OF ALABAMA
### Personnel Department

Employee Name: **ANNIE L BROWN**         Social Security Number: **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**

Agency: **045/PUBLIC LIBRARY SERVICES**         Division: /

Classification: **LIBRARY OPERATIONS MGR**         Class Code: **30515**

Period Covered From: **05/04/2002** To: **11/03/2002**         Position Number: **3880103**

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

SSN **587** - **28** - **0058**   *Rebecca S Mitchell*    Date / Initial if comments are attached **10/23/02**
RATING SUPERVISOR    Signature

*Annie L Brown*    Date / Initial if comments are attached **10/23/02** *ALB*
EMPLOYEE Signature

SSN **587** - **28** - **0058**   *Rebecca S Mitchell*    Date / Initial if comments are attached **10/23/02**
REVIEWING SUPERVISOR    Signature

It is recommended that the employee be:

___ Continued probationally in the position named (reason stated in Disciplinary Actions area)

_X_ Given permanent status in the position  Probationary increase to $ **2173.50** Step **13** Effective **11/16/02**

___ Terminated before or at the end of the probationary period (reason stated in Disiplinary Actions Area)

---

APPOINTING AUTHORITY Signature         Date

---

**PROBATIONARY PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Probationary Performance Appraisal Score.

| 37.1 | - | 0 | = | 37.1 |
|------|---|---|---|------|
| Responsibility Score | | Disciplinary Score | | Probationary Performance Appraisal Score |

This employee's work:

| [ ] | [ ] | [ ] | [ ] | [X] |
|-----|-----|-----|-----|-----|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the probationary period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | [X] | [ ] |
| Punctuality | [X] | [ ] |
| Cooperation with Coworkers | [X] | [ ] |
| Compliance with Rules | [X] | [ ] |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this probationary period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|:---:|
| 1. Plan, organize, coordinate, monitor, and evaluate the Networking, Development | 3 |
| 2. Provide public librarians and public library trustees assistance in the areas | 4 |
| 3. Coordinate the statewide continuing education training for public librarians | 4 |
| 4. Monitor Internet, telecommunications legislation and programs that are relevant | 3 |
| 5. Assist the agency Grants Coordinator in the development, monitoring, and evaluating | 4 |
| 6. Coordinate the work of statewide committees as assigned by the agency director. | 4 |
| 7. Maintain liaison with other relevant library, informational, and other groups | 4 |
| 8. | |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

| 26 | ÷ | 7 | = | 3.71 | x | 10 | = | 37.1 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this probationary period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this probationary period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

**EXHIBIT**

5

Form 13
Revised (1/1/1999)

**EMPLOYEE PERFORMANCE AP**
**STATE OF ALABAMA**
**Personnel Department**

Number
of Steps

Employee Name: ANNIE L BROWN                Social Security Number: 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

Agency: 045/PUBLIC LIBRARY SERVICE          Division:

Classification: LIBRARY OPERATIONS MGR       Class Code: 30515

Period Covered From: 09/01/2002   To: 09/01/2003   Annual Raise Effective: NOVEMBER 2003

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN 587 - 28 - 0058 | | SSN 587 - 28 - 0058 |
| Signature | Signature | Signature |
| 9-17-03 | 9-17-03 | 9-17-03 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 37.1 | 0 | 37.1 |
|---|---|---|
| Responsibility Score | Disciplinary Score | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☐ | ☒ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7-16.6) | Meets Standards (16.7-26.6) | Exceeds Standards (26.7-36.6) | Consistently Exceeds Standards (36.7-40) |

---

**WORK HABITS:** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☒ | ☐ |
| Compliance with Rules | ☒ | ☐ |

***RESPONSIBILITIES:*** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1 Plan, organize, coordinate, monitor, and evaluate the Networking . . . | 3 |
| 2 Provide public librarians and public library trustees assistance in . . . | 4 |
| 3 Coordinate the statewide continuing education training for public . . . | 3 |
| 4 Monitor Internet, telecommunications legislation and programs that . . . | 4 |
| 5 Assist the agency Grants Coordinator in the development, monitoring . . . | 4 |
| 6 Coordinate the work of statewide committees as assigned by the agency . . . | 4 |
| 7 Maintain liason with other revelant library, informational, and other . . . | 4 |
| 8. | |
| 9 | |
| 10. | |

***RESPONSIBILITY SCORE:***

| 26 | ÷ | 7 | = | 3.71 | x | 10 | = | 37.1 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

***DISCIPLINARY ACTIONS:*** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

***DISCIPLINARY SCORE:*** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:        0

**EXHIBIT**
6

**Form 13**
Revised (1/1/1999)

**EMPLOYEE PERFORMANCE A**
**STATE OF ALABAMA**
**Personnel Department**

Number
of Steps

Employee Name: ANNIE L BROWN

Social Security Number: 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

Agency: 045/PUBLIC LIBRARY SERVICES

Division:

Classification: LIBRARY OPERATIONS MGR

Class Code: 30515

Period Covered From: 09/01/2003    To: 09/01/2004

Annual Raise Effective: NOVEMBER 2004

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN  587 - 28  0058 | | SSN  587 - 28  0058 |
| *Rebecca S Mitchell* | *Annie L Brown* | *Rebecca S Mitchell* |
| Signature | Signature | Signature |
| 9-28-04 | 9-28-04 | 9-28-04 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 32.9 | − | 0 | = | 32.9 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7-16.6) | Meets Standards (16.7-26.6) | Exceeds Standards (26.7-36.6) | Consistently Exceeds Standards (36.7-40) |

*WORK HABITS:* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☒ | ☐ |
| Compliance with Rules | ☒ | ☐ |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Plan, organize, coordinate, monitor, and evaluate the Networking . . . | 3 |
| 2. Provide public librarians and public library trustees assistance in . . . | 4 |
| 3. Coordinate the statewide continuing education training for public . . . | 3 |
| 4. Monitor Internet, telecommunications legislation and programs . . . | 3 |
| 5. Assist the agency Grants Coordinator in the development, monitoring . . . | 3 |
| 6. Coordinate the work of statewide committees as assigned by the agency . . . | 3 |
| 7. Maintain liaison with other revelant library, informational, and other . . | 4 |
| 8. | |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

| 23 | ÷ | 7 | = | 3.29 | x | 10 | = | 32.9 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:        0

EXHIBIT

7

**Form 13**
Revised (1/1/1999)

**EMPLOYEE PERFORMANCE APPR**
STATE OF ALABAMA
**Personnel Department**

Number
of Steps

Employee Name: ANNIE L BROWN

Social Security Number: 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

Agency: 045/PUBLIC LIBRARY SERVICES

Division:

Classification: LIBRARY OPERATIONS MGR

Class Code: 30515

Period Covered From: 09/01/2004   To: 09/01/2005

Annual Raise Effective: NOVEMBER 2005

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN 587 28 0058 | | SSN 587 28 0058 |
| Signature | Signature | Signature |
| Date 8/29/05 | Date 8/29/05 | Date 8/29/05 |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 30 | 0 | 30 |
|---|---|---|
| Responsibility Score | Disciplinary Score | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6 6 or below) | Partially Meets Standards (6 7-16 6) | Meets Standards (16 7 - 26 6) | Exceeds Standards (26 7 - 36 6) | Consistently Exceeds Standards (36 7 - 40) |

---

*WORK HABITS:* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☒ | ☐ |
| Compliance with Rules | ☒ | ☐ |

*RESPONSIBILITIES:* List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1 Plan, organize, coordinate, monitor, and evaluate the Networking . . . | 3 |
| 2 Provide public librarians and public library trustees assistance in . . . | 3 |
| 3 Coordinate the statewide continuing education training for public . . . | 3 |
| 4 Monitor Internet, telecommunications legislation and programs that . . . | 3 |
| 5 Assist the agency Grants Coordinator in the development, monitoring . . . | 3 |
| 6 Coordinate the work of statewide committees as assigned by the . . . | 3 |
| 7 Maintain liaison with other relevant library, informational, and . . . | 3 |
| 8 | |
| 9 | |
| 10 | |

**RESPONSIBILITY SCORE:**

| 21 | ÷ | 7 | = | 3 | x | 10 | = | 30 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0



EXHIBIT

8

**Form 13**
**Revised (01/2006)**

**EMPLOYEE PERFORMANCE *APPRAISAL***
**STATE OF ALABAMA**
**Personnel Department**

Employee Name: <u>ANNIE L BROWN</u>          Social Security Number: <u>XXX-XX- 8791</u>

Agency: <u>045/PUBLIC LIBRARY SERVICES</u>          Division: _____

Classification: <u>LIBRARY OPERATIONS MGR</u>          Class Code: <u>30515</u>     Position #: <u>3880103</u>

Period Covered From: <u>9/1/2005</u>  To: <u>9/1/2006</u>          Annual Raise Effective: _____

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN  XXX - XX - 0058 | | SSN  XXX –XX- 0058 |
| *Rebecca S Mitchell* | *Annie Y Brown* | *Rebecca S Mitchell* |
| Rater Signature | Employee Signature | Reviewer Signature |
| Rebecca S. Mitchell | | Rebecca S. Mitchell |
| Rater Printed Name | | Reviewer Printed Name |
| *8-31-06* | *8-31-06* | *8-31-06* |
| Date | Date | Date |
| _____ | _____ | _____ |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 20.000 | − | 7 | = | 13.000 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☒ | ☐ | ☐ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

***WORK HABITS:*** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

|  | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | _____ | ☒ | _____ |
| Punctuality | _____ | ☒ | _____ |
| Cooperation with Coworkers | ☒ | _____ | _____ |
| Compliance with Rules | ☒ | _____ | _____ |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                                   **Rating**

1. Plan, organize, coordinate, monitor, and evaluate the Networking, Development and . . .    `2`

2. Provide public librarians and public library trustees assistance in the areas of . . .    `3`

3. Coordinate the statewide continuing education training for public librarians and . . .    `2`

4. Monitor Internet, telecommunications legislation and programs that are relevant . . .    `2`

5. Assist the agency Grants Coordinator in the development, monitoring, and evaluating . .    `1`

6. Coordinate the work of statewide committees as assigned by the agency director.    `2`

7. Maintain liason with other relevant library, informational, and other groups . . .    `2`

8. _____    `   `

9. _____    `   `

10. _____    `   `

**RESPONSIBILITY SCORE:**

| 14 | ÷ | 7 | = | 2.00000 | x | 10 | = | 20.000 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| **Warning** | **Reprimand** | **Suspension** | **Demotion** |
|---|---|---|---|
| 0 | 1 | 0 | 0 |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, and demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** _____7_____

EXHIBIT

9

November 16, 2005

Mary Payne came to me concerning Annie Brown and the Bayou La Batre Project. In the meeting on 11/15/05 it was discussed that Ms. Brown and Chris Bowman would go on 11/17/05 to BLB and physically view the site for equipment and furniture placement and to bring back donated books from the library to APLS for either cataloging or disposal.

Ms. Brown made the arrangements to go, then cancelled due to workman in the building at BLB issues. Ada Williamson assured Ms. Brown that the workmen were not going to be there, but Ms. Brown cancelled after all. Ms. Brown stated to Ms. Payne that she was not going if she were going only to bring back the books. That she did not do "lifting" that without the assurance that someone would place the books in the car she would not bring them back to APLS. The trip was cancelled.

Ms. Brown also complained to Ms. Payne about the new consultant, Kim Owen, getting a 19" monitor and new computer, when she did not have a 19" monitor or new computer. Ms. Payne said she told Ms. Brown the monitors were used and we had just received them from DOE and if she requested one there would be no problem.

Ms. Payne also requested that Ms. Brown get the dimensions for the furniture being donated from Opelika public library to BLB, but was initially told that she would do that later, even though it was apparent that she was not working on anything. Ms. Payne insisted she call and get the information so plans could proceed on securing a vehicle large enough for the furniture to be taken to BLB. Ms. Payne felt that Ms. Brown was not being cooperative in the BLB effort, even though Ms. Brown is the project coordinator.

Ms Payne also stated she did not want to work w/Ms. Brown on projects in the future due to lack of cooperation —

11/16/05

EXHIBIT

tabbies®

10

November 28, 2005


To:     Annie Brown, NDP
From:  Rebecca Mitchell, Director
Subj:   Bayou La Batre Project

Due to failure to perform the duty of supervising and coordinating the Bayou La Batre
Project, I am taking you off of the project. On Tuesday, November 15th at a called
meeting of the division heads concerning the BLB project, I requested that all other
projects be placed in less than high priority. This was due to the information that Mary
Payne and Kelyn Ralya brought back from the previous day's trip to BLB and
discovering that Ada Williamson had already scheduled a reopening program for
December 1st with local and state elected officials.


On Thursday, November 17th at 2:53 p.m. I emailed you that the tentative date for rental
of the truck for the furniture and books for BLB was Tuesday, November 22nd. You were
off on approved leave on Friday, Nov. 18th. You emailed me on Monday, November 21st
asking if you should go? You were the coordinator of this project, I returned your email
at 10:29 a.m. and said that was your choice, but as coordinator that should not have been
in question. As coordinator of this project, email was not an effective way to determine
your participation. You should have come to my office. You should have asked other
members of the project where they were in their progress to accomplish their portion of
the project and then proceeded to help finalize details. This is a major project and I
expected full participation in seeing that it was accomplished. I do not see this from you


I will not need your assistance in the final phase of this project.

EXHIBIT

11

*Annie Brown evaluation*

**Mitchell, Rebecca**

5/25/06

| | |
|---|---|
| **From:** | Judy Douglas [judy6290@lycos.com] |
| **Sent:** | Thursday, May 25, 2006 10:15 AM |
| **To:** | Rebecca Mitchell |
| **Subject:** | Gates Webjunction workshop |

Dear Rebecca,

Please excuse the Ashville, Springville, Ragland libraries from having to attend this workshop. Doris Stanley Memorial Library/Moody (Patsy Spradley) attended the January workshop as I did so I don't know why we are on your list to attend. Two of my librarians have reported that whoever called them about this workshop was very rude and insistant and threatened to cancel their Gates computer grant if they did not attend. Is this really necessary?

Since Patsy, Debbie and I have attended this workshop we have passed what little we learned along to our fellow librarians. We as a System are very much aware of what we need in the way of technology for our libraries and patrons. This is a subject that is discussed on a regular basis. We all regularly discuss issues, future plans, problems etc. as a group. Our computer use policies and rules are current and reviewed annually by the libraries, the library boards, the library staff and the librarians. Our Technology Plans are current and accepted by APLS and erate. Our Technology Plans have been given to other libraries to use as a model as they write their plans.

I don't like saying negative things about the efforts that APLS make for our libraries but given these circumstances I feel it is necessary to do so. In my over thirty years and hundreds of workshops, this workshop was the biggest waste of time I have ever attended. Annie and John give it their best effort but it was still pointless and unnecessary. Patsy, Debbie (Odenville) and I got nothing out of it but frustration and learn absolutely nothing. In fact, I'm still uncertain what the point or main goal of the workshop was.

I just can't see making these librarians waste their time also. These are librarians with no other staff and no the trustees would be even more confused than the librarians and pointless for any of them to have to go. Their libraries would have to be closed all day for them to attend. They are in the middle of Summer Reading Program planning also. This is a very busy time for them. Their cities also do not usually pay them mileage and with the cost of gas this will be a double burden upon them. Sometimes these librarians are not paid if they are not in the library.

I resent being treated this way. I also resent that my librarians are being treated this way. I also hate that I have been placed in a position to have to write these negative things about something that should be wonderful and helpful to our libraries.

These Gates computer grants have always been a source of joy for our librarians, staff, and patrons. This has taken away the excitment of receiving such a wonderful gift. When these grants become a burden and takes them away from their libraries this clouds and distorts the original purpose of the Gates grants.

The original Gates grant got our libraries started on the road to providing computer/Internet access for our staff and patrons and this grant will continue it as it should. They have also make it a necessity for us to become aware of future technology needs and plans. A workshop just is not necessay to do this since it is being done already.

I hope you will understand my concerns and exempt Ashville, Ragland and Springville from having to attend this workshop. If you don't, they will attend since the Gates computers are extremely important to their libraries. I apologize for the very negative tone of this email but believe it was necessary to state my concerns regarding this matter.

Judy Douglas, Director, St. Clair County Library System, 205 594-3694

--

Search for businesses by name, location, or phone number. -Lycos Yellow Pages

http://r.lycos.com/r/yp_emailfooter/http://yellowpages.lycos.com/default.asp?SRC=lycos10

*Annie said she talked with librn but did not mention other Gates grants.*

*5/31/06*



EXHIBIT
12

# MEMORANDUM

July 25, 2006

TO:        Rebecca Mitchell
                Director

FROM:     Sheila Fulmer
                Personnel Assistant

RE:        Difficulty with Training Requests from Annie Brown and Documentation of
                Misdirected Telephone Calls Received

On June 2, I received an email from you requested training for yourself and approving other supervisors for the Managerial Leadership Styles for Today's Workforce class. (Exhibit 1).

Due to difficulties with Outlook email on my computer, I accidentally deleted the State Personnel Training memo with the training schedule and requested that Mr. Harry Lensch send me an email with a copy of his schedule attached.

On June 22, I sent an email to the supervisors with the State Personnel Department's training schedule for July, August and September attached. (Exhibit 2).

On July 3, I received an email from Annie Brown requesting training for herself and Kim Owen. One of the classes she requested for herself was the "Progressive Discipline" class. Since this class is not considered a "core" or necessary class for supervisors and because I thought that Ms. Brown had already attended this class a few years ago, I decided to research her file (Mrs. Brown has been diligent in making sure that any training certificates and letters from libraries were placed in her personnel file) and discuss the request with Mr. Lensch. Also, due to the 4th of July holiday, I wanted to give the other supervisors a little more time to decide what, if any, training, they wanted to request. I researched Mrs. Brown's file and did not find that she had previously taken the Progressive Discipline class. (Exhibit 3).

On July 5, I received an email from Fara Zaleski requesting training for herself and Tim Emmons. (Exhibit 4).

On the morning of July 10, I phoned Norma Taylor in the Training Division of State Personnel Department in order to schedule the requested training. I was able to schedule you for the Managerial Leadership Styles for Today's Workforce on August 2 and was able to schedule Kim Owen and Tim Owens for both of the new employees classes. Norma stated that the Progressive Discipline class was already booked as well. I placed Annie Brown and Fara Zaleski on the waiting list for the Managerial Leadership Styles for Today's Workforce class and asked that Mrs. Brown be added to the waiting list for the Progressive Discipline class. I then sent emails to you, Fara Zaleski and Mrs. Brown. (Exhibit 5).

On July 10, I received an email from Mrs. Brown, which I forwarded to Mr. Lensch. (Exhibit 6).

On July 11, upon arriving at work, I noticed a phone message and after checking it knew that Mrs. Taylor from the State Personnel Department Training Division had called after my work hours on July 10. In returning her call, she informed me that Mrs. Brown had called to "check up" on the information I had sent in the email to her the day before. After much discussion with Mrs. Taylor, it was determined that Mrs. Taylor had inadvertently failed to add Mrs. Brown to the waiting list for one of the classes she requested. Having worked closely with Mrs. Taylor and Sharleen Smith when I was employed as a Training Coordinator with the Department of Transportation, Mrs. Taylor asked me if it would "help" if she were to be able to get Mrs. Brown into the Progressive Discipline class offered on July 18th. She further stated that she would do this "favor" for me, but definitely not for Mrs. Brown. Although Mrs. Taylor did not state that she did not approve of Mrs. Brown's phone call, it was clear to me that she did not approve of Mrs. Brown "stepping out" of the chain of command and checking up on my work. I asked Mrs. Taylor to please enroll Mrs. Brown in order to keep peace, and further stated that I did not want a "mountain made out of this molehill". I phoned Mrs. Brown and informed her that she was enrolled for the Progressive Discipline class and was on the waiting list for the Managerial Leadership Styles for Today's Workforce class.

On July 12, I hand delivered Mrs. Brown a confirmation letter for the Progressive Discipline class to be held on July 18. (Exhibit 7).

On the morning of July 24, I received two phone messages from a Mr. Phil in the Governor's Office. In the first message, he stated that he was calling in regard to a letter regarding travel approval for Mrs. Brown. He further stated that the letter had been approved and that he didn't know whether to mail it or phone, but had decided to mail the letter. He left a phone number in case I needed to call him. In the second message (received almost immediately after the first message), he called and asked that I disregard the first message, because Mrs. Brown had phoned him and stated that she would pick up the approved letter. After receiving these two messages, I called Will Purswell, the APLS front desk receptionist, to inform him that I did not handle the employee travel as part of

my duties so that calls would not be misdirected. I then phoned Tonya Moore to inform her of the two phone messages, since I knew that she was responsible for obtaining approval from the Governor's Office for travel requests.

## Mitchell, Rebecca

**From:**    Taylor, Norma [NTAYLOR@personnel.state.al.us]

**Sent:**    Monday, July 31, 2006 12:58 PM

**To:**    'rmitchell@apls.state.al.us'

**Subject:** FW: Conversation with Annie Brown and follow-up with Sheila Fulmer regarding enrollment in SPD Training Classes



On or around July 10, 2006, Annie Brown called me regarding availability of slots for the July 18 Progressive Discipline and the August 2 Managerial Leadership classes offered by our division. I told her all the classes were already filled. Also, I let her know she would need to go through her department (Public Library Service) training coordinator Sheila Fulmer to register for classes. Ms. Brown indicated to me that she had already talked to Ms. Fulmer but was double checking to make sure there were no available slots.

I contacted Ms. Fulmer to let her know about the call from Ms. Brown. Ms. Fulmer asked me if we could get Ms. Brown in the Progressive Discipline class if we had a cancellation. I said I would keep the request and see what we could do. Later, we had some cancellations for that class, so I contacted Ms. Fulmer and told her Ms. Brown could attend. Ms. Brown attended the Progressive Discipline class on July 18.


--
This message has been scanned for viruses and dangerous content by **MailScanner**, and is believed to be clean.

8/1 2006



MEMORANDUM

DATE:        July 28, 2006

TO:          Rebecca S. Mitchell, Director

FROM:        Tonya Moore, Executive Secretary

SUBJECT:     The Continuing Education sub-committee meeting on July 27, 2006

On July 26, 2006, you asked me if there was a meeting scheduled for either July 26 or 27, for the Continuing Education sub-committee (of the Strategic Planning Committee). I checked the Meeting Room Calendar in Outlook and all the actual books containing the room reservation sheets and did not find anything concerning this meeting. You then told me to prepare a room set-up/reservation form for the meeting, since Mrs. Brown the Agency contact person for this meeting had not done so.

On July 27, 2006, Mrs. Denita Oliver, former APLS Executive Board member, arrived for the sub-committee meeting (around 11:30). At 12:30 Mrs. Oliver asked me if the lunch that had been ordered for their meeting had arrived yet. I told her I was not aware of any lunches having been ordered. I asked Mary Payne to get Mrs. Brown out of the Administrator's meeting to speak with Mrs. Oliver about this. Mrs. Oliver is an insulin-dependent diabetic that must eat on a regular schedule. When Mrs. Brown came out and Mrs. Oliver asked her about the lunch, Mrs. Brown informed her that only 3 members wanted lunch, so she decided not to order any lunches. At that time, due to Mrs. Oliver's condition, we fixed convinced her to grab a bagel, some peanuts, and juice to prevent her blood sugar from bottoming out.

EXHIBIT

15

MEMORANDUM

DATE:        July 28, 2006

TO:          Rebecca S. Mitchell, Director

FROM:        Tonya Moore, Executive Secretary

SUBJECT:     Conversation with Mrs. Brown on May 16, 2006

On May 16, 2006, I was working on Mrs. Brown's travel request letter to send to the Governor for his approval. I had to call Mrs. Brown to find out which days she would on annual leave. She questioned me as to why this was necessary and I explained to her that if she would be using her personal vehicle and taking annual leave that I needed to include details of that information on the Governor's letter. Her comment to me was "I better not find out that you all are not doing the same for me as what you do for the white people." I informed her that I was merely following the instructions I had been given for completing travel request forms and that I handled them all the same. Mrs. Brown told me that she would be on annual leave beginning the evening of June 27 through June 30.



MEMORANDUM
June 14, 2006


To:    Annie Brown, Jim Smith, Kim Owen, Chris Bowman, Hulen Bivins, Kelyn Ralya
From:  Rebecca Mitchell
Subj:  Consultant assignment by district and duty

Attached is a copy of the division of the state into library districts and duties for each
consultant and reporting format. We will begin this process on July 1, 2006 will official
kickoff on October 1, 2006. This is both an old and new concept. It is new in that many
of you were not a part of APLS when this method was used back in the 80's. It is old in
that it is a process that has been used before both here and in other states. The purpose is
to provide closer ties between our role as the state library and the role of the public
libraries in their communities.

The reports will be due to me by the 10th of each month.

State Consultant Areas:  2007

| Name: | Counties |
|---|---|
| Kelyn Ralya | Lauderdale; Colbert; Limestone; Morgan; Lawrence; Franklin; Northwest (Lamar, Marion, Franklin); Fayette |
| | Pickens; Tuscaloosa; Greene; Hale: Bibb; Sumter; Perry; Dallas; Marengo; Lowndes; Wilcox |
| Jim Smith | Choctaw; Clarke; Washington; Mobile (county) Baldwin; Escambia; Monroe; Conecuh; Butler |
| Chris Bowman | St. Clair; Shelby; Horseshoe(Coosa, Elmore, Tallapoosa, Lee); Chambers Chilton; Autauga; Macon; Russell |
| Kim Owen | Blount; Jackson; DeKalb; Marshall; Cheaha (Clay, Cherokee, Cleburne, Randolph, Talladega); Talladega (town); Etowah; Sylacauga; Calhoun |
| Annie Brown | Crenshaw; Covington; Coffee; Pike; Bullock; Barbour; Dale; Henry; Geneva; Houston |
| Hulen Bivins | Mobile Public; Montgomery County |
| Rebecca Mitchell | Huntsville-Madison County; Jefferson County |

## CONSULTANTS/SPECIALITIES/DISTRICTS
### 2006-2008

| | | |
|---|---|---|
| LSTA/Grants/Collections | Kelyn Ralya | District |
| E-Rate/Automation Systems | Kim Owen | District |
| Youth and Children | Chris Bowman | District |
| Trustees/Special Projects/Friends | Annie Brown | District |
| Long Range Plans/Audits/CE | Jim Smith | District |
| Bookmobiles/Outreach Services | New Consultant | District |
| Adult Services | New Consultant | District |
| State Aid/Laws | Hulen Bivins | Mobile (city), Montgomery |
| Advocacy/PR/Admin | Rebecca Mitchell | Huntsville, Jefferson County |

## OTHER CONSULTANTS FOR SPECIAL AREAS

| | |
|---|---|
| Blind & Physically Handicapped | Tim Emmons/Fara Zaleski |
| Administrative/Personnel/Budget | Harry Lensch |
| Reference/Online Resources | Al Craig/Katie Ray |
| Interlibrary Loan | Judy Shepard |

Acquisition/Cataloging          Janet Hamilton/Ruth Evans

II                              Mary Payne/staff

## LIAISONS IN STATE TO ASSIST WITH:

Foundations                     Shirley Spears/Sue Murrell

Disaster Plan                   Spencer Watts/Bonnie Lee/John Paul Myrick

Building/Construction           Keep in house up-to-date list of recent building
                                   Projects

## WHAT IS EXPECTED FROM EACH CONSULTANT IN THEIR REGION:

Visit every library twice a year, call, email, or write the quarters you don't visit

Reporting forms: Folder on each of your libraries, get familiar with their official file, 5 year plan (date due), stats filed, history, board members, community profile, local government, grants applied for…

Summary report yearly on each library

You will keep your counties for 2 fiscal years. Bone up on your area of expertise, be prepared to assist other consultants, be prepared to do small and large group presentations. Keep a record of all who attend

We will have monthly or quarterly meetings as a group.





EXHIBIT

17



**ALABAMA
PUBLIC LIBRARY
SERVICE**

REBECCA S. MITCHELL
DIRECTOR

July 17, 2006

### ADMINISTRATIVE MEMORANDUM #06-08

TO:  Library Administrators

FROM:  Rebecca S. Mitchell, Director  RSM

RE:  APLS consultants divided across Alabama

In an effort to increase the relationship between your local library and APLS and to give you a stable and direct contact person at the state level, I have divided the State into 10 regions. Each region will have 1 consultant assigned to it. Below is a table showing what counties are in which region and the consultant responsible for each region. This new process will be discussed further at the July 27 Administrator's Meeting.

| REGION | COUNTIES | CONSULTANT |
|--------|----------|------------|
| 1 | Lauderdale, Colbert, Limestone, Morgan, Lawrence, Northwest _Walker, Winston_ (Lamar, Marion, Franklin), & Fayette, _Cullman_ | **Kelyn Ralya** **(334) 213-3976** kralya@apls.state.al.us |
| 2 | Pickens, Tuscaloosa, Greene, Hale, Bibb, Sumter, Perry, Dallas, Marengo, Lowndes, & Wilcox | **APLS Staff** |
| 3 | Choctaw, Clarke, Washington, Mobile (county), Baldwin, Escambia, Monroe, Conecuh, & Butler | **Jim Smith** **(334) 213-3907** jsmith@apls.state.al.us |
| 4 | Blount, Jackson, DeKalb, Marshall, Cheaha (Clay, Cherokee, Cleburne, Randolph, Talladega), Talladega (town), Etowah, Sylacauga, & Calhoun | **Kim Owen** **(334) 213-3936** kowen@apls.state.al.us |
| 5 | St. Clair, Shelby, Horseshoe (Coosa, Elmore, Tallapoosa, Lee), Chambers, Chilton, Autauga, Macon, & Russell | **Chris Bowman** **(334) 213-3978** cbowman@apls.state.al.us |
| 6 | Crenshaw, Covington, Coffee, Pike, Bullock, Barbour, Dale, Henry, Geneva, & Houston | **Annie Brown** **(334) 213-3917** abrown@apls.state.al.us |
| 7 | Huntsville-Madison County | **Rebecca Mitchell** **(334) 213-3901** rmitchell@apls.state.al.us |
| 8 | Jefferson County | **Rebecca Mitchell** |
| 9 | Montgomery County | **Hulen Bivins** **(334) 213-3974** hbivins@apls.state.al.us |
| 10 | Mobile Public | **Hulen Bivins** |

## FREEDOM COURT REPORTING

1

```
1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5    CASE NUMBER:  2:07-CV-841-MHT-WC

6    ANNIE LUCAS BROWN,

7              Plaintiff,

8              vs.

9    ALABAMA PUBLIC LIBRARY SERVICE,

10             Defendant.

11

12             S T I P U L A T I O N

13             IT IS STIPULATED AND AGREED by and

14   between the parties through their respective

15   counsel, that the deposition of Annie Lucas

16   Brown may be taken before Sara Mahler, CCR,

17   at the offices of Rushton, Stakely, Johnston

18   & Garrett, at 284 Commerce Street,

19   Montgomery, Alabama 36104, on the 23rd day

20   of January, 2008.

21

22        DEPOSITION OF ANNIE LUCAS BROWN

23
```

COPY

EXHIBIT
B

## FREEDOM COURT REPORTING

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5     CASE NUMBER:  2:07-CV-841-MHT-WC

6     ANNIE LUCAS BROWN,

7               Plaintiff,          *ORIGINAL*

8               vs.

9     ALABAMA PUBLIC LIBRARY SERVICE,

10              Defendant.

11

12          S T I P U L A T I O N

13          IT IS STIPULATED AND AGREED by and

14    between the parties through their respective

15    counsel, that the deposition of Annie Lucas

16    Brown may be taken before Sara Mahler, CCR,

17    at the offices of Rushton, Stakely, Johnston

18    & Garrett, at 284 Commerce Street,

19    Montgomery, Alabama 36104, on the 25th day

20    of January, 2008.

21

22          DEPOSITION OF ANNIE LUCAS BROWN

23

# FREEDOM COURT REPORTING

29

```
 1          A.      No.

 2          Q.      Ever met him before?

 3          A.      No, sir.

 4          Q.      What position did you hold

 5    before Library Operations Manager?

 6          A.      Consultant for Library

 7    Administration and Management.

 8          Q.      Is that the same consultant

 9    position that you hold today?

10          A.      Yes, sir, I guess.

11          Q.      How long did you hold that

12    consultant position?

13          A.      Until I was promoted to

14    Library Operations Manager.

15          Q.      So when did you begin with

16    Public Library Service?

17          A.      1997.

18          Q.      So from '97 until 2003, you

19    were a consultant?

20          A.      Yes, sir.

21          Q.      What class number do you hold,

22    your employment number?

23          A.      I can't recall that right now.
```

# FREEDOM COURT REPORTING

39

```
 1          A.      That's all I can recall at

 2     this time.

 3          Q.      Okay.  Have you seen or heard

 4     Ms. Mitchell as referring to herself as a

 5     consultant?

 6          A.      No, sir.

 7          Q.      How about Mr. Bivens or

 8     Mr. Lensch?

 9          A.      Referring to themselves as

10     consultant?

11          Q.      Or have somebody else refer to

12     them as consultants?

13          A.      No, sir.

14          Q.      What is your current salary?

15          A.      Let me look at my check stub.

16     It's 2998.40 every two weeks.

17          Q.      Is that before or after taxes?

18          A.      That's before taxes.

19          Q.      Do you know what step that

20     equivilates to?

21                  I'll tell you what I've done,

22     Ms. Brown, is I've gotten on the State

23     Personnel Department website, and I've
```

## FREEDOM COURT REPORTING

40

1    printed out the step charts for consultants

2    and Library Operations Managers, and I'm

3    going to put those two in front of you.

4    I've marked as Defendant's Exhibit 2 the

5    step chart for a library consultant and as

6    Exhibit 3, the step chart for Library

7    Operations Manager.

8              Tell me, ma'am, which step,

9    you were being paid at?

10             (Whereupon, Defendant's

11             Exhibits No. 2 and 3 were

12             marked for

13             identification.)

14    A.    Step 17.

15    Q.    On which exhibit?

16    A.    3.

17    Q.    Okay.  And it's showing a

18    semi-monthly payment of two thousand nine

19    hundred ninety-eight dollars and forty

20    cents; is that right?

21    A.    Yes.

22    Q.    And what you just did a second

23    ago was look at your check stub or your

# FREEDOM COURT REPORTING

41

1   payment stub?

2          A.     I did.

3          Q.     Do you have that there with

4   you?

5          A.     Yes.

6          Q.     Will you pull that out for me,

7   please, ma'am?

8          A.     (Witness complies.)

9          Q.     I want to make a copy of this

10  real quick, and I'll be right back.

11              MS. BIGGERS:   Make two.

12              MR. HUFFAKER:   All right.

13                  (Off the Record.)

14                  (Whereupon, Defendant's

15                   Exhibit No. 4 was marked

16                   for identification.)

17          Q.     (BY MR. HUFFAKER):   Ms. Brown,

18  what I've done is mark as Exhibit 4,

19  whatever document this is you've brought

20  with you.   Can you tell me what it is

21  exactly?

22          A.     The document that you're

23  looking at now?

## FREEDOM COURT REPORTING

42

1          Q.      Yes, ma'am.

2          A.      It's a copy of my check stub

3     for December 31st, '07.

4          Q.      This is not a check, there

5     used to be check attached to it?

6          A.      It goes directly into the bank

7     account.

8          Q.      This is what the Public

9     Library Service for the State of Alabama

10    gives you -- tells you your payment or your

11    check's been put into your checking account?

12         A.      Yes.

13         Q.      Ms. Brown, going back and

14    looking at Defendant's Exhibit 3, you said

15    you were step 17 on that document?

16         A.      Yes.

17         Q.      And the class number that you

18    have, according to that document, is 30515;

19    is that right?

20         A.      Yes.

21         Q.      That's a class that you

22    continue to be paid under; is that right?

23         A.      Yes.

## FREEDOM COURT REPORTING

43

1          Q.      What does it show as the

2     actual title of that particular class?

3          A.      It shows Library Operations

4     Manager.

5          Q.      Okay.  Do you disagree with

6     that?

7          A.      No.

8          Q.      Do you agree that the State

9     Personnel Department records show you as

10    being paid as a Library Operations Manager?

11         A.      Yes.

12         Q.      Since June or July of 2006,

13    have you ever been paid as a consultant?

14         A.      No.

15         Q.      Okay.  You've always been paid

16    as a classification number 30515, since

17    June, July of 2006; is that right?

18         A.      Yes.

19         Q.      And according to that

20    document, you have one more step to go

21    before you max out at that particular

22    position?

23         A.      Yes.  According to this

## FREEDOM COURT REPORTING

44

1    document as of January the 1st, '08.

2              Q.    Assuming that you were in line

3    for the next step raise, when would that be?

4              A.    Next December.

5              Q.    And then after next December,

6    assuming you move to the step level 18, is

7    there any additional steps for advancement

8    within that job classification?

9              A.    Only if requested by the

10   director or recommended by the director.

11             Q.    Tell me how that would work.

12             A.    I guess the director would

13   have to justify asking that you get an

14   increase in pay to State Personnel.

15             Q.    And then what would the State

16   Personnel do?

17             A.    I guess it would be up to the

18   personnel board to approve it or not approve

19   it.

20             Q.    Would they make an additional

21   step level within that particular

22   classification?

23             A.    I don't know how they operate

# FREEDOM COURT REPORTING

128

1          Q.      Okay.   So the next thing that

2    happens is two weeks later, you still

3    haven't received reimbursement?

4          A.      A month has gone by.

5          Q.      So it's been about thirty days

6    since you initially submitted your form for

7    reimbursement; right?

8          A.      Yes.

9          Q.      Then what happens?

10          A.      That's when I called LaTonya

11    to ask about the travel.

12          Q.      What does LaTonya tell you?

13          A.      She said, oh, it is still down

14    at the governor's office.

15          Q.      Did she tell you anything

16    else?

17          A.      No.

18          Q.      What did you tell her?

19          A.      "Thank you," that's all I

20    remember.

21          Q.      So this was a very short

22    conversation then?

23          A.      I asked her if she could check

## FREEDOM COURT REPORTING

129

1    on it.

2         Q.    And what did she tell you?

3         A.    She just said it was down at

4    the governor's office.  She said, oh, it's

5    still at the governor's office.  It is still

6    at the governor's office, I think that's

7    what she said.

8         Q.    But you asked her if she would

9    check on it?

10        A.    Check on it.

11        Q.    What did she tell you?

12        A.    That's all she said.

13        Q.    She didn't say, I'll check on

14   it?

15        A.    I don't recall LaTonya saying

16   she was going to check on it.

17        Q.    So you just -- The last thing

18   you remember is telling her if she would

19   check on it?

20        A.    Would she check on it for me.

21        Q.    But you don't recall what her

22   response was?

23        A.    What her response was at this

## FREEDOM COURT REPORTING

130

1    time.

2        Q.      Anything else said during that

3    conversation with LaTonya?

4        A.      No.  Not that I know of.

5        Q.      All right.  Right after that

6    conversation, what did you do next?

7        A.      Right after that conversation,

8    I decided that I want to check on my travel

9    myself.

10       Q.      Why didn't you contact

11   Ms. Mitchell?

12       A.      Because I have been trying to

13   work with them, but they were not working

14   with me.  And if they have been working with

15   me in trying to get my travel reimbursement,

16   then they would have been telling me what

17   was the holdup for my travel.  So I just

18   thought I would just check on my own.  I

19   didn't see anything in the travel policy

20   that said you couldn't call to check on it.

21       Q.      That's all that you were

22   doing, was just calling to check on the

23   status?

## FREEDOM COURT REPORTING

136

1          A.      I did.

2          Q.      And where did Ms. Bice work at

3    that time?

4          A.      She worked in the legislator's

5    office.

6          Q.      How did you know Ms. Bice?

7          A.      She worked at APLS.

8          Q.      She worked there when you did?

9          A.      Yes.  During the time, yeah.

10          Q.      Which legislator did she work

11    with?

12          A.      Mike Milligan, I think that's

13    the name.

14          Q.      So you called Joanna up, and

15    what do you tell Joanna?

16          A.      I called Joanna up and asked

17    her if she knew anybody that worked in the

18    travel office over in the governor's office,

19    that I wanted to check on my travel; that it

20    had been thirty days, and they said it was

21    over there in the governor's office.  So I

22    wanted to know if she knew anybody that she

23    could call just to check on it.  That's all

## FREEDOM COURT REPORTING

140

1    check on the travel.  I said, I just want to

2    know how much longer it will be before I get

3    the check.

4          Q.      And during this phone call, is

5    that when the governor's office was called?

6          A.      She called someone named

7    Thomas, I think that was the gentleman's

8    name that she spoke with, that she knew.

9    And he transferred the call to Cheryl in the

10   travel office.

11         Q.      Were you on the phone too?

12         A.      I was holding on the phone

13   while she was talking, and she introduced me

14   each time.

15         Q.      What did she tell Cheryl?

16         A.      She just told Cheryl that --

17   who I was on the telephone and where I

18   worked and that I wanted to call and check

19   on my travel check because it had been about

20   thirty days since I had made that trip, and

21   that I was on the phone and where I worked

22   and could she help me.

23         Q.      Then what happened next?

## FREEDOM COURT REPORTING

145

1    where you requested supplies and were turned

2    down?

3          A.     Well, we were told we couldn't

4    get pens and pencils, so not to ask for

5    those.

6          Q.     Who is we?

7          A.     Consultants.

8          Q.     What consultants have been

9    told not to ask for pens and pencils?

10         A.     Well, Mr. Bivens told us in a

11   meeting.

12         Q.     All right.  But who was the

13   recipient of that?  When you say, we were

14   told, who is the we that were told don't ask

15   for pens because you're not going to get

16   them?

17         A.     All of the consultants and

18   Library Operations Managers.

19         Q.     Okay.  So that instruction

20   about don't ask for them, you're not going

21   to get them, was given to all consultants

22   and operations managers; is that right?

23         A.     Yes.  Then I was denied the

# FREEDOM COURT REPORTING

146

1       the phone conversation?

2           A.      That was the end of that phone

3       conversation.

4           Q.      Okay.  And then what happened

5       next?

6           A.      The next, Ms. Mitchell

7       e-mailed me -- called me and e-mailed me and

8       told me to go pick the check up, that Cheryl

9       had said I told her I was going to pick the

10      check up.  So I told Ms. Mitchell that I

11      didn't tell her that I was going to pick the

12      check up.  I asked her to put it in the

13      mail, the routing mail, so that whomever

14      picked up the mail for our office would pick

15      it up there.

16          Q.      Was this a meeting that you

17      had with Ms. Mitchell in her office?

18          A.      No.  It was -- She called me

19      at my desk on my phone.

20          Q.      What exactly did she tell you

21      or ask you?

22          A.      She told me to go and -- That

23      Cheryl said for me to come and pick that --

## FREEDOM COURT REPORTING

148

1    A.    When Ms. Mitchell called, she

2    said -- she asked why did I call the

3    governor's office.  And I told her I did not

4    call the governor's office.  And she said

5    the same thing over again:  She said, why

6    did you call the governor's office?  And she

7    said, Annie, yes, you did.  And I said, no,

8    ma'am, I didn't.  I did not call the

9    governor's office.

10          And then she wanted to know

11   how I talked to Cheryl.  And I told her I

12   had someone to call for me; I did not call

13   over there, I asked somebody to call for me

14   to check on my travel.

15          Q.    Anything else said during this

16   phone call?

17          A.    No.

18          Q.    So she calls you up and asks

19   you why did you call the governor's office.

20   And you said, I didn't call the governor's

21   office; is that right?

22          A.    That's right.

23          Q.    She asked you that again.  And

## FREEDOM COURT REPORTING

149

1    you said you didn't call the governor's

2    office; is that right?

3          A.      That's right.

4          Q.      And did you tell her that you

5    had called a friend of yours?

6          A.      I told her I had someone to

7    call for me.

8          Q.      Did she ask you who that

9    person was?

10         A.      Yes.

11         Q.      And what did you tell her?

12         A.      I told her that I didn't think

13   that I had to give her the name of the

14   person that called for me.

15         Q.      Did Director Mitchell ask you

16   to give her the name of the person you had

17   called?

18         A.      She just -- She said who

19   called for you.

20         Q.      And you refused to tell her?

21         A.      And I just said that I didn't

22   think that I had to share that information

23   with her.

## FREEDOM COURT REPORTING

150

1          Q.      Did you ever tell her during

2     that phone call who you had called?

3          A.      No.

4          Q.      That was a request from the

5     director of the APLS, was it not?

6          A.      Yes, it was.

7          Q.      And you refused to answer that

8     question; is that correct?

9          A.      I did.

10         Q.      Is that disobeying an

11    instruction from the director of APLS?

12         A.      Well, I didn't think it was at

13    the time.

14         Q.      Why did you refuse to tell

15    her?

16         A.      I guess because of the tone of

17    voice that she spoke to me in, I guess, was

18    the reason that I didn't tell her.  If she

19    had asked me to come to her office and sit

20    down and have a seat and talk about the

21    travel and did I call over there, I would

22    have been more than happy to share that

23    information with her.  But when she called,

# FREEDOM COURT REPORTING

159

1          Q.      That's one trip.  Okay.  When

2     was that trip supposed to be?

3          A.      I don't have the exact dates.

4     That trip was supposed to be on a Monday.

5          Q.      Do you recall what month and

6     year?

7          A.      It was whenever Kim Owen was

8     reporting to work on that day, and she was

9     employed in my division.

10         Q.      Would it have been after

11    Hurricane Katrina?

12         A.      Beg your pardon?

13         Q.      Would it have been after

14    Hurricane Katrina?

15         A.      Yes.  But that was the reason

16    for going, it was the Hurricane Katrina that

17    destroyed the library.

18         Q.      What was going on at the Bayou

19    La Batre Library?

20         A.      We were working -- The agency

21    was working with the library to get the

22    library reestablished, and we all had

23    assignments.

## FREEDOM COURT REPORTING

160

1    that for me?

2                  And I'm also going to hand you

3    Exhibit 13.

4         A.    This is Exhibit 13, the

5    amended copy for the travel request, and

6    it's for the state vehicle.

7         Q.    All right.  Why did you

8    ultimately use the state vehicle compared to

9    your personal?

10        A.    Because Ms. Mitchell said for

11   me to do that.

12        Q.    She's the one who gave you the

13   instruction to do that?

14        A.    Yes, sir.

15        Q.    And Exhibit 12, what was that?

16        A.    It was the request for

17   out-of-state travel.

18        Q.    Was that approved by Director

19   Mitchell?

20        A.    Yes, it was.

21                  (Whereupon, Defendant's

22                  Exhibit No. 14 was marked

23                  for identification.)

## FREEDOM COURT REPORTING

161

1           Q.      Exhibit 14, can you identify

2     that for me, please, ma'am.

3           A.      Yes.  This is the statement of

4     official travel form.

5           Q.      And that's after you've

6     returned from the trip; is that right?

7           A.      Yes, sir.

8           Q.      All right.  When was that

9     trip?

10          A.      June 23rd through the 27th.

11                  MS. BIGGERS:  What year?

12          A.      In '06.

13          Q.      And when did you sign that

14    form?

15          A.      July the 7th, that's what's on

16    this form.

17          Q.      July 7, 2006?

18          A.      Yes.

19          Q.      Do you have any reason to

20    disagree with that date?

21          A.      I submitted it on July the

22    5th.

23          Q.      Per one of those forms you

## FREEDOM COURT REPORTING

163

1    LaTonya Moore sent out this form on July 7

2    for reimbursement?

3            A.    No, I don't.

4            Q.    Do you know when she sent this

5    form out for reimbursement?

6            A.    No, sir.

7            Q.    Do you think somebody delayed

8    in sending that form out?

9            A.    I don't know when the form

10   went out, sir.

11           Q.    When was the first day of work

12   that you returned after that trip?

13           A.    I know I was at work on July

14   the 5th, when I did my reimbursement and

15   submitted it to the business office.

16                    (Whereupon, Defendant's

17                     Exhibit No. 15 was marked

18                     for identification.)

19           Q.    Exhibit 15, does that bear

20   your signature?

21           A.    Yes.

22           Q.    Okay.  When is it dated?

23           A.    This is dated July the 11th,

## FREEDOM COURT REPORTING

164

1      '06.

2           Q.      What is that?

3           A.      This is request with respect

4      to authorization for travel.  This is after

5      the trip is over.

6           Q.      Didn't they have to go back

7      and change the initial request in order to

8      get the registration charge changed?

9           A.      Yes.

10          Q.      Is that what that document

11     shows?

12          A.      Yes.

13          Q.      Do you have any reason to

14     disagree with the date reflected on that

15     document?

16          A.      No.

17          Q.      It bears your signature;

18     right?

19          A.      Yes.

20          Q.      It bears Director Mitchell's

21     signature; right?

22          A.      Yes.

23          Q.      Is that four days after the

## FREEDOM COURT REPORTING

166

1          A.      They're supposed to notarize

2    it in your presence.

3                              (Whereupon, Defendant's

4                              Exhibit No. 16 was marked

5                              for identification.)

6          Q.      Exhibit 16, can you tell me

7    whether you've seen that document before?

8          A.      No, sir, I've never seen this

9    before.

10         Q.      It's dated July 12; is that

11   right?

12         A.      Yes.

13         Q.      Is this the first time you've

14   ever seen it?

15         A.      Yes.

16         Q.      Do you recognize that as Tonya

17   Moore's initials?

18                 MS. BIGGERS:  Are you --

19                 THE WITNESS:  Yeah, I heard

20   him.

21         A.      I was just trying to make

22   sure, I hadn't seen her initials in quite a

23   while.

# FREEDOM COURT REPORTING

184

1    travel check, nothing inappropriate, nothing

2    unprofessional, but very professional.

3              And the first sentence says:

4    I am informing you that effective

5    immediately, you are removed from any and

6    all supervisory responsibilities of your

7    current position.

8              In this progressive discipline

9    manual it states that the first step of

10   discipline is a verbal warning. Now,

11   I've -- I feel that I should have gotten, if

12   I had gotten anything, it should have been a

13   verbal warning. This reprimand is false and

14   incorrect and all of my supervisory

15   responsibilities were taken away without any

16   explanation as to why. And I feel that this

17   reprimand was a conspiracy, I was written up

18   between she and Mr. Lynch and Mr. Bivens and

19   a way to try to force me off my job like

20   many other blacks have left their jobs --

21   have left the jobs at APLS. I did not

22   refuse to work with anyone; I always

23   cooperate with any of the staff members.

# FREEDOM COURT REPORTING

185

1          Q.      We'll go through in a second.

2     First off, this was a reprimand; is that

3     right?

4          A.      Yes.

5          Q.      And this reprimand came out

6     after these two discussions you had with

7     Director Mitchell about the travel trip and

8     the travel expenses?

9          A.      And after I had called -- had

10    someone to call for me to check on my

11    travel.

12         Q.      All right.  But you had

13    already --

14         A.      That's when this came out.

15         Q.      You had already had this phone

16    call with Director Mitchell in which she

17    asked you about calling the director's

18    office and asked you about who you had

19    called; is that right?

20         A.      Yes.

21         Q.      Okay.  And you think you

22    should have at least gotten -- Strike that.

23              You think you should have

# FREEDOM COURT REPORTING

186

1      gotten a warning, an oral warning?

2           A.     I think I should have gotten a

3      verbal warning.  That's -- According to this

4      progressive discipline manual, the first

5      step is a verbal warning.  That's if I had

6      done something that was so bad.  There was

7      nothing in the travel policy that said that

8      you couldn't call to check on your travel if

9      you wanted to.  And I have never ever been

10     insubordinate to Ms. Mitchell or anyone else

11     that I have worked with.

12          Q.     Is refusing to answer a

13     question from the director of APLS

14     insubordination?

15          A.     No.  I don't think that just

16     refusing to answer a question is

17     insubordinate.

18          Q.     Where in that guideline you

19     have there in front of you does it say that

20     you have to get a warning first?

21          A.     It says it right here on page

22     ten.

23          Q.     All right.  Read it to me

## FREEDOM COURT REPORTING

201

1          A.      Yes.

2          Q.      Starting with -- I wouldn't

3    say the least harsh penalty, but the least

4    or the bottom one on that four-step prong,

5    is a warning; right?

6          A.      Yes.

7          Q.      And then the more serious one

8    is reprimand, right?

9          A.      Yes.

10         Q.      And then what's more serious

11   than a warning and a reprimand is

12   suspension; right?

13         A.      Yes.

14         Q.      And then the ultimate

15   consequence could be termination; is that

16   right?

17         A.      Yes.

18         Q.      Would you agree that under

19   this Progressive Discipline Manual that for

20   insubordination the director of APLS could

21   give a warning or a reprimand or a

22   suspension or termination?

23         A.      Yes, she could depending on

## FREEDOM COURT REPORTING

202

1    the degree of insubordination.

2          Q.      Did Director Mitchell conclude

3    that you had been guilty of insubordination?

4                  MS. BIGGERS:  Object to the

5    form.

6                  MR. HUFFAKER:  In the

7    reprimand.

8                  MS. BIGGERS:  Okay, in the

9    reprimand.  You didn't say that.

10          A.      She did.

11          Q.      Just so we're clear, she did

12    not suspend you or terminate you; is that

13    right?

14          A.      That's right.

15          Q.      I assume that we have marked,

16    as well, the employee handbook.  We did last

17    Wednesday, didn't we?

18                  MS. BIGGERS:  Uh-huh.  I don't

19    know, did we?  Yeah.

20          Q.      What I put in front of you is

21    what was marked as Defendant's Exhibit 6, on

22    Wednesday, and I've turned to page eight

23    there in front of you.  And if you will read

DEFENDANT'S
EXHIBIT

11

3913

## APLS TRAVEL REQUEST

TODAY'S DATE **5/15/06** IN-STATE _____ OUT-OF-STATE ✓

1. TRAVELER: _A Brown_
2. DESTINATION CITY: _New Orleans_

3. PURPOSE OF TRAVEL: _Attend American Library Association Annual Conference_

4. PERIOD OF TRAVEL: DATE (S) FROM: **6-23-06** TO: **6-27-06-30**
   HOUR (S) FROM: **8 pm** TO: **8 pm**

5. DESIRED MODE OF TRAVEL: _Personal Vehicle_
6. ESTIMATED COSTS: _700 miles @ 44.5_
   A. TRANSPORTATION: $ **311.50**    B. CONFERENCE FEE: $ _____
   C. REGISTRATION FEE: $ **170.00**    _160.00_

E. LIST WORKSHOPS & SEMINARS you plan to attend during conference:
   _See list attached_

| | | COST PER DAY | |
|---|---|---|---|
| F. ROOM: | $ **169.00 + 13% tax** | COST PER DAY: $ **198.00** x4 = **792** |
| G. MEALS: | $ **250.00** | COST PER DAY: $ **50.00** x5 = **250** |
| H. TAXI: | $ _____ | |
| I. CAR RENTAL: | $ _____ | |
| J. PARKING: | $ **100.00** | |
| K. MISC: (itemize) | $ _____ | |

L. TOTAL COST OF TRIP: $ **1580.00** ~~1625.50~~

*********************************************************************************

Vehicle and Equipment Reservation Form: (check which items you will need)

State Car ☐      State Cell Phone ☐      Digital Camera ☐      Laptop ☐

**A signature will be required when picking up and dropping Vehicles and Equipment

*********************************************************************************

_Annie J Brown_
TRAVELER                                        **5/15/06**
                                                DATE

DIVISION HEAD                                   DATE

_Rebecca Mitchell_
DIRECTOR                                        **5/15/06**
                                                DATE



## ALABAMA PUBLIC LIBRARY SERVICE



**DEFENDANT'S EXHIBIT**

*12*



REBECCA S. MITCHELL
DIRECTOR

### REQUEST FOR OUT-OF-STATE TRAVEL

Honorable Bob Riley
Governor of Alabama
Montgomery, AL 36130

Date:  May 16, 2006

Dear Governor Riley:

Request is respectfully made for authorization of travel to New Orleans, LA, to attend the American Library Association (ALA) Annual Conference, June 23-27, 2006.

## TRAVEL WILL BE PAID FROM GATES FOUNDATION GRANT.

Mode of Transportation:                     Personal Vehicle
Date of Departure:                          June 23, 2006
Date of Return to Home Base:                June 30, 2006**

## ESTIMATED COST:

| | | |
|---|---|---|
| Transportation: | $ 160.00 | Signature: *Annie T Brown* |
| Conference: | $ 000.00 | Annie L. Brown |
| Registration Fee: | $ 170.00 | |
| Room: | $ 900.00 | |
| Meals: | $ 250.00 | |
| | | |
| In City Transportation: | | APPROVED: *Annie T Brown* |
| Taxi: | $ 00.00 | Division Head |
| Car Rental: | $ | |
| Parking: | $ 100.00 | APPROVED: *Rebecca S Mitchell* |

**TOTAL        $1580.00**
Expenses will be paid from:
   **(0394)**

APPROVED: _____ Director

APPROVED: *Bob Riley*
                 Governor

Charge to Organization: (0210)

**Mrs. Brown will be on Annual Leave from the evening of Tuesday, June 27 through Friday, June 30, and all expenses incurred during these dates will be personal expenses.

DEFENDANT'S
EXHIBIT
13

3973

## APLS TRAVEL REQUEST

TODAY'S DATE 6/13/06   IN-STATE _____   OUT-OF-STATE ✓

1. TRAVELER: _Auing L Brown_
2. DESTINATION CITY: _New Orleans, LA_
3. PURPOSE OF TRAVEL: _D attend ALA_

4. PERIOD OF TRAVEL: DATE (S) FROM: _6-23-06_ TO: _6-27-06_
   HOUR (S) FROM: _____ TO: _____
5. DESIRED MODE OF TRAVEL: _State Vehicle - #10_
6. ESTIMATED COSTS:
   A. TRANSPORTATION: $ _____   B. CONFERENCE FEE: $ _____

   C. REGISTRATION FEE: $ _____

   E. LIST WORKSHOPS & SEMINARS you plan to attend during conference:
   _____
   _____

   F. ROOM:          $ _____        COST PER DAY: $ _____
   G. MEALS:         $ _____        COST PER DAY: $ _____
   H. TAXI:          $ _____
   I. CAR RENTAL:    $ _____
   J. PARKING:       $ _____
   K. MISC. (itemize) $ _____

   L. TOTAL COST OF TRIP: $ _See travel Request date_
   
   _5/15/06_

*************************************************************************

Vehicle and Equipment Reservation Form: (check which items you will need)

State Car ☒      State Cell Phone ☐      Digital Camera ☐      Laptop ☐

**A signature will be required when picking up and dropping Vehicles and Equipment

*************************************************************************

_Auing L Brown_                          _6-13-06_
TRAVELER                                 DATE

_____                 _____
DIVISION HEAD                            DATE

_Rebecca Mitchell_                       _6/13/06_
DIRECTOR                                 DATE

0394 045 0430

**DEFENDANT'S EXHIBIT 14**

# STATE OF ALABAMA
## Statement of Official Travel

Ala Public Library Service
Department/Agency

_____ Code Number _____ Division _____ Funds

Annie L Brown
Name of Traveler

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
Social Security Number

Montgomery, AL
Official Station or Base

2508 Brothers Drive, Tuskegee, AL 36083
Address of Traveler (including street, city, state, and zip code)

The mileage and subsistence expense indicated in this expense account has been previously authorized and has been checked for compliance.

Attend American Library Association Convention
Purpose of Travel

APPROVED:

Rebecca A Mitchell
Departmental

I Hereby Certify That the Within Account in the Amount of $1,512.32 is correct, due, and unpaid.

_____
Signature of Payee

Sworn to and subscribed before me this 1th day of July 2006

_____
Notary Public

### RECAPITULATION OF EXPENSES

Travel Expenses | Amount
---|---
Commercial Transportation (incl rental car/gas) 0400-02 |
Mileage, private car 0400-01 |
Meals and lodging 0400-03 - | $966.88
**SUBTOTAL TRAVEL EXPENSES** | **$966.88**

Emergency and Necessary Expenses incurred in Connection with Travel | Amount
---|---
Total other expenses such as postage, fax, telephone, parking, baggage, handling, tolls, etc, 0400-07 | $150.44
Conference Registration Fees | $395.00
**GRAND TOTAL TRAVEL EXPENSES** | **$1,512.32**

### ITEMIZED STATEMENT OF NECESSARY TRAVELING EXPENSES INCURRED FOR PERIOD 06/23/06 TO 06/27/06

| Date mm/dd/yy | Points of Travel From City/State | To City/State | Hour of Depart/ Return | Private Car Miles / Fare Description | Commercial Fare Amount | Breakfast | SUBSISTENCE Lunch | Supper | Total Meals | Lodging | Total Meals & Lodging | Emergency & Necessary Expense Detail | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/23/06 | Montgomery, AL | New Orleans, LA | 9:00 AM | SV | | | | | | | | | |
| 06/24/06 | New Orleans, LA | | | SV | | | | 39.00 | 39.00 | 192.97 | 192.97 | valet parking | 31.36 |
| 06/25/06 | New Orleans, LA | | | SV | | | | 39.00 | 39.00 | 192.97 | 231.97 | valet parking | 31.36 |
| 06/26/06 | New Orleans, LA | | | SV | | | | 39.00 | 39.00 | 192.97 | 231.97 | valet parking | 31.36 |
| 06/27/06 | New Orleans, LA | Montgomry, AL | | SV | | | | 39.00 | 39.00 | 192.97 | 231.97 | valet parking | 31.36 |
| | | | | | | | | | 0.00 | 0.00 | 39.00 | 0 | 0.00 |
| | | | | | | | | | | | | baggage | 25.00 |
| **TOTALS** | | | | | 0 | | | | 195.00 | 771.88 | 966.88 | | 150.44 |

Donus



**DEFENDANT'S EXHIBIT**

*15*



REBECCA S. MITCHELL
DIRECTOR

**ALABAMA PUBLIC LIBRARY SERVICE**

## AMENDMENT

## REQUEST FOR OUT-OF-STATE TRAVEL

Honorable Bob Riley                    Date:  July 11, 2006
Governor of Alabama
Montgomery, AL  36130

Dear Governor Riley:

Request is respectfully made for authorization of travel to New Orleans, LA, to attend the American Library Association (ALA) Annual Conference, June 23-27, 2006.

## TRAVEL WILL BE PAID FROM GATES FOUNDATION GRANT.

Mode of Transportation:          State Vehicle
Date of Departure:               June 23, 2006
Date of Return to Home Base:     June 27, 2006**

### ESTIMATED COST:

| | |
|---|---|
| Transportation: | $ 000.00 |
| Conference: | $ 000.00 |
| Registration Fee: | $ 395.00 |
| Room: | $ 800.00 |
| Meals: | $ 250.00 |

Signature: _Annie D Brwn_
Annie L. Brown

In City Transportation:
| | |
|---|---|
| Taxi: | $  00.00 |
| Car Rental: | $ |
| Parking: | $ 130.00 |

**TOTAL**              **$1575.00**
Expenses will be paid from:
   (0394)

Charge to Organization:  (0430)

APPROVED: _Rebecca S. Mitchell_
Division Head

APPROVED: _Rebecca S. Mitchell_
Director

APPROVED: _Bob Riley_
Governor

RECEIVED GOVERNORS OFFICE 2006



# ALABAMA
# PUBLIC LIBRARY
# SERVICE



DEFENDANT'S
EXHIBIT

_16_



REBECCA S. MITCHELL
DIRECTOR

DATE:       July 12, 2006

TO:         Cheryl Fondon

FROM:       Tonya Moore _TM_

SUBJECT:    Amendment to approved out-of-state travel

I am submitting an amendment for out-of-state travel previously approved by Governor Riley.
The amendment covers the deletion of the transportation costs; an increase in the registration
amount and the parking amount; and a decrease in the room amount. The total amount of travel
reimbursement is about $5 less than originally submitted. Thank you for your assistance with
this matter.



**Alabama** — State Personnel Depar...
Online Employment S...

Home     Job Listings     Applicants     Employees     Exams     Agency Services     About Us

Search



**DEFENDANT'S EXHIBIT**

2

Class:   30520     **Library Consultant**
Grade:  0078        **Rate Comparison**

| | Semi-Monthly | Annual | Hourly |
|---|---|---|---|
| **Step 01:** | 1922.60 | 46142.40 | 22.18 |
| **Step 02:** | 1969.60 | 47270.40 | 22.73 |
| **Step 03:** | 2017.70 | 48424.80 | 23.28 |
| **Step 04:** | 2068.30 | 49639.20 | 23.87 |
| **Step 05:** | 2120.10 | 50882.40 | 24.46 |
| **Step 06:** | 2173.70 | 52168.80 | 25.08 |
| **Step 07:** | 2227.30 | 53455.20 | 25.70 |
| **Step 08:** | 2282.00 | 54768.00 | 26.33 |
| **Step 09:** | 2338.40 | 56121.60 | 26.98 |
| **Step 10:** | 2396.00 | 57504.00 | 27.65 |
| **Step 11:** | 2455.40 | 58929.60 | 28.33 |
| **Step 12:** | 2517.30 | 60415.20 | 29.05 |
| **Step 13:** | 2579.60 | 61910.40 | 29.76 |
| **Step 14:** | 2644.50 | 63468.00 | 30.51 |
| **Step 15:** | 2712.40 | 65097.60 | 31.30 |
| **Step 16:** | 2781.70 | 66760.80 | 32.10 |
| **Step 17:** | 2853.80 | 68491.20 | 32.93 |
| **Step 18:** | 2926.20 | 70228.80 | 33.76 |

Act # 2005-316 REQUIRES STATE EMPLOYEES TO BE PAID AT A SEM
RATE.
COMPARISON TABLE IS PROVIDED FOR INFORMATIONAL PURPOS

Previous Steps     Search Again     Next Steps

The information presented here is updated regularly and is accurate as o
01/01/2008



State Personnel Department

Copyright © 2006 State of Alabama. All rights reserved.





# Alabama State Personnel Department — Online Employment S...

Home     Job Listings     Applicants     Employees     Exams     Agency Services     About Us



DEFENDANT'S EXHIBIT

3

Search

**Class:** 30515    **LIBRARY OPERATIONS MGR**
**Grade:** 0079    **Rate Comparison**

| | Semi-Monthly | Annual | Hourly |
|---|---|---|---|
| Step 01: | 2017.70 | 48424.80 | 23.28 |
| Step 02: | 2068.30 | 49639.20 | 23.87 |
| Step 03: | 2120.10 | 50882.40 | 24.46 |
| Step 04: | 2173.70 | 52168.80 | 25.08 |
| Step 05: | 2227.30 | 53455.20 | 25.70 |
| Step 06: | 2282.00 | 54768.00 | 26.33 |
| Step 07: | 2338.40 | 56121.60 | 26.98 |
| Step 08: | 2396.00 | 57504.00 | 27.65 |
| Step 09: | 2455.40 | 58929.60 | 28.33 |
| Step 10: | 2517.30 | 60415.20 | 29.05 |
| Step 11: | 2579.60 | 61910.40 | 29.76 |
| Step 12: | 2644.50 | 63468.00 | 30.51 |
| Step 13: | 2712.40 | 65097.60 | 31.30 |
| Step 14: | 2781.70 | 66760.80 | 32.10 |
| Step 15: | 2853.80 | 68491.20 | 32.93 |
| Step 16: | 2926.20 | 70228.80 | 33.76 |
| Step 17: | 2998.40 | 71961.60 | 34.60 |
| Step 18: | 3073.60 | 73766.40 | 35.46 |

Act # 2005-316 REQUIRES STATE EMPLOYEES TO BE PAID AT A SEM
RATE.
COMPARISON TABLE IS PROVIDED FOR INFORMATIONAL PURPOS

[ Previous Page ]   [ Search Again ]   [ Next Page ]

The information presented here is updated regularly and is accurate as o
01/01/2008



State Personnel Department
Copyright © 2006 State of Alabama. All rights reserved.



**DEFENDANT'S EXHIBIT**

4



***YOUR NEXT PAYDAY WILL BE WEDNESDAY, 01/16/2008.***

| EMPLOYEE NAME | SOC SEC NO | ISSUE DATE | WARRANT NO | NET AMOUNT |
|---|---|---|---|---|
| ANNIE L BROWN | XXX-XX-8791 | 12/31/07 | 87196141 | $1,009.53 |

|  | GROSS WAGES | FICA WAGES | MEDICARE WAGES | FICA TAX | MEDICARE TAX | FED W/H TAX |
|---|---|---|---|---|---|---|
| CURRENT | 2,998.40 | 2,998.40 | 2,998.40 | 185.90 | 43.48 | 291.54 |
| YTD | 67,784.50 | 67,784.50 | 67,784.50 | 4,202.64 | 982.88 | 6,455.40 |

|  | STATE W/H TAX | OCCUP TAX | RETIREMENT | EIC | DEFERRED COMP | CU & MISC |
|---|---|---|---|---|---|---|
| CURRENT | 120.55 | .00 | 149.92 | .00 | 75.00 | 1,113.48 |
| YTD | 2,707.62 | .00 | 3,364.31 | .00 | 1,800.00 | 13,311.76 |

|  | SAVINGS BONDS | DUES | INS & MISC | LIENS |  |  |
|---|---|---|---|---|---|---|
| CURRENT | .00 | 9.00 | .00 | .00 |  |  |
| YTD | .00 | 108.00 | 1,986.48 | .00 |  |  |

| LEAVE BALANCES | PAY PERIOD END DATE | ANNUAL & EX ANNUAL | SICK | COMP | PERSONAL | HOLIDAY |
|---|---|---|---|---|---|---|
|  | 12/15/07 | 234.20 | 125.35 | .00 | .00 | .00 |

*To Remove Document Fold and Tear Along This Perforation*

12669317

## State of Alabama

DEPARTMENT OF FINANCE
OFFICE OF STATE COMPTROLLER
MONTGOMERY, ALABAMA 36130-2602

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT — CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM

ON 12/31/07, THE AMOUNT OF $1,009.53 HAS
BEEN ELECTRONICALLY TRANSFERRED TO THE ACCOUNT
OF ANNIE L BROWN

**NON-NEGOTIABLE**

NOTE: THIS IS NOT A CHECK.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               MIDDLE DISTRICT OF ALABAMA

 3                   NORTHERN DIVISION

 4

 5     ANNIE LUCAS BROWN,          )
                                   )
 6          Plaintiff,             )
                                   )  CASE NO.:
 7     VS.                         )  2:07-cv-841-MHT
                                   )
 8     ALABAMA PUBLIC             )  DEPOSITION OF:
       LIBRARY SERVICE,           )  REBECCA MITCHELL
 9                                 )
            Defendant.             )
10

11            S T I P U L A T I O N S

12        IT IS STIPULATED AND AGREED, by and

13     between the parties through their respective

14     counsel, that the deposition of:

15                  REBECCA MITCHELL

16     may be taken before Frances P. Looney,

17     Commissioner and Notary Public, State at

18     Large, at the law offices of R. Austin

19     Huffaker, Jr., 184 Commerce Street,

20     Montgomery, Alabama 36101, on the 30th day of

21     January, 2008, commencing at approximately

22     9:15 a.m.

23
```

EXHIBIT
C
Blumberg No. 5119

COPY

|    |    |                                                |
|----|----|------------------------------------------------|
| 1  |    | within?  He was already employed with the      |
| 2  |    | Alabama Public Library Service?                |
| 3  | A. | Yes, ma'am.                                    |
| 4  | Q. | And what capacity?                             |
| 5  | A. | Consultant.                                    |
| 6  | Q. | And what are the duties and responsibilities   |
| 7  |    | of a consultant?                               |
| 8  | A. | They vary depending on their expertise.  It can |
| 9  |    | be children's and young adult programing.  It  |
| 10 |    | can be reference.  It could be working with    |
| 11 |    | trustees, foundations, administration,         |
| 12 |    | collection development, anything that has to do |
| 13 |    | with running a library.  And consultants are our |
| 14 |    | just that word.  The word "consultant" is part |
| 15 |    | of our mission.  That is what we do is consult |
| 16 |    | with public libraries to provide the expertise |
| 17 |    | that they need, that they may not have, or that |
| 18 |    | they're just more comfortable having someone   |
| 19 |    | else come in and help them make decisions on.  |
| 20 | Q. | Let me ask you this question.  Are             |
| 21 |    | consultants hired merely as consultants, or    |
| 22 |    | do you have other persons employed in other    |
| 23 |    | positions acting as consultants or utilizing   |

1    offices that you just described?

2    A.    Yes.

3    Q.    Approximately what year did that occur in?

4    A.    '05, '06, somewhere in that time frame.

5    Q.    Was Ms. Brown still a library operations

6          manager?

7    A.    She is still an operations manager.

8    Q.    Was she still supervising individuals at the

9          time of her office reassignment?

10   A.    Yes, ma'am.

11   Q.    What was the purpose of moving her office at

12         this time?  And tell me where she moved from

13         and to.

14   A.    She moved from an office that was in the

15         administrative area along with two consultants

16         to the audio visual area which was larger and

17         the purpose being the audio visual was on the

18         opposite side of the building and halfway down

19         from the administrative.  And for the purpose of

20         it being convenient for her to have ready access

21         to her employees that she supervised, she was

22         moved into the area and given the space that she

23         now occupies.

 1    Q.    Was Ms. Stephens a library operations
 2          manager?
 3    A.    I don't remember her exact title.  I think that
 4          was it, but I would have to go back and look and
 5          see.
 6    Q.    Can you tell me how -- Ms. Brown's job
 7          description did change from consultant; is
 8          that correct?
 9    A.    Correct.
10    Q.    What did it change to?
11    A.    Operations library manager.
12    Q.    Tell me, how was Ms. Brown selected for this
13          position?
14    A.    When Alice Stephens retired within six weeks of
15          my arriving at the agency she was -- Alice had
16          been over the consultants when I arrived.  She
17          opted to retire.  And at that point I needed
18          someone that I felt like could come in and be
19          temporary ops manager until I could figure out
20          what was going on with agency till I could
21          really understand the ins and outs.  And I asked
22          Ms. Brown if she would at that point consider
23          being the interim library operations manager

1    which she accepted.  She was on the register to

2    become a library operations manager.  And there

3    were several options I had that state personnel

4    gives directors.  And one of them was that even

5    though you look at a register, not pull it,

6    there's a difference.  You can look at a

7    register without actually notifying personnel

8    you're ready to hire.  Ms. Brown worked in that

9    capacity until early May.  And I was getting

10   ready along with her, Mr. Bevins -- there were

11   about five people on the register for library

12   operations manager.  Teresa Traywick who was

13   also a consultant was on the register.  Some

14   individuals that I was unfamiliar with that were

15   not employees of the agency.  And rather than go

16   through the interview process, I felt like that

17   Ms. Brown was the candidate I wanted to serve in

18   that position.  And I appointed her library

19   operations manager in, I believe, May of '02.

20 Q.  I believe you testified she worked

21      previously in an acting capacity?

22 A.  Yes.

23 Q.  Was there any additional compensation for

| | | |
|---|---|---|
| 1 | | so? |
| 2 | A. | No.  It would never -- well, I say that.  If it |
| 3 | | were done during the Monday through Friday when |
| 4 | | the delivery was made, it would have gone down |
| 5 | | in the delivery of that day if it was ready at |
| 6 | | that point.  If it was done and ready on a |
| 7 | | Friday afternoon, it might have sat there until |
| 8 | | Monday just simply because we don't necessarily |
| 9 | | make two trips downtown during the day. |
| 10 | Q. | Now, what is your understanding regarding |
| 11 | | any inquiries Ms. Brown made about her |
| 12 | | travel? |
| 13 | A. | I was unaware of any inquiries until till the -- |
| 14 | | till I was made aware that the Governor's office |
| 15 | | had been contacted. |
| 16 | Q. | Tell me how you became aware. |
| 17 | A. | LaTonya Moore came into my office extremely |
| 18 | | upset saying since when do other employees other |
| 19 | | than myself work with the travel agents to find |
| 20 | | out about their travel.  I thought that was my |
| 21 | | job.  I asked her what she meant because this |
| 22 | | was early on a Monday morning, and I was not |
| 23 | | privy to what she was even referring to at this |

1     point.  And she said that Sheila Former, the

2     personnel person who had come in earlier than

3     LaTonya that day, had had a call from Phil in

4     the Governor's office -- I have no idea who Phil

5     is -- saying to tell Ms. Brown that her travel

6     amendment form was in the mail room at the state

7     house.  And she could come get it.

8  Q.  And Ms. Moore was upset about that?

9  A.  Yes.  Because she handled all travel and it had

10     been pattern and practice at the agency that

11     only one or two people, myself or my executive

12     secretary, would handle all travel so that you

13     do not get -- create issues within other

14     departments of who responds to what, you know.

15     And it was not written in the handbook.

16  Q.  It wasn't even communicated to the staff,

17     was it?

18  A.  It had been pattern and practice long before I

19     came.

20  Q.  My question is had that been communicated to

21     the staff by you?

22  A.  Staff that traveled was very much aware of it,

23     but it was not printed.

```
 1              identification)

 2    Q.   Ms. Mitchell, I'm going to show you what I

 3         have marked for identification purposes as

 4         Plaintiff's Exhibit 16.  I'm going to ask

 5         you to identify that document?

 6    A.   A reprimand from me as Director of the agency to

 7         Ms. Annie Brown dated July 25th, 2006.

 8    Q.   Describe for me the circumstances in which

 9         you issued that reprimand.

10    A.   It was based on events that started with the

11         Governor's office and then the Governor's office

12         travel office individual being very upset at the

13         way she was talked to by Ms. Brown, the fact

14         that Ms. Brown herself refused on two occasions

15         to admit that she had instigated this, also

16         refusal on Ms. Brown's part to tell me who had

17         spoken in her behalf if she did not.

18    Q.   What's the first sentence that you say in

19         that letter?

20    A.   I am informing you that effective immediately

21         you are removed from any and all supervisory

22         responsibilities of your current position.

23    Q.   Can you tell us why you took this action
```

1     just described in the first sentence?

2  A.  Because I am a stickler for people telling the

3     truth.  I felt like Ms. Brown had deliberately

4     lied to me and misrepresented what had gone on

5     based on the testimony of people outside of the

6     agency.  I did not feel like that that was a

7     quality or an attribute that I wanted in my

8     supervisory personnel because if I could not

9     trust them to tell the truth I certainly did not

10     want them supervising others.

11  Q.  Now, specifically, what did you believe

12     Ms. Brown falsified?

13  A.  She denied on two occasions while I was talking

14     to her after this event that she had called the

15     Governor's office.  When I continued to press

16     her about it, she finally said that she did not

17     call, but someone called in her behalf.  When I

18     asked her who, she refused to tell me who that

19     was.

20  Q.  Now, just on that part.  What was the lie in

21     what you just described?  You just testified

22     Ms. Brown told you she did not make the call

23     directly.  Someone called on her behalf.  So

```
 1          what's the lie there?
 2     A.   The lie is semantics.  She instigated the call.
 3          She refused to admit that she had any part in it
 4          on two occasions before she finally admitted
 5          that she had called someone else to make the
 6          call for her.
 7     Q.   Now, you were present during Ms. Brown's
 8          deposition; is that correct?
 9     A.   Correct.
10     Q.   Did Ms. Brown testify that she said that she
11          did not make the call directly?  She kept
12          saying that.
13     A.   I would have to go back and look at her
14          deposition.
15     Q.   But isn't that what she told you when you
16          talked with her?
17     A.   She told me she did not make the call.
18     Q.   And she did tell you that someone called her
19          on her behalf?
20     A.   After I pressed her.
21     Q.   But that is different than her making the
22          actual call, is it not?
23     A.   She did the actual speaking to Cheryl during the
```

```
 1        situation.  And to me she tried to mislead me

 2        that she had nothing to do with it.

 3   Q.   But that's not what she said.

 4   A.   That's what I read into the situation and what I

 5        believe.

 6   Q.   But that's not what she said.

 7   A.   I can't speak to -- you know, what she said is

 8        what she said.  What I interpreted, what I heard

 9        is what I reported just now.

10   Q.   She did tell you that someone else called on

11        her behalf, did she not?

12   A.   After I pressed the point.

13   Q.   And based on Ms. Brown's testimony, that is

14        what occurred?  She told you someone called

15        because she didn't know who called the

16        Governor's office?  Did you hear that

17        testimony?

18   A.   Yes, I heard that testimony.

19   Q.   So because you didn't believe what Ms. Brown

20        said is why you took her supervisory

21        responsibilities away from her?

22   A.   Based on what she told me that she did not call

23        based on the testimony from the travel
```

| | |
|---|---|
| 1 | secretary, from my own secretary, from other |
| 2 | conversations I had with Ms. Brown concerning |
| 3 | this and her ability to go pick up the |
| 4 | information herself. And she said she had not |
| 5 | made -- and this is in the form of a memo -- |
| 6 | that she said she had made no request to go get |
| 7 | it. And I was told by people outside of the |
| 8 | agency that she had pressed that point. That |
| 9 | was all to me a case of appearing to lie. And, |
| 10 | therefore, I did not feel like I could trust her |
| 11 | in the position to supervise others. |
| 12 | Q. Let me ask you this. Who were the people |
| 13 | that said she -- specifically, said she was |
| 14 | coming to pick up her travel that you were |
| 15 | referencing? |
| 16 | A. Phil in the Governor's office, Cheryl Fondon. |
| 17 | Q. Did you speak to Cheryl Fondon directly? |
| 18 | A. Yes, I did. |
| 19 | Q. Do you have a memo from you between you and |
| 20 | Cheryl Fondon? |
| 21 | A. I'm not sure what you're referring to. |
| 22 | Q. Well, the memo that was produced during |
| 23 | Ms. Brown's deposition Defendant's Exhibit |

```
 1        17 indicates that LaTonya Moore spoke with

 2        Cheryl Fondon.

 3    A.  She talked with Cheryl first.  I talk with

 4        Cheryl second because LaTonya reported to me

 5        that Cheryl was extremely upset with the

 6        conversation she had had with Ms. Brown.

 7    Q.  Did you talk to Phil?

 8    A.  I have no idea who Phil is.  I never talked to

 9        Phil.

10    Q.  So all of this is hearsay based on the

11        description of the facts.  Cheryl Fondon did

12        not say Ms. Brown told her that she was

13        going to come and pick it up?  She was

14        referencing something that a Phil told her;

15        isn't that correct?

16    A.  Which memo are you referring to?

17    Q.  The one that LaTonya wrote to you.

18    A.  Ms. Fondon wrote me another memo.

19    Q.  Is it factually different.

20    A.  I would have to compare them?

21    Q.  Does not that memo indicate something that

22        Phil said regarding Ms. Brown allegedly

23        coming to pick up her check, not what Cheryl
```

1       told you?

2   A.  Again, I would have to look at Cheryl's memo.

3   Q.  You testified you never talked with Phil

4       directly yourself; isn't that correct?

5   A.  I don't remember talking to Phil directly.

6   Q.  Continue on in Plaintiff's Exhibit 16.

7           MR. HUFFAKER:  Just so we're clear.  What we

8       have had her look at was a memo from LaTonya

9       Moore, not the memo from Cheryl Fondon?

10          MS. BIGGERS:  This is to Rebecca from

11      LaTonya Moore regarding LaTonya Moore's

12      conversation with Cheryl.  Right, Defendant's

13      Exhibit 17.

14          MR. HUFFAKER:  Plaintiff's or Defendant's?

15          MS. BIGGERS:  That was yours, Defendant's.

16          MR. HUFFAKER:  I thought you said

17      Plaintiff's.

18  Q.  Now, in your second paragraph, Ms. Mitchell,

19      you tell Ms. Brown that her actions of

20      contacting the Governor's office and not

21      allowing your executive secretary to work on

22      the travel plans without any notice to you

23      or to your executive secretary was a gross

```
 1           breach of trust, management responsibility,
 2           and professional courtesy to the point of
 3           insubordination.  Can you just tell me how
 4           Ms. Brown's inquiry to the Governor's travel
 5           office specifically was a gross breach of
 6           trust, management responsibility, and
 7           professional courtesy?
 8     A.    Ms. Brown accused -- according to Ms. Moore and
 9           her statements to me that she was mishandling
10           her travel because she was black.  Ms. Moore is
11           also black.  She also indicated that she had
12           already informed Ms. Brown that she was working
13           on finding out why there had been a delay.  And
14           going outside of what has been pattern and
15           practice for the agency and travel, it's
16           professional courtesy.  Plus, she had also
17           insulted according Ms. Fondon, who talked to me
18           personally, Ms. Fondon by trying to tell her how
19           to do her job.  And Ms. Fondon explained to her
20           she had been doing travel for the State of
21           Alabama for "X" number of years and did it for
22           multiple people.  And she did not appreciate
23           Ms. Brown trying to tell her how to do her job.
```

1     yesterday?

2         MR. HUFFAKER:  Uh-huh.

3   A.  My initial letter was a warning.

4   Q.  What initial letter?

5   A.  The initial letter that I wrote on the Tuesday

6     following the Monday event was a warning.

7   Q.  Do you have that?

8   A.  No.

9   Q.  Wait a minute.  I don't know about this.

10    That's why I'm asking.

11        MR. HUFFAKER:  If you'll let her finish.

12  Q.  Are you saying a letter that you wrote to

13    Ms. Brown?

14  A.  Uh-huh.

15  Q.  Do you have a copy of that letter?

16  A.  No, I do not.

17  Q.  Why not?

18  A.  Because it was in my word processing and I went

19    back and changed it to a reprimand.

20  Q.  So this letter it never came out and was

21    actually given to Ms. Brown?

22  A.  No, it was not.

23  Q.  Now, answer my question why you didn't give

1       her a written warning?

2   A.  I called state personnel and a matter of this

3       severity, talked to the attorney Alice Ann Bryne

4       for state personnel, to Darby Forester who at

5       the time was serving in the capacity of

6       Assistant Director of State Personnel, took them

7       the warning letter that I had drafted, sat down

8       with them and explained to them what had

9       happened, wanted to make sure that I was

10      following correct disciplinary procedure for the

11      state.  And I was advised by the state personnel

12      attorney that the offense was severe enough that

13      it should not be a warning, but either a

14      reprimand or a dismissal.

15  Q.  Who was that person that you talked with at

16      the state --

17  A.  Alice Ann Byrne, B-y-r-n-e-s, no, she doesn't

18      have an "s" on the end of her name.

19  Q.  Byrne?

20  A.  Right.

21  Q.  And what did you tell her that Ms. Brown had

22      done?

23  A.  I explained to her what I had learned the

1      previous day concerning the telephone calls to

2      the Governor's office, the telephone call to

3      Cheryl Fondon, what Tonya Moore had told me

4      about how she had proceeded with the travel, and

5      the fact that I had confronted Ms. Brown and she

6      had denied twice that she had been involved with

7      calling the Governor's office.  And they said

8      under the circumstances -- Alice Ann said under

9      the circumstances she felt like that it was

10     insubordination of the nature since it did

11     involve an outside agency other than ours and

12     especially since it concerned the Governor's

13     office and the legislature that --

14  Q.  How did the legislature get involved?

15  A.  The secretary that called Cheryl Fondon, Cheryl

16     told me worked at the speaker's office.

17  Q.  Did she know the name of that person?

18  A.  Joan or Joanne.  I never knew the full name of

19     the person.

20  Q.  Do you know the name Joanna Bice?

21  A.  I had not heard it before Ms. Brown's

22     testimony.

23  Q.  Were you aware that she used to work for the

1    Q.   And that's during the 2002/2003 rating

2         period?

3    A.   Correct.

4    Q.   What are the exact months on there?

5    A.   September 2002 through -- September 1, 2002, to

6         September 1, 2003.

7              (Plaintiff's Exhibit 19, appraisal, marked

8               for identification)

9    Q.   I'm going to show you what I have marked for

10        identification purposes, Ms. Brown's

11        employee performance appraisal, I believe,

12        for September 1, 2003, September 1, 2004.

13        What does that document indicate her overall

14        rating or performance rating was?

15   A.   Exceeds standards.

16   Q.   And were you her supervisor during that

17        period?

18   A.   Yes, ma'am.

19   Q.   Would Ms. Brown have been eligible assuming

20        there were no fiscal constraints on

21        receiving any kind of merit pay increase?

22   A.   She would be eligible for up to a two-step.

23             (Plaintiff's Exhibit 20, appraisal, marked

```
 1              for identification)

 2    Q.   I'm going to show you what I have marked for

 3         identification purposes as Plaintiff's

 4         Exhibit 20.  And this one has all the

 5         necessary three pages.  It's for the

 6         performance period covering September 1st,

 7         2004, through September 1st, 2005, and ask

 8         you if you recognize that document?

 9    A.   Yes, I do.

10    Q.   What was Ms. Brown's overall performance

11         rating during that period?

12              MR. HUFFAKER:  Actually, Deborah, you've got

13         stapled on here pre-appraisal.

14              MS. BIGGERS:  I'll take that one off.

15              (Plaintiff's Exhibit 21, appraisal, marked

16              for identification)

17    Q.   I'm going to show you what I have marked for

18         identification purposes as Plaintiff's

19         Exhibit 21.  And is this is Ms. Brown's

20         performance appraisal for September 1, '05,

21         through September 1, 2006?

22    A.   Yes, it is.

23    Q.   And what is Ms. Brown's overall performance
```

```
 1              rating on that appraisal?

 2      A.     Before or after the disciplinary score?

 3      Q.     Well, what is it -- that one has a

 4              disciplinary score on it?

 5      A.     Correct.

 6      Q.     What is that disciplinary score

 7              representing?

 8      A.     It is representing the reprimand that she

 9              received in July.

10      Q.     The one that you have testified to in this

11              deposition?

12      A.     Yes, ma'am.

13      Q.     Explain for the ladies and gentlemen of the

14              jury how a disciplinary score -- strike

15              that.  Let me ask you this.  Would a written

16              warning be a disciplinary score reflected on

17              one's performance appraisal?

18      A.     If it was a warning it does not reflect

19              according to what it says on our forms.

20      Q.     Okay.

21      A.     If it was a reprimand or suspension or demotion,

22              then it does reflect.

23      Q.     And how is it reflected on a performance
```

## AFFIDAVIT OF CHERYL FONDON

STATE OF ALABAMA    )

COUNTY OF MONTGOMERY  )

Before me, the undersigned Notary Public in and for said state and county, personally appeared Cheryl Fondon, who is known to me, and who being by me first duly sworn, deposes and states as follows:

I am Cheryl Fondon, and I am currently employed with the State of Alabama as the Director of Administrative Services for Governor Bob Riley. I held this position in July 2006. All facts set forth herein are facts of which I have personal knowledge. I give this Affidavit in the action styled *Annie Lucas Brown v. The Alabama Public Library Service,* pending in the United States District Court for the Middle District of Alabama.

As the Director of Administrative Services, it is one of my responsibilities to receive and process out-of-state travel reimbursement requests for State employees. It is the general policy and practice of the State agencies to designate one or two contact persons to handle travel related issues so that I am not required to contact each and every individual within an agency for purposes of answering questions and handling travel reimbursements. This policy and practice existed with the Alabama Public Library Service ("APLS"). In 2006, the designated contact person at the APLS was Tonya Moore.

On July 24, 2006, I received a telephone call from the Speaker of the House's Office. Annie Brown from the APLS was on the call also. During this phone call, Ms. Brown questioned me about why she had not received her travel reimbursement. Among others, she told me that it was taking too long to get the reimbursement, that most of her expenses were on her credit card, that Tonya Moore at the APLS had not properly handled her reimbursement, and implied that there were problems with Tonya's office.

Attached hereto as **Exhibit 1** is a true and correct copy of a memorandum that I wrote concerning the travel reimbursement issue involving Ms. Brown. This memo accurately depicts the events of July 24, 2006 concerning Ms. Brown's travel reimbursement. I drafted this memorandum voluntarily and without coercion from anyone at the APLS.

EXHIBIT

D

Blumberg No. 5118

_____

CHERYL FONDON

SWORN TO AND SUBSCRIBED before me this _____ day of April 2008.

_____
Notary Public

My Commission Expires: 7-12-11

OFFICE OF THE GOVERNOR

BOB RILEY
GOVERNOR



STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-0937

## STATE OF ALABAMA

# MEMORANDUM



EXHIBIT
1

July 25, 2006

To: Rebecca Mitchell
    Executive Director, AL Public Library Service

From: Cheryl Fondren
    Director, Administrative Services; Governor's Office

Re: Out-of-State Travel
    Ms. Annie Brown

---

Ms. Mitchell,

I appreciate your staff's willingness and understanding of our process for handling out-of-state travel pre-approval forms. It appears there was some confusion among your staff and my office in regards to travel for Ms. Annie Brown.

As you requested, below is a summary of my recollection of the phone conversation with Ms. Brown.

On Monday morning July 24, I received a transfer call from JoAnn in the Speaker's Office asking if I were the person responsible for the Governor's out-of-state pre-approval forms required from state agencies. I replied I was and she said she had Ms. Annie Brown from AL Public Library on the line to transfer to me. Ms. Brown spoke up and proceeded to explain she had an amended travel needing approval. I indicated that all travel had been signed as of Friday and was ready for pick up in our mailroom or had been returned via handmail.

She began stating she did not have hers and it was taking too long to get it back and my office needed to understand most of her $1000+ charges were on her credit card and she needs her paperwork in order to get reimbursed. I indicated I was aware of the

reimbursement procedures and to assist I process amended travel with a greater amount of urgency

She also stated she didn't understand why her travel had to be amended because of the registration fee difference but overall her travel expenses were cheaper than on the original approved travel. I explained several times the criteria of travel expenses were based on categories of transportation, lodging, meals, etc and not overall expenses When the amount of money is excessive in one or more category and/or dates of travel and/or mode of transportation changes an amended form is required.

In my opinion, I'm not sure she quite understood the concept or process because after several explanations and examples she continue to inform me that this was not right to do this to her because she needed her reimbursement ASAP
On this point she gets JoAnn to agree with her and I realize JoAnn has stayed on the phone line rather than transferring and hanging up.

I also informed Ms. Brown when her amended travel arrived in our office it was in need of some additional information to clarify the changes so I contacted Tonya at APL to assist me. Ms. Brown indicated Tonya may not have handled her travel properly, may not have done it correctly and implied there were problems in Tonya's office that was holding up her ability to get reimbursement

I stated in my opinion Tonya and I handled the travel correctly and we had it taken care of as quickly as possible. I indicated I have had a good working relationship with Tonya and have not had problems with other APL out-of-state travel in the past

I explained our process was to deal directly with the one or two contact persons the director has placed in charge of travel so my office dealt with the same person consistently rather than the many individual employees in each agency

Ms. Brown asked if she could personally come and pick up her travel which I replied yes I called her back in 5 minutes to say her travel was located in the pick up box located in our mailroom and gave directions I expected to see her shortly thereafter in the morning but instead she arrived about 4:00 Monday afternoon and picked it up

I appreciate your response and follow up to my call. I make every effort to assist employees with their out-of-state travel forms in a timely manner. Due to such a large volume from all state agencies, boards and commissions our office prefers to stay with our traditional practice of dealing with one or two contact person or persons assigned by the director in handling travel so I am not placed in a position to be contacting each and every individual within an agency. This also helps individual agencies apply their own procedures for processing travel before it is sent to the Governor's Office

Again, thank you for assistance and I look forward to continue working with you and your agency.

# STATE OF ALABAMA
# PROGRESSIVE
# DISCIPLINE
# MANUAL



DEFENDANT'S
EXHIBIT

*22*

## State of Alabama Personnel Department
## Training Division

### June 2006 Edition



Blumberg No. 5119

EXHIBIT

E

# STATE OF ALABAMA

# PROGRESSIVE

# DISCIPLINE

**State of Alabama Personnel Department**
**Training Division**
**June 2006 Edition**

## TABLE OF CONTENTS

PROCEDURES ........................................................................4

FEDERAL LAW.....................................................................39

STATE LAW..........................................................................49

OTHER AREAS OF LEGAL CONSIDERATION............................71

CASE STUDIES......................................................................87

# PROCEDURES

## DISCIPLINE PROCEDURES

### TABLE OF CONTENTS

**Introduction**..................................................................................................6

Reasons for Discipline Systems..........................................................................6

Counseling Before Discipline.............................................................................8

The Disciplinary Session With the Employee .....................................................9

**Steps of the Discipline Process**....................................................................10

Step One: Warning............................................................................................10

Step Two: Reprimand.......................................................................................12

Step Three: Suspension....................................................................................14

Step Four:    Termination..................................................................................22

**Effective Practices With Discipline**.............................................................28

Practical Application of the Discipline Steps.....................................................28

Corrective Action Plan......................................................................................29

Documentation of Discipline.............................................................................30

Proper Discipline Techniques...........................................................................32

**Termination Guidelines**...............................................................................34

Immediate Termination.....................................................................................34

How to Terminate Employees and Avoid Liability.............................................34

| INTRODUCTION |

## REASONS FOR A DISCIPLINE SYSTEM

The State's discipline system, once called Positive Discipline, is now termed as "Progressive Discipline." The form of discipline system is of progressive discipline steps. It is a way for the supervisor to make the employee aware of a weakness in a job-related area. This allows an employee the opportunity to change the undesired behavior. The discipline process is a management tool used to teach an employee the correct conduct and/or behavior. The objective of this discipline is not punishment, but to bring a change in the employee's behavior through a series of steps starting with counseling and progressive in severity. In many case, the employee will change with a simple counseling session. This change leads toward the desired result required in the position.

The discipline process involves four steps. Usually it is used in a progressive format from the first step to the fourth step. Each step is a more involved process to allow the employee continued awareness and accountability of the problem and offer opportunity to change behavior. This process makes sense from several angles. First of all, use of the four step process is good business management. It communicates the weak area to the employee and provides an opportunity for the employee to change performance. At this point, the employee becomes a productive member of the agency again. Second, it is the standard by which discipline procedures, in general, are judged. This process is the ruler by which discipline procedures are measured to see if they are defensible and fair in court, agency hearings, or State Personnel Department hearings.

The discipline system is to be used hand-in-hand with the performance appraisal system. These are the two most important management tools a supervisor possesses in state government. The management role of a supervisor's job is to get work done through others. In some cases, a supervisor may find that an employee's behavior is hindering productivity. Counseling should be used at the time a supervisor is monitoring performance and notices the problem. If the problem behavior continues, then discipline may need to be brought into the situation. If discipline is used, at any level, the behavior warranting the corrective action should be documented on the Employee Performance Appraisal. Deductions for severe disciplinary actions are discussed in "Steps of the Discipline Process." This situation, then, may lower the appraisal score as a reflection of what occurred during the year. Since appraisal is not the discipline tool, the lower appraisal score is simply the result of the discipline that occurred during the year. Figuratively speaking, performance appraisal is a mirror that reflects what has occurred during the year. Positive discipline is the corrective tool to use at the time an infraction occurs in work conduct.

Some supervisors think that ignoring a problem employee will help the problem go away by not drawing attention to the situation. Some supervisors think that for a minor problem the problem is best served by laying a severe step of discipline on the employee - not using the system progressively. Both of these thoughts are incorrect. In fact, if a work unit or office has an employee with a conduct problem, it is imperative for the supervisor to take action. Progressive discipline is the most effective means to dealing problem situations.

If a problem is not dealt with, it hurts the work quality and productivity in the area. First, it hurts the employee with the problem because their performance is suffering in some way. If productive employees see the problem employee getting away with less than "the load" each one carries, the productive employees will loose motivation. However, that is not all it hurts. It also damages other employees and the supervisor's image. Employees need to be treated similarly if their performance and conduct on the job is similar. If a supervisor allows one employee to continually be tardy, have absenteeism problems, be insubordinate, etc. it will cause morale and motivation issues with the other employees that abide by policies and support management. Productivity, quality, morale, harmony and other healthy workplace attributes will decline. Respect for the supervisor will also decline if problems are left unattended. Credibility and perceived loyalty of the supervisor will decrease.

On the other hand, it is equally ineffective and often harmful to handle a minor problem with an employee by over reacting and/or using harsh discipline. This improper use of discipline usually occurs when a supervisor does not think through the consequences of their management or treats employees differently based on biases. It is especially harmful if the supervisor has not taken time to tell the employee the needed change. This supervise damages the office and employee motivation because the discipline is being used a punishment not a teaching tool. Now, there are times when the offense is critical enough that steps of discipline may need to be skipped. However, in most cases that is not appropriate. When other productive employees see the outburst of discipline taken on the employee only after one occasion of a lesser problem, they also become weary that the supervisor is "out to catch people doing something wrong" instead of looking to catch people doing something right.

The appropriate supervisory action is to treat workers according to their actions, work history, and performance issues. This means rewarding performance above standards and progressively disciplining employees with conduct problems.

Remember, the object of using the discipline process is to identify unwanted behavior on the part of an employee and bring it to the employee's attention. Most importantly, a change in behavior that leads the employee back to productive performance should be the method. It is the only method that yields desirable results.

Studies have shown that it is less costly to correct performance of an existing employee than to terminate the employee and hire a replacement. Rehabilitating an existing employee will save in the areas of recruitment, lost time in the job, initial training costs of a new employee, quality lost in the change of employees, and shutdown of productivity until a new employee has been trained and is on board. These are only a few reasons why it pays to work with an employee through the discipline process in order to change the unwanted behavior.

On the other hand, improperly dealing with discipline will spark an increase in absenteeism, turnover, hostility at work between productive and unproductive employees, and employees seeking positions elsewhere.

However, there may be times when the employee does not change the undesirable conduct and the discipline will lead to termination. On these occasions, the supervisor must think of the responsibility of state employees. Each Merit System employee is to receive their position based on merit and competence. Each Merit System employee is to be promoted because of merit and competence. Likewise, each Merit System employee is to maintain their job based on merit and competence in fulfillment of their responsibilities. An employee that fails to demonstrate this competence and fulfillment of duties, after extensive time and effort working through the discipline process, may need to be terminated. A supervisor's job is to manage their employees, maintain quality services, and foster a productive and effective work environment.

In most cases, the discipline process will restore the employee to a productive and effective work style. Some employees just need the reminder of discipline to spur them back into the right conduct or behavior. It may be that just a word will turn performance around. Often, an employee's problem area can be handled by a simple word. The employee changes the behavior with this knowledge. This is the supervisory responsibility of coaching. A supervisor should coach employees in areas of strength, weakness, and even fully competent performance.

In other cases it may take more time and effort through the more severe steps of discipline to show an employee the need to maintain productive work conduct. Therefore, the discipline system offers a four step procedure to be used in this event. The four steps are warning, reprimand, suspension, and termination.

In any case, the supervisor's management and leadership abilities are the vehicle and avenue to get their employees to enhance and progress in performance of quality services. State employees are servants of the people. As such, should maintain service excellence.

## COUNSELING BEFORE DISCIPLINE

It is easy to forget when faced with a "problem employee," to stop, think, and act only after you have considered the proper judgment call. In Performance Appraisal, a supervisor is advised to counsel an employee whenever they see performance or work conduct issues arise. Counseling should be conducted prior to jumping into discipline with the employees. One, it shows that the supervisor has properly communicated and given the employee an opportunity to change. Second, an employee needs a simple reminder of the proper path to take. In any case, counseling is a sure way to start when a problem arises to inform the employee does not allow the opportunity to change. If a formal counseling session is going to be used in the Work Habit section of the Appraisal, it must be made "officially." The best way to ensure that supervisory actions are appropriately conducted with proper documentation is to put the counseling in writing in a memo, corrective action plan, or sample form found in this manual.

However, having stated that most offences are first addressed with a counseling prior to proceeding to disciplinary steps, in rare occasions counseling may be skipped to reach a higher step of the discipline system because of the severity of the offence. For example, in most agencies infractions in punctuality, dress code, or excessive use of telephone for

personal calls would be addressed by use of each step of discipline but beginning with counseling. Theft, gross insubordination, fighting, use of alcohol/drugs while on duty, for example, would probably bypass counseling and proceed to a more severe step of discipline. Use of discipline other than step-by-step should be discussed with the Personnel Office or Legal Office of the particular agency.

## THE DISCIPLINARY SESSION WITH THE EMPLOYEE

A session between supervisor and employee should be conducted at each step of the discipline process. In fact, more than one session may be necessary in order to complete a particular step. Sessions should always be held strictly confidential and held in private. It may be that someone else (i.e. Legal Staff, personnel staff, reviewing supervisor) is present. Other than necessary individuals, the meeting should be held in a private office.

The supervisor needs to anticipate the reaction of the employee to the disciplinary session. This anticipation is for several reasons. It is important for the supervisor to have information planned out so that the purpose and problem is clearly explained. Also it is important to state the desired results. The supervisor should be in control so the agenda may be covered with as few problems as possible. Since an employee may demonstrate any one of an array of emotions, the supervisor should be prepared to handle these situations.

It is wise to let the employee talk. This may be best to pose questions regarding correct actions or ask the employee to suggest possible solutions. Allowing an employee to talk may even assist with a change in conduct if they can just talk it out. In other words, this may be a dialogue instead of one-way communication.

The supervisor should be sure that the employee is told what will happen if the lack of proper behavior continues. In most cases this will be the next step of the discipline process.

The supervisor should document what happened in the session after the session is over. The documentation should include information regarding the conversation between the supervisor and employee such as points that were covered, the corrective action plan, discussions, and other areas of the session that could be important for future reference.

## STEPS OF THE DISCIPLINE PROCESS

### STEP ONE: WARNING

The first step of discipline is a warning. A warning must be documented in writing. Make sure that the warning has the word "Warning" on it so that there is no doubt as to what step of discipline the supervisor has taken. The supervisor must provide the employee with the warning in the method of a memo, letter, or form. A sample form is included in this section on which to document the reprimand. A supervisor should hold a formal session (meeting) with the employee.

The session should outline the unwanted behavior and desired changes. The supervisor should be specific in describing the issues and the change needed by the employee. Supervisors should not take for granted that employees automatically know the specifics of the desired change. It is best for supervisors to be direct but show that they care about the employee's performance. After all, the supervisor is the team coach of the office or group.

The supervisor would be wise to let the employee repeat back to them the needed change in behavior. The most effective way to talk with the employee is for the supervisor to ask the employee about solutions to the performance issues. If the supervisor "asks" for solutions rather than "tells" the employee their solution, the employee will be more apt to look at the discipline as constructive rather than punishment. This action allows the employee to take responsibility in his/her performance changes. In addition, the employee should be informed of further disciplinary actions that will occur if the behavior does not change.

It would be helpful to set up a corrective plan of action for the employee. This corrective action plan lets an employee know what behavior needs to be changed, the results that are desired, and a time period in which the behavior will be monitored. How the supervisor will assist and a follow-up date to review performance should be included in the corrective action plan. To learn more about corrective action plans, please refer to Corrective action plan section of this Manual. The supervisor should document the discussion regarding the warning and corrective action plan, if used, in his or her own supervisory files. Supervisory file means the informal notes that each supervisor should maintain on each employee. These informal supervisory files are also mentioned in the Performance Appraisal Manual as documentation that is collected in order to justify ratings at the end of the year and serve as a memory source for that appraisal.

The supervisor is to wait until after the session with the employee and then proceeds to write a warning. The wait is suggested because, if the supervisor has used appraisal and discipline correctly, this meeting is conducted only after one or two counseling sessions (in most situations). Therefore, the meeting may result in the employee providing information that may change the perspective of the supervisor. For example, information from the employee indicates that in the particular situation, no infraction actually occurred — it was

hearsay. However, in most cases, the supervisor proceeds with the warning if there is no change in perspectives and it is fair for the employee to receive a warning.

The supervisor must then instruct the employee to sign and date the warning to indicate acknowledgment and receipt of the warning. If an employee refuses to sign the warning, despite being instructed to do so, the employee has become insubordinate, and the next step of discipline—the reprimand—is to be taken with the employee. If an employee continues to refuse to sign the documents, discipline should progress, up to and including termination.

Under the State Personnel Board Rules, "insubordination" includes the following misconduct:

✓ Failure to follow an order (of a supervisor or someone with authority to direct the employee or agency policy or procedures);
✓ Disobedience (not obeying supervisor's instructions or agency policy or procedures);
✓ Failure to submit to authority as shown by demeanor or words, except in circumstances where the employee has good reason to believe the order is unsafe or illegal.

Rule 670-x-19.01(2)(b), State Personnel Board Rules. Furthermore, any disruptive or disrespectful behavior is insubordination. An employee who commits the act of insubordination may be suspended or dismissed on the first offense, considering work record and length of service.

A copy of the warning is given to the employee after the session has been held. The supervisor should document appropriate information in the supervisory file regarding what occurred in the meeting with the employee. The discussion should include the information as discussed in the session to include the problem area, the correct behavior, future consequences if behavior does not change, date of the session, and the agreement made between the employee and supervisor. An appropriate corrective action plan is written for the employee as an agreement to change within a certain period. Any corrective action plan is to be given to the employee immediately after the disciplinary session. A copy of the warning and corrective action plan should be kept in the supervisory file. A copy of the warning is given to the reviewing supervisor. A copy of the warning and corrective action plan must be sent to the central Personnel Office of the agency. Any other copies should be handled according to department policy. A sample form is included in this section or one may use a letter or memo format.

A warning is documented on the Employee Performance Appraisal at the end of the appraisal year for the employee. The documentation simply explains the situation for which a warning was given. In addition, a work habit area or responsibility should reflect that discipline took place. However, no points are deducted under "Disciplinary Score" on the Employee Performance Appraisal. Counseling and warnings are giving the employee an opportunity to change behavior with no future action that would deduct points from the appraisal. This documentation on the appraisal form (with no points deducted) is also a

record of when troublesome behavior started in case it continues into the next appraisal period. The appraisal will either support or refute future personnel actions.

Remember if, a warning is placed in a formal file of the employee, a copy should be given to the employee within ten days of receipt into the file. Failure to do so can result in the warning being made null or void, as dictated by state law.

The warning and session, openly labeled as a warning, should set the employee on the right track. However, there are those times when the conduct of an employee continues to deteriorate. In this case, the next step of the discipline system should be taken. The next step is a reprimand.

## STEP TWO: REPRIMAND

The second step of the discipline system is referred to as a reprimand. This involves a more serious approach to problem areas. A reprimand is documented in writing. A letter, form or memo should be written to the employee should clearly state it is a "Reprimand." The employee must sign that they received the reprimand.

Additionally, a reprimand should state the continued or additional unwanted behavior and the necessity of the desired behavior. It should state that further disciplinary action would take place if the behavior does not come in line with the job standards. Again, a corrective action plan should be developed if possible. The supervisor may choose to discuss the corrective action plan then or in another session. The letter or memo may include both the reprimand and the corrective action plan. A supervisor may reprimand the employee in conjunction with a corrective action plan. A sample form is included in this section or one may use a letter or memo to document the reprimand.

The supervisor is to hold a disciplinary session with the employee. The supervisor should talk through the problem area including correct behavior and future consequences. The supervisor must then instruct the employee to sign and date the reprimand to indicate acknowledgment and receipt of the reprimand. If an employee refuses to sign the reprimand, despite being instructed to do so, the employee has become insubordinate and the next step of discipline—suspension—is to be taken with the employee. If an employee continues to refuse to sign the documents, discipline should progress, up to and including termination. The employee is given the reprimand letter or form as the session ends.

A copy of the letter is given to the reviewing supervisor. A copy is maintained in the supervisor's file. A copy is maintained in the official employee files of the Personnel Office of the agency. Departmental procedure should dictate whether any other copies are to be maintained. All sessions with the employee should be documented in supervisory files.

Remember if, a reprimand is placed in a formal file of the employee, a copy should be given to the employee within ten days of receipt into the file. Failure to do so can result in the warning being made null or void, according to state law.

A written reprimand is documented on the Employee Performance Appraisal at the end of the employee's appraisal year. The work habit area or responsibility of poor performance should reflect the discipline that occurred. This reprimand should be documented in the "Disciplinary Action" section of the Employee Performance Appraisal. In addition, one or more reprimands, if the most severe step taken with the employee during an appraisal year, results in 7 points being calculated in the "Disciplinary Score" section of the Employee Performance Appraisal.

Unfortunately, there will be times when a warning and a reprimand does not change behavior. In this case further disciplinary action should be taken. The next step of the discipline process is suspension.

```
SAMPLE FORM THAT MAY BE USED FOR A
COUNSELING, WARNING OR REPRIMAND
```

THIS IS A ☐ COUNSELING

☐ WARNING

☐ REPRIMAND

Employee Name
_____

State the facts of the performance or work conduct problem:
_____
_____
_____
_____

State what actions have been taken with the employee prior to this step of discipline (include counseling, coaching, and/or any disciplinary step):
_____
_____
_____

State how the situation can be resolved based on discussion with employee and input from the employee:
_____
_____
_____

If a corrective action plan is developed in conjunction with the discipline, include the time frame that is being monitored for change in performance and the follow-up meeting date:
_____
_____

Supervisor's Signature: _____

Employee's Signature: _____

Date of Meeting _____

Employee's signature denotes discussion not necessarily agreement.   The employee may add comments which must be attached to this form.  The form must be given to the employee with copies to the supervisory file and Personnel Office file in the agency.

## STEP THREE: SUSPENSION

The third step of the disciplinary procedure is suspension. This is a severe and extremely serious step in the employee's career in state government. It is important for the employee to realize this fact. An employee may be suspended for up to 30 days in one year. Suspension is always Leave Without Pay.

The supervisor must contact the agency Personnel Office and Legal Staff regarding the recommendation for suspension. A letter should be written regarding the recommendation for suspension and include the continued problems of employee performance and the counseling and disciplinary actions that have been taken with the employee thus far. Depending upon the agency, the letter may be written by the supervisor, division chief, attorney, or Personnel manager. The letter should be written based on the continued documentation of the supervisor to include dates of problems, dates of counseling/disciplinary sessions, goals, and discussions with the employee. In addition, other pertinent information that provides detail and evidence of infractions and the opportunities provided to the employee to change behavior. The employee is to be told the suspension is a time for the employee to consider the criticality of the continued offenses and to decide if he or she would like to continue employment in state government.

As with all personnel actions, a letter must be written to the employee informing him/her of the decision and the dates of suspension. Departmental procedure governs any other necessary paperwork and communication processes. The letter of recommendation for suspension and the letter informing the employee of the appointing authority's decision to suspend the employee must be given to the employee. The supervisor must then instruct the supervisor to sign and date the letter, ndicating acknowledgment and receipt of the document. If an employee refuses to sign the letter, despite being instructed to do so, the employee is insubordinate and the next step of discipline—termination—is to be taken with the employee.

Upon the employee's return, the employee should be required to give the supervisor an answer as to their decision regarding behavior change and employment with the department.

The supervisor should carefully document each action and each discussion with the employee. Again, note that the agency Personnel Office and Legal Staff must be contacted before any action or discussion takes place between a supervisor and an employee regarding a suspension.

A suspension is documented on the Employee Performance Appraisal at the end of the employee's appraisal year. The work habit area or responsibility of poor performance should reflect discipline occurred. This suspension should be documented in the "Disciplinary Action" section of the Employee Performance Appraisal. In addition, if the most severe step of the appraisal year is one or more suspensions, 17 is deducted in the "Disciplinary Score" section of the Employee Performance Appraisal.

Unfortunately, there are a few cases where an employee's conduct does not change even after suspension. Perhaps the employee came back from the suspension and stated they were willing to change the deviant conduct and desired to continue employment with the department. However, the unwanted behavior starts again. In this case, it may be necessary to take the fourth step of the discipline process known as termination.

## Agencies must have chosen one of two ways in which to conduct a suspension:

The law on suspensions has recently been expanded to include appeals in certain cases. Employees who work for agencies that did not have in place by August 1, 2001 a procedure that provided for a due process hearing are entitled to an appeal. Ala. Code 1975, §36-26-28 SUSPENSIONS provides:

1.    A suspension with a right to appeal.

An appointing authority, from time to time, may peremptorily suspend any employee without pay or other as punishment for improper behavior, but such suspension or total suspension by such appointing authority of such person shall not exceed thirty (30) days in any year of service. Such suspension with loss of pay may be affected by service upon the employee by the appointing authority of written charges setting out clearly the delinquency for which the suspension was made, a copy of which must be at the same time mailed or delivered to the director. The suspended employee does have the right to file with the Board and the appointing authority a written answer or explanation of such charges.

The suspended employee may within 10 days after notice pursuant to this section file a written notice of appeal from the suspension. If the suspended employee gives notice of appeal from the suspension, the appointing authority shall have the discretion of whether to stay the suspension pending the disposition of the appeal or proceed with the suspension and provide the employee with a post-suspension review subject to the time frames prescribed herein.

If a timely notice of appeal is filed, the appointing authority shall elect between one of the following methods of reviewing the claim. The appointing authority shall, within 10 days after receipt of the appeal, do one of the following:

a.    Appoint a panel as provided for in subsection (c) to decide questions of fact, conclusions of law, and make recommendations to the appointing authority.

b.    Appoint a designated hearing officer as provided for in subsection (d) who will decide questions of fact, conclusions of law and make recommendations to the appointing authority.

This subsection shall apply only to a department or agency of the state that has 25 or more employees for each working day during each of 20 or more calendar weeks in the current or preceding calendar year.

In instances where the appointing authority elects to appoint a panel, the panel shall consist of three individuals, two of whom shall be in the same or equivalent classification as the suspended employee.

The panel, by majority vote, may recommend to the appointing authority, after a hearing, either of the following:

(1)    That the charges are unwarranted and that the suspension be revoked.

(2)    That the charges are warranted and that the suspension be upheld.

In instances where an appointing authority elects to appoint a hearing officer, the hearing officer shall be selected from a jointly approved list of individuals agreed upon by the Alabama State Employees Association and the respective department or agency. This process shall be repeated annually.

Irrespective of which method the appointing authority selects for adjudicating suspension appeal hearing, all hearings shall be conducted in accordance with notions of due process. The burden of proof shall lie with the appointing authority to prove the charges forming the basis of the suspension.

Those departments or agencies currently having an existing process for suspension hearings may continue to use the existing process, provided that they observe tenets of due process including that the burden of proof shall lie with the appointing authority.

Further, this section shall not apply to any department which currently employs and continues to employ as a standard practice in such cases a pre-disciplinary hearing before an independent hearing officer who makes a recommendation for disciplinary action to the appointing authority based upon a  fair hearing of the matter.

Further, this section shall not apply to any department which currently employs and continues to employ as a standard practice in such cases an appeal hearing before an in-house hearing officer independent of the division or area in which the employee works. Said hearing officer shall be selected from an approved list of individuals who shall be jointly agreed upon by the Alabama State Employees Association and the respective department or agency. This process shall be repeated annually.

The employee may file for an appeal within 10 days after the notice may file an appeal. The appointing authority has the discretion to stay the suspension or proceed with the suspension and provide a post-suspension review. The appointing authority, within 10 days after receipt of the appeal must determine whether to appoint a hearing officer or a panel. The employee should receive due process concerning the hearing. The letters and meetings occurring up to and including the suspension hearing are applying the due process. Due process should involve a notice of intention of the appeal hearing and a meaningful opportunity for the employee to respond.

17

2.    A due process hearing prior to a suspension with no appeal rights.

In this situation, the employee is served with a letter detailing the charges. Prior to the decision of the suspension, the employee is entitled to advance written notice, a full due process hearing with witnesses and exhibits. Again, due process should involve a notice of intention of the appeal hearing and a meaningful opportunity for the employee to respond. The employee is to be told the length of the recommended suspension.

A letter is to be given to the employee that outlines the details of a pre-suspension hearing including the location, date, and time. The letter must include the facts regarding the employee's allowance to bring representation. It should be noticed that only the employee is allowed to speak in the hearing unless determined otherwise by the agency policy. In addition, the letter should inform the employee that a hearing would result in the employee being given the opportunity to answer the charges made against the past performance. Prior to the hearing, an employee is to be told about the option of signing a Waiver of Due Process Suspension Hearing. If the employee decides to sign the waiver, no hearing is held and the suspension is immediately enacted.

If the employee decides the option of a pre-suspension hearing, the hearing officer holds a hearing as stated in the letter. The hearing officer recommends whether to uphold or revoke the suspension recommendation, based on the facts. The appointing authority's decision to suspend or revoke the suspension is final in the agency. If revoked, the employee simply continues to work without disruption.

However, if the suspension is upheld, the employee is sent a letter of suspension including the duration of suspension and dates of suspension. The employee is to be informed to consider the criticality of the continued offenses and to decide if he or she would like to continue employment in state government. This decision is based upon whether the employee will change the undesirable behavior after returning from suspension. Mentioning this to an employee gives the employee the opportunity to know that continued performance problems may lead to termination.

### SAMPLE RECOMMENDATION LETTER FOR SUSPENSION FOR EMPLOYEE
*Italics indicate information from actual situation*

Date

Inside Address

Re:  Recommendation of suspension

Dear _____:

It has been recommended to me by your supervisor, _____, that you be suspended. The following information has been submitted.

*Give SPECIFIC information – for example:*

*You were asked to come in to your supervisor's office to discuss improper behavior with coworkers.  When you were seated and your supervisor began to talk about the problems, you yelled at him, used profanity, and proceeded to leave the office, slamming the door. Upon request of supervisor, you did not return to the supervisor's office.  Instead, you left the building and property*

If true, your actions constitute the following violations:

*Provide the rules they violated – for example:*

*1.  Insubordination in response to your supervisor in accordance with Agency Policy VI.*
*2.  Walking off the job in accordance with Agency Policy VII.*

*(If previous disciplinary history – add the following:)*

A review of your past disciplinary history indicates that you received the following disciplinary actions:

*1.      May 10, 1996 – Counseling –Printing and distributing jokes regarding gender*
*2.      September 17, 1996 – Warning – Inappropriate use of state equipment*
*3.      August 3, 1997 –Reprimand – Failure to Obey a Direct Order*

Sincerely,


LEGAL COUNSEL

## SAMPLE PRE-SUSPENSION HEARING LETTER
### *Italics indicate information from actual situation*

Date

Inside Address

Re:  Notice of Pre Suspension Hearing

Dear _____:

It has been recommended to me by your supervisor, _____, that you be suspended. The following information has been submitted.

*Give SPECIFIC information – for example:*

*You were asked to come in to your supervisor's office to discuss improper behavior with coworkers.  When you were seated and your supervisor began to talk about the problems, you yelled at him, used profanity, and proceeded to leave the office, slamming the door. Upon request of supervisor, you did not return to the supervisor's office.  Instead, you left the building and property*

If true, your actions constitute the following violations:

*Provide the rules they violated – for example:*

*1.  Insubordination in response to your supervisor in accordance with Agency Policy VI.*
*2.  Walking off the job in accordance with Agency Policy VII.*

*(If previous disciplinary history – add the following:)*

A review of your past disciplinary history indicates that you received the following disciplinary actions:

*3.     May 10, 1996 – Counseling –Printing and distributing jokes regarding gender*
*4.     September 17, 1996 – Warning – Inappropriate use of state equipment*
*5.     August 3, 1997 –Reprimand – Failure to Obey a Direct Order*

A pre-suspension hearing is scheduled for you on _____ at _____ a.m. in my Office.  This conference is an opportunity for you to tell "your side of the story."  If you desire, you may have a lawyer present, but only for observation purposes.  After listening to your response, I will inform you by letter of my decision.

Sincerely,

APPOINTING AUTHORITY

## WAIVER OF DUE PROCESS FOR PRE-SUSPENSION HEARING

I do hereby knowingly waive my constitutional rights to a due process suspension hearing and accept a _____ day suspension leave without pay.

This waiver is not made as a result of any coercion, duress, threat, or promise.  I have chosen this course of action on my own volition.

EMPLOYEE NAME PRINTED: _____

EMPLOYEE SIGNATURE: _____

DATE: _____

NOTARY: _____

Sworn to and subscribed before me this _____ day of, _____.

OR

WITNESS: _____

Date of signature: _____.

This waiver option expires *(enter date and time).*

## SAMPLE LETTER OF SUSPENSION DECISION
### *Italics indicate information from actual situation*

Date

Inside Address

Re:    Notice of Suspension

Dear:

On _____, you were hand delivered a notice of a pre-suspension hearing.  You were informed you that an opportunity would be provided at _____ on _____ to informally respond to the charges against you.  You appeared at this meeting and addressed the allegations contained in the _____ notice.

The charges upon which your suspension is based arise from incidents beginning on _____.  Specifically, the following is alleged:

*(List specific allegations)*

1.
2.
3.

These actions constitute the following violations:

*(List general violations – such as "insubordination", "walking off the job", etc.)*

1.
2.

Based upon the foregoing charges and after consideration of your responses at the pre-suspension hearing, you are hereby suspended *for 5 working days starting on Monday,* _____ *and ending Friday* _____.

It is regrettable that this action is necessary, but your actions cannot be condoned.


Sincerely,


APPOINTING AUTHORITY

## STEP FOUR: TERMINATION

The fourth and final step of the discipline system is called termination. This is also referred to as separation or dismissal. At this point all necessary documentation and procedural paperwork should be completed. The supervisor must contact the agency Personnel Office and Legal Staff prior to taking any action. The supervisor does not have the authority to fire an employee. A supervisor makes a recommendation to the appointing authority of the department. The appointing authority for the department is the only one with the authority to terminate an employee's employment. The appointing authority should consult with the personnel and Legal Staff regarding prior events and proper actions.

Proper procedure and documentation trail is of utmost importance if an employee is to be terminated. Again, due process should be afforded to any permanent Merit System employee. This right to due process under the Merit System means the permanent employee is given notice of the intention and is provided an opportunity to respond to the charges. The departmental Personnel Office and Legal Staff should handle the termination procedures.

Typically, a letter of recommendation for termination is forwarded to the appointing authority by the supervisor. The letter is to outline the offenses, actions taken with the employee in the past — counseling through disciplinary steps; the results of the suspension and continued non-performance. Similarly to the suspension process, a pre-dismissal conference letter is sent to the employee from the appointing authority outlining the information that was included in the letter from the supervisor. In addition, this letter to the employee should include the opportunity to bring representation, time, location, and date of the conference. The letter must also inform the employee of the opportunity to sign a Pre-Dismissal Conference Waiver thereby waiving the employee's right to the pre-dismissal conference.

The appointing authority or a designated individual by the appointing authority holds the pre-dismissal conference. The employee may bring representation to the pre-dismissal conference. However, only the employee may answer the charges listed against the performance in the letter from the appointing authority unless otherwise determined by departmental policy. The appointing authority will uphold or revoked the termination.

If the employee is terminated, a letter is written listing the date of termination, reasons for termination, and the opportunity for the employee to contact the State Personnel Department. An employee is given 10 days in which to contact the State Personnel Department in writing for an opportunity for an appeal hearing before the State Personnel Board. This is all part of the due process right of an employee. Sample letters are included in this section.

An appeal process will begin if the employee contacts the State Personnel Department regarding an appeal hearing. This request must be made in writing within 10 days of being dismissed from the agency. In the request, the employee must specifically answer each and every charge made against him or her. The employee must also include a current address, a telephone number where the employee can be reached, and, if possible, an email address and facsimile number. After submitting the request, the employee will have

a hearing before a hearing officer designated by State Personnel. This hearing is a full evidentiary hearing with attorneys, witnesses, evidence, and other formalities of hearings. The hearing officer will render a decision to recommend to uphold or revoked the decision of the agency.

This recommendation is given to the State Personnel Board in a report prior to the Board meeting in which the employee will be given the opportunity to appeal. A time and date is given to the employee for that hearing. The employee, with representation if desired, then appears before the Board. The agency attends with their appropriate representation. A limited hearing is held before the State Personnel Board members. From this hearing, the Board will either uphold termination or revoked the termination. The decision by the Board is final.

### SAMPLE RECOMMENDATION LETTER OF PRE-DISMISSAL CONFERENCE
#### *Italics indicate information from actual situation*

Date

Inside Address

Re:  Notice of Recommendation for Dismissal

Dear _____:

Pursuant to Rule 670-X-18-02 of the State Personnel Board Rules and Regulations, it has been recommended to me by your supervisor, _____, that you be dismissed from employment with the _____. The following information has been submitted.

*Give SPECIFIC information – for example:*

*On January 5, 2001, you reported that you were scheduled to report for jury duty for the week of January 8, 2001 for Elmore, County, Alabama.*

*On Monday, January 8, 2001, you called this Office, spoke with me, and stated that you were on jury duty.  You stated that you had to report for jury duty the following day.*

*On January 16, 2001, you brought in a statement signed by _____, Circuit Clerk of Elmore County, certifying that you served as a juror from January 8, 2001 to January 18, 2001.*

*_____ was contacted concerning this form and he stated that you received a juror service form for one day only, January 8, 2001 - not for January 8, 2001 to January 18, 2001 as you submitted.  Judge Reynolds dismissed you from jury service the morning of January 8, 2001.*

If true, your actions constitute the following violations:

Provide the rules they violated – for example:

1.  *Lying to your supervisor.*
2.  *Submitting false and fraudulent information.*
3.  *Falsification of records.*
4.   *Attempt to obtain leave under false pretenses.*

(*If previous disciplinary history – add the following:*)

A review of your past disciplinary history indicates that you received the following disciplinary actions:

5.  *June 10, 1999 – Suspension – 10 days. - Sleeping on the job.*
6.  *August 3, 1997 – Written Reprimand – Failure to Obey a Direct Order*

Therefore, you are being recommended for dismissal.

Sincerely,

LEGAL COUNSEL

## SAMPLE PRE-DISMISSAL CONFERENCE LETTER
### *Italics indicate information from actual situation*

Date

Inside Address
Re: Notice of Pre-Dismissal Conference

Dear _____:

Pursuant to Rule 670-X-18-02 of the State Personnel Board Rules and Regulations, it has been recommended to me by your supervisor, _____, that you be dismissed from employment with the _____. The following information has been submitted.

*Give SPECIFIC information – for example:*

*On January 5, 2001, you reported that you were scheduled to report for jury duty for the week of January 8, 2001 for Elmore, County, Alabama.*

*On Monday, January 8, 2001, you called this Office, spoke with me, and stated that you were on jury duty. You stated that you had to report for jury duty the following day.*

*On January 16, 2001, you brought in a statement signed by _____, Circuit Clerk of Elmore County, certifying that you served as a juror from January 8, 2001 to January 18, 2001.*

*_____ was contacted concerning this form and he stated that you received a juror service form for one day only, January 8, 2001 - not for January 8, 2001 to January 18, 2001 as you submitted. Judge Reynolds dismissed you from jury service the morning of January 8, 2001.*

If true, your actions constitute the following violations:

*Provide the rules they violated – for example:*
1. *Lying to your supervisor.*
2. *Submitting false and fraudulent information.*
3. *Falsification of records.*
4. *Attempt to obtain leave under false pretenses.*

*(If previous disciplinary history – add the following:)*
A review of your past disciplinary history indicates that you received the following disciplinary actions:
5. *June 10, 1999 – Suspension – 10 days. - Sleeping on the job.*
6. *August 3, 1997 – Written Reprimand – Failure to Obey a Direct Order*

I have scheduled a pre-dismissal conference for you on _____ at _____ a.m. in my Office. This conference is an opportunity for an employee to tell "your side of the story." If you desire, you may have a lawyer present, but only for observation purposes. This meeting will be tape-recorded. After listening to your response, I will inform you by letter of my decision.

Sincerely,

APPOINTING AUTHORITY

## SAMPLE TERMINATION LETTER
### *Italics indicate information from actual situation*

Date
Inside Address

Re:    Notice of Dismissal

Dear:

On _____, you were hand delivered a notice of a pre-dismissal conference regarding your employment with _____.    You were informed you that an opportunity would be provided at _____ on _____ to informally respond to the charges against you.  You appeared at this meeting and addressed the allegations contained in the _____ notice.

The charges upon which your dismissal is based arise from incidents beginning on _____.  Specifically, the following is alleged:

*(List specific allegations)*
*1.*
*2.*
*3.*
*4.*

These actions constitute the following violations:  *(List general violations – such as falsification of records", "under the influence of alcohol", etc.)*
*1.*
*2.*
*3.*

Based upon the foregoing charges and after consideration of your responses at the pre-dismissal conference, you are hereby dismissed from employment with the_____, effective at 5:00 p.m., _____.    Your dismissal is being ordered for the good of the service.

It is regrettable that this action is necessary, but your actions cannot be condoned.  If you think your dismissal is unwarranted, you may appeal the dismissal within ten days to the State Personnel Board and request a hearing before the Board.  Such written request should be forwarded to the State Personnel Department, 313 Folsom Administrative Building, Montgomery, Alabama, 36130.  In your request, you must specifically address each and every charge made against you.  You must also include a current address, a telephone number where you can be reached, and, if possible, an email address and a facsimile number.

Sincerely,


APPOINTING AUTHORITY

## WAIVER OF DUE PROCESS FOR PRE-DISMISSAL CONFERENCE

I do hereby knowingly waive my constitutional rights to a due process pre-dismissal conference. I know that by waiving this conference, I will be terminated from employment with _____.

This waiver is not made as a result of any coercion, duress, threat, or promise. I have chosen this course of action on my own volition.

EMPLOYEE NAME PRINTED: _____

EMPLOYEE NAME SIGNATURE: _____

DATE: _____

PRINT NOTARY:_____

Sworn to and subscribed before me this ____ day of _____.

Notary Signature: _____

**OR**

PRINT WITNESS: _____

Date of signature: _____.

Witness Signature: _____

This waiver expires _(enter date and time)._

### EFFECTIVE PRACTICES WITH DISCIPLINE

## PRACTICAL APPLICATION OF THE DISCIPLINE STEPS

The discipline process is to be utilized at management's judgment of the situation(s) or event(s) of the employee's undesirable behavior. This supervisory judgment is critical and must not be taken lightly since the supervisor must decide which step of discipline is appropriate. There are two areas that must be examined when using supervisory judgment in determining when to use discipline or what step of discipline to take. The two areas are as follows: 1) The work history of the employee and 2) the severity of the conduct or performance.

Discipline, especially the last two steps, is serious business. Management must make decisions on each employee situation. Yet, while looking at an individual situation, the supervisor must be consistent with past discipline taken with other employees

First, a supervisor examines the past work history of the employee. Have there been continual problems for five years non-stop? Or is this the first time in ten years the employee has ever been out of line? Has the employee worked for you twenty years with "Meets Standards" performance or is the employee eight weeks into probation and has already received a warning?

Second, the supervisor has to examine the severity or frequency of the offense or problem. For example, one employee is five minutes tardy. Another employee comes in drunk on alcohol or stoned on marijuana. Which one will you obviously deal with first? Which one will receive harsher discipline? The severity of the offense or the number (frequency) of occurrences of the infraction contribute to the decision if which step of discipline to take. It is management's judgment whether to progress from counseling and through the four steps, one-by-one, or move to a more severe step immediately.

Part of supervisory judgment is to determine the point in the employee's behavior at which to implement the discipline process. For example, an employee violates the punctuality policy and is tardy. Does the employee receive a step of discipline the first time a supervisor sees the employee walk in late? Or is discipline administered after four or five tardy situations? Is discipline administered if the tardiness is five minutes? Or does discipline start when tardiness is consistently twenty minutes after the start time?

It is up to supervisory judgment as to what determines the applications of discipline. One way to understand more about supervisory judgment is to discuss these type issues in a supervisory meeting. Usually there are no set numeric policies within agencies. Typically, agencies set generic rules that supervisors must make specific additions to agency procedures. Senior supervisors are another source of assistance. If a supervisor has been around for years and had proper management skills, she or he may be able to helpful with which action to administer. Another source of expertise is the agency Personnel Office. Discipline actions must be administered consistent with what has been done in the past.

For the most part, the steps of discipline are to be adhered to in order of progression. There may be occasions where repeating an earlier step is appropriate. For example, if it has been determined that there is a problem with an employee's tardiness, a counseling may be given. If the tardiness continues, the supervisor may determine that a warning is necessary. If the tardiness becomes greater and more frequent in occurrence and has not improved, the supervisor may chose to reprimand the employee. In this example, the tardiness continues and inappropriate attendance problems start occurring. A suspension may be warranted. However, it is not appropriate, in most circumstances, to give another written warning after the suspension if similar offenses continue.

However, the discipline application may change if, after the counseling, warning, reprimand, and suspension for attendance and punctuality problems, a verbal conflict with a coworker occurred. It may be that the supervisor determines that another reprimand is in order because the conflict with the coworker was dramatically different and apart from the problem with punctuality and/or attendance. At this point, on most occasions, future infractions would be looked at in a cumulative manner so as not to digress in the disciplinary steps. It is probable that suspension and eventually termination would occur if other tardiness, attendance, outbursts, or new infractions occur.

Most employee infractions in disciplinary terms are examined in an accumulative manner. Of course, this is considering the work history of the employee. A situation where a supervisor might consider starting over in the discipline process is if considerable time has passed since a particular problem needing discipline occurred. In addition, during this lapsed time, the employee's conduct has been fully competent. Consider the example used earlier. The employee had a problem with tardiness, attendance, and coworker conflict. A counseling, warning, reprimand, and suspension have taken place. The employee improves to comply with the departmental policy. Two years have gone by and no problem has occurred. Two performance appraisals have been given and indicate no problems in the performance of the employee. Then, the employee starts work habits problems again. The supervisor would be wise to begin with a warning again – certainly not start where the discipline left off two years ago and proceed with a termination.

Again discipline is not a science. Most infractions are not identical in nature from year to year or employee to employee. However, as a supervisor grows in their management skills and leadership judgment, so will their judgment in employee discipline.

## CORRECTIVE ACTION PLAN

A corrective action plan is recommended for the first three steps of the discipline process. A corrective action plan should be used with a warning, reprimand, and suspension. In fact, a corrective action plan is useful for any performance problem.

A corrective action plan consists of five areas. Each area needs to be communicated to the employee. This is best done through written means such as a memo or form. It may be communicated during the disciplinary session that is held in conjunction with the discipline process. Again, remember that discipline is to assist an employee in changing undesirable

behavior to desirable performance. A corrective action plan assists in this goal by providing an orderly, precise, and practical plan to overcome the weak area.

There are five areas included in a corrective action plan. The supervisor should:

1.    State the behavior or area of conduct that is deficient and needs to change. Be very specific in this explanation. It is helpful to include examples of actual situations when the conduct occurred. It helps an employee understand the importance of changing if a supervisor lets them know the consequences that make the conduct undesirable.

2.    State the desired behavior or conduct. Be specific as to what actions would be appropriate and provide the necessary change. This part may be as simple as writing the policy regarding the area or a complicated as explaining work operations or processes.

3.    Set a time frame that will be used to monitor the behavior to assure that the employee changes the conduct to proper behavior. This time frame should be long enough such that the area in question can be observed enough times to ensure the proper behavior are occurring. For example, a month – four work weeks – would be appropriate if punctuality is an issue.

4.    State any assistance that the supervisor or department will provide to the employee, if appropriate. For example, the employee may need training or additional resources such as equipment or supplies. If so, those should be outlined. There is no actual assistance on the part of the agency or supervisor if the problem is a Work Habit.

5.    Set a follow-up date and time to meet with the employee. This meeting should be at the end of the time frame that was set. For example, a supervisor set six weeks as the time frame in which to monitor a change in employee behavior. The supervisor should set a day and time for a meeting at the end of the six weeks to conduct a session with the employee. This session should be written into the corrective action plan. It gives the employee a point of closure to determine whether a change in conduct has occurred or not. It is important for this session to be conducted and not neglected even if the employee's behavior appears to have improved.

A corrective action plan will clarify to the employee the importance of the situation. A corrective action plan demonstrates that conduct is a critical part of performance. Again, a corrective action plan is appropriate at any time an employee's performance is not up to standards, policies, or procedures.

## DOCUMENTATION OF DISCIPLINE

Documentation is extremely important in today's litigious environment. In fact, "If it is not written down, a situation did not happen" is a phrase frequently used to emphasize the

importance. If documentation of a negative light regarding the employee's performance is included in the agency's Personnel Office file. This is not just proper management but also a state law.

The term "file" is usually perceived differently depending upon the employee, supervisor, or agency. Therefore, it is important to know the work "file" has specific meanings as referred to while reading the Progressive Discipline Manual. The supervisory file is the first "file" that has more detailed notes contained in it regarding employee's performance. Documentation may include the daily and weekly notes of performance of responsibilities whether the information demonstrates weak performance areas, excellent performance, or fully competent performance. Coaching and counseling is kept in the supervisory files. For example, a supervisor may keep up with dates and times of punctuality for an employee. Of course, this type documentation would only be in the supervisory file. Many supervisors use a calendar to document performance, some use a notebook or file, a few maintains documentation on electronic files. Regardless of the method, all supervisory file should be secured and confidential.

The next level of "files" as paperwork goes up the chain of command or agency is the division, branch, unit, county or regional office file. Agencies are all divided into sub groups based on location around the state or the discipline/career field in which one works. In large agencies, these decisions (i.e. regional sections of the state based on geographical location) may have units within the division. It is up to departmental procedure for the division of departments and where files are mandatory to be maintained. The next level of "files" is usually the agency Personnel Office field. This one is referred to as the official departmental file. Lastly, but foremost, is the employee file that is maintained at the State Personnel Department.

By law, a copy of any documentation or information that is provided to the unit, division, branch, county and, certainly, agency files must be given to the employee within ten days of putting it in the formal file(s).

Having defined the term "files, this section of the manual refers to the documentation by the supervisor during the year. This information contains helpful hints. It does not refer to documentation written on the Employee Performance Appraisal Form. Please refer to the "Steps of the Discipline Process" for information on the Employee Performance Appraisal and deductions. Additionally refer to the State of Alabama Performance Appraisal Manual for documentation associated with form and supervisory file documentation.

Any memos or letters written in the administration of discipline is also considered documentation and should adhere to good documentation techniques. The original of such memos or letters should be given to the employee. The supervisor should maintain a copy in the informal supervisory files. However, formal notices of personnel actions must also be sent to the agency Personnel Office according to departmental procedures.

The supervisor should document specific incidences of improper conduct as it is observed or investigated. Specifically, the behavior should be documented as it is occurs. Daily and weekly informal documentation is usually the backbone of whether an agency will proceed with a severe step of discipline. A paper trail must clearly show the improper conduct or

continual failure to perform duties properly. In addition, notes need to consist of actions, conversations, and employee responses during the disciplinary session for a warning, reprimand, and/or suspension. This type of documentation is typically referred to as supervisory documentation and maintained in informal supervisory files.

Good documentation techniques can be summed up in the first three letters of the alphabet. This is referred to as the "A, B, C's of Documentation." "A" stands for "accurate." "B" stands for "behavioral." "C" stands for "consistent."

Documentation should be accurate. A supervisor should never back date or falsify notes. The supervisor should document the truth. Documentation should be behavioral. It should contain actual examples of conduct, behavior, or performance. It should not include references to personality or ambiguous labels such as "slow service," "poor attitude," or "bad employee." It should include specific examples of behavior and actions of the inappropriate performance. For example, the documentation for "poor attitude" should read "the employee screamed at the supervisor, left the office, and slammed the door while the supervisor was still talking." In addition, documentation should be consistent. It should include documentation on all employees throughout the year.

There are many types of documentation. The most recognized forms of documentation are diary keeping, summary, and critical incident. The method called "critical incident" is the best suited for discipline and performance problems. A supervisor documents performance leading to the counseling, warning, reprimand, suspension. A supervisor documents what occurs in the meetings with the employee associated with the personnel actions mentioned above. Documentation should include corrective action plans, follow-up on performance and/or continued employee actions as incidents occur. Note that the critical incident method is also used to record examples of good performance.

## PROPER DISCIPLINE TECHNIQUES

There are certain characteristics that add to the success of disciplinary actions. These characteristics add to the employee's return to proper performance. Proper discipline is initiated in a timely manner. This means disciplinary action takes place as the unwanted action is identified or when there is a pattern of inappropriate conduct. The only time discipline would not take place immediately is when an investigation is being conducted. Otherwise, the intervention is immediate. Likewise, the consequence should be immediate. After the unwanted behavior has been brought to the attention of the employee, the consequence of such unwanted conduct should be specified. Again, the only time this may differ is when an investigation is pending.

Discipline should be non-discriminatory. It should be based on nothing more than the infraction. It should not be based on race, sex, personality, associations, age, etc. The discipline should be individualized based on the work history of the employee and the length of employment. For example, there may be a twenty-year employee that demonstrates tardiness for the first time in their work history. Then, there may be a probationary employee employed with the state for the first time. The tardiness of this employee has increased consistently during the first three months. A supervisor may

determine to take action with both employees. However, the supervisor may mention the problem earlier to the probationary employee. The supervisor may decide to administer different steps of the discipline process. At the same time keep in mind that discipline is consistently applied.

Another characteristic of proper discipline concerns feedback to the employee. Feedback should be specific and accurate. Supervisory actions and employee responses should be documented. Disciplinary actions should be documented on the appraisal form as well.

**TERMINATION GUIDELINES**

## IMMEDIATE TERMINATION

As mentioned, the discipline steps are followed in sequence for most cases. On occasion it may be deemed necessary to skip lower steps such as warning and/or reprimand to proceed to suspension. However rare, there are situations that condone immediate termination.

Examples of conduct that may warrant immediate separation include, but are not limited to, safety violations of a serious nature, fighting, insubordination, abusive language, drugs, falsification of records, possessing weapons, sleeping on job, job abandonment, walking off the job, theft, and other serious violations. This list is not exhaustive. In addition, a supervisor needs to contact the Personnel Office and legal representatives of their department before taking actions associated with termination. Each situation needs to be looked at in context and in relation to the consequence of the violation. For example, a safety violation is listed as a possible reason for termination. Safety violations may vary in danger, consequence, and result. One of slight consequence may result in a lower step of the discipline process being taken. Another safety violation of a critical nature and costly consequence may result in immediate termination. The supervisor should carefully document all events and actions surrounding or leading up to the disciplinary action so personnel and legal experts can assess the situation appropriately. Even in the case where the termination is appropriate on a first offense, the employee is entitled to due process.

## HOW TO TERMINATE EMPLOYEES AND AVOID LIABILITY

### Preventive Measures to Avoid Wrongful Discharge Claims

The termination of an employee can be a traumatic experience for the employee, and at the same time it is one of the most difficult and sensitive tasks that an employer has to perform. Every employer's decision to dismiss an employee represents a potential lawsuit under a variety of causes of action.

The decision to discharge an employee should be carefully planned to avoid potential liability. The amount of planning going into the termination decision is made much less necessary in a situation where the employee has committed crimes (i.e., theft, forgery, assault, etc.) or a serious infraction of an employer's work rules or policies. However, in most dismissal situations, the basis for the termination is much less clear cut. To avoid potential lawsuits, employers should establish a "paper trail" documenting the circumstances leading to the decision to terminate an employee.

Any disciplinary action that deprives an employee of the property rights in their job will require a due process hearing.

The following is a list of preventative measures an employer can take to avoid wrongful discharge claims. Each of these measures should be reviewed and compared to your present workplace policies. Following these guidelines could help avoid potential claims.

A.  Review the department rules and regulations. Familiarity with the representations of the regulations is crucial in the event that the regulations are used against the company in litigation.

B.  When asked for information regarding a former employee, consider giving neutral information, unless there may be a legal duty to disclose information about an employee's potential risk of harm to others. Generally, it should suffice to provide the first and last dates of employment, job title, and level of compensation. If a reference is given provide facts, not opinions. Let the recipient of the reference make his own conclusions.

C.  Make and file written notations about any telephone inquiries regarding an employee.

D.  Never disclose to anyone the fact that an employee has filed a discrimination charge against the company.

E.  Keep in mind that a common law tort cause of action can be brought against individual managers and supervisors as well as their employer.

F.  Discussions of employees among management should be among those with a need to know. Further, information that is personal to employees should be kept confidential and employers should permit only limited access to employee information. Further, employees are encouraged to adopt a privacy policy with respect to employee information.

G.  Medical information related to employees should be maintained in a file separate and apart from employee personnel files. Additionally, results from any type of testing program should be maintained separately as well.

H.  Review the method of disciplining and discharging an employee. Are the company's methods effective?

I.  In reviewing terminations, look for factors which might cause an employee or a jury to conclude that the employee was discharged in retaliation for satisfying a legal obligation, or for opposing or refusing to assist in unlawful activities of the employer.

When employers discipline employees, they should document carefully what rule or rules have been violated, the date of the violation, and the time and/or circumstances surrounding this rule violation. Employers should also indicate in their documentation any discussions held with employees, the explanation to the employees that this infraction of rules is a violation of department policy, and that continuation of this infraction will result in more severe penalties, up to and including termination.

If an employee fails to perform his or her job adequately, the employer needs to document this information through the use of periodic performance evaluations. Failure to document (create a "paper trail" of) the substandard performance of an employee may create unnecessary problems for the employer should the employee later claim that the reason for the termination was actually pretextual (i.e., another reason, possibly a discriminatory reason, was the actual reason for the termination).

In evaluating the proposed termination, the interviewer should follow a checklist of some sort to make sure that all pertinent issues are considered. Among the issues that should be on the checklist are the following:

1.    What is the employee's seniority?

2.    Is the termination consistent with the employee's performance appraisals?

3.    Are there any statutory problems? That is, do any of the circumstances suggest actual or apparent problems under the fair employment statutes or other employment statutes?

4.    Has the supervisor complied with relevant portions of the personnel policies and procedures?

5.    Is the proposed termination consistent with the department's actions in similar circumstances in the past?

6.    Was the employee aware of the performance standards, work rules, or other standards for which he or she is to be terminated?

7.    Has the employee been provided progressive discipline?

8.    Are there mitigating circumstances which suggest that less drastic action is appropriate?

9.    Does the punishment fit the crime?

## **The Standard**

Under all of the circumstances, does this case present a fair and honest reason, regulated by good faith, for termination?

The most common motivation for a wrongful discharge claim is an inappropriately handled notice of termination. This can be a notice of termination that is poorly timed, poorly stated, and/or too publicly handled. If properly handled, a discharged employee should not feel that he or she has been humiliated, lied to, or provoked. Not taking the proper steps in conducting a termination interview can result in a discharged employee who has a "grudge" against his or her employer. Steps employers should take when conducting a termination interview are discussed in the next section.

## Conducting the Termination Interview

1.  **In Person.**

    All termination recommendations should be announced to the employee personally. Letter or memorandum should not be the first encounter communicating the message. If possible, even agency termination letters should be delivered in person.

2.  **Who, When, and Where.**

    Issues such as who should tell the employee, when the conversation should take place, and where the conversation should take place should be decided on a case-by-case basis. In general, the employer should decide these issues with an eye to minimizing the employee's discomfort, including embarrassment, and maximizing the chances that the employee will have an opportunity to quickly regain his or her composure and begin taking steps to find employment elsewhere.

3.  **Tell the Employee the Reason.**

    Tell the employee the reason he or she is being terminated. Although there is no statute in most states requiring such a statement, the jury may well believe that decency and compassion require, at the minimum, that the employer tell the employee why he or she is being terminated.

4.  **Tell the Truth.**

    The employer should be candid about the reason for termination. This will be more difficult in some cases than in others. Where the reason for the termination reveals misgivings about the employee's honesty, intelligence, or some other fundamental facet of his or her makeup, supervisors will feel a natural reluctance to say things, which reveal those misgivings. Employers nonetheless should be as direct as possible, because at trial they will need to prove the full business reason for the termination.

5.  **Avoid Excessive Detail.**

    On the other hand, employers should avoid being overly specific or detailed in explaining the reason for termination. In the uncomfortable setting of a termination interview, the supervisor may well get his or her facts wrong. Accordingly, it is best to present the reason in as general a way as possible.

6.  **Answer Questions.**

    Supervisors should be prepared to answer reasonable questions and to spend a reasonable amount of time in discussion with the employee following announcement of the termination.

7.  **Be Compassionate, Yet Firm.**

    The supervisor's demeanor during the termination interview should be humane, but firm. While the supervisor should be mindful of the disheartening effect the news will have on the employee, he or she should not be apologetic. However unfortunate the decision is for the employee, and however difficult it was for the employer to make up its mind, the employer has made a legitimate business decision. Statements of apology may well be perceived later to reflect a sense of guilt or uncertainty which, in turn, may be interpreted as recognizing some sort of wrongdoing.

# FEDERAL LAW

DEFENDANT'S
EXHIBIT
6



# ALABAMA
# PUBLIC LIBRARY
# SERVICE

# Employee
# Handbook

EXHIBIT
F
Blumberg No. 5118

# NOTICE TO EMPLOYEES

# OF THE

# ALABAMA PUBLIC LIBRARY SERVICE

The Alabama Public Library Service Employee Handbook is not a contract of employment between the agency and its employees. All persons employed by the Alabama Public Library Service are hired, evaluated, promoted and/or discharged in accordance with the rules and laws governing employment with the State of Alabama and its agencies.

The policies set forth in this Employee Handbook may be altered, modified or rescinded and new policies may be issued by the APLS Director at any time. If there is any conflict between the policies in this Handbook and the Administrative Rules of the State Personnel Department or the laws governing employment with the State of Alabama, the Administrative Rules and employment laws shall prevail.

Questions concerning the policies, rules or laws applicable to employment with the Alabama Public Library Service should be directed to the Personnel Division of the agency.

This handbook has been prepared to provide you with a written summary of the personnel policies, rules and standards of conduct which govern your employment with the Alabama Public Library Service. Read this handbook carefully and keep it as a reference. If you have questions about the content of this handbook, seek clarification from your immediate supervisor, division director or the Personnel Office.

This handbook summarizes most of the important information regarding employment with the Alabama Public Library Service, but it is not all-inclusive.

**APLS reserves the right to change policies and rules at any time.**

Table of Contents

| | |
|---|---|
| History | 5 |
| Directors of the Agency | 5 |
| Agency Mission | 5 |
| Agency Objectives | 6 |
| Agency Overview | 6 |
| Equal Opportunity Statement | 7 |
| State Merit System | 7 |
| Employee Work Rules | 8 |
| Americans With Disabilities Act (ADA) | 9 |
| APLS Professional Conduct Policy And Prohibition Against Harassment | 9 |
| Harassment Policy Form Receipt | 11 |
| Illegal Substances | 12 |
| General Liability Litigation | 12 |
| Ethics | 12 |
| Smoking Policy | 12 |
| Probationary Period | 13 |
| Promotion | 13 |
| Services Provided for Employees | 13 |
| Political Activities | 15 |
| Performance Appraisal | 15 |
| Compensation | 16 |
| Annual Leave | 16 |
| Personal Leave Day | 16 |
| Sick Leave | 17 |
| Donated Leave | 17 |
| Bereavement Leave | 18 |
| Military Leave | 19 |
| Leave Without Pay | 19 |
| Family and Medical Leave Act of 1993 (FMLA) | 20 |
| Court Attendance | 20 |
| Voting and Working At Voting Polls | 21 |
| On The Job Injury | 21 |
| Overtime/Compensatory Time | 21 |
| Attendance | 22 |
| Flexible Working Hours | 22 |
| Lunch/Breaks | 22 |
| Retirement | 23 |
| Employee Discipline | 23 |
| Travel | 24 |
| Travel Allowances | 24 |
| State Vehicles | 24 |
| Outside Employment | 25 |

Weather                                            25
Building Operations And Security                   26
Electronic Equipment                               26
Security                                           26
Tours                                              26
Telephones                                         27
Mail                                               27
Dress Code                                         28
Conference Rooms                                   28
Registration and Circulation Security              29
Computer Security                                  29
Handbook Receipt and Acknowledgement               31
APLS Accessibility Plan                            32
Travel Forms                                       39

## HISTORY

The Alabama Public Library Service (APLS), the State Library Agency, was created from the Library Division of the Department of Archives and History by Act 600 of the State Legislative in 1959. As the State Library Agency it is empowered by statute (Section 41-8-1 ET SEQ, **Code of Alabama 1975**) to carry out its responsibilities. The Library Division of the Department of Archives and History was authorized in 1939 by Legislative Act No 171. At that time, the library was located on the third floor of the Archives Building. In 1949, the library moved to 403 Jefferson Street and then again in 1951 to 4 North Union Street. When the State Administrative Building in the Capitol Complex was completed in 1957, the library moved there. This was the last move until 1976 when APLS moved to its current quarters on Monticello Drive. The Blind and Physically Handicapped Division moved to the agency in 1978.

## DIRECTORS OF THE AGENCY

Rebecca S. Mitchell – 2002 to Present
Lamar Veatch, 1999-2001
Patricia L. Harris, 1992-1998
Alice G. Stephens, 1991—Interim Director
Blane K. Dessy, 1986-1991
Fred Neighbors, 1986—Interim Director
Anthony W. Miele, 1975-1986
Elizabeth Parks Beamguard, 1960-1975
Emily Wheelock Reed, 1957-1960
Gretchen Schenk, 1957—Interim Director
Evelyn Day Mullen, 1954-1957
Gretchen Schenk, 1954—Interim Director
Lois Rainer Green, 1939-1954

## AGENCY MISSION

The mission of the Alabama Public Library Service, as the State Library Agency, is to support an educated citizenry through equal access to excellent educational, recreational, and cultural information sources.

## AGENCY OBJECTIVES

The objectives of the Alabama Public Library Service are:
- To provide library services to the citizens of Alabama directly or through local libraries.
- To provide library services for those with special needs through the Regional Library for the Blind and Physically Handicapped.
- To assist in the improvement and/or expansion of all public libraries.
- To provide library services to the Alabama State employees to meet their work related information needs.
- To assist in establishing cooperative library services and networks.
- To provide continuing education opportunities for librarians.

## AGENCY OVERVIEW

The Alabama Public Library Service (APLS) is responsible for receiving and administering state funds as provided by the State Legislature, and federal funds as provided by the Library Services and Technology Act (LSTA). These funds are used to provide the best possible library service to the citizens of Alabama.

APLS is comprised of several divisions that provide direct library services to the citizens of Alabama and/or through local libraries. Listed below are the various service divisions and a brief summary of their functions.

A. Office of the Director:  Provides for the administration of the agency, Executive Board, public information, publications and the State Advisory Council on Libraries.

B. Administrative Services:  Provides for fiscal management of all funds received and disbursed; personnel administration; purchasing; building and grounds; agency owned vehicles; and audits.

C. Evaluation and Research:  Provides for the publication of specialized newsletters, reports, and research of importance to APLS and librarians.

D. Networking, Development, and Planning:  Provides for consultative assistance to public libraries and public library trustees; children and young adult services; continuing education; networking; technology assistance including the Internet and telecommunication issues; and statewide planning for library services.

E. Information Services:  Provides reference services to the public either directly at APLS or indirectly through local libraries; provides interlibrary loan services to libraries; database searches; and video services.

F. Technical Services:  Provides for the acquisition and cataloging of all library materials at APLS; serials management; government documents information; provides cataloging assistance and instruction to local libraries.

G. Automated Services: Provides for the management of all automated systems at the Alabama Public Library Service and technology training.

H. Regional Library for the Blind and Physically Handicapped:  Provides specialized library materials for those with disabilities in reading standard print format.

APLS is governed by a seven-member Executive Board appointed by the governor. Board members are appointed for a five-year term. Each member is appointed to represent one of the Congressional districts. Board members must reside in the district he/she is appointed to represent.

## EQUAL OPPORTUNITY STATEMENT

The Alabama Public Library Service is committed to provide equal employment opportunities for all qualified persons without regard to race, color, national origin, religion, sex, physical handicap, age, or status as a disabled veteran, or veteran.

## STATE MERIT SYSTEM

The law that set up the merit system was enacted in 1939 and now appears in Section 36-26-1, **Code of Alabama 1975**. The purpose of the merit system as stated in the law is as follows: "...to assure to all citizens of demonstrated capacity, ability, and training an equal opportunity to compete for service with the state of Alabama; to establish conditions in the state service which will attract officers and employees of character and capacity and to increase the efficiency of the governmental departments and agencies by the improvement of methods of personnel administration."

As a merit system employee you are protected against job discrimination and unfair dismissal. You are also protected against demands that have nothing to do with how well you do your job, such as:

- You cannot be forced to pay any political contribution or assessment.
- You cannot be made to vote "as you are told".
- You cannot be replaced by someone who happens to have more "pull".
- You CAN be fired for cause. See the information on the next page.

EMPLOYEE WORK RULES

The following information is from the Alabama State Personnel Board, Alabama State
Personnel Department.

General Work Rules. In addition to any special rules issued by the APLS Executive Board or the
APLS director for the guidance of its employees, the following standard general work rules shall
apply to all classified employees:

Violations that normally result in disciplinary actions of increasing severity:

1. Violations of safety rules.
2. Absenteeism - Unexcused absence, unreported absence, a pattern of absences, or
   excessive absences.
3. Tardiness -- Not on the job ready to work at the beginning of the shift.
4. Inattention to job - Doing anything distracting while on the job.
5. Failure to perform job properly.
6. Leaving job station without permission.
7. Disruptive conduct of any sort.
8. Abuse of equipment.
9. Unauthorized operation of vehicles, machinery, or equipment.
10. Participation in unauthorized activity or solicitations on work premises.
11. Poor housekeeping.
12. Unauthorized use of telephones.
13. Unauthorized use of bulletin boards.
14. Violation of specific department rules.

More serious violations that may result in suspension or discharge on the first offense,
considering work record and length of service:

1. Violations of safety rules which endanger life or property.
2. Insubordination - Failure to follow an order; disobedience; failure to submit to
   authority as shown by demeanor or words, with the one exception of not following
   an order which the employee has good reason to believe is unsafe or illegal.
3. Theft or unauthorized possession of company property.
4. Fighting.
5. Use of abusive or threatening language.
6. Falsification of records - Application for Employment, time card, doctor's excuse,
   etc.
7. Possession or use of alcohol, narcotics, or dangerous weapons.
8. Sleeping on the job.
9. Leaving before the end of the shift/walking off the job.
10. Serious violation of any other department rule.
11. Job abandonment which consists of three days of unexcused, unreported absence.

Amended 5/23/85
Effective 6/27/85

The listing of violations above is not meant to be all inclusive and does not imply that discipline may not be imposed for other sufficient reasons. (Statutory Authority: Section 36-26-9, **Code of Alabama 1975**.)

## AMERICANS WITH DISABILITIES ACT (ADA)

It is APLS policy that no qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any employment, program, benefit, service, or activity conducted by the Agency. This policy applies to all permanent and temporary full-time and part-time employees, all patrons, and all applicants for positions of employment with APLS. APLS has developed a comprehensive ADA policy and will furnish each new employee with a copy.

A copy of the APLS ADA policy is located in the back of this booklet.

## APLS PROFESSIONAL CONDUCT POLICY
## AND PROHIBITION AGAINST HARASSMENT

APLS is proud of its professional and congenial work environment, and will take all necessary steps to ensure that the work environment remains pleasant for all who work here. All employees must treat each other with courtesy, consideration and professionalism. This agency will not tolerate harassment of any employee by any other employee or supervisor for any reason. In addition, harassment for any discriminatory reason, such as race, sex, national origin, disability, sexual orientation, age, or religion, is prohibited by law, which may subject the agency and/or the individual harasser to liability for any such unlawful conduct. With this policy, this agency prohibits not only unlawful harassment, but also other unprofessional and discourteous actions. Accordingly, derogatory racial, ethnic, religious, age, sexual orientation, sexual or other inappropriate remarks, slurs, or jokes will not be tolerated.

   Sexual harassment includes unwelcome sexual advances, requests for sexual favors, or any other visual, verbal, or physical conduct of a sexual nature when:

1.   Submission to the conduct is made either implicitly or explicitly a condition of the individual's employment;

2.   Submission to or rejection of the conduct is used as the basis for an employment decision affecting the harassed employee; or

3.   The harassment has the purpose or effect of unreasonably interfering with the employee's work performance or creating an environment that is intimidating, hostile or offensive to the employee.

Each employee must exercise his or her own good judgement to avoid engaging in conduct that may be perceived by others as harassment. Forms of harassment include, but are not limited to:

1.  Verbal: repeated sexual innuendoes, racial or sexual epithets, derogatory slurs, off-color jokes, propositions, threats or suggestive or insulting sounds;

2.  Visual/Non-verbal: derogatory posters, cartoons, or drawings; suggestive objects or pictures; graphic commentaries; leering; or obscene gestures;

3.  Physical: unwanted physical contact including touching, interference with an individual's normal work movement, or assault; and

4.  Other: making or threatening reprisals as a result of a negative response to harassment.

Any employee who believes that he/she is being subjected to objectionable conduct must report it immediately to the Personnel Officer. If the Personnel Officer is the alleged harasser, the conduct should be reported to the Director. If the Director is the alleged harasser, the conduct should be reported to the APLS Executive Board. It is the intent of this provision to specifically designate the appropriate person for complaints and to further ensure that the employee has another avenue of reporting misconduct if the designated individual is the alleged harasser.

Do not allow an inappropriate situation to continue by not reporting it, regardless of who is creating that situation. No employee in this agency is exempt from this policy. In response to every complaint, the agency will take prompt investigatory actions, and corrective and preventative actions where necessary. Employees who bring complaints to the attention of the agency and/or participate in investigations regarding such complaints will not be retaliated against in any way.

An employee who engages in objectionable conduct is subject to discipline up to and including termination.

## ILLEGAL SUBSTANCES

The provisions of the Drug-Free Workplace Act of 1988 apply to APLS because the Agency receives Federal funds. The Act makes it illegal for employees to distribute, dispense, possess, or use a controlled substance in any Agency workplace or vehicle. Each employee is pledged to avoid the prohibited activities enumerated in the Act and to notify the Department within five days of any criminal drug statute conviction for a violation occurring in the APLS facilities or vehicles. Violations will result in appropriate personnel action. Drug counseling, substance abuse assistance, and rehabilitation is available through the APLS Employee Assistance Program (EAP). The EAP is a highly confidential program where employees can seek assistance for any personal problem.

## GENERAL LIABILITY LITIGATION

Lawsuits naming state employees as defendants for actions in the line and scope of their employment must be reported immediately to the Division of Risk Management and the Attorney General's office. Failure to report lawsuits may result in denial of coverage for the state employee. Employees should report this information to their supervisor who will then forward the information to the Agency Director and Personnel Manager and send it to the proper authorities.

## ETHICS

The standards of ethics for APLS employees are cited in both Federal and State statutes. Generally, both agree that using, or the appearance of using, an employee's position to derive personal financial gain for the employee or the employee's family is forbidden.

The penalty for infractions include statutory consequences as well as disciplinary action up to and including termination of employment.

## SMOKING POLICY

The APLS facility is a totally smoke-free building. Smoking is prohibited by staff, patrons, and guests. This smoking ban extends to all vehicles operated by the Agency. Any employee wishing to smoke may do so outside the building during break times and lunch. Smokers may not stand in the front doorways upstairs or downstairs in BPH, as the smoke enters the building when the doors open for patrons. Smokers may stand outside the entrances but away from the doors. Smokers on break may also use the designated outside smoking areas – patio outside the breakroom or the covered area outside the main conference room.

## PROBATIONARY PERIOD

If you are appointed to a position from a promotional or open-competitive register, you must serve a probationary period of not less than six (6) months. During the probationary period you must reach a satisfactory level of performance on both your work habits and responsibilities/results as shown on your performance appraisal. Once you have successfully completed this period, your appointment will become permanent.

## PROMOTION

Opportunities exist for qualified employees to be promoted both within the Agency and statewide. Promotions are made under the merit system guidelines. For promotional consideration, your name must be on the register of eligible individuals at the State Personnel Department. There is a separate register for each job classification. Announcements of exams will be posted on the bulletin boards in the staff lounges and above the copy machine near the Reference Department.

## SERVICES PROVIDED FOR EMPLOYEES

APLS maintains a collection of books, videos and documents for the use of libraries in the state and for state employees. The collection is primarily non-fiction and is used to supply public libraries and other libraries with material they need to fill their patrons requests. State employees are encouraged to use the library for their job-related needs.

The Information Services staff can show you how to use the online catalog to find the items you need and to help you use the reference collection. Each employee is encouraged to fill out an application for a library card. Please check out the books that you want so that we will know where the books are in case a library or someone else needs the items.

Staff may borrow books located in the stack area. Books are checked out for three weeks. If you need to renew the books, just contact the front desk and renew them as soon as you get the first overdue. Books you need for your work may be checked out for a year. Always renew them when you get the first overdue.

Staff must have the approval of the head of Information Services to borrow reference books. Books in the Alabamiana Room do not circulate as a rule because one of our responsibilities is to identify and maintain copies of books by Alabama authors. There are usually duplicate copies of Alabamiana in the stacks.

Popular books may be reserved at the front desk or by placing a slip in a book that you see in Technical Processing. Reserves go to libraries first and then to state employees and staff in the order in which the reserves are placed.

At least once a year, you will receive a copy of all of the books you have charged on your card. Please look at it and check to see that the books you have returned have been checked in. From time to time there will be discrepancies and the sooner they can be resolved the easier it will be for all concerned.

The APLS video collection contains videos for all ages that are suitable for using in library, club, and school programming. Videos may be booked in the Video Department. See the video staff or reference staff if you have trouble using the Video Catalog.

Books and videos are state property, and you are responsible for all of the material charged on your card so be careful about checking out materials for friends and family.

If you retire or leave APLS for another job in another agency or out of state government, a list will be run of materials checked out to you. You will be charged for all items that you do not return. If you do not return the material or pay for it, the amount will be deducted from your last paycheck.

Professional journals and other periodicals are housed in the Periodical Room adjacent to the Reference Room. More popular magazines and newspapers are shelved in the lobby. If you want to have a periodical routed to you, ask the Serials staff to add you to the list. These periodicals should not be kept longer than three days. If you find that you will not have time to read a particular item, pass it to the next person and make a note to return it to you after everyone has seen it. If you want to read items shelved in the Lobby or the Periodical Room, please fill out the slips that are on the ends of the shelves in the Periodical Room or ask the Circulation staff at the front desk for a slip. Staff needs to be able to locate these items when they are needed to fill requests.

**Alabama Virtual Library** is a joint project of APLS, Network of Alabama Academic Libraries, State Department of Education, Alabama Supercomputer Authority, and the Alabama Department of Post Secondary Education. The AVL is funded by the Alabama State Legislature. This Internet site contains numerous databases suitable for all ages. It is especially useful for school assignments. There are numerous full text databases available for use by all citizens of the state. Ask the front desk staff for an AVL card. Reference staff will show you how to use the AVL.

**APLS WEB Page** at http://www.apls.state.al.us has links to information about each department at APLS, email addresses of all the staff, library news from around the state, and helpful links to many useful internet sites.

## POLITICAL ACTIVITIES

APLS employees are somewhat restricted in their political activities by the merit system and by state laws. (Statutory Authority: Section 36-26-38, **Code of Alabama 1975**.)

State merit system law prohibits the use of influence by any person to secure or attempt to secure an appointment within the merit system based on their political support of any candidate.

State law provides that "No person in the employment of the State of Alabama shall use state funds, property, or time for any political activities." While the Alabama Equality of Citizenship Act of 1983 permits state employees to participate in essentially the full gamut of political activities, the law is very clear that this must be done on the individual's own time (approved leave, before and after work, holidays, etc.).

## PERFORMANCE APPRAISAL

All employees who are appointed from a promotional or open-competitive register will have their performance evaluated in accordance with the performance appraisal system established by the State Personnel Department. During an employee's probationary period, two performance appraisals are conducted; one for the first three months and one for the second three months.

The performance appraisal system is designed to help employees grow personally and professionally and to provide supervisors with a method of objective evaluation of actual job performance. The supervisor should base an employee's evaluation on objective ratings of assigned responsibilities/results as spelled out in the Pre-Appraisal form. Moreover, ratings should be based on a comparison of the employee's performance of the requirements of the position rather than a comparison of the performance of other employees. If the employee does not agree with the evaluation, the following procedure should be followed. The employee should first discuss the evaluation with the immediate supervisor. If the matter is not resolved at this level then the employee should talk to the Division Manager. If not resolved there, the employee should talk to the Personnel Officer. If the matter is still not resolved, the employee should speak with the Director. The employee should put in writing the specific items on the evaluation form with which he/she disagrees. A copy of the written disagreement will be filed with the employee's evaluation form. Since the employee's signature on the evaluation form does not mean agreement, only that the evaluation has been read and understood, the employee must sign it.

Performance appraisals are used for a variety of personnel actions including promotions and salary increases. They are also a factor in ranking employees for layoffs if a reduction in the workforce becomes necessary.

## COMPENSATION

The amount of your pay is based upon the salary scale for your classification of work as identified in the state merit system pay plan. Each classification has a minimum and maximum salary range with intermediate steps. New employees normally begin service at the minimum salary for their classification. Salary increases are based upon the employee's length of service, performance appraisal ratings, and the availability of funds.

Merit system employees have 26 paydays per year; they are paid every other Friday. You may have your paycheck delivered to your worksite or opt for direct deposit to your bank or financial institution. If you select direct deposit, you will receive a pay statement every payday.

## ANNUAL LEAVE

This is time available for any purpose the employee chooses. Employees in permanent positions, including provisional appointments, earn annual leave initially at the rate of four (4) hours for each biweekly pay period. This entitlement increases by one (1) hour for every five (5) years of continuous service up to a maximum of nine (9) hours per pay period after twenty-five (25) years service. Temporary employees do not earn annual leave.

Leave may be taken in 15-minute increments.

Annual leave may be accumulated up to a maximum of 480 hours or 60 work days. No more than 60 days of accumulated annual leave may be carried over from one calendar year to another. An employee must be in a pay status at least eight (8) days in a pay period to earn annual leave for the pay period. Leave earned during a pay period cannot be taken until that pay period is complete. You must be in pay status the day before and the day after a holiday in order to receive pay for the holiday. Pay status means being present at work, being on approved annual leave with pay or being on approved sick leave with pay.

All annual leave is taken at the convenience of the Agency and with the approval of the immediate supervisor. Supervisors are responsible for seeing that leave slips are correctly filled out and turned in. All leave requests should be made as early as possible. No leave is considered approved until signed by the supervisor.

## PERSONAL LEAVE DAY

All state employees, except those employed in Baldwin and Mobile counties, are entitled to one (1) personal leave day per year. The employees in Baldwin and Mobile counties are granted Mardi Gras day instead of a personal leave day. The personal leave day is granted on January 1 of each year; therefore, only those employees who are employed (regardless of pay status) on January 1, are entitled. If an employee enters state service after January 1, he/she does not receive the personal leave day that year.

The personal leave day must be used by the end of the calendar year. Personal leave days cannot be accumulated or carried forward to the next calendar year. If the personal leave day is not taken during the year, the employee will be paid at his/her regular rate for the day. The failure of the employee to take their personal day must be justified in writing to the State Personnel Director by the employee's supervisor.

## SICK LEAVE

This is time available for illness, injury, caring for an immediate family member, and/or death of a family member. Immediate family members include wife or husband, children, grandchildren, parents, grandparents, sister, brother, mother-in-law, and father-in-law. Permanent employees earn sick leave at the rate of four (4) hours for each biweekly pay period. This entitlement does not change with the length of service. Sick leave may be accumulated up to a maximum of 1,200 hours or 150 days in a calendar year.

## DONATED LEAVE

Act 2001-352 permits the donation of leave from one state employee to another state employee when certain conditions are met.

In order to receive donated leave, an employee or a member of their immediate family must have suffered a catastrophic illness or injury. A catastrophic illness or injury has been defined as one from which an individual will never fully recover or which is life threatening, or one requiring a recuperation period of approximately one or more years.

The employee receiving the donated leave must have exhausted all their annual and sick leave, secured the approval of their appointing authority, and submitted the request in writing on the appropriate forms in time for it to be acted upon prior to the donated leave being used. Permanent status is not a requirement.

In addition, the donating employee must be at a salary range equal to or greater than the salary range of the employee receiving the leave. Employees who are leaving state service are not allowed to donate their leave prior to their separation date.

Either annual or sick leave may be donated, however it is to be credited as sick leave for the beneficiary employee. Donations of leave may occur between the executive, legislative and judicial branches of government.

The request should typically originate with the employee who will be the beneficiary of the donation and must be approved by the appointing authority of the agency in which they work. The initial form should also typically include a detailed physician's statement. (Forms are available in the Business Office.) The donating employee and his agency then complete the

appropriate section of the Leave Donation Request (Form 25) and forward it to the State Personnel Department for review. Whether the hours donated are annual or sick should be noted on the form as well. A copy of the approved form is returned to the Personnel Division of both agencies. The time should not be deducted from the donating employee until the copy of the approved form is received.

The forms normally should not be submitted for more than one pay period into the future. Once the donation has been approved, the leave no longer belongs to the employee who donated it but to the beneficiary. It cannot be returned to the employee who gave it.

Some examples of qualifying leave donations are a brain tumor, rejection of a kidney transplant, and a mother caring of her son after his spinal cord was severed.

Act 2002-391 made two changes to the donated leave program.

1.    Employees who are eligible to receive compensatory time may now donate it as well. As with annual leave, it will become sick leave for the beneficiary.

II.   The act also allows leave to be donated to a beneficiary for maternity leave as well as for a catastrophic illness or injury. In these instances, State Personnel Board Rule 670-x- 14-.02 Use of Sick Leave for Maternity applies and should provide the guidelines for use.

Accumulated sick leave may be used for purposes of maternity leave so long as: (1) the employee works up until the time she is disabled as a result of pregnancy, and (2) returns to work as soon as she ceases to be disabled for this reason. A doctor's verification of disability may be required by the appointing authority. (Statutory Authority: Section 36-26-9, **Code of Alabama 1975)**

The Donated Leave form should indicate that the time given is for disability due to pregnancy and the signature of the beneficiary's appointing authority will serve as the certification for that.

## BEREAVEMENT LEAVE

All persons who are regularly employed by the state, and who are subject to the provisions of the state Merit System, and all legislative personnel, officers, and employees, including, but not limited to, Legislative Reference Service personnel, whether subject to the state Merit System or not, may be granted bereavement leave with pay for the death of a person related by blood, adoption, or marriage, or as otherwise provided for by the Alabama State Personnel Board.

Bereavement leave may be granted only to an employee who does not have accrued sick leave available for such use.

For any one occurrence, the bereavement leave shall not exceed three days.

Any bereavement leave granted to an employee must be reimbursed to the state in the form of leave days, including sick leave, annual leave, and personal leave, within one calendar year of the use of the bereavement leave.

In the event an employee leaves state service before repaying any bereavement leave used, he or she shall have the leave deducted from his or her final pay check. (Section 36-26-36.3)

## MILITARY LEAVE

This is leave time available for active duty training or other service ordered by the Federal Government or the Governor of Alabama. Such leave is granted to an active member of the Alabama National Guard or reserve components of the Army, Navy, Marine Corps, Air Force, or Coast Guard. Military leave is limited to 168 hours with pay during a calendar year.

## LEAVE WITHOUT PAY

Leave without pay is granted only under unusual circumstances and the granting of such leave is subject to the approval of the Agency Director. Normally, if the employee has satisfactory service, leave without pay will be granted for short periods. Leave without pay can only be granted to permanent employees and cannot exceed one year. An employee cannot take leave without pay to go to another job or go into business for themselves.

Leave without pay is not an alternative form of leave. Leave without pay status without compelling reason will result in initiation of the Progressive Discipline process explained on page 23.

If an employee is out of annual and sick leave time, he/she must work the day before a state holiday and the day after the state holiday in order to be paid for the holiday. These are rules from the State Personnel Board.

## FAMILY AND MEDICAL LEAVE ACT OF 1993 (FMLA)

FMLA provides covered employees with up to 12 weeks of unpaid, job-protected leave for certain family and medical reasons. A covered employee is one who has been employed by the agency for at least one year and who has worked at least 1,250 hours during the previous 12 months.

Employees are entitled to FMLA leave for one or more of the following reasons:

1.  To care for the employee's child after birth, or placement for adoption, provided the leave is taken within a twelve-month period following birth or adoption.

2.  To care for the employee's spouse, child, or parent who has a serious health condition.

3.  For a serious health condition that makes the employee unable to perform the employee's job.

The employee may be required to provide advance leave notice and medical certification. Taking of leave may be denied if the following requirements are not met:

1.  The employee ordinarily must provide 30 days advance notice when the leave is "foreseeable".

2.  APLS may require medical certification to support a request for leave because of a serious health condition, and may require second or third opinions (at APLS's expense) and a fitness for duty report before returning to work. While the employee is on FMLA leave the employee's health coverage will be continued by APLS. If the employee has family medical coverage the employee is responsible for the premiums.

If any additional information on the FMLA is needed, please contact the APLS Personnel Officer.

## COURT ATTENDANCE

Leave for jury duty by permanent employees requires one copy of the summons from the court be given to the supervisor. This copy is to be forwarded to the Business Manager for the employee's leave records. If the employee is excused from jury duty during regular work hours they are required to return to work at APLS.

Permanent and temporary employees who are required as a witness for APLS will not be charged leave for their appearance. Time off for a court appearance by a permanent employee as a witness in other proceedings will be charged to annual leave. Temporary employees serving as a witness will have to take leave without pay.

## VOTING AND WORKING AT VOTING POLLS

Employees will be provided the opportunity to vote as they choose in local, state, and national elections. One hour leave is granted to each employee in order to vote. Employees must secure their supervisor's approval before taking time off work to vote. Employees who are requested or who volunteer to work at the polling places must take annual, personal, or leave without pay for the time they are away from their jobs.

## ON THE JOB INJURY

Employees who are injured on the job are covered under the State Employee Injury Compensation Trust Fund (SEICTF). If the employee is covered by Blue Cross he/she must use a doctor designated by the SEICTF to be covered by the benefits. However, if the employee is an HMO member he/she would then use the HMO. As soon as possible after the injury occurs you must notify your supervisor. A First Report of Accident must be filed with SEICTF within 24 hours of the injury for the injury to be covered. There is a three day waiting period before the SEICTF begins. If an employee is off more than three days because of the injury, he/she has two options; 1) he/she may continue to use annual or sick leave or 2) he/she may receive 2/3 of his/her current pay, subject to the maximum compensation rate in effect at the time of the accident. The 2/3 pay is not taxable income. The list of physicians are maintained in the Business Office along with the complete policy.

## OVERTIME/COMPENSATORY TIME

APLS employees are subject to the provisions of the Fair Labor Standards Act (FLSA). The FLSA is a federal law governing minimum wage, overtime pay, equal pay, record keeping, and child labor laws.

According to the FLSA's criteria, APLS employees fall into one of two basic categories, exempt and nonexempt. Exempt employees are not covered by the overtime provisions of the FLSA and are not entitled to overtime. Nonexempt employees are covered by the Act and do receive overtime. If you are unclear as to your status, please contact the APLS Personnel Officer.

In the event overtime becomes necessary, the employee's supervisor and the Agency Director shall approve it, in advance. Compensation for overtime shall be in the form of compensatory leave and shall be used as soon as possible. In all cases, compensatory leave shall be taken before any annual or personal leave is used.

The Fair Labor Standards Act, for the purpose of determining "hours worked" for calculation of overtime states that if an employee is absent during a work week for reasons such as illness,

holidays, vacations, jury duty, bereavement, or personal leave, such absences, even though they may be paid, do not count as time worked in that particular work week.

All compensatory time must be pre-approved by the division head and the director.

For information on overtime/compensatory time employees should ask their supervisor or the APLS Personnel Officer.

## ATTENDANCE

The normal work week at APLS is Monday through Friday from 8:00 a.m. to 5:00 p.m. With a supervisor's permission, an employee may work a flex schedule between the hours of 7:30 a.m. to 5:30 p.m. There may be times, however, when schedules may vary depending upon work flow or a supervisor's approval. Each employee is expected to arrive at work on time and ready to perform their duties. If an employee is unable to report to work on a particular day, the employee is responsible for notifying their supervisor no later than 8:15 a.m. It is the employee's responsibility, not friends or relatives, to ensure APLS is aware of their absence. If an employee fails to inform APLS of their absence, the employee may be declared on "Unauthorized" leave and placed in "Leave Without Pay" status, at the discretion of the director.

Tardiness is sometimes unavoidable. When employees are late to work they are to immediately, upon arrival, inform the supervisor of the reason for the delay. In most cases, an explanation will resolve the matter. If an employee is consistently late, then he/she may be subjected to disciplinary action.

## FLEXIBLE WORKING HOURS

The use of flex time is authorized; however, it must not reduce the mission of APLS. Flex time hours must be approved by division directors. Since flex time is a privilege and not a right, documented abuse of flex time may be cause to exclude an employee from participation.

## LUNCH/BREAKS

All employees are entitled to a one hour lunch period each day. Lunch hours normally fall between 11 a.m. and 2 p.m. This schedule can be varied with the permission of the supervisor. Lunch hours may not be taken within a work area if it is disturbing to other employees.

Each employee receives two (2) fifteen minute breaks each day, one in the morning and one in the afternoon. These breaks are 15 minutes for every four hours worked. Break time cannot be

saved or accumulated for use at another time and may not be used in conjunction with leaving early or lunch. If on rare occasions, an employee is late arriving in the morning or coming back from lunch, the employee can decide to fill out a leave slip or skip his break. However, if an employee is habitually late, he/she may be subjected to disciplinary action.

## RETIREMENT

Employees in classified service are eligible to retire at age 60 or upon the completion of 25 years state service. The effective date of the retirement is usually the last day of the month.

Employees may also be approved for retirement without meeting qualifications stated above if the retirement is caused by a disability. In this case, however, the employee must have at least ten (10) years service. Retiring employees who have held permanent positions are eligible to receive payment for accumulated annual leave and one half of their accumulated sick leave. Only retiring employees are eligible for payment of sick leave.

Employees at least 55 years of age with 25 years of service may elect to participate in the Deferred Retirement Option Plan. For more information on DROP, check with the Business Office. For more information on retirement options, check with the APLS business office or visit the RSA web site at www.rsa.state.al.us.

## EMPLOYEE DISCIPLINE

In general, APLS follows the progressive discipline system used by all state agencies. Progressive discipline is a system of escalated penalties which are imposed with increasing severity for repeated infractions. This is the process:

Verbal warning
Written reprimand
Suspension without pay and/or demotion
Discharge

At each step, the supervisor provides a clear statement of the problem behavior, what to do to correct the problem, a time limit for correction, and consequences of continued misconduct. Verbal warnings, written reprimands and suspensions should be viewed as stimuli for positive changes in behavior and performance and not considered simply as punishments or steps toward termination.

Also regarding positive discipline, the agency reserves the right to bypass any and all of these steps or use other forms of discipline which are in the best interest of the department and for the good of state service.

Criminal violations shall also be subject to prosecution in according with Alabama criminal laws.

## TRAVEL

(For examples of travel forms filled out by state employees, refer to the back of the manual.)

1. Travel Approval:  A travel request form must be filed with the Director as soon as possible prior to the date of travel.  All travel must be approved by the Director and is not considered definite until such time as it is approved.

2. Schedule:  Each person is responsible for submitting to his/her supervisor, no later than Wednesday of the preceding week, any travel for the following week.  Supervisors of each division are responsible for submitting to the Director, no later than Thursday of the preceding week, any travel for the next week.

3. In-State:  A reimbursement form must be submitted upon return.  In-state travel is reimbursed on a per diem schedule with the Director's approval.  Check with the Business Office for the reimbursement rates.  For overnight travel, check with the Business Office to determine what receipts are required.

4. Out-of-State:  A "Request for Out-of-State Travel" form must be submitted to the Director as soon as possible prior to date of travel.  Then a letter must be sent to the Governor's Office for approval and is not valid until signed.  A copy of the approved form will be returned to the employee.  In rare situations, advances for travel expenses can be issued. If an employee receives a travel advance, he/she will submit all receipts, excess funds, etc. to the Business Office upon return. Reimbursements will be made only after an expense form is submitted to the Business Office.  Check with the Business Office to determine what receipts are required.

## TRAVEL ALLOWANCES

Employees are entitled to reimbursement for official travel. Act No. 91-564 allows you to receive mileage and per diem rates for in-state travel based on trips of six hours or more. Out-of-state trips are reimbursed for actual expenses with prior approval.

Employees must be pre-approved for all travel. See the section in the back on forms which must be filled out for approval and then for reimbursement.

## STATE VEHICLES

All state vehicles must be scheduled and checked out through the Business Office.  Any needed repairs should be reported to the Business Manager immediately after the vehicle is returned.

The inside of each vehicle shall be in a clean condition and have no less than one-half tank of fuel after each trip. All fuel purchased in Montgomery County shall be obtained at the State Motor Pool. For trips outside Montgomery County there is a gasoline credit card assigned to each vehicle. When returned to APLS, each vehicle shall be parked in its designated parking area and the keys returned to the Business Office. Each employee driving a state vehicle is required to have a valid Alabama Driver's License and to have it in their possession when operating state vehicles.

## OUTSIDE EMPLOYMENT

Anyone having employment outside the Agency must have the Director's approval according to a ruling of the Ethics Commission. This ruling is intended to protect you as an individual from unintentionally violating the State Ethics Law. A form for those who have outside employment is available in the Business Office. Complete a copy of this form and obtain approval before you accept outside employment.

## WEATHER

Extreme or severe weather conditions, such as freezing rain, ice, snow, floods, etc., or natural emergencies, will exempt an employee of the affected area from reporting to work on time or reporting to work for the duration of the situation only if any of the following conditions are met:

1. The Governor declares that State Offices in a specific area or on a statewide basis are closed.

2. The Mayor or chief city official declares the area closed where the employee's place of work is located or where the employee lives.

3. The routes that the employee would use for travel to work from his/her official base assignment (home) are closed by the Public Safety Department or other law enforcement agencies.

4. The employee is contacted by their supervisor and instructed not to report for work that day.

In case of severe weather (tornado, etc.) during work hours, the employees are to report to the designated shelter area which is in the downstairs lounge and restrooms. Patrons are to be directed to the designated areas as well.

## BUILDING OPERATIONS AND SECURITY

### Opening and Closing of the Building

The building is open for employees no later than 7:30 a.m. The building is locked at 5:00 p.m. Division heads are responsible for closing procedures within their areas. An employee leaving the building after 5:00 p.m. is responsible for securing the door he/she uses to exit. An employee who remains working in the building after 5:00 p.m. must notify his/her supervisor and the Capitol Police at 242-0700. All doors, with the exception of the main entrance and the entrance to the Regional Library for the Blind and Physically Handicapped, are to remain closed and locked at all times. Locked doors are for emergency use only and should not be used to exit the building anytime during the day.

### ELECTRONIC EQUIPMENT

Electronic equipment including telephone, e-mail, voice and video communications, facsimiles, the Internet, computers, copiers, and beepers and cell phones are to support the department in achieving its goals and missions. Incidental and occasional personal use is permitted as long as it does not adversely affect the performance of your duties, interfere with existing rules or policies pertaining to the Agency, overburden the communication system, create significant additional cost to the Agency, involve a profit personal business activity, have potential to harm or reflect adversely on the state, or involve illegal activities.

### SECURITY

All employees are to be aware of individuals in their areas. Report any suspicious behavior, disruptive behavior, or unusual activities, both in the building and on the parking lot, to the Director, Business Manager, or designated individual immediately. Do not confront anyone yourself but notify the proper individuals.

### TOURS

The Administrative Office should be notified of all tours arranged in the building.

## TELEPHONES

Telephones are provided for job-related purposes. All phones have a direct line with voice mail. Staff members who will be away from the office are expected to leave a temporary voice mail for their callers as to when they will be back and whether or not to leave a message with anyone else. If the entire department is out because of a meeting, phones may be forwarded to the Front Desk, after the Front Desk has been notified. Calls will be taken at the Front Desk until messages are picked up and the Front Desk is notified that the area is now staffed.

Personal calls should be kept brief and to a minimum. It is understandable than an emergency personal call must be handled immediately, but be considerate of fellow employees by keeping them short. If a personal long-distance call must be made, the employee is responsible for placing this call collect or billing it to their home phone. Itemized phone bills are received monthly and checked against calls placed.

After work hours, every weekend and all holidays, the regular lines ring over the nightbells. When working during these off hours, the nightbells may be answered by depressing 14.

## MAIL

A.   In-coming: Mail is received at the building each morning. This mail is sorted and routed to the proper department. For safety purposes, the mail clerk is the only one authorized to sort mail. Mail is put in the individual's interoffice mailbox. When removing mail, please be sure to remove your mail only.

B.   Out-going: Out-going mail is sent to the Central mailroom each morning. Mail must be at the mail table no later than 9:30 a.m. each day to be posted. All mail may be put on the table outside the mail clerk's office or on the table downstairs by the mail equipment. Personal mail may go out with the Agency's mail if the proper postage has been applied by the individual. APLS will not provide postage for personal mail.

C.   Handmail: Handmail is picked up by the State central mailroom once daily at 10:00 a.m.

D.   Interoffice: Materials requiring routing will have a route slip attached and placed in the interoffice mailbox. Each staff member located on the route slip should check his/her name off and should pass the material on as quickly as possible. Periodicals should not be kept by any staff member longer than 3 working days. The last staff member to receive a routed article should return it to the person or department indicated. Interoffice mail is delivered and picked up at the designated places twice daily (approximately 10 a.m. and 3 p.m.).

E.   Daily Run: APLS makes a daily morning run to town to pick up supplies, deliver and pick up items at Montgomery City-County Public Library, and make pick ups/deliveries

at the capitol complex. Any one needing a special pick up/delivery should contact the Business Office by 9:00 a.m. with their request.

## DRESS CODE

Each APLS employee and volunteer is expected to maintain an acceptable appearance while in the workplace. By doing so, you help create a professional atmosphere that encourages public support of the library and confidence in the advice and help provided by Agency staff. Employees are in frequent contact with the public in the provision of library services. At any time, any employee of APLS could be asked to represent the Agency at an outside meeting.

Guidelines cannot be issued to cover every situation. However, the guidelines that follow will convey some specifics about the APLS dress code.

- Good grooming is important. Employees are expected to be clean and neat at all times.
- Dress appropriately for your job responsibilities. For most employees, business casual or business/office clothes are appropriate, especially for those employees in constant contact with the public. In a few instances, especially tasks involving manual labor, a more casual, durable form of clothing may be worn.
- Examples of clothing not appropriate in the normal APLS working environment are hats, blue jeans which are dirty, faded, patched, have holes, and/or very tight, tight clothing which outlines the undergarments, casual shorts. Other inappropriate clothing includes: sweat suits, tube tops, spandex pants, halters, mini-skirts, flip-flops, slippers and similar informal footwear.
- Casual Fridays means all employees may wear their jeans to work, provided they are clean and without holes.

It is your responsibility to come to work dressed appropriately. APLS employees are held accountable for their work attire. When in doubt about appropriate office attire, you may wish to consult your supervisor. If your attire is deemed inappropriate, you may be required to return home to change clothes on your own time.

Your appearance should express personal pride in yourself and the Alabama Public Library Service. It benefits all staff when you make a good impression on the public.

## CONFERENCE ROOMS

APLS has several conference rooms that staff may schedule for use. See the Business Office to book a meeting room. If a special arrangement is needed for the room, a form must be filled out and given to the clerk who will set the room up for use. See the Business Office for more details.

## REGISTRATION AND CIRCULATION SECURITY

All circulation transactions between APLS employees and the public are to be handled in a confidential manner. Under no circumstances shall registration and circulation information concerning employees or patrons of APLS be released, made public, or discussed. These records are of a confidential nature (Section 41-8-10, **Code of Alabama 1975**). If any problem arises in this area, immediately refer the matter to the supervisor or the APLS Director.

## COMPUTER SECURITY

All programs and operating software installed on APLS computer systems are the property of APLS. Unauthorized use or duplication of this software is strictly prohibited. All employees are expressly forbidden to install any unauthorized or "bootleg" software on APLS computers. Any question in this area should be referred to the Automated Services division Manager of APLS. No employee should attempt to breach or infiltrate the computer network security systems.

Computers are provided for each staff member for official state business. The APLS computer system is monitored and misuse will be reported to you and your supervisor. Misuse will result in disciplinary action being taken.

Due to the sluggishness of the APLS computer system sometimes, users should be reminded:

1) Downloading and/or installing anything (games, any software, etc.) is prohibited. NEVER place a disk or CD into your Computer - All disks or CDs received should be taken to Automated Services for scanning. No person should save work to a diskette or load work from a diskette without checking with Automated Services. No games should be loaded onto office computers

2) Playing of on-line games (games accessed through Netscape on the Internet) uses excessive system resources. This should not be done on state-owned equipment or during work hours.

3) Computers in the work areas are for use by employees. Public access PCs are available in the Reference Area. E-mail is provided for official state use only.

4) Attachments to e-mail can contain viruses and should not be opened unless you are expecting it and know what it is.

5) E-mail containing garbage characters, as subjects or sender names should be deleted at once. For security reasons, logoff your computer when going to lunch and at the end of the day. You should use START SHUTDOWN - RESTART THE COMPUTER. Passwords should be safeguarded. Passwords are the Agency's protection for the

computer system. Passwords should not be given to anyone, without checking with Automated Services. Users will be required to change their passwords periodically. Keep these your little secret.

6) Power your computers off on Friday when you leave - START SHUTDOWN - SHUTDOWN THE COMPUTER.

7) NEVER place liquid or magnetic objects on or near your computer! All liquid and magnetic objects should be kept away from your computer.
Nothing (including your telephone) should be placed on the top of your CPU or monitor. Your computer needs air to breathe.

8) Computer settings should not be modified. Automated Services staff sets your computer settings at the time the computer is installed on your desk.
These settings should remain, as they were set. The only exception to this is screen savers and wallpapers. Each user may set these, if desired, using only the ones provided on your computer, unless approved by Automated Services.

Users of the Alabama Public Library Service are responsible for using them in an ethical, legal and considerate manner. Examples of prohibited usage include, but are not limited to

- Using the Internet workstations for any illegal purposes.
- Engaging in any activity that is deliberately offensive.
- Representing oneself as another person
- Using the Internet to transmit obscene, threatening or harassing material
- Viewing, displaying, or printing explicit graphical images
- Damaging or destroying equipment, software or data belonging to the Library, including adding, changing, or deleting files
- Violating computer system or network integrity, including attempts to bypass network security
- Violating copyrights laws. U.S. Copyright law (Title 17, U.S. Code) prohibits unauthorized reproduction or distribution of copyrights materials, except as permitted

# ALABAMA PUBLIC LIBRARY SERVICE ACCESSIBILITY PLAN

# POLICIES AND PROCEDURES MANUAL

## 1.  STATEMENT OF POLICY FOR THE APLS DISABILITY ACCESSIBILITY PLAN:

### A.  POLICY

It shall be the policy of the Alabama Public Library Service that no qualified disabled person shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any employment, program, benefit, service or activity conducted by APLS. This policy applies to all permanent and temporary full-time and part-time employees, all patrons and all applicants for positions of employment with APLS.

The designated coordinator for APLS's compliance with Section 504 of the Rehabilitation Act of 1973 (P.L. 93-112) and The Americans with Disabilities Act of 1990 (P.L. 101-336) is the Business Manager, located in the Business Office, 213-3929.

### B.  PURPOSE

In order to implement the APLS Disability Accessibility Policy, this plan will serve as the agency's regulations conveying Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990. The plan will also establish rules or procedure which will ensure compliance with the standards issued under these and any subsequent laws pertaining to disabled accessibility in the public sector.

### C. REQUIREMENTS OF SECTION 504 OF THE REHABILITATION ACT OF 1973 AND THE AMERICANS WITH DISABILITIES ACT OF 1990

For the purposes of this plan a disabling condition or disability is defined as: "An individual's physical or mental impairment which substantially limits one or more of the major life activities of that individual."

The following are general guidelines for determining a disabled person under the applicable laws:

1. Non-ambulatory disabilities: A person who uses a wheelchair for mobility.
2. Semi-ambulatory disabilities: Conditions affecting a person's mobility, either partially or totally.
3. Coordination disabilities: Conditions affecting a person's mobility.
4. Sight disabilities: Conditions affecting a person's sight.
5. Hearing disabilities: Conditions affecting a person's hearing.
6. Speech impairments: Conditions affecting a person's ability to communicate orally.
7. Learning disabilities: Conditions that affect a person's process of learning.
8. Mental or psychological disorders: Conditions that affect a person's normal mental process or emotional stability.

Any individual who exhibits any of these characteristics may be considered an "individual with disabilities". A disability is determined on an individual basis. This definition, however, does not include any individual who is an alcoholic or illegal drug user and whose use of these items prevents such individual from performing the duties of his employment.

Certain infectious and communicable diseases are covered by the applicable laws, and are considered to be included in this plan. A list of these diseases has been prepared by the United States Department of Health and Human Resources and the Centers for Disease Control. The Business Office has a copy of this list. For persons who fall into this category, accessibility requirements and reasonable accommodations will be determined on a case-by-case basis by medical and legal authorities.

The provisions of Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990 prohibit state and local governmental agencies from discriminating against individuals on the basis of disability.

In providing employment, programs, services, benefits, or activities, APLS will not, on the basis of disability:
  -deny a qualified disabled person the opportunity to participate in or benefit from the programs, services, benefits, or activities;
  -afford a qualified disabled person the opportunities to participate in or benefit from the programs, services, benefits, or activities that are not equal to the opportunities afforded others;
  -provide a qualified disabled person with the programs, services, benefits, or activities that are not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;
  -provide different or separate programs, services, benefits or activities to disabled persons than those provided to others, unless such action is necessary in order to provide qualified disabled persons with programs, services, benefits, or activities that are as effective as those provided to others;

-deny a qualified disabled person the opportunity to participate as a member of any committee; or

-otherwise limit a qualified disabled person in the employment of any right, privilege, advantage or opportunity which is enjoyed by others receiving or participating in the programs, services, benefits or activities.

APLS shall not utilize criteria or administrative methods which would subject a qualified disabled person to discrimination on the basis of program, service, benefit or activity objectives with respect to disabled persons.

### D.    SELF-EVALUATION OF APLS'S FACILITIES AND PROGRAMS
In accordance with applicable laws, APLS's ADA coordinator will conduct an agency self-evaluation to determine if APLS's current policies and practices meet all requirements of laws and regulations regarding disabled individuals. Any rules/regulations not meeting these requirements will be modified as necessary to ensure compliance.

The self-evaluation shall contain the following:
1.  A disability accessibility survey.  This survey will contain a description of the areas examined and any accessibility problems.
2.  A description of any disabling conditions exhibited by APLS employees.
3.  A description of any modifications or changes required to make the physical facility comply to ADA requirements.

### E.    NOTICE OF POLICY AND AVAILABILITY OF INFORMATION
APLS shall make available to its employees, job applicants, patrons and other interested individuals, any information requested regarding the APLS Disability Accessibility Plan and its application to the programs, services, benefits or activities conducted by the agency.

## II.    APLS'S EMPLOYMENT POLICY FOR DISABILITY ACCESSIBILITY:

### A.    STATEMENT OF NONDISCRIMINATION IN EMPLOYMENT PROCEEDINGS

In employment proceedings at APLS, it shall be the agency's policy not to discriminate on the basis of disability in the agency's:

-recruitment, advertising and job application procedures;

-hiring, upgrading, promotion, demotion, transfer, layoff, termination and re-employment;
- raises of pay or compensation;
- job assignments, classifications, seniority lists, or lines of progression;
- granting of sick leave, maternity leave, military leave, annual leave, leave of absence, leave
    without pay or other fringe benefits;
- selection for training or any educational opportunities.

> APLS will not limit, segregate or classify a job applicant in such a way that his or her employment opportunities would be adversely affected due to a disabled condition. All standards, criteria, and requirements used in the employment procedures shall be strictly job related. Any positions at APLS which preclude hiring of a disabled individual must have explicit job descriptions indicating why a disabled person cannot perform the duties.

> It shall be the responsibility of the APLS Personnel Officer and the ADA Coordinator to monitor and implement all disability accessibility employment provisions.

The goal of this employment policy is to prohibit any disabled employee from receiving unfair and unequal consideration for employment and, within the workplace, when employed:

In addition to the above, the APLS Personnel Officer shall follow all guidelines provided by the Alabama State Personnel Department to ensure enforcement of all applicable federal and state laws, rules and regulations regarding employment of the disabled.

If an individual with a disability is disabled by an infectious or communicable disease, and the risk of transmitting the disease cannot be eliminated by a reasonable accommodation to that individual's job, then the agency may take appropriate action to protect the health and safety of that individual and others in the workplace. Any action taken in this respect must be in accordance with all state and federal laws.

In the pre-employment stage, the APLS shall not require any applicant to submit to a medical examination, nor make inquiries as to whether the applicant has a disability. Questions may be asked, however, prior to offer of employment, about the individual's ability to perform all job-related functions. Once an offer of employment is made, the APLS can require a medical exam and base hiring on the results of the exam, provided all other employees in the same job category are subject to the same medical exam.

## B.    REASONABLE ACCOMMODATIONS TO JOB FUNCTIONS, DUTIES, TASKS AND ASSIGNMENTS

If an APLS employee with a covered disability desires that a reasonable accommodation be made to that individual's ' job functions, duties, tasks and assignments, then the employee shall follow the following procedures:

1.    The employee shall notify his or her supervisor, in writing, of the disability which prevents that employee from completing his/her job functions, duties, tasks and assignments.

2.  The employee shall provide evidence, in writing, to the supervisor explaining why assigned tasks, duties, functions and assignments cannot be achieved due to the individual's disability.

3.  The employee, supervisor, APLS Personnel Officer and ADA Coordinator shall meet to determine what options are available in providing reasonable accommodations to enable the employee to accomplish his/her job functions, duties, tasks and assignments.

4.  When making the final decision on the best reasonable accommodation, if more than one option is available, the agency shall select and implement the accommodation which is most appropriate. However, if APLS determines that a request for necessary reasonable accommodations would impose an undue hardship on the agency's budget, goals or objectives, then such accommodation might not be provided to the requesting employee.

5.  In cases where a reasonable accommodation has been made for the employee, a description of that accommodation will be placed in the individual's file, which is kept separate from the employee's personnel file and will not be considered a public record.

## III.    PHYSICAL PLANT STRUCTURAL BARRIERS AND EQUIVALENT FACILITATION:

In accordance with Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990, it shall be the policy of APLS to make its physical plant readily accessible to, and usable by any individual with disabling conditions.

In general, these facilities include parking areas, accessible routes to and from the building, entrances, public areas in the building, bathrooms and water fountains. All technical specifications on accessibility will be governed by the provisions of the uniform federal accessibility standards.

### A.    EMPLOYEE WORK STATIONS

Areas within APLS's plant, used only by employees as work stations, shall follow recommended structural design and construction so that employees with disabilities can approach, enter, use and exit their areas. If individual work areas already constructed are inaccessible to disabled employees, then modifications to these areas may be made as a reasonable accommodation to the disabled person.

### B.    COMMON AREAS IN THE WORKPLACE

The physical plant of the APLS contains public areas used by all individuals. These areas are referred to as "common areas" and include: Parking lots, driveways, sidewalks, entrance ways, lobbies, hallways, stairwells, elevators, restrooms, water fountains, fire exits, break rooms and conference rooms.

Such common areas shall be accessible to all individuals either with or without reasonable

accommodations for those disabled individuals utilizing such areas and facilities.

## C.   REASONABLE ACCOMMODATIONS TO STRUCTURAL BARRIERS

If an APLS employee with a covered disability desires reasonable accommodations be made to his/her work station or to a common area within the agency the employee shall:

1.  Notify his/her supervisor, in writing, of the disability that prevents the employee from using the work station or common area.
2.  Provide clear reasons to the supervisor as to why the work station or common area is inaccessible.
3.  Meet with the supervisor, APLS Personnel Officer and ADA Coordinator to consider options available to provide reasonable accommodations to the work station or common area.
4.  In considering feasible options for reasonable accommodations, consideration shall be given to the disabled individual's preference, cost to APLS and the impact of the accommodations on the individual's ability to work in the accommodated area or use the accommodated work station.
5.  If one or more options are available, the agency shall implement the one which is most appropriate.
6.  If a reasonable accommodation is made for an employee, a description of that accommodation shall be placed in that individual's personnel file.

## IV.   PROGRAMMATIC ACCESSIBILITY FOR APLS PERSONNEL. IF A DISABLED EMPLOYEE OF APLS PERCEIVES THAT THERE IS A LACK OF ACCESSIBLE MEANS TO THE PROGRAMS, SERVICES, BENEFITS OR ACTIVITIES CONDUCTED BY APLS, THEN SUCH EMPLOYEE SHALL FOLLOW THE PROCEDURES ESTABLISHED TO ADDRESS SUCH MATTERS:

## A.   GRIEVANCE PROCEDURE AND NON-RETALIATION PROVISIONS

If an employee of APLS has requested, and been denied, a reasonable accommodation for accessibility to the Agency's Employment Policies and Practices, physical plant or to any of APLS's programs, services, benefits, or activities and such request was to accommodate the employee's disability, then the employee may file a grievance to seek resolution of his/her disability accessibility-related complaint.

All grievances should be discussed first with the employee's immediate supervisor. This discussion should include description and medical proof of the employee's disability and the request for reasonable accommodations for that disability. If the employee feels he/she will not be granted a fair resolution to the problem from the immediate supervisor, then that employee shall be granted permission to discuss the grievance with the next line supervisor. The chain of command shall be followed when trying to resolve grievances. If the grievance process proves unsuccessful, then the employee may request a formal grievance hearing. This request shall be

made in writing and shall detail all previous actions in this matter. Copies of the grievance shall be forwarded to the Director of APLS and to legal counsel for their review.

The grievance hearing shall be held before the Director of APLS and be scheduled at a date that will give all parties sufficient time to prepare presentations, call witnesses and obtain legal or other representation, if desired. In attendance at the hearing will be the Director, Personnel Manager, employee, employee's supervisor and any legal or other counsel desired by the employee and/or APLS.

The grievance hearing will be recorded and the decision of the Director rendered in written format. The decision shall be delivered to all concerned within fourteen (14) working days of the hearing. If the employee finds no relief from APLS, he/she may appeal to the State Personnel Board.

No employee shall be discriminated against nor suffer retaliation from his/her supervisor or APLS because he/she made a charge, gave testimony or in any other way assisted or participated in disability accessibility investigations or proceedings at APLS.

## B.  TEMPORARY DISABILITIES

Temporary disabilities are excluded from coverage under this policy. Temporary non-chronic impairments of short duration, with no long-term permanent impact are generally not classified as disabilities. If a temporary disability persists for an extended period of time, any necessary reasonable accommodations for this employee will be handled on a case-by-case basis.

## C.  DISABILITIES AFTER POLICY BECOMES EFFECTIVE

If an APLS employee becomes disabled after this policy becomes effective, that employee shall inform his/her supervisor and the APLS Personnel Officer as soon as possible, but no more than five (5) working days after the disability occurs. Failure to report a disability could result in the Agency's failure to provide reasonable accommodations to the individual's disability.

# APLS TRAVEL REQUEST

IN-STATE __X__    OUT-OF-STATE _____

DATE __3/14/2002__

1.  Traveler: __John Doe__    SSAN: __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__

2.  Destination: Activity: __Alabama Library Association__
    City: __Huntsville, AL__

3.  Purpose of Travel: __To attend various programs at the convention, including Technical Svcs, Gov't Docs., general meetings, serials preconference.__

4.  Period of Travel:    Date(s) From __4/8/02__    To __4/12/02__
                         Hours   From __1:00 PM__    To __5:00 PM__

5.  Desired Mode of Travel: __State Car w/ other APLS staff__

6.  Estimated Costs:

    A.  Transportation: $_____

    B.  Conference Fee: $__85.00 (pre-conf); $48.00 (conf)__

    C.  Are you a member of the Association giving the Conference?
        Yes __X__    No _____

    D.  Registration Fee(s): $_____

    E.  List workshops, seminars you plan to attend during conference:
        __Electronic serials cataloging preconf; Internet resources; opening general session; GODORT, CUS/TSSRT; Ala. authors award luncheon.__

    F.  Room: $_____    Cost per Day: $_____

    G.  Meals: $_____    Cost per Day: $_____

    H.  Taxi: $_____

    I.  Car Rental: $_____

    J.  Parking: $_____

    K.  Misc: (Itemize) $__375.00 ($75.00 per diem)__

    L.  **TOTAL COST OF TRIP:** $ __508.00__

TRAVELER: _John Doe_    DATE: __3/14/02__

DIVISION HEAD: _____    DATE: _____

DIRECTOR: _____    DATE: _____

# STATE OF ALABAMA
## STATEMENT OF OFFICIAL IN-STATE TRAVEL

Public Library Service
Department/Agency                    Code Number                    Division                    Funds

APPROVED _____
                    Department Head

| Name | Jane Doe |
| Address | 555 Philmore Dr |
| City | Montgomery, AL 36111 |
| SSN | 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 |

MONTGOMERY
Official Station or Base

Above Space for Name, Address & SSN of Traveler

| Month And Date | POINTS OF TRAVEL | | Private Car Miles | Hour of Departure From Base | | Hour of Return to Base | | Amount Per Diem Claimed |
|---|---|---|---|---|---|---|---|---|
| | From City/County | To City/County | | AM | PM | AM | PM | |
| 04/08/02 | Montgomery/Montg Co | Huntsville/Madison Co | | | 1:30 | | | 75.00 |
| 04/09/02 | In Huntsville | | | | | | | 75.00 |
| 04/10/02 | In Huntsville | | | | | | | 75.00 |
| 04/11/02 | In Huntsville | | | | | | | 75.00 |
| 04/12/02 | Huntsville/Madison Co | Montgomery/Montg Co | | | | | 5.00 | 75.00 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Total Number of Miles Traveled

Detail miscellaneous expense and furnish receipts when required. This space for departmental approval, etc. Use extra sheets when necessary.

| | |
|---|---|
| TOTAL PER DIEM CLAIMED | 375.00 |
| MILEAGE (# of miles x mileage rate) | |
| MISCELLANEOUS EXPENSE | 133.00 |
| TOTAL THIS EXPENSE ACCOUNT $ | 508.00 |

I HEREBY CERTIFY that the travel and expense indicated hereon was accomplished in the performance of official duties pursuant to travel granted me.

_Jane Doe_
Signature of Traveler

Sworn to and subscribed before me this _____ day of

_____

_____
Notary Public

Registration Fee--$133.00

# APLS TRAVEL REQUEST

IN-STATE _____    OUT-OF-STATE X

DATE _3/12/2002_

1. Traveler: _Jane Doe_    SSAN: _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_

2. Destination: Activity: _American Library Association Annual Conference_
   City: _Atlanta, GA_

3. Purpose of Travel: _To attend various sessions dealing with TEchnical Services and other library issues (see meetings listed below)_

4. Period of Travel:  Date(s) From _6/14/02_  To _6/18/02_
   Hours  From _1:00 PM_  To _5:00 PM_

5. Desired Mode of Travel: _Personal Car_

6. Estimated Costs:

   A. Transportation:$ _____

   B. Conference Fee:$ _150.00 (by May 10)_

   C. Are you a member of the Association giving the Conference?
      Yes _X_    No _____

   D. Registration Fee(s):$ _____

   E. List workshops, seminars you plan to attend during conference:
      _Exploring the role of Tech. Svcs. within library digital initiatives; Cataloging using the Internet; Service Websites._

   F. Room:$ _400.00_    Cost per Day:$ _100.00_

   G. Meals:$ _150.00_    Cost per Day:$ _30.00_

   H. Taxi:$ _____

   I. Car Rental:$ _____

   J. Parking:$ _____

   K. Misc: (Itemize) $ _____

   L. **TOTAL COST OF TRIP:** $ _700.00_

TRAVELER: _Jane Doe_    DATE: _3/12/02_

DIVISION HEAD: _____    DATE: _____

DIRECTOR: _____    DATE: _____

# STATE OF ALABAMA
## Statement of Official Travel

Public Library Service

Department/Agency

Name of Traveler: Jane Doe

Code Number

Social Security Number: 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

Division

Address of Traveler (including street, city, state, and zip code):
SSS Pahrore Dr Montgomery, AL 36111

Official Station or Base: Montgomery, AL

Purpose of Travel                    Funds

APPROVED:

Departmental

I Hereby Certify That the Within Account in the Amount of $542.99 is correct, due, and unpaid.

Sworn to and subscribed before me this _____ day of _____

Signature of Payee

Notary Public

The mileage and subsistence expense indicated in this expense account has been previously authorized and has been checked for compliance.

### ITEMIZED STATEMENT OF NECESSARY TRAVELING EXPENSES INCURRED FOR PERIOD 10/00/00 TO 10/31/00

| Date mm/dd/yy | From City/State | To City/State | Hour of Depart/Return | Private Car Miles / Fare Description | Commercial Fare Amount | Breakfast | Lunch | Supper | Total Meals | Lodging | Total Meals & Lodging | Emergency & Necessary Expense Detail | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/08/00 | Montgomery, AL | Columbus, OH | 12:00 PM | | | | | 8.65 | 8.65 | 91.44 | 100.09 | | |
| 10/09/00 | In Columbus | | | | | | | 23.25 | 23.25 | 91.44 | 114.69 | | |
| 10/10/00 | In Columbus | | | | | | | 10.07 | 10.07 | 91.44 | 101.51 | | |
| 10/11/00 | In Columbus | | | | | | | 20.06 | 20.06 | 91.44 | 111.50 | | |
| 10/12/00 | In Columbus | | | | | | | 12.45 | 12.45 | 91.44 | 103.89 | | |
| 10/31/00 | Columbus, OH | Montgomery, AL | 7:00 PM | | | | | 11.31 | 11.31 | | 11.31 | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| TOTALS | | | | | | | | 85.79 | 85.79 | 457.20 | 542.99 | | |

### RECAPITULATION OF EXPENSES

| Travel Expenses | Amount |
|---|---|
| Commercial Transportation (incl rental car/gas) 0400-01 | |
| Mileage, private car 0400-02 | |
| Meals and lodging 0400-03 | $542.99 |
| SUBTOTAL TRAVEL EXPENSES | $542.99 |
| Emergency and Necessary Expenses Incurred in Connection with Travel | |
| Total other expenses such as postage, tax, telephone, parking, baggage, handling, tolls, etc. 0400-07 | |
| GRAND TOTAL TRAVEL EXPENSES | $542.99 |



**Employee Acknowledgment:**

> I have carefully reviewed the APLS policy on Harassment. I understand its contents. I agree to abide by this policy and understand that my conduct will be governed by this policy.

_____

Employee signature

_____

Witness signature

_____

Date

*Deborah Hill Biggers*
*Attorney at Law*
*113E Northside*
*Tuskegee, Alabama  36083-1750*

PLAINTIFF'S
EXHIBIT

24

*Telephone: (334) 727-0092*
*and*
*Fax: (334) 727-7117*
*E-Mail: debbig@debbig.com*

*Please Reply to:*
*P. O. Box 1183*
*Tuskegee Institute,*
*Alabama 36087-1183*

August 9, 2006

Rebecca S. Mitchell, Director
**ALABAMA PUBLIC LIBRARY SERVICE**
6030 Monticello Drive
Montgomery, Alabama  36130-6000

### RE: ANNIE BROWN

Dear Ms. Mitchell:

I represent Ms. Annie Brown, whom since May 2002, has been employed as Library Operations Manager with the Alabama Public Library Service. Mrs. Brown has been a competent, efficient, and loyal employee with the Alabama Public Library Service since 1997, when she was initially hired as a consultant in Library Administration and Management.

However, on July 25, 2006, you gave Mrs. Brown an alleged written reprimand based on erroneous facts, and advising of an adverse disciplinary action.

Although your letter indicates that it was a "written reprimand", your reprimand letter fails to comply with the definition described in the **State of Alabama Progressive Discipline Manual, June 2006 Edition.** According to the manual, a "reprimand" should state the continued or additional unwanted behavior and the necessity of the desired behavior. It should also state that further disciplinary action would take place if the behavior does not come in line with the job standards.  A corrective action plan should be developed, if possible.  The reprimand letter should contain the reprimand and the corrective action plan.

Therefore, you have violated the State's Progressive Discipline Policy by failing to properly write a letter of reprimand; by reprimanding Mrs. Brown based on false accusations; and thirdly, removing any and all supervising responsibilities associated with Mrs. Brown's current



EXHIBIT

G

position.    The latter action is an adverse employment action, which should provide Mrs. Brown with her due process rights, and should not be included in a letter of reprimand.

Mrs. Brown denies being insubordinate; denies engaging in disruptive conduct; and denies undermining your authority.

Therefore, we are requesting that you immediately rescind your July 25, 2006 letter and reinstate all of Mrs. Brown's supervising responsibilities associated with her position as Library Operations Manager.

I find it quite suspect that you would take this type of malicious and apparent racist action against the only professional minority employed in the Alabama Public Library Service.

Please provide Mrs. Brown with a letter, rescinding the illegal action, within seven (7) days from the date of this letter, or an EEOC complaint will be immediately filed against you personally and the Alabama Public Library Service.

Sincerely,

**DEBORAH HILL BIGGERS**
**Attorney at Law**

DHB/bea

cc:  Mrs. Annie Brown
    Personnel File

*Deborah Hill Biggers*
*Attorney at Law*
*113E. Northside*
*Tuskegee, Alabama  36083-1750*



*Telephone: (334) 727-0092*
*and*
*Fax: (334) 727-7117*
*E-Mail: debbig@debbig.com*

August 11, 2006

*Please Reply to:*
*P. O. Box 1183*
*Tuskegee Institute,*
*Alabama 36087-1183*

Mr. Ronald A. Snider
APLS Executive Board Member
407 Church Street
Mobile, AL  36602-2303

### RE:  MRS. ANNIE BROWN, LIBRARY OPERATIONS MANAGER,
### ALABAMA PUBLIC LIBRARY SERVICE

Dear Mr. Snider:

I represent Mrs. Annie Brown, who has been an exemplary employee of the Alabama Public Library Service since 1997.

Mrs. Brown is also the only professional minority, currently employed by the Alabama Public Library Service.

Therefore, it is unfortunate that in 2006, the State of Alabama is allowing racism to promote illegal employment actions and foster a hostile work environment.

Please find enclosed a copy of a letter that I was required to send to Director Rebecca S. Mitchell on behalf of Mrs. Brown.  I assure you that if the illegal actions of Ms. Mitchell are not immediately rescinded, an EEOC complaint will be filed against the Alabama Public Library Service.

We expect this unlawful action to be rescinded by August 16, 2006.

Thank you in advance for your favorable consideration.

Sincerely,

**DEBORAH HILL BIGGERS**
**Attorney at Law**

**DHB**/bea

encl

cc: Mrs. Annie Brown

PLAINTIFF'S EXHIBIT

EXHIBIT
H
Blumberg No. 6118

*Deborah Hill Biggers*
*Attorney at Law*
*113 E. Northside*
*Tuskegee, Alabama  36083-1750*

PLAINTIFF'S
EXHIBIT

26

*Telephone: (334) 727-0092*
*and*
*Fax: (334) 727-7117*
*E-Mail: debbig@debbig.com*

August 11, 2006

*Please Reply to*
*P. O. Box 1183*
*Tuskegee Institute,*
*Alabama 36087-1183*

Mr. Donald Dickey
APLS Executive Board Member
B.B. Comer Memorial Library
314 North Broadway Avenue
Sylacauga, AL  35150-2528

### RE:  MRS. ANNIE BROWN, LIBRARY OPERATIONS MANAGER, ALABAMA PUBLIC LIBRARY SERVICE

Dear Mr. Dickey:

I represent Mrs. Annie Brown, who has been an exemplary employee of the Alabama Public Library Service since 1997.

Mrs. Brown is also the only professional minority, currently employed by the Alabama Public Library Service.

Therefore, it is unfortunate that in 2006, the State of Alabama is allowing racism to promote illegal employment actions and foster a hostile work environment.

Please find enclosed a copy of a letter that I was required to send to Director Rebecca S. Mitchell on behalf of Mrs. Brown. I assure you that if the illegal actions of Ms. Mitchell are not immediately rescinded, an EEOC complaint will be filed against the Alabama Public Library Service.

We expect this unlawful action to be rescinded by August 16, 2006.

Thank you in advance for your favorable consideration.

Sincerely,

**DEBORAH HILL BIGGERS**
**Attorney at Law**

**DHB**/bea

encl.

cc: Mrs. Annie Brown

*Deborah Hill Biggers*
*Attorney at Law*
*113 E. Northside*
*Tuskegee, Alabama  36083-1750*

PLAINTIFF'S
EXHIBIT
2-7

*Telephone: (334) 727-0092
and
Fax: (334) 727-7117
E-Mail: debbig@debbig.com*

August 11, 2006

*Please Reply to:
P. O. Box 1183
Tuskegee Institute,
Alabama 36087-1183*

Ms. Bobbie Lou Leigh
c/o Florence-Lauderdale Public Library
APLS Executive Board Member
350 North Wood Avenue
Florence, AL  35630-4706

### RE:  MRS. ANNIE BROWN, LIBRARY OPERATIONS MANAGER, ALABAMA PUBLIC LIBRARY SERVICE

Dear Ms. Leigh:

I represent Mrs. Annie Brown, who has been an exemplary employee of the Alabama Public Library Service since 1997.

Mrs. Brown is also the only professional minority, currently employed by the Alabama Public Library Service.

Therefore, it is unfortunate that in 2006, the State of Alabama is allowing racism to promote illegal employment actions and foster a hostile work environment.

Please find enclosed a copy of a letter that I was required to send to Director Rebecca S. Mitchell on behalf of Mrs. Brown. I assure you that if the illegal actions of Ms. Mitchell are not immediately rescinded, an EEOC complaint will be filed against the Alabama Public Library Service.

We expect this unlawful action to be rescinded by August 16, 2006.

Thank you in advance for your favorable consideration.

Sincerely,

**DEBORAH HILL BIGGERS**
**Attorney at Law**

**DHB**/bea

encl.

cc:  Mrs. Annie Brown

*Deborah Hill Biggers*
*Attorney at Law*
*1138 Northside*
*Tuskegee, Alabama 36083-1750*

PLAINTIFF'S
EXHIBIT

28

*Telephone: (334) 727-0092*
*and*
*Fax: (334) 727-7117*
*E-Mail: debbig@debbig.com*

August 11, 2006

*Please Reply to:*
*P. O. Box 1183*
*Tuskegee Institute,*
*Alabama 36087-1183*

Ms. Helen Harrison Phillips
APLS Executive Board Member
Harrison Regional Library
50 Lester Street
Columbiana, AL  35051-9477

**RE:  MRS. ANNIE BROWN, LIBRARY OPERATIONS MANAGER,**
**ALABAMA PUBLIC LIBRARY SERVICE**

Dear Mr. Butler:

I represent Mrs. Annie Brown, who has been an exemplary employee of the Alabama Public Library Service since 1997.

Mrs. Brown is also the only professional minority, currently employed by the Alabama Public Library Service.

Therefore, it is unfortunate that in 2006, the State of Alabama is allowing racism to promote illegal employment actions and foster a hostile work environment.

Please find enclosed a copy of a letter that I was required to send to Director Rebecca S. Mitchell on behalf of Mrs. Brown.  I assure you that if the illegal actions of Ms. Mitchell are not immediately rescinded, an EEOC complaint will be filed against the Alabama Public Library Service.

We expect this unlawful action to be rescinded by August 16, 2006.

Thank you in advance for your favorable consideration.

Sincerely,

**DEBORAH HILL BIGGERS**
**Attorney at Law**

DHB/pea
encl.
cc: Mrs. Annie Brown

**CHARGE OF DISCRIMINATION**

PLAINTIFF'S EXHIBIT
33

This form is affected by the Privacy Act of 1974; see Priva... before completing this form.

ENTER CHARGE NUMBER
☐ FEPA
☐ EEOC 420-2006-04866

and EEOC

_(State or local Agency, if any)_

| NAME _(Indicate Mr., Ms., or Mrs.)_ Mrs. Annie Lucas Brown | HOME TELEPHONE NO. _(Include Area Code)_ (334) 727-2080 |
|---|---|

| STREET ADDRESS 2508 Brothers Drive, | CITY, STATE AND ZIP CODE Tuskegee, Alabama 36083 | COUNTY Macon |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME _(If more than one list below.)_

| NAME Alabama Public Library Service | NO. OF EMPLOYEES/MEMBERS 20+ | TELEPHONE NUMBER _(Include Area Code)_ (334) 213-3900 |
|---|---|---|

| STREET ADDRESS 6030 Monticello Drive, | CITY, STATE AND ZIP CODE Montgomery, AL 36130-6000 |
|---|---|

| NAME Rebecca S. Mitchell, Director | TELEPHONE NUMBER _(Include Area Code)_ (334) 213-3900 |
|---|---|

| STREET ADDRESS 6030 Monticello Drive | CITY, STATE AND ZIP CODE Montgomery, AL 36130-6000 |
|---|---|

CAUSE OF DISCRIMINATION BASED ON _(Check appropriate box(es))_

☒ RACE  ☒ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ AGE  ☐ RETALIATION  ☐ OTHER _(Specify)_

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE _(Month, day, year)_
July 25, 2006

THE PARTICULARS ARE _(If additional space is needed, attached extra sheet(s)):_

Annie Brown, who is a black female, has been employed with the Alabama Public Library Service since 1997. Mrs. Brown was initially hired as a consultant in Library Administration and Management. In May 2002, Mrs. Brown was promoted to Library Operations Manager. Mrs. Brown is the only professional minority employed in the Alabama Public Library Service.

On July 25, 2006 Ms. Rebecca Mitchell, who is white and the Director of the Alabama Public Library Service, gave Mrs. Brown an alleged written reprimand based on erroneous facts and advised Mrs. Brown of an adverse disciplinary action.

Although Ms. Mitchell's letter indicated that it was a "written reprimand" the reprimand letter fails to comply with the definition of "reprimand" described in the **State of Alabama Progressive Discipline Manual, June 2006 Edition.** According to the manual, a "reprimand" should state the continued or additional unwanted behavior and the necessity of the desired behavior. It should also state that further disciplinary action would take place if the behavior does not come in line with the job standards. A corrective action plan should be developed, if possible. The reprimand letter should contain the reprimand and the corrective action plan.

RECEIVED
EEOC

SEP 0 6 2006

EXHIBIT
I

BIRMINGHAM DISTRICT OFFICE

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - _(When necessary to meet State and Local Requirements)_ |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT _Annie Lucas Brown_ |
| _Annie Lucas Brown_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE _(Day, month, and year)_ 28th day of August 2006. |
| Date 8/28/06    Charging Party _(Signature)_ | My Commission Expires: 6/08/09 |

MRS. ANNIE L. BROWN
2508 BROTHERS DRIVE
TUSKEGEE, AL  36083

## CHARGE OF DISCRIMINATION
**(Continued - Page 2 of 2)**

**THE PARTICULARS ARE:**

Therefore, Ms. Mitchell has violated the State's Progressive Discipline Policy by failing to properly write a letter of reprimand; by reprimanding Mrs. Brown based on false accusations; and thirdly, by removing any and all supervising responsibilities associated with Mrs. Brown's current position.  The latter action is an adverse employment action, which should have provided Mrs. Brown with her due process rights, and should not be included in a letter of reprimand.  Mrs. Brown, who is black is being treated differently from the white Library Operations Manager, who have not been relegated to a "consultant" like Mrs. Brown.

Mrs. Brown has been discriminated against because of her race and color by Ms. Mitchell's actions in the attached letter dated July 25, 2006.  Ms. Mitchell has always treated Mrs. Brown in an adverse manner since she is the only black professional in the office, thus exposing Mrs. Brown to an hostile work environment on a day to day basis.

The discriminatory action by Rebecca Mitchell of reducing Ms. Brown from a Library Operations Manager to a Library Consultant is an adverse employment action. As a Library Operations Manager, Mrs. Brown is at Step 15, and is eligible for three more steps of advancements up to Step 18 for an annual salary of $67,879.20.  (See attached)

However, as a Library Consultant, Mrs. Brown is already at Step 17 with only one opportunity for advancement to Step 18 for an annual salary of $64,622.40.  (See attached)  Therefore, a Library Operations Manager can earn much more than a Library Consultant.

Mrs. Brown is the only Library Operations Manager who is black and is the only Library Operations Manager who has been reduced to a Library Consultant.

Mrs. Brown desires to be immediately re-instated as a Library Operations Manager.



RECEIVED
EEOC
SEP 0 6 2006
BIRMINGHAM DISTRICT OFFICE

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Birmingham District Office

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Charge Number:     420 2006 04866

Annie Lucas Brown
2508 Brothers Drive
Tuskegee, AL 36083                                    Charging Party

Alabama Public Library Service
6030 Monticello Drive
Montgomery, AL 36130-6000                              Respondent

## DETERMINATION

I issue the following determination on the merits of this charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. (Title VII). Timeliness and all other requirements for coverage have been met.

Charging Party alleged that she was discriminated against on the basis of her race, Black, in that Respondent removed her supervisory duties as part of a disciplinary reprimand, which resulted in the denial of her annual raise.

Evidence disclosed that a similarly situated White person was issued a similar disciplinary reprimand, yet did not lose her supervisory duties, nor her annual raise.

I have determined that the evidence obtained during the investigation establishes reasonable cause to believe a violation of the statute has occurred.

Upon finding there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. Please complete the enclosed Invitation to Conciliate and return it to the Commission at the above address no later than March 19, 2007. You may fax your response directly to (205) 212-2105 to the attention of Glenn Todd. Failure to respond by March 19, 2007 will indicate that you are not interested in conciliating this matter and the Commission will determine that efforts to conciliate this charge as required by Title VII, Section 706(b), have been unsuccessful.



EXHIBIT
J

Letter of Determination
Charge Number 420 2006 04866

If the Respondent declines to participate in conciliation discussions or when, for any other reason, a conciliation agreement acceptable to the Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission.

On Behalf of the Commission:

_3/7/07_
Date

Delner Franklin-Thomas
District Director

Enclosure:    Invitation to Conciliate

Copy:  Deborah Hill Biggers, Attorney for Charging Party
       Margaret L. Fleming, Attorney for Respondent

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## INVITATION TO PARTICIPATE IN CONCILIATION DISCUSSIONS

Section 706(b) of Title VII of the Civil Rights Act of 1964, as amended, requires that when the Commission determines there is reasonable cause to believe the charge is true, it shall endeavor to eliminate the alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. This invitation is being issued to both parties to determine their willingness to engage in such conciliation discussions. If either party declines discussion, or the Commission is unable to secure an acceptable agreement, the District Director shall inform both parties, in writing, of alternatives for obtaining relief available to the Charging Party and the Commission.

Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned.

| DATE  March 1, 2007 | CHARGE NUMBER 420-2006-04866 |
|---|---|

PLEASE COMPLETE THE FOLLOWING INFORMATION AND RETURN TO EEOC BY MAIL OR FACSIMILE (205/212-2105):

| TO: U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION~ Birmingham District Office<br>Ridge Park Place<br>1130 - 22 Street South, Suite 2000<br>Birmingham,   AL 35205-2070 | FROM:  (Name and address of charging party or respondent) |
|---|---|

I \_\_WILL \_\_WILL NOT ENGAGE IN CONCILIATION DISCUSSIONS.

SUGGESTED

| DATE | TIME |
|---|---|

LOCATION

COMMENTS

| DATE | SIGNOR'S TELEPHONE NUMBER |
|---|---|
| TYPED NAME OF CHARGING PARTY/RESPONDENT | SIGNATURE |

EEOC FORM 153



U.S. Department f Justice

Civil Rights Division

Employment Litigation Section - PHB
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
www.usdoj.gov/crt/emp/emphome.html

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

WJK:WBF:mdw
DJ 170-2-122

CERTIFIED MAIL                          JUN 1 8 2007
RETURN RECEIPT REQUESTED

Annie Lucas Brown
2508 Brothers Drive
Tuskegee, AL 36083

       Re: Annie Lucas Brown v. Alabama Public Library
       Service, EEOC No. 420-2006-04866

Dear Ms. Brown:

    It has been determined that the Department of Justice will not file suit on the above-referenced charge of discrimination that was referred to us by the Equal Employment Opportunity Commission (EEOC). This should not be taken to mean that the Department of Justice has made a judgment as to whether or not your charge is meritorious.
    You are hereby notified that conciliation in this matter was unsuccessful by the EEOC. You are further notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent. If you choose to commence a civil action, such suit must be filed in the appropriate court within 90 days of your receipt of this Notice.
    Therefore, you should consult an attorney of your own choosing at your earliest convenience. If you are unable to locate an attorney, you may wish to contact the EEOC, or apply to the appropriate court, since that court may appoint an attorney in appropriate circumstances under Section 706(f)(1) of Title VII, 42 U.S.C. 2000e-5(f)(1).
    We are returning the files in this matter to EEOC's Birmingham District Office. If you or your attorney have any questions concerning this matter or wish to inspect the investigative file, please feel free to address your inquiry to: Delner Franklin-Thomas, District Director, EEOC, 1130 22nd Street, South, Birmingham, AL 35205.

               Sincerely,

               Wan J. Kim
               Assistant Attorney General
               Civil Rights Division

    By:

               William B. Fenton
               Deputy Chief
               Employment Litigation Section

cc: Margaret L. Fleming, Esq.
    Alabama Public Library Service

EEOC
00012



EXHIBIT
K

DEFENDANT'S
EXHIBIT

37

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ANNIE LUCAS BROWN,                        )
                                          )
            Plaintiff,                    )
                                          ) CASE NO.:2:07-cv-841-MHT-WC
                                          )
Vs.                                       )
                                          )
ALABAMA PUBLIC LIBRARY SERVICE,           )
                                          )
            Defendant.                    )

## PLAINTIFF'S ANSWERS TO DEFENDANT'S INTERROGATORIES AND REQUESTS FOR PRODUCTION

Comes now the Plaintiff, **ANNIE LUCAS BROWN**, and answers Defendant's Interrogatories and Requests for Production as follows:

1.  **Annie M. Lucas Brown**, 55 years of age; SS# 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; Alabama Drivers' License No.: 3031186; 2508 Brothers Drive, Tuskegee, Alabama 36083.

2.  2508 Brothers Drive, Tuskegee, Alabama 36083.

3.  I have been employed for the past ten years with the Alabama Public Library Service.

4.  I have an Associates of Arts Degree from Alexander City State Jr. College. I also have a B.S. from Alabama State University in Sociology with a minor in Business Administration. I also have a Masters Degree in Library and Information Studies from Atlanta University.

EXHIBIT

L

Blumberg No. 5110

5.    Objection, irrelevant and immaterial.

6.    About three years ago, I sued an individual for property damage and bodily injuries resulting from an automobile accident. I recovered but I do not recall the amount of the damages awarded.

7.    The written reprimand of July 25, 2006 by Rebecca Mitchell, who is white, was unwarranted because the underlying allegations of Ms. Mitchell were not based in fact and it violated the definition of a "reprimand" as described in the State of Alabama Progressive Discipline Manual, June 2006 Edition. According to the manual, a reprimand should "state the continued or additional unwanted behavior and the necessity of the desired behavior." It should also state that "further disciplinary action would take place if the behavior does not come in line with job standards." A corrective action plan was to be developed and the reprimand should have included the reprimand and the corrective action plan. More importantly, a reprimand is the "second step" of the discipline system for Ms. Mitchell should have utilized step one of the discipline process which is a "written warning". Finally, there is no language in the Alabama Public Library Service Employee Handbook, "Travel" section that prohibits an employee checking on his or her

travel reimbursement, especially when one has incurred more than $1,500 on his or her personal credit card and is in need of reimbursement.

8.  Yes, but it was more than 10 years ago in the Middle District of Alabama, Eastern Division. I do not know the case number.

9.  See my response to Question 7.

10. In addition to the improper and unwarranted written reprimand of July 25, 2006, Ms. Mitchell and other managerial staff, intentionally created a hostile work environment for me. Other white co-workers have been instructed not to associate with me; I have been denied the use of supplies to conduct workshops; my performance appraisal for 2005-2006 was unreasonably reduced to "Partially Meets Standards" to prevent me from receiving a pay raise; my supervisory duties were removed from me, as the only black professional hired by Defendant; my job title as Library Operations Manager, a professional position was changed to a mere "Consultant"; and I am constantly being treated differently from my white counter-parts employed by Defendant.

11. Rebecca Mitchell informed me that my title was Consultant and no longer Library Operations Manager in June of 2006.

12. See my response to Question 10.

13. See my response to Question 10.

14. Judith Shepard, who is a white professional, also received a letter of reprimand during the same time period and her supervisory authority was retained and her performance appraisal for the period in which she received the reprimand was completed in such a manner to allow her to receive a pay raise.

   None of the white employees are forbidden from using supplies and none of the white employees are ostracized.

15. The allegation by Rebecca Mitchell in her July 25, 2006 written reprimand that I committed "gross insubordination, and disruptive conduct undermining her authority" is false and is pretextual. Ms. Mitchell's allegations that "I made false accusations on staff and that my demeanor and words created an environment of personal and professional embarrassment for the agency and Ms. Mitchell, are false and pretextual.

16. See my responses to Questions 7, 9, 10, 11, 12 and 13.

17. Rebecca Mitchell, Director; Hulen Bivens, Assistant Director and Harry Lensch, Confidential Assistant/Business Manager, all of whom are employed by Defendant.

18. The discriminatory employment actions perpetuated against me have caused me to have high blood pressure; and I have broken out in spots on my arms, back and legs due to emotional stress caused by my job; the emotional stress has prompted my thyroid to act up; I have gone to see a psychologist to assist me to deal with the emotional stress of my job.

19. Dr. Robert M. Combs, 2165 Normandie Drive, Montgomery, Alabama 36111 and Dr. Daniel C. Clark, 4146 Carmichael Court, Montgomery, Alabama 36130.

20. Objection to going back to 1997 for such information is irrelevant, immaterial and unduly burdensome.

21. The persons who witnessed or who have information relevant to the claims of the basis of this suit are: Rebecca Mitchell; Hulen Bivens; Judith Shepard; Christine Bowman; Kim Owen; Cheryl Fondon; LaTonya Moore, Joanna Bice; Jackie Barnes; Amanda Daniel; Kim Goodson; Mack Butler; George T. Washburn, Jr., Robert E. Hodge; Ronald A. Snider; Donald Dickey; Bobbie Lou Leigh; Helen Harrison Phillips; Robert Schremser; DeLois Humphrey and Aseelah Salaam.

22. Back pay which is the difference between what I could have earned if I had received an "Exceeds Standards" in all areas of my 2005-2006 performance appraisal with a pay raise and what I had actually earned without the

pay raise. I also am requesting compensatory damages in the amount of $300,000 and punitive damages for the intentional employment discriminatory conduct of Defendant.

23. The experts identified at this time are Plaintiff's medical providers identified in the response to Question 19.

24. I was provided a copy of the December 3, 2007 letter that LaTonya Moore, who is black, sent to the Executive Board members of the Alabama Public Library Service regarding the hostile work environment she faced as an Administrative Support Assistant from October 2000 through March 2004 and as Executive Secretary from October 2004 through May 31, 2007. Ms. Moore cited many instances of racial discrimination and hostile work environment, in her letter.

25. Objection, not relevant and immaterial.

26. Objection, not relevant and immaterial.

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## REQUEST FOR PRODUCTION OF DOCUMENTS

Comes now Plaintiff, **ANNIE LUCAS BROWN** and answers Defendant's Request for Production of Documents as follows:

1. I have attached a copy of the July 25, 2006 improper and unwarranted "written reprimand" to me from Rebecca Mitchell. I have also attached a copy of the "Reprimand" section from the State of Alabama

Progressive Discipline Manual; a copy of the Travel Policy from the Alabama Public Library Service Employee Handbook; a copy of my rebuttal to the contested Performance Appraisal attached copies of my previous Performance Appraisals; a copy of a June 2, 2006 memo from me to Rebecca Mitchell requiring me to justify my request for office supplies; copies of the salary schedule for a Library Operations Manager and salary schedule for a Library Consultant; a copy of the July 11, 2006 Amendment, Request for Out of State Travel for Annie Brown; a copy of Chapter 670-X-4 Prohibition of Discrimination policy from the State Personnel Board's Administrative Code; and a copy of a June 14, 2006 memo from Rebecca Mitchell to Annie Brown and others about their respective consultant assignments.

2. In addition to the documents referenced in 1 above, I have enclosed a copy of an August 9, 2006 letter to Rebecca Mitchell from my attorney, copies of relevant communication with EEOC and copies of an August 11, 2006 letter to each of Defendant's Board Members from my attorney regarding the August 9, 2006 letter to Rebecca Mitchell regarding her discriminatory actions. I also have enclosed a copy of a March 8, 2007 letter to me from Beta Kappa Chapter of Beta Phi Mu selecting

me as 2007 Librarian of the Year.

3.  None

4.  Copy of a December 3, 2007 letter from LaTanya Moore to
    Executive Board of Alabama Library Service.

5.  I have requested such records but I have not received
    them.  Therefore, I will supplement this response with
    the records upon receipt of same.

6.  None

7.  None other than those produced, but additional
    documents could be revealed during further discovery.

8.  See documents provided showing difference in salary
    according to Salary Schedule for Library Consultant and
    Library Operations Manager.  My performance appraisal
    for 9/01/2005 to 9/01/2006 indicating "Partially Meets
    Standards" also prevented me from receiving a pay
    raise.

9.  See response as that to Question 5.

10. None

11. None other than those provided.

12. Not available, which is the automobile accident in
    which I was the Plaintiff as referenced in my
    interrogatory Response to Question 6.

13. See attached.

14. The medical records which I have requested from my
    treating physicians and the salary schedules produced

herein.

15. Undetermined at this time.

16. None

17. I am relying on the Title VII of the Civil Rights Act of 1964, 42USCA Section 2000e et seq. as amended by the Equal Employment Opportunity Act of 1972.

18. See attached.

19. See attached.

20. Objection, irrelevant and immaterial.

21. See attached.

22. Objection, overly burdensome and poses an undue hardship since Plaintiff has been employed with Defendant since 1997.

23. Objection, overly burdensome and poses an undue hardship since Plaintiff has been employed with Defendant since 1997.

24. I have copied and attached the relevant portions of the manual. The entire manual is available for inspection by Defendant's counsel.

25. See attached.

26. Objection, irrelevant and immaterial.

**Done this the 11th day of January, 2008.**

ANNIE LUCAS BROWN

STATE OF ALABAMA )
)
COUNTY OF MACON )

I, _____Barbara E. Adams_____, Notary Public for said
state in said county hereby certify that **ANNIE LUCAS BROWN**
whose name is signed to the foregoing **Plaintiff's Answers to
Defendant's Interrogatories and Requests for Production**, and
who is known to me, acknowledged before me on this day that,
being informed of said contents of said foregoing, she
executed the same voluntarily on the day the same bears
date.

Given under my hand and official seal this the ___11th___
day of ___January___, 2008.

_____
NOTARY PUBLIC

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 8, 2009     My Commission Expires: 6/08/09
BONDED THRU NOTARY PUBLIC UNDERWRITERS


## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the
foregoing **Plaintiff's Answers to Defendant's Interrogatories
and Requests for Production**, upon the following attorney of
record, by U. S. Mail, postage prepaid and properly
addressed, this the 11th day of January, 2008:

R. Austin Huffaker, Jr.
Attorney for Defendant,
Alabama Public Library Service
Post Office Box 270
Montgomery, AL 36101

_____
DEBORAH HILL BIGGERS
Attorney at Law

ALABAMA STATE PERSONNEL BOARD ALABAMA STATE PERSONNEL DEPARTMENT

ADMINISTRATIVE CODE

## CHAPTER 670-X-19 EMPLOYEE WORK RULES

TABLE OF CONTENTS

### 670-X-19-.01 General Work Rules

### 670-X-19-.02 Prohibition Of Political Activities

### 670-X-19-.01 General Work Rules.

(1) In addition to any special rules issued by the various appointing authorities for the guidance of their employees, the following standard general work rules shall apply to all classified employees:

(a) Violations that normally result in disciplinary actions of increasing severity:

1. Violations of safety rules.

2. Absenteeism - Unexcused absence, unreported absence, a pattern of absences, or excessive absences.

3. Tardiness - Not on the job ready to work at the beginning of the shift.

4. Inattention to job - Doing anything distracting while on the job.

5. Failure to perform job properly.

6. Leaving job station without permission.

7. Disruptive conduct of any sort.

8. Abuse of equipment.

9. Unauthorized operation of vehicles, machinery, or equipment.

10. Participation in unauthorized activity or solicitations on work premises.

11. Poor housekeeping.

12. Unauthorized use of telephones.

13. Unauthorized use of bulletin boards.



14. Violation of specific department rules.

(b) More serious violations that may result in suspension or discharge on the first offense, considering work record and length of service.

1. Violations of safety rules which endanger life or

property.

2. Insubordination - Failure to follow an order; disobedience; failure to submit to authority as shown by demeanor or words, with the one exception of not following an order which the employee has good reason to believe is unsafe or illegal.

3. Theft or unauthorized possession of company property.

4. Fighting.

5. Use of abusive or threatening language.

6. Falsification of records - Application for Employment, time card, doctor's excuse, etc.

7. Possession or use of alcohol, narcotics, or dangerous weapons.

8. Sleeping on the job.

9. Leaving before the end of the shift/walking off the job.

10. Serious violation of any other department rule.

11. Job abandonment which consists of three days of unexcused, unreported absence.

(2) The listing of violations above is not meant to be all inclusive and does not imply that discipline may not be imposed for other sufficient reasons.

**Author:**

**Statutory Authority:** Code of Ala. 1975, § 36-26-9.

**History:** Filed September 29, 1981. **Amended:** Filed May 24, 1985.

**670-X-19-.02 Prohibition Of Political Activities.**

(1) No person shall be appointed or promoted to or demoted or dismissed from any position in the classified service, or in any way

favored or discriminated against with respect to employment in the classified service because of his political or religious opinions or affiliations.

(2) No person shall seek or attempt to use any political endorsement in connection with any appointment to a position in the classified service.

(3) No person shall use or promise to use, directly, or indirectly, any official authority or influence whether possessed or anticipated, to secure or attempt to secure, for any person an appointment or advantage in appointment to a position in the classified service, or an increase in pay or other advantage in employment in any such position, for the purpose of influencing the vote or political action of any person, or for any consideration.

(4) No employee in the classified service and no member of the Board shall, directly or indirectly, pay or promise to pay any assessment, subscription or contribution for any political organization or purpose or solicit to take any part in soliciting any such assessment, subscription or contribution under coercion; provided, however, it shall be unlawful for any officer or employee to solicit any type political campaign contributions from other employees who work for said officer or employee in a subordinate capacity.

(5) No employee in the classified service shall be a member of any national, state or local committee of a political party or an officer of a partisan political club or a candidate for nomination or election to any public office or shall take any part in the management or affairs of any political party or in any political campaign, except on his personal time and to exercise his right as a citizen privately to express his opinion and to cast his vote; provided, however, that nothing in this section shall prohibit any person in the classified service from serving the time this chapter goes into effect.

(6) Any employee in the classified service may engage in political action or political activities on personal time before and after work, holidays and during approved leave.

(7) Any officer or employee in the classified service who violates any of the foregoing provisions of this section shall forfeit his office or position. Revised by Act No. 83-497, 1983 Regular Session of the Alabama State Legislature.

**Author:**

**Statutory Authority:** Code of Ala. 1975, §§ 36-26-1, et seq.

**History:** Filed September 29, 1981.

February 27, 2006

To:        Judith Shepard

From:      Hulen E. Bivins

Re:        Employee Reprimand

    This memo to your attention is with regard to two items of employee conduct that are unacceptable. One item is intentional statements of false data in a written form. (See: <u>Alabama Administrative Code</u>, Chapter 670-X-19-.01(a)(4), (5), and (7)). The second item is insubordination. (See: <u>Alabama Administrative Code</u>, Chapter 670-X-19-.01(b)(2)

    1.    In a written communication from you concerning the topic of "Videos and DVDs" (see attachment) issued on February 24, 2006 to the attention of Rebecca Mitchell, State Librarian, and myself, you conclude with a suggested action that you claim to have proposed in the past. Such a statement is false and without basis. Rather, it is Ms. Mitchell who, as State Librarian, has suggested for the past two years the action that you now claim as your thought. Indeed, it is fact, confirmed by several APLS employees including Ms. Mitchell herself, that not only did you not propose the action for which you credit yourself, what you did do is delay the implementation of any action regarding the matter of videos and DVDs that was suggested by the State Librarian. Your statement therefore shows an inattention to your job tasks resulting in a failure to perform your job properly thus causing a disruptive influence. (See: <u>Code</u>, items (a)(4), (5) and (7))

    Furthermore, your communication of February 24, suggest, "We need to notify these patrons that we are no longer purchasing videos and that we are going to stop circulating them." You present such as a statement of fact. This is not true. APLS has in the past month, placed an order for new video titles in the DVD format and plan to add additional titles in the hope that increased circulation, through and including FY '07, will indicate a usefulness of this library circulation service. To incorrectly imply any other decision has been made by the agency, certainly to the public, has a disruptive effect showing an inattention to your specific job and its inherent duties resulting in a failure to perform your job properly. (See: <u>Code</u>, items (a)(4), (5) and (7))

    As you are aware following many years of service as a professionally trained librarian, honesty is an integral part of the profession of librarianship. For example, issues such as plagiarism have been and continue to be of great importance. Personal honesty is of no less importance. Diligence must be

1

EXHIBIT
N
Blumberg No. 5116

exercised to preserve the truth and you are directed to conform to this standard. Certainly, to appropriate the words, thoughts and the directives of the State Librarian as your own is not acceptable

2.      Under the reorganization of APLS as announced in January of this year, I am now designated as your immediate supervisor. Your memo of February 24 (cited above) was given to Ms. Mitchell prior to any discussion with me. You did not even have the courtesy to inform me personally of the memo but rather sent an email after already insuring the delivery of your comments to Ms. Mitchell. Your conduct in this matter is disrespectfully, hurtful and mean-spirited. It is simply an act of insubordination. (See: <u>Code</u>, item (b)(2)). Such will not be tolerated.

Further, this is the second time, in recent days, of conduct of insubordination on your part, the former time being when you discussed, in January (2006), a wedding celebration party for APLS employee Beverly Davis. Again, you talked with Ms. Mitchell prior to me. To make the matter of greater disrespect, you then scheduled the function of honor for Ms. Davis on a date that you, for more than two weeks prior, knew was a date on which I would not be at APLS. Further compounding the disrespect, the date and time you selected to honor Ms. Davis was a date on which Ms. Mitchell, the State Librarian, could not be present. (See: <u>Code</u>, item (b)(2))

Everyone at APLS is participating in a period of great change designed to assure that the agency fulfills the charge placed before it via the <u>Code of Alabama</u>. In so doing, the status quo of the past is being left behind as APLS molds itself into an agency prepared to fulfill its charge in the future. You, as a member of the APLS staff, must participate in these changes and you must be supportive of said changes. Anything less in your words, conduct, or countenance, shall not be appreciated, shall not be rewarded, and will not be acceptable.

You are encouraged to make positive change so as not to allow a recurrence of the problems outlined herein. A copy of this employee reprimand as directed to your attention this day shall be placed in the APLS Personnel File. You may provide a written explanation of your actions as cited in this reprimand and/or you may provide in writing any factors which you believe mitigate your responsibility for your actions as cited. You are requested to provide said writing within a period of three (3) working days from the date of this reprimand.

_Hulen E. Bivins_
Hulen E. Bivins
Assistant Director
Alabama Public Library Service

Received _27th_ day of February, 2006

Judith Shepard

2

*file copy*

**Form 13**
**Revised (01/2006)**

# EMPLOYEE PERFORMANCE *APPRAISAL*
## STATE OF ALABAMA
### Personnel Department

Employee Name: <u>JUDITH R SHEPARD</u>  Social Security Number: <u>XXX-XX-4389</u>

Agency: <u>045/PUBLIC LIBRARY SERVICES</u>  Division:

Classification: <u>LIBRARY OPERATIONS MGR</u>  Class Code: <u>30515</u> Position #: <u>03880100</u>

Period Covered From: <u>08/01/2005</u> To: <u>08/01/2006</u>  Annual Raise Effective: <u>OCTOBER 2006</u>

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN XXX-XX-3100 | | SSN XXX-XX-0055 |
| *signature* | *signature* | *signature* |
| Rater Signature | | Reviewer Signature |
| Hulen E. Bivins | | Rebecca S. Mitchell |
| Rater Printed Name | Employee Signature | Reviewer Printed Name |
| 7/28/06 | 7-28-06 | 7-28-06 |
| Date | Date | Date |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 25.70 | − | 7.00 | = | 18.70 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) [XX] | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|

---

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

| | **Unsatisfactory** | **Satisfactory** |
|---|---|---|
| Attendance | | X |
| Punctuality | | X |
| Cooperation with Coworkers | | X |
| Compliance with Rules | | X |

EXHIBIT

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| **0** | **1** | **2** | **3** | **4** |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                                                    **Rating**

| | Rating |
|---|---|
| Plan, organize, coordinate, monitor, and evaluate the Information Services | 3 |
| Interviews, selects, and trains new staff, monitors, and evaluates professional | 3 |
| Provides agency administration with accurate and timely reports of divisional | 3 |
| Maintains positive working relationships with other agency staff, library | 2 |
| Provides, either directly or by delegation, reference, research, and | 2 |
| Assists in collection development activities for the agency to insure that | 3 |
| Plans for the on-going development of resource sharing programs and manages | 2 |
| | |
| 0. | |

**RESPONSIBILITY SCORE:**

| 18 | ÷ | 7 | = | 2.57 | × | 10 | = | 25.70 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| Warning | Reprimand | Suspension | Demotion |
|---|---|---|---|
| -0- | 1 | -0- | -0- |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, and demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:**                    7