## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **ANNIE LUCAS BROWN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Case Number 2:07-cv-841-MHT** |
| | § | |
| **ALABAMA PUBLIC LIBRARY** | § | |
| **SERVICE,** | § | |
| | § | |
| **Defendant.** | § | |

## BRIEF IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

This is a Title VII action arising out of a written reprimand ("the Reprimand") received by Plaintiff Annie Lucas Brown ("Brown") from her employer, the Alabama Public Library Service ("APLS"), a 50-person agency of the State of Alabama charged with the responsibility of providing, among others, consulting services to public libraries throughout the State. The Reprimand was issued by the Director of the APLS after Brown undermined the chain of command at the APLS, criticized the work of her co-workers to the Governor's Office, misled the Director of the APLS, and refused to answer direct questions posed to her by the Director of the APLS concerning APLS business. Despite admitting to most of the conduct on which the Reprimand was founded, Brown nevertheless claims that the Reprimand was discriminatory because she should have received a lesser mode of discipline (a written warning). When the APLS refused to rescind the Reprimand after Brown threatened the APLS with an EEOC charge against the APLS and the Director of the APLS, personally, Brown filed this action for

compensatory damages, punitive damages, and equitable relief.

As will be demonstrated, no genuine issues of material fact exist concerning Brown's claims against the APLS and, accordingly, the APLS is entitled to summary judgment in its favor on all claims in the Complaint.

## NARRATIVE SUMMARY OF FACTS

### The APLS

The APLS is a 50-person agency of the State of Alabama charged with the responsibility of promoting and supporting access to library and information resources and services for Alabama citizens. [See Mitchell Aff., Ex. A to M.S.J.]. These tasks are accomplished through the APLS's statewide programs and by providing direct grants and assistance to libraries and library systems to meet users' needs. [See Mitchell Aff., Ex. A to M.S.J.]. In furtherance of this mission, the APLS consults with all public libraries in the State of Alabama for the purpose of maximizing the resources that can be provided by the APLS. [See Mitchell Aff., Ex. A to M.S.J.; Mitchell depo., p. 61, ll. 14-19, Ex. C to M.S.J.].

### Annie L. Brown's Employment

Brown, an African-American, was hired by the APLS in 1997 as a "Library Consultant" in its Library Administration and Management division. [See Brown depo., p. 29, l. 17, Ex. B to M.S.J.]. A "Library Consultant" is a job classification recognized by the State Personnel Department. [See Mitchell Aff., Ex. A to M.S.J.]. According to the State Personnel Department, a "Library Consultant" is designated with the classification

code "30520" and has 18 step levels with a salary range of $46,142.40 to $70,228.80, annually.  [See Mitchell Aff., Ex. A to M.S.J.].  Brown served as a Library Consultant from 1997 until May 2002.  [See Mitchell Aff., Ex. A to M.S.J.].

In May 2002, Rebecca Mitchell, Director of the APLS, promoted Brown to the position of "Library Operations Manager." [See Brown depo., p. 29, ll. 11-20, Ex. B to M.S.J.; Mitchell Aff., Ex. A to M.S.J.; Mitchell depo., p. 78, l. 14 to p. 79, l. 19, Ex. C to M.S.J.].  Brown was chosen over 5 other applicants, 3 of whom were Caucasian.  [See Mitchell Aff., Ex. A to M.S.J.].    According to the State Personnel Department, a "Library Operations Manager" is designated with the classification code "30515" and has 18 step levels with a salary range of $48,424.80 to $73,766.40.  [See Brown depo., p. 39, l. 19 to p. 44, l. 1 & Ex. 3 thereto, Ex. B to M.S.J.].  Brown continues to hold that position today.  [Brown depo., p. 41, l. 17 to p. 43, l. 18 & Ex. 4 thereto; Mitchell depo., p. 72, l. 7, Ex. C to M.S.J.].

From May 2002 through 2006, Director Mitchell completed annual performance appraisals of Brown as required by the State of Alabama Personnel Department, all of which were "Exceeds Standards" or better – "Consistently Exceeds Standards" on 10/23/02; "Consistently Exceeds Standards" on 9/13/03; "Exceeds Standards" on 9/28/04; and "Exceeds Standards" on 8/29/05. [See Mitchell Aff., Ex. A to M.S.J.; Mitchell depo., p. 188, l. 9 to p. 189, l. 22 & Exs. 19, 20 & 21, Ex. C to M.S.J. ].  On August 31, 2006, Brown received a "Partially Meets Standards" rating as a result of the events in the preceding 12 months. [See Mitchell Aff., Ex. A to M.S.J.; Mitchell depo., p.

189, l. 17 to p. 190, l. 9 & Ex. 21]. It is this rating and the preceding Reprimand that forms the basis of Brown's lawsuit.

## The Reprimand

In May 2006, Brown submitted a request to Director Mitchell to travel to New Orleans for a library conference. [See Brown depo., p. 159, ll. 7-13 & Ex. 11 thereto, Ex. B to M.S.J.]. This request was approved by Director Mitchell. [See Brown depo., p. 159, ll. 7-13 & Ex. 11 thereto, Ex. B to M.S.J.]. On May 16, 2006, an official "Request for Out-of-State Travel" was submitted by the APLS to, and approved by, Governor Riley. [See Brown depo., p. 159, l. 23 to p. 160, l. 20 & Ex. 12 thereto, Ex. B to M.S.J.]. The travel request was subsequently amended to reflect the fact that Brown intended to take a state vehicle instead of her own personal vehicle. [See Brown depo., p. 159, l. 23 to p. 160, l. 20 & Ex. 13 thereto, Ex. B to M.S.J.]. This change was approved by Director Mitchell. [See Brown depo., p. 159, l. 23 to p. 160, l. 20 & Ex. 12 thereto, Ex. B to M.S.J.].

After the trip, on July 7, 2006, Brown submitted a "Statement of Official Travel" form in which she itemized the specific costs for which she sought reimbursement. [See Brown depo., p. 160, l. 21 to p. 161, l. 22 & Ex. 14 thereto, Ex. B to M.S.J.]. Because the actual costs differed from those that had been pre-approved, as required by the Governor's Office, Brown submitted an "Amended Request for Out-of-State Travel." [See Brown depo., p. 163, l. 16 to p. 164, l. 22 & Ex. 15 thereto, Ex. B to M.S.J.]. The revised form was processed by Tonya Moore, an African American employee at the

APLS, who on July 11, 2006 forwarded it to the Governor's Office for processing and approval. [See Brown depo., p. 166, ll. 3-12 & Ex. 16 thereto, Ex. B to M.S.J.; Fondon Aff., Ex. D to M.S.J.]. Moore was the designated liaison between the APLS and the Governor's Office for purposes of handling any travel reimbursement related issues. [Fondon Aff., Ex. D to M.S.J.; Mitchell Aff., Ex. A to M.S.J.].

On Monday, July 24, 2006, Brown contacted Moore to determine the status of her travel reimbursement. [See Brown depo., p. 128, ll. 10-11, Ex. B to M.S.J.]. During this conversation, Moore told Brown that she had already spoken with the Governor's Office (Cheryl Fondon) the preceding Friday, and that the reimbursement was in the process of being sent back to the APLS. [See Ex. 2 (Moore Memo) to Mitchell Aff., Ex. A to M.S.J.]. Brown then requested that Moore place a reminder call to Ms. Fondon later that day, to which Moore agreed. [See Brown depo., p. 128, l. 21 to p. 129, l. 10, Ex. B to M.S.J.; Ex. 2 (Moore Memo) to Mitchell Aff., Ex. A to M.S.J.].

Instead of waiting for Moore's phone call or contacting Director Mitchell about any perceived problems with her travel reimbursement, Brown called the office of a State Legislator about her travel reimbursement. [Brown depo., p. 130, ll. 7-9, p. 136, ll. 2-18; Ex. B to M.S.J.; Mitchell depo., p. 150, ll. 13-19, Ex. C to M.S.J.]. Brown and "JoAnn" from the State Legislator's Office then called the Governor's Office about the travel reimbursement. [See Brown depo., p. 140, ll. 6-14, Ex. C to M.S.J.; Fondon Aff., Ex. D to M.S.J.]. The two were put in touch with Cheryl Fondon, the Governor's Travel Secretary. [See Brown depo., p. 140, ll. 6-14, Ex. C to M.S.J.; Fondon Aff., Ex. D to

M.S.J.].   During this phone call, according to Ms. Fondon, Brown questioned Ms. Fondon about Brown's travel reimbursement, complained about the State's travel reimbursement procedures, represented that she had put over $1,000 on her credit card (which was false) that had to be paid, stated that Tonya Moore at the APLS had messed up her travel reimbursement, was argumentative, and stated that there were problems with Tonya Moore's office in handling travel reimbursement.  [See Fondon Aff., Ex. D to M.S.J.; Ex. 3 (Fondon Memo) to Mitchell Aff., Ex. A to M.S.J.].   In response, Ms. Fondon repeatedly explained the State's travel procedures and advised that she had not had any problems with Ms. Moore.  [See Fondon Aff., Ex. D to M.S.J.; Ex. 3 (Fondon Memo) to Mitchell Aff., Ex. A to M.S.J.].  Ms. Fondon also told Brown that her travel reimbursement was ready and that Brown personally could come by the mail room and pick up her travel reimbursement.  [See Fondon Aff., Ex. D to M.S.J.; Ex. 3 (Fondon Memo) to Mitchell Aff., Ex. A to M.S.J.].

Shortly thereafter, Ms. Moore was informed that Brown had called the Governor's Office about her travel reimbursement.  [See Ex. 2 (Moore Memo) to Mitchell Aff, Ex. A to M.S.J.; Mitchell depo., p. 143, l. 17 to p. 144, l. 15, Ex. C to M.S.J.].  Ms. Moore informed Director Mitchell of the phone call, who in turn called Ms. Fondon at the Governor's Office to find out what happened. [See Ex. 2 (Moore Memo) to Mitchell Aff, Ex. A to M.S.J.; Mitchell depo., p. 143, l. 17 to p. 144, l. 15; Ex. C to M.S.J.].     Ms. Fondon proceeded to complain about Brown's phone call, and in particular, the fact that it had been made through a State Legislator's Office, that Brown was argumentative

during the phone call, that Brown was critical of Tonya Moore, and that Brown had misled Ms. Fondon into believing that the State Legislator's Office was no longer on the telephone call. [See Fondon Aff., Ex. D to M.S.J.; Mitchell Aff., Ex. A to M.S.J.; Mitchell depo., p. 152, l. 22 to p. 154, l.6, Ex. C to M.S.J. ].

After talking with Ms. Fondon and after speaking with Tonya Moore, Director Mitchell confronted Brown about her telephone call. In response to specific questions from Director Mitchell, Brown *twice* denied that she had called the Governor's Office. [See Mitchell depo., p. 149, l. 10 to p. 151, l. 6, Ex. C to M.S.J.]. After being confronted with the fact that Director Mitchell had already spoken with the Governor's Office and confirmed the phone call, Brown confessed that a phone call was made, but stated that she had called a State Legislator's Office first. [See Brown depo., p. 148, l. 1 to p. 149, l. 7, Ex. B to M.S.J.; Mitchell depo., p. 149, l. 10 to p. 151, l. 6, Ex. C to M.S.J.]. Director Mitchell then asked Brown which State Legislator she had called. [See Brown depo., p. 149, 1. 8-p. 150, l. 9, Ex. B to M.S.J.; Mitchell depo., p. 149, l. 10 to p. 151, l. 6, Ex. C to M.S.J.]. Brown *refused* to answer the question. [See Brown depo., p. 149, 1. 8-p. 150, l. 9, Ex. B to M.S.J.; Mitchell depo., p. 149, l. 10 to p. 151, l. 6, Ex. C to M.S.J.]. In her deposition, Brown concedes that she refused to disclose the name of the person she had called. [See Brown depo., p. 149, 1. 8 to p. 150, l. 9, Ex. B to M.S.J.]. According to Brown, she "didn't think that [she] had to share that information with [Director Mitchell]." [Brown depo., p. 149, ll. 21-23, Ex. B to M.S.J.].

Following this conversation, Director Mitchell sent an email to Brown stating that

7

she needed to go to the Governor's Office and pick up her reimbursement check as she had told Ms. Fondon she would do. [See Brown depo., p. 146, ll. 6-15, Ex. B to M.S.J.]. In response, Brown denied that she had told Ms. Fondon that she would pick up her travel reimbursement. [See Brown depo., p. 146, ll. 6-15, Ex. B to M.S.J.].

On July 25, 2006, Director Mitchell drafted a written "warning" as a result of the events concerning the phone call to the Governor's Office. [Mitchell depo., p. 173, l. 3, Ex. C to M.S.J.]. A "warning" is one of four possible levels of discipline available under the State Personnel Progressive Discipline Manual ("Discipline Manual"). [See Progressive Discipline Manual excerpts, Ex. E to M.S.J.]. Prior to submission of the written warning to Brown, Director Mitchell consulted with counsel for the State of Alabama Personnel Department and Darby Forrester (Assistant Director of State Personnel) about the warning and the available discipline under the Discipline Manual. [See Mitchell depo., p. 174, l. 2-p. 175, l. 13, Ex. C to M.S.J.]. State Personnel confirmed that Brown's conduct constituted insubordination under the Discipline Manual, which made available levels of discipline ranging from a warning to termination. [See Mitchell depo., p. 174, l. 2 to p. 175, l. 13, Ex. C to M.S.J.]. Brown concedes that, under the Discipline Manual, she could have been terminated for the infraction of insubordination. [Brown depo., p. 201, l. 18 to p. 202, l. 1, Ex. B to M.S.J.; Employment Manual, Ex. F to M.S.J.]. After consulting with State Personnel, Brown's discipline was upgraded to a written "reprimand." [See Mitchell depo., p. 174, l. 2 to p. 175, l. 13, Ex. C to M.S.J.]. As a result, Brown was reprimanded for her conduct, and her supervisory

duties were removed. [Mitchell Aff., Ex. A to M.S.J.].

Within two weeks, Brown retained an attorney who issued a letter to Director Mitchell and the APLS and who threatened to file an EEOC charge against the APLS and Director Mitchell, personally, for race discrimination if Director Mitchell did not immediately rescind the Reprimand. [See August 9, 2006 Letter, Ex. G to M.S.J.]. No mention was made in the letter to the existence of a hostile work environment at the APLS, or any other problems that Brown deemed existent at the APLS. [See August 9, 2006 Letter, Ex. G to M.S.J.]. Several days later, Brown's attorney issued similar letters to all members of the Board of Directors for the APLS again demanding that the Reprimand be rescinded; otherwise, a discrimination charge would be filed with the EEOC. [See August 11, 2006 Letter, Ex. H hereto].

## The EEOC Charge

After the APLS refused to rescind the Reprimand, on September 6, 2006, Brown filed an charge of discrimination with the EEOC. [EEOC Charge, Ex. I to M.S.J.]. In her charge, Brown verified under oath that the Reprimand and the removal of her supervisory responsibilities were discriminatory, that the Reprimand was based on "erroneous facts", and that the Reprimand violated the Discipline Manual. [EEOC Charge, Ex. I to M.S.J.]. Brown also verified that Director Mitchell had wrongfully demoted her from a "Library Operations Manager" to a "Library Consultant." [EEOC Charge, Ex. I to M.S.J.]. Finally, Brown made vague reference to a hostile work environment, but provided no specific facts supporting the allegation. [EEOC Charge, Ex. I to M.S.J.]. Based on these

allegations, Brown sought "to be immediately re-instated as a Library Operations Manager." [EEOC Charge, Ex. I to M.S.J.].

Following several discussions with Brown's counsel, the EEOC ultimately issued a letter finding that a violation of Title VII occurred when Director Mitchell removed Brown's supervisory responsibilities in the Reprimand. [EEOC Letter, Exhibit J to M.S.J.]. Thereafter, on June 18, 2007, the EEOC issued a Right to Sue letter, and Brown initiated this lawsuit on September 17, 2007. [EEOC Right to Sue Letter, Ex. K to M.S.J.].

## The 2005-2006 Performance Appraisal

After the Reprimand was issued and as required by state personnel guidelines, Director Mitchell on August 31, 2006 completed Brown's annual Performance Appraisal. [Performance Appraisal attached to Mitchell Aff., Ex. A to M.S.J.]. While Brown had received ratings of "Exceeds Standards" or better in the preceding years, for the 2005-2006 term, Brown received a rating of "Meets Standards", which was reduced to a "Partially Meets Standards" due to the Reprimand. [Performance Appraisal attached to Mitchell Aff., Ex. A to M.S.J.]. As set forth in the Affidavit of Rebecca Mitchell, Brown's 2005-2006 Performance Appraisal was negatively impacted by a host of factors including the following:

1. Performance issues surrounding the July 25, 2006 Reprimand;

2. Performance issues concerning a post-Katrina project in Bayou La Batre, Alabama, including a complaint voiced by another co-worker, Mary Payne, about Brown's lack of cooperation on the project and her refusal to do any "lifting."

3.  Performance issues concerning another complaint voiced by Mary Payne about Brown in which Brown complained about the fact that a new employee received a new computer when Brown did not.

4.  A complaint made by the Director of the St. Clair Library System concerning a workshop that Brown and another employee coordinated and put together.  In his e-mail, the St. Clair Director complained that the workshop was a complete waste of time and commented that she was offended by having to attend the workshop.

5.  A complaint made by Sheila Fulmer, the Personnel Assistant at the APLS and the coordinator for training classes, about Brown stepping out of the chain of command and calling the State Personnel Department to determine if Ms. Fulmer had in fact enrolled Brown in a training class as Ms. Fulmer had already told Brown that she had done.

6.  A complaint by Tonya Moore about Brown's coordination of a continuing education sub-committee meeting on July 27, 2006 during which Brown decided not to order lunches for the committee members even though one member was diabetic.

7.  A complaint made by Ms. Moore about a comment made by Brown on May 16, 2006 in which Brown stated "I better not find out that you all are not doing the same for me as what you do for the white people."  The statement was made in response to a request by Ms. Moore that Brown provide her with the days she would take on annual leave for purposes of completing a travel request form.

8.  In 2006, Brown committed APLS funds to the Alabama Humanities Foundation without full documentation and authorization.  This resulted in a claim made by the Alabama Humanities Foundation which the APLS had to submit to the Board of Adjustment.

[Mitchell Aff., Ex. A to M.S.J.].

## **Complaint Allegations**

In her Complaint, Brown asserts the following violations of Title VII have occurred:

(1) Director Mitchell gave an unwarranted written reprimand;

(2) Brown's 2005-2006 Performance Appraisal was unreasonably reduced to

11

"Partially Meets Standards"; and

(3) The APLS has subjected Brown to a hostile work environment.

For relief, Brown seeks the following:

(1) A judicial determination that the APLS's actions, as set forth in the Complaint, be deemed discriminatory based on Brown's race;

(2) A judicial order that Brown's 2005-2006 Performance Appraisal be increased to "Meets Standards", so that Brown can be eligible for a pay raise for that period;

(3) An award of compensatory damages and punitive damages.

## Interrogatory Responses

In her interrogatory responses, which sought identification of the specific facts made the basis of the hostile work environment claim, Brown identified the following:

1. Other employees have been told not to associate with her;

2. She has been denied the use of supplies;

3. Her Performance Appraisal was unreasonably reduced;

4. Her supervisory responsibilities have been removed;

5. She was demoted from Library Operations Manager to Consultant; and

6. She was treated differently.

[Brown Interrogatory Responses, Ex. L to M.S.J.].

## STANDARD OF REVIEW

Summary Judgment is appropriate if this Court finds that there exists no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of

law. See Fed. R. Civ. P. 56(c);  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Co. v. Catrett, 477 U.S. 317, 322 (1986); Turnes v. AmSouth Bank, 36 F.3d 1057, 1061 (11th Cir. 1994).

    In order to prevail on a Title VII claim, Brown must make the showing set forth in forth in McDonald Douglas Corp. v. Green, 411 U.S. 792 (1973).  In order to survive summary judgment under this approach, Brown must first set forth a prima-facie case of illegal discrimination, and, once satisfied, a presumption of illegal discrimination or retaliation arises. If she establishes a prima-facie case, the burden then shifts to the APLS to rebut the presumption by articulating a legitimate, non-discriminatory reason for its employment action.  See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). The APLS has the burden of production, not of persuasion, and thus does not have to persuade the Court that it was actually motivated by the reason advanced.  See Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-55 (1981).

    Once the APLS satisfies this burden of production, the presumption of discrimination is eliminated and Brown has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima-facie case, sufficient to permit a reasonable factfinder to conclude that the reason given by the APLS was not the real reason for the adverse-employment decision.  See Chapman, 229 F.3d at 1074.  Brown may meet this burden by persuading the Court that a discriminatory reason more than likely motivated the APLS or by demonstrating that the proffered reason for the employment decision is not worthy of belief.  See Burdine, 450 U.S. at 256.

## ARGUMENT

### I.  THE CLAIM FOR PUNITIVE DAMAGES IS DUE TO BE DISMSISED.

In her Complaint, Brown seeks the recovery of compensatory damages, punitive damages and attorney's fees.  [Compl., Wherefore Para.].  Without dispute, the APLS is an agency of the State of Alabama. [See Compl., ¶5; Mitchell Aff., Ex. A to M.S.J.]. As such, Brown cannot obtain punitive damages from the APLS for an alleged violation of Title VII. See, e.g., Cummings v. Univ. of Fla., 2008 U.S. Dist. LEXIS 27824 (M.D. Fla. 2008)("Punitive damages are not available in this Title VII case because Defendant is a governmental agency."); 42 U.S.C. § 1981a(b)(1).   Accordingly, this claim for damages should be dismissed.

### II.  BROWN CANNOT ESTABLISH A PRIMA FACIE CASE FOR RACE DISCRIMINATION UNDER TITLE VII AS A MATTER OF LAW.

Brown's central claim in this case concerns the Reprimand she received on July 25, 2006.  In its simplest, Brown claims that the Reprimand violated the Discipline Manual, that it was based on false accusations, and that it was discriminatory.  As a corollary, she claims that her supervisory responsibilities were wrongfully removed, again, because of her race.  Finally, Brown contends that, due to the "erroneous facts" set forth in the Reprimand, she was wrongfully demoted from a "Library Operations Manager" to a "Consultant."   None of these allegations support a prima facie case for race discrimination and, therefore, her claims for race discrimination should be dismissed.

14

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin…" 42 U.S.C. §2000e-2(a)(1). To establish a prima facie case of race discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) she was replaced by someone outside the protected class or treated less favorably than a similarly situated employee outside the protected class. See Nettles v. LSG Sky Chefs, 211 Fed. Appx. 837 (11th Cir. 2006) (citing Maynard v. Bd. of Regents of the Div. of Univ. Of Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003)). "If the plaintiff satisfies these elements, the defendant must show a legitimate, non-discriminatory reason for its employment action. If it does so, then the plaintiff must offer evidence to support a finding that the reason provided by the defendant is a pretext for unlawful discrimination. If the plaintiff does that, she can avoid judgment as a matter of law against her." Njie v. Regions Bank, 198 Fed. Appx. 878, 883 (11th Cir. 2006)(internal citations omitted).

For purposes of this summary judgment motion, the APLS concedes the satisfaction of the first and second prongs of Brown's prima facie case since Brown is an African-American and she is qualified for the positions of Library Operations Manager and Library Consultant. As such, the viability of Brown's Title VII race discrimination claims hinge on the third and fourth prongs, namely, whether the Reprimand, the removal

of Brown's supervisory responsibilities, the alleged demotion, and the Performance Appraisal are "adverse employment actions" within the context of Title VII and whether Brown has been treated differently from a white comparator.

**A.** **There Has Been No Adverse Employment Action As it Concerns Brown's Employment at the APLS**

As it concerns the removal of Brown's supervisory responsibilities, the alleged demotion from a "Library Operations Manager" to a "Consultant", the Reprimand, and the Performance Appraisal, Brown cannot show that she has been subject to an adverse employment action as defined by Title VII.

In order to establish that she suffered a tangible (or adverse) employment action as required for a Title VII claim, Brown must demonstrate that a *serious* and *material* change in the terms, conditions, or privileges of employment has occurred. See Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). Not all conduct taken by the APLS that causes a negative or adverse effect on Brown constitutes an adverse employment action under Title VII; there must be some level of substantiality that must be met for unlawful discrimination to be cognizable. See Sasser v. Ala. Dep't of Corr., 373 F.Supp.2d 1276, 1287-88 (M.D. Ala. 2005). Further, "Title VII is not designed to make federal courts sit as a super-personnel department that re-examines an entity's business decisions." Taylor v. CSX Transp., 418 F.Supp.2d 1284, 1303 (M.D. Ala. 2006)(quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)). See also Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997)(holding that "federal courts do not sit to second-guess the business judgment of employers"). Title

VII also does not shield the employee from harsh criticisms for her behavior.  See Portera v. State Dep't of Finance, 322 F.Supp.2d 1285, 1290 (M.D. Ala. 2004)(Thompson)("Title VII does not protect an employee against harsh criticism by her employer.").

First, concerning the removal of an employee's supervisory responsibilities, the Eleventh Circuit has recognized that such an action does not constitute an "adverse employment action" under Title VII.  See, e.g., Njie v. Regions Bank, 198 Fed. Appx. 878, 882 (11th Cir. 2006)(concluding that being stripped of management authority does not constitute an adverse employment action); Davis v. Town of Lake Park, Florida, 245 F.3d 1232 (11th Cir. 2001)(noting that changes in job duties do not constitute an adverse employment action).  See also Portera v. State Dep't of Finance, 322 F.Supp.2d 1285, 1294 (M.D. Ala. 2005)(Thompson)(holding that the "removal of supervision is not an adverse-employment action because it is not a serious and material change in the terms, conditions, or privileges of employment.").  Accordingly, Brown's claim of race discrimination in the context of the removal of her supervisory responsibilities is due to be dismissed.

Second, Brown's claim that she was wrongfully demoted from a "Library Operations Manager" to a "Consultant" suffers the same fate.  In this regard, Brown's allegation is based upon a false premise, i.e., that she has been demoted.  To the contrary, Brown has not been demoted, and there is absolutely no evidence showing otherwise. [Mitchell depo., p. 72, l. 7, Ex. C to M.S.J.].  While Brown has verified under oath on two occasions (her Interrogatory Responses and the EEOC Charge) that she has been

"demoted" to a "Consultant" from a "Library Operations Manager", and thereby suffered a reduction in her ability to advance in salary, when cross-examined about this particular allegation, Brown conceded that she has not, nor has she ever been, demoted from a "Library Operations Manager" to a "Consultant":[1]

> Q.    Ms. Brown, going back and looking at Defendant's Exhibit 3, you said you were step 17 on that document?
>
> A.    Yes.
>
> Q.    And the class number that you have, according to that document, is 30515; is that right?
>
> A.    Yes.
>
> Q.    That's a class that you continue to be paid under; is that right?
>
> A.    Yes.
>
> Q.    What does it show as the actual title of that particular class?
>
> A.    It shows Library Operations Manager.
>
> Q.    Okay.  Do you disagree with that?
>
> A.    No.
>
> **Q.    Do you agree that the State Personnel records show you as being paid as a Library Operations Manager?**
>
> **A.    Yes.**

---

[1] During her deposition, Brown mentioned that she had in her possession a copy of her recently received pay stub. [See Brown depo., p.39, ll. 14-18, Ex. B to M.S.J.].  When asked to produce it, the document produced by Brown showed that she was a "Library Operations Manager" and that she was being compensated as a "Library Operations Manager" at Step 17, which is one level short of "capping out" in her job classification.  [See Brown depo., p. 40, l. 10 to p. 43, l. 11 & Exs. 2, 3 & 4, Ex. B to M.S.J.].

> **Q.    Okay. You've always been paid as a classification number 30515, since June, July of 2006; is that right?**
>
> **A.    Yes.**

[Brown depo., p. 42, l. 13 to p. 43, l. 18, Ex. B to M.S.J.]. Moreover, the fact that Brown continues to be a "Library Operations Manager" is confirmed by the State Personnel Department. [Graham Aff., Ex. C to M.S.J.]. In short, Brown has not been demoted and, therefore, her allegation otherwise is due to be rejected.

Third, Brown cannot show that the Reprimand constitutes an adverse employment action because Brown cannot show that it constituted a tangible harm or that it led to any tangible harm in the form of lost pay or benefits or lost job promotions. Indeed, the Eleventh Circuit generally has refused to recognize a reprimand as a tangible adverse employment action. See Wallace v. Ga. DOT, 212 Fed. Appx. 799, 801 (11th Cir. 2006); Summerlin v. M & H Valve Co., 167 Fed. Appx. 93, 96-97 (11th Cir. 2006); Embry v. Callahan Eye Foundation Hosp., 147 Fed. Appx. 819, 828 (11th Cir. 2005); Pittman v. Marshall, 2007 U.S. Dist. LEXIS 77591, at * 13-*14 (M.D. Ala. 2007); Butler v. Ala. Dep't of Transp., 512 F.Supp.2d 1209 (M.D. Ala. 2007) (reprimands and letters of written counsel that did not lead to tangible harm in the form of a loss of pay or benefits or lost opportunity for a job promotion, were not adverse employment actions for purposes of a Title VII prima facie case). Based on the Eleventh Circuit's general refusal to recognize that a written reprimand constitutes an adverse employment action and Brown's inability to show that it resulted in a tangible harm, this aspect of Brown's discrimination claim is due to be dismissed.

Finally, the 2005-2006 Performance Appraisal does not constitute an adverse employment action. In this regard, Brown cannot show, nor is there any evidence of such, that the Performance Appraisal, by itself, was in any way connected to a denial of a promotional opportunity or loss in benefits. See Anderson v. United Parcel Serv., Inc., 248 Fed. Appx. 97, 100 (11th Cir. 1007) (employees did not suffer any adverse employment action regarding low-quality performance review scores, thus defeating their Title VII race discrimination claims; there was no evidence that the poor performance evaluations by themselves qualified as adverse employment actions, or that the evaluations were, in any way, connected to a denial of lateral transfers, promotions, or pay raises); Brown v. Snow, 440 F.3d 1259, 1265-66 (11th Cir. 2006)(holding that a "[l]ower score on [an employee's] performance evaluation, by itself, is not actionable under Title VII unless [the employee] can establish that the lower score led to a more tangible form of adverse action"); Davis v. Town of Lake Park, Florida, 245 F.3d 1232 (11th Cir. 2001)(summarizing cases and discussing adverse actions in the context of performance memoranda and appraisals).

In short, none of Brown's allegations about racially discriminatory actions constitute a serious and material change in the terms, conditions, or privileges of employment. For this reason, Brown's discrimination claim is due to be dismissed.

### B. Brown Has Not Been Treated Less Favorably Than A Similarly Situated White Comparator

Aside from failing the adverse employment action prong of her prima facie case, Brown also cannot make a prima facie showing that a white comparator was treated more

favorably than Brown. Here, Brown undoubtedly advances Judy Shepard, a white Library Operations Manager at the APLS, as a white comparator.  [See Complaint].  Ms. Shepard, however, is not an appropriate white comparator, and ever if she was, her receipt of a reprimand shows that she was treated equally to Brown.  Thus, even if any of the alleged discriminatory actions constitute an adverse employment action under Title VII, Brown's discrimination claim nevertheless fails because of the lack of a white comparator who has been treated more favorably than Brown.

"To show that employees are similarly situated, the plaintiff must show that the employees are similarly situated in all relevant respects . . . it is necessary to consider whether the employees are involved in or accused of the <u>same or similar conduct</u> and are disciplined in different ways." <u>Knight v. Baptist Hosp. of Miami</u>, 330 F.3d 1313, 1316 (11th Cir. 2003)(emphasis added);  <u>Jones v. Bessemer Carraway Med. Ctr</u>., 137 F. 3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998)("it is necessary to consider whether [they] are involved in or accused of the same or similar conduct and are disciplined in different ways.").  Comparators must be "similarly situated in <u>all relevant respects</u>," <u>Knight</u>, 330 F.3d at 1316, and the "quantity and quality of the comparator's misconduct [must] be <u>nearly identical</u> to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368-69 (11th Cir. 1999).

As it concerns Ms. Shepard, the APLS does not dispute that Ms. Shepard is a white Library Operations Manager, who, like Brown, received a reprimand which

negatively impacted her subsequent performance appraisal. Brown does not dispute this fact either. Therefore, because Brown and Ms. Shepard both received reprimands and negative performance appraisals, Brown cannot show that Ms. Shepard was treated more favorably than Brown.[2]

To the extent Brown asserts a claim of discrimination based upon the removal of her supervisory responsibilities, as shown above, this issue (regardless of whether Ms. Shepard did or did not have her supervisory responsibilities removed) is irrelevant because the removal of supervisory responsibilities does not constitute an adverse employment action as a matter of law. See Portera v. State Dep't of Finance, 322 F.Supp.2d 1285, 1294 (M.D. Ala. 2005)(Thompson).

Regardless, even if the removal of supervisory responsibilities constituted an adverse employment action, Ms. Shepard is not a proper comparator because she was not accused of the same underlying conduct and was not disciplined by the same decision-maker. In this regard, Brown's supervisory responsibilities were removed for a variety of reasons including the fact she refused to acknowledge that Tonya Moore was working on her travel reimbursement, for calling the Governor's Office with no notice to Tonya Moore or the Director, for criticizing staff competency with the Governor's Office, for being argumentative with the Governor's Office, for failing to tell the Governor's Office that an employee of a state legislator remained on the telephone, for lying to the Director about telling the Governor's Office that she would pick up her travel reimbursement that

---

[2] There is no need to address Brown's claim that she was discriminated against in being demoted to a "Consultant" because Brown concedes that she has not been demoted.

morning, for misleading and lying to the Director about whether she had in fact called the Governor's Office, and for refusing to tell the Director the name of the individual she had called.

Ms. Shepard, on the other hand, was disciplined for an altogether separate and distinct set of facts. In this regard, Ms. Shepard was disciplined for plagiarism (i.e., misappropriating an idea of another as her own), and for failing to include her immediate supervisor in internal agency communications and events. [See Shepard Reprimand, Ex. N to M.S.J.]. While Ms. Shepard's actions were classified as "insubordination", they are wholly dissimilar to those committed by Brown, which involved communications outside the APLS, involved criticizing co-workers to an outside department, involved arguing with the Governor's Office, involved misleading the Director, and involved the refusal to answer direct questions from the Director concerning and relating to APLS business. In short, Ms. Shepard and Brown are not "similarly situated in all relevant respects" and the "quantity and quality" of Ms. Shepard's conduct is not "nearly identical" to that of Brown. See Knight, 330 F.3d at 1316; Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999). See also Roland v. U.S. Postal Serv., 200 Fed. Appx. 868, 872-73 (11th Cir. 2006)(discussing the dissimilarities of the conduct between employees that formed the basis of a Title VII claim).

In addition, Brown and Ms. Shepard were disciplined by different decision-makers, also making them dissimilar. In this regard, Director Mitchell (Brown's immediate supervisor) issued the June 25, 2006 Reprimand and discipline in connection

with Brown's conduct, while an altogether different individual (Hulen Bivens who was Ms. Shepard's immediate supervisor), issued Ms. Shepard's reprimand and discipline. [Shepard Reprimand, Ex. N to M.S.J.].

As the Eleventh Circuit has noted in the context of the white comparator inquiry, a court "must focus on the actual knowledge and actions of the decision-maker." Fikes v. Ala. Dep't of Youth Services, 2007 U.S. Dist. LEXIS 42698 (M.D. Ala. Jun. 11, 2007) (quoting Lubetsky v. Applied Card Sys., Inc., 296 F.3d 1301, 1306 (11th Cir. 2002)). Because of this, "courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989). Here, the fact that the disciplinary measures were undertaken by different supervisors disqualifies Ms. Shepard as a proper white comparator, and her discrimination claim therefore must fail. See also Roland v. U.S. Postal Serv., 200 Fed. Appx. 868, 872-73 (11th Cir. 2006); Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001).

## C. Brown Cannot Rebut the APLS's Legitimate, Non-Discriminatory Reasons for Issuing the Reprimand

Even if Brown can make a prima facie case of an adverse employment action and show that she was treated less favorably than a white comparator, the APLS is still entitled to summary judgment because Brown cannot rebut the APLS's legitimate, non-discriminatory reasons for issuing the Reprimand.

In the context of a Title VII claim, "[a] *prima facie* case of discrimination raises the inference that discriminatory intent motivated the adverse employment action." Coutu

v. Martin County Board of County Comm'n, 47 F.3d 1068, 1073 (11th Cir. 1995). "The employer may rebut this inference by 'clearly articulating in a reasonably specific manner a legitimate non-discriminatory reason' for the adverse action." Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1499 (11th Cir. 1985). "The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons." Standard v. A.B.E.L. Servs,, Inc., 161 F.3d 1318, 1333 (11th Cir. 1998). "Once the employer satisfies this burden of production, the plaintiff then has the burden of persuading the court that the proffered reason is a pretext for the true discriminatory reason." Coutu, 47 F.3d at 1073. "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." Chapman v. AI Transp., 229 F.3d 1012, 1024, 1025 (11th Cir. 2000) (en banc).

Here, Brown was reprimanded "as a direct result of [her] gross insubordination, and disruptive conduct." [See Reprimand, Ex. 1 to Mitchell Aff, Ex. A to M.S.J.]. The underlying conduct (all of which constitutes legitimate, non-discriminatory reasons for discipline) included the following:

1. After being told by Tonya Moore that Ms. Moore had already spoken with the Governor's Office about the status of her reimbursement check and that she would place a reminder call later that day, Brown refused to accept that Ms. Moore had in fact done what she had said;

2. Brown took matters into her own hands by contacting a State Legislator's Office, who then contacted the Governor's Office;

25

3.    Brown contacted the State Legislator's Office and the Governor's Office without notice to Tonya Moore (the travel liaison) and Director Mitchell;

4.    Brown failed to tell the Governor's Office (Cheryl Fondon) that the State Legislator's Office was still on the phone while Brown proceeded to discuss her travel reimbursement, which Ms. Fondon deemed unprofessional;

5.    Even though Brown told Ms. Fondon that she would in fact pick up her travel reimbursement that day, Brown denied to Director Mitchell that she ever told Ms. Fondon she would do this[3];

6.    Brown criticized her co-employee, Tonya Moore, to Ms. Fondon and thereby criticized staff competency to an outside department, without the knowledge of the Director, and without first bringing this to the attention of APLS management;

7.    Brown was argumentative with Ms. Fondon during the telephone call;

8.    Brown misled and lied to Director Mitchell when she denied on two occasions that she had in fact called the Governor's Office about her travel reimbursement;

9.    Brown misled and lied to Cheryl Fondon when she stated that she needed her travel reimbursement because she had put $1,500 in charges on her credit card;

10.    Despite a directive from Director Mitchell, Brown refused to tell Director Mitchell the name of the State Legislator's office that she first called.

All of these legitimate, non-discriminatory events factored into the ultimate decision to

reprimand Brown and remove her supervisory responsibilities.[4]

---

[3] The Director's primary issue with this concerned not only Brown's misstatement about what she had told Ms. Fondon, but also with the fact that while Brown deemed her travel reimbursement delay of such urgency and importance to call a State Legislator's Office and the Governor's Office, she did not deem it important enough to actually go and pick up the check when she was told when and where to get it.

[4] As Director Mitchell stated in her deposition, one cannot supervise others if one cannot demonstrate the skills, professionalism, and judgment necessary to be a supervisor, especially as it concerns truthfulness, obeying the chain of command and submitting to authority. [Mitchell depo., p. 152, l. 22 to p. 153, l. 11; p. 155, l. 18 to p. 156, l. 23, Ex. C to M.S.J.].

—

Aside from taking issue with the facts underlying the Reprimand, Brown also takes issue with whether the Reprimand violated the Discipline Manual.[5]   In Brown's opinion, it did because, according to Brown, Director Mitchell could only give a warning for the conduct made the basis of the Reprimand. This simply is not the case.

Without dispute, the Reprimand was issued under the broad scope of "insubordination."   Under State Personnel Board Rules, "Insubordination" is broadly defined as:

> (1) the "failure to follow an order (of a supervisor or someone with authority to direct the employee or agency policy or procedures)";
>
> (2) "disobedience (not obeying supervisor's instructions or agency policy or procedures"; and
>
> (3) the "failure to submit to authority as shown by demeanor or words, except in circumstances where the employee has good reason to believe the order is unsafe or illegal."

[See Rule 670-x-19.01(2) (b), State Personnel Board Rules, Ex. M to M.S.J.].   The Discipline Manual also charges that: "any disruptive or disrespectful behavior is insubordination."   [See Discipline Manual, p. 11, Ex. E to M.S.J.].   Further, the Discipline Manual provides that discipline for "insubordination" can vary between a warning, reprimand, suspension and termination, all of which depend on the level of and seriousness of the conduct involved. [See Discipline Manual, p. 11, Ex. G to M.S.J. ("An employee who commits the act of insubordination may be suspended or dismissed for the

---

[5] As a threshold matter, whether the Reprimand violated the Discipline Manual does not constitute an adverse employment action under Title VII.

first offense, considering work record and length of service.")].

Brown's conduct leading to the Reprimand plainly fits within all categories of "insubordination."  For example, Brown failed to follow an order, failed to submit to authority, and was disobedient and disruptive when she refused to fully and truthfully answer the questions posed to her by Director Mitchell about the phone call to the Governor's Office.  Similarly, Brown was disobedient, disruptive and disrespectful in calling a State Legislator and the Governor's Office without notice to the Director, and in criticizing the competency of APLS staff outside the department.  Under the Discipline Manual, Brown could have been suspended or terminated; instead, she was simply reprimanded.

That the facts underlying the Reprimand are legitimate and non-discriminatory are underscored by Brown's concession that she did deserve to be disciplined for her conduct.  In discussing her conduct and the Reprimand, Brown conceded the following:

> A. In this progressive discipline manual it states that the first step of discipline is a verbal warning.  Now, I've – <u>I feel that I should have gotten, if I had gotten anything, it should have been a verbal warning</u>.

[<u>See</u> Brown depo., p. 184, ll. 8-13, Ex. B to M.S.J.].

> Q.   Okay.  And you think you should have gotten – Strike that.  You think you should have gotten a warning, an oral warning?
>
> A.   I think I should have gotten a verbal warning.

[<u>See</u> Brown depo., p. 185, l. 23 to p. 186, l. 3, Ex. B to M.S.J.].

Brown's concession proves fatal to her charge of discrimination as it is well-

settled that an employee's disagreement over the severity of punishment or whether it is based on erroneous facts does not support a claim of race discrimination. As the Eleventh Circuit noted in Abel v. Dubberly:

> Although termination may, to some, seem a draconian response given the level of the Plaintiff's offense, the reasonableness of [the employer's] disciplinary policies are not a consideration. As we have said before, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."

Abel v. Dubberly, 210 F.3d 1334, 1339 n. 5 (11th Cir. 2000)(quoting Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir.1984)).

### D. Brown Cannot Rebut the APLS's Legitimate, Non-Discriminatory Reasons for Brown's Performance Appraisal

While not the focus of her EEOC Charge, Brown apparently claims, as a corollary to the Reprimand, that the rating she received on her subsequent Performance Appraisal was discriminatory. As shown by Director Mitchell's Affidavit, the Performance Appraisal was based in large part upon the events surrounding the Reprimand. Therefore, for the same legitimate, nondiscriminatory reasons that warrant dismissal of the race discrimination claim as it concerns the Reprimand, the discrimination claim as it concerns the Performance Appraisal should also be dismissed.

Brown's Performance Appraisal, however, was not based solely on the events surrounding the Reprimand. It was also based on many other performance issues in 2005 and 2006 that serve as legitimate, non-discriminatory reasons for giving a less-than-stellar appraisal. These other issues include the following:

1. Performance issues concerning a post-Katrina project in Bayou La Batre, Alabama, including a complaint voiced by another co-worker, Mary Payne, about Ms. Brown's lack of cooperation on the project. These performance issues resulted in Brown's removal as the project coordinator.

2. Performance issues concerning another complaint voiced by Mary Payne about Brown in which Brown complained about the fact that a new employee received a new computer when Brown did not.

3. A complaint made by the Director of the St. Clair Library System concerning a workshop that Brown and another employee coordinated and put together. The Director complained that the workshop was a waste of time and an utter failure.

4. A complaint made by Sheila Fulmer, the Personnel Assistant at the APLS and the coordinator for training classes, about Brown stepping out of the chain of command and calling the State Personnel Department to determine if Ms. Fulmer had in fact enrolled Brown in a training class as Ms. Fulmer had already told Brown that she had done.

5. A complaint by Tonya Moore about Brown's coordination of a continuing education sub-committee  meeting on July 27, 2006 during which Brown decided not to order lunches for the committee members even though one member was diabetic.

6. A complaint made by Ms. Moore about a comment made by Brown on May 16, 2006 in which Brown stated "I better not find out  that you all are not doing the same for me as what you do for the white people." The statement was made in response to a request by Ms. Moore that Brown provide her with the days she would take on annual leave for purposes of completing a travel request form.

7. In 2006, Brown committed APLS funds to the Alabama Humanities Foundation without full and proper documentation and authorization. This resulted in a claim made by the Alabama Humanities Foundation which the APLS had to submit to the Board of Adjustment.

[See Mitchell Aff., Ex. A to M.S.J.].

These performance-related issues are all legitimate, nondiscriminatory reasons for

the Performance Appraisal that Brown received. See, e.g., Holifield v. Reno, 115 F.3d 1555, 1567 (11th Cir. 1997); Davis v. U.S. Postmaster General, 190 Fed. Appx. 874, 877 (11th Cir. 2006). Indeed, Brown herself acknowledges that her performance for the period in question was less than perfect. For example, in the context of her Reprimand, Brown admitted that her conduct deserved some measure of discipline. [See Brown depo., p. 184, ll. 8-1; p. 185, l. 23 to p. 186, l. 3, Ex. B to M.S.J.].

Furthermore, in reviewing her Performance Appraisal scores, Brown concedes that her annual performance deserved less than a perfect score (5/5). In this regard, Brown concedes that she did not deserve the highest score (5 out of 5), nor the next highest score (4 out of 5), but instead deserved a middle score (3 out of 5). [Brown depo., pp. 212, l. 11 to p. 216, l. 3, Ex. B to M.S.J.].

In short, no racial animus can be inferred from the Performance Appraisal since there are numerous legitimate, nondiscriminatory reasons for the poor grade that Brown received.

## III.    BROWN CANNOT DEMONSTRATE THE EXISTENCE OF A HOSTILE WORK ENVIRONMENT AS A MATTER OF LAW.

In both her Complaint and her EEOC charge, Brown vaguely references a hostile work environment. When asked in the APLS's interrogatories to detail her allegation of a hostile work environment, Brown provided a list of approximately six items, none of which, in whole or in part, infer any racial content or support a claim under Title VII for a racially hostile work environment.

As a threshold matter, it is well-settled that "[a] hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). To make a prima facie case of a hostile work environment, a plaintiff must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin (or race); (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under a theory of vicarious or direct liability. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999).

In determining whether the harassment is "sufficiently severe or pervasive to alter the terms and conditions of employment", the Court must consider the following: (1) the

frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).   See also Smithers v. Wynne, 2008 U.S. App. LEXIS 167, at *7-*8 (11th Cir. 2008).   In addition, a plaintiff must establish that she perceived the work environment as racially hostile and abusive, and that a reasonable person would also perceive the environment as racially hostile and abusive. See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000); Mendoza, 195 F.3d at 1246; Faragher, 524 U.S. at 788 (explaining that the objective component of the "severe and pervasive" element prevents the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing from falling under Title VII's broad protections).

It is well-settled that Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace.  See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001).  Moreover, Title VII does not protect against "harsh treatment at the workplace."  See Grant v. Bullock County Bd. of Educ., 895 F. Supp. 1506, 1513 (M.D. Ala. 1995).

Indeed, "[a]lthough [the Court must] examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute [racial] harassment, the statements and conduct must be of a [racial] nature . . . before they are considered in determining whether the severe or pervasive

requirement is met." <u>Washington v. Kroger Co</u>., 218 Fed. Appx. 822, 825 (11th Cir. 2007)(quoting <u>Gupta v. Florida Bd. Of Regents</u>, 212 F.3d 571, 583 (11th Cir. 2000)). "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." <u>Id.</u> "Additionally, teasing, offhand comments, and isolated incidents (unless extreme) will not amount to discriminatory changes in the terms and conditions of employment." <u>Id.</u> (quoting <u>Mendoza v. Borden, Inc</u>., 195 F.3d 1238, 1245 (11th Cir. 1999) (<em>en banc</em>)).

    Even this Court has recognized that harsh or unjustified reprimands or other employment actions, which are devoid of any statements that could be construed as racially offensive, are not the type of pervasive discriminatory conduct that Title VII is intended to prevent. <u>See</u> <u>Portera v. State Dep't of Finance</u>, 322 F.Supp.2d 1285, 1291 (M.D. Ala. 2004), <em>aff'd</em>, 133 Fed. Appx. 739 (11th Cir. 2005). As this Court noted, "[i]n order to be actionable under the statute, an … objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." <u>Id.</u> at 1290 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1988)).

    The Eleventh Circuit's recent decisions provide telling insight into the level of conduct necessary for satisfying the "severe or pervasive" prong of the hostile work environment test. For example, in <u>Harrington v. Disney Regional Entertainment, Inc</u>., 2007 U.S. App. LEXIS 24713 (11th Cir. Oct. 19, 2007), the Eleventh Court held that while a "slave driver" screen saver was utterly inappropriate, plaintiff's mere exposure to

that image, without more, failed to satisfy the requirement that the defendant's conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment. The court went on to add that the "racially offensive conduct [was] not severe or pervasive enough to be actionable under Title VII where plaintiff was called 'ghetto' and once or twice over heard black co-workers being described as 'monkeys'." Id.

Similarly, in Godoy v. Habersham County, 211 Fed. Appx. 850 (11th Cir. 2006), the Eleventh Court concluded that the "severity and pervasiveness requirement was not satisfied where Plaintiff's evidence was that [his] supervisor told him to 'sail back to South Africa where he belongs,' and where he was subject to racial slurs on occasions." Id. See also Nije v. Regions Bank, 198 Fed. Appx. 878 (11th Cir. 2007)(affirming summary dismissal of hostile work environment claim despite evidence that claimant had been called a "token", that co-employees stated they did not want to work for a black manager, that they did not respect her, etc.); James v. Montgomery Reg'l Airport Auth., 181 Fed. Appx. 930, 932 (11th Cir. 2007)(affirming dismissal of hostile work environment claim based on allegations that white officers made racial remarks and false accusations where white officers tried to provoke fights, white officers showed a picture and stated that it was picture of one of his ancestors); Barrow v. Ga. Pacific Corp., 144 Fed. Appx. 54 (11th Cir. 2005)(involving racial slurs and symbols).

Indeed, hostile work environment claims have only been permitted to proceed in cases where egregious and repeated instances of overtly racially motivated conduct occurred. See, e.g., Mack v. ST Mobile Aero. Eng'g, Inc., 195 Fed. Appx. 829 (11th Cir.

2006)(plaintiffs observed seven nooses on the premises, constant presence of racial graffiti; supervisors and co-workers directed racially derogatory comments toward the plaintiffs; the Confederate Flag was repeatedly displayed); Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)(a noose was hung by plaintiff's work station on two occasions); Perkins v. U.S. Airways, Inc., 8 F. Supp. 2d 1343, 1351 (M.D. Fla. 1998)(racial pictures on a bathroom wall, a newspaper article regarding a lawsuit by black employees hung in the break room, and a clay doll with racial overtones); Williams v. Asplundh Tree Expert Co., 2006 U.S. Dist. LEXIS 52197 (M.D. Fla. July 28, 2006)(supervisors constructed a noose and told plaintiff to "try it on, nigger," told plaintiff to run through the woods "like a hog" so that hunting dogs could chase him, and supervisor also threatened injury with a wood chipper).

In short, the well-settled test in this Court, as recently reinforced by the Eleventh Circuit, affirmatively establishes that a plaintiff claiming a hostile work environment bears an extremely difficult burden in making a prima facie case.

Here, Brown cannot maintain a prima facie case of a hostile work environment. At the outset, Brown only makes a vague reference to a hostile work environment claim in her Complaint and EEOC charge. See Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir. 1992)(concluding that claims of racial harassment were properly dismissed where the claimant failed to file a specific charge with the EEOC). In this regard, Brown's Complaint and EEOC charge are devoid of any facts, events or manner of specificity whatsoever to support any notion that a hostile work environment based upon

race existed at the APLS.  For this reason, Brown's hostile work environment claim is due to be dismissed.  See Rush, 966 F.2d at 1110.  See also Lieberman v. Miami-Dade County, 2000 U.S. Dist. LEXIS 14789, at *11-*12 (S.D. Fla. 2000)(concluding that employee's vague and brief mention of harassment in EEOC charge was insufficient to maintain a harassment claim under Title VII).

Moreover, there are no allegations, much less evidence, existing to suggest that a racial slur or derogatory comment was directed at Brown or in her vicinity, or that anything was ever said or done to her that can be objectively interpreted as having any racial content, let alone anything that can be deemed to have unreasonably interfered with her job performance.  See Washington v. Kroger Co., 218 Fed. Appx. 822, 825 (11th Cir. 2007)(affirming summary dismissal of hostile work environment claim because the conduct alleged to be the basis of the hostile work environment claim was "devoid" of "any racial content"); Davis v. U.S. Postmaster General, 190 Fed. Appx. 874, 877 (11th Cir. 2006)(dismissing hostile work environment claim based, in part, on allegation that supervisor gave out a biased "warning");  Hooks v. Bank of America, 183 Fed. Appx. 833, 836-37 (11th Cir. 2006)(concluding that acts of an oral reprimand, a written reprimand, the withholding a building key, and a restriction on responsibilities did not support a claim for hostile work environment).

Instead, Brown's claim is based solely on uncorroborated (and incorrect) suspicions and workplace trivialities that do not infer any racial content and certainly do not support a hostile work environment claim.

For example, in her interrogatory responses, when asked to identify the basis for her hostile work environment claim, Brown states that other employees have been told not to associate with her. [See Interrogatory Responses, Ex. L to M.S.J.]. However, there is absolutely no evidence that this is the case. Regardless, such evidence, even if true, does not support a claim of a hostile work environment based on race. At worst, it is a workplace triviality that in no way infers racial content or a racially hostile work place. See, e.g., Davis v. U.S. Postmaster General, 190 Fed. Appx. 874, 877 (11th Cir. 2006)(affirming dismissal of hostile workplace claim which was based, in part, upon allegation that no one would talk to her).

Brown also points to a May 2005 event in which she was denied a request for supplies (a box of pens, a tape dispenser, recycling container, and notebook). This evidence certainly does not support a claim for a hostile work environment since it infers no racial content, is a workplace triviality, does not affect a term or condition of her employment, is an isolated event over the course of her 10 year employment at the APLS, and was a request that was, by her own admission, denied to other employees at the APLS. [See Brown depo., p. 145, ll. 19-23, Ex. B to M.S.J.]. See, e.g., Hooks v. Bank of America, 183 Fed. Appx. 833, 836-37 (11th Cir. 2006)(concluding that act of withholding a building key did not support a claim for hostile work environment).

Brown also contends that the 2005-2006 Performance Appraisal and the Reprimand removing her supervisory duties supports her claim for a hostile work environment. On the contrary, these allegations simply evidence Brown's disagreement

with the severity of punishment given for her actions in 2005 and 2006, which certainly do not contain or infer any racial content.  See, e.g., Austin v. City of Montgomery, 196 Fed. Appx. 747, 751-52 (11th Cir. 2006)(concluding that employee's claim of a *de facto* demotion and her subjective belief that it was due to her race did not constitute evidence supporting a claim of a hostile work environment); Davis v. U.S. Postmaster General, 190 Fed. Appx. 874, 877 (11th Cir.  2006)(dismissing hostile work environment claim based, in part, on allegation that supervisor gave out a biased "warning"); Hooks v. Bank of America, 183 Fed. Appx. 833, 836-37 (11th Cir. 2006)(dismissing claim involving alleged biased written reprimand).  As shown by the evidence in the record, and Brown's own concessions, both actions were well justified given her conduct.  Even if they were not, such actions do not support a hostile work environment claim.

Finally, Brown argues that she was demoted from a "Library Operations Manager" to a "Consultant."  As already demonstrated, Brown has not been demoted.  However, even if she has been demoted, this act still would not support a claim for a racially hostile work environment because it does not infer any racial content.

Indeed, the factual allegations in this case are no different from those considered by the Eleventh Circuit in Davis v. U.S. Postmaster General, 190 Fed. Appx. 874, 877 (11th Cir.  2006).  There, the plaintiff alleged that the employer had created a hostile work environment because of the following actions:

(1)     reassigning him to work on different machines;

(2)     assigning him to work alone;

(3)     not allowing him to work with other African-Americans;

(4)     not providing him with requested assistance;

(5)     monitoring his work excessively;

(6)     paging him throughout the work day;

(7)     giving him difficult work assignments;

(8)     moving him between work operations;

(9)     giving him a "biased warning" after he worked through a break;

(10)    preventing him from talking to other co-workers;

(11)    closely monitoring his movements at work;

(12)    frequently changing his job responsibilities; and

(13)    talking down to him in a demeaning manner.

190 Fed. Appx. at 975.    In rejecting these facts as evidence of a hostile work environment, the Eleventh Circuit noted that "[t]he employee must present 'concrete evidence in the form of specific facts, not just conclusory allegations.'"    Therefore, the appellate court held that the district court correctly dismissed the hostile work environment claim because the "allegations, even if true, do not meet our standard for establishing a hostile work environment that was sufficiently severe or persuasive to alter the terms and conditions of his employment." Id. at 877.

Similarly, in Nettles v. LSG Sky Chefs, 211 Fed. Appx. 837 (11th Cir. 2006), the Eleventh Circuit affirmed the dismissal of an employee's hostile work environment claim despite evidence that:

(1) The employee's supervisor undermined him;

(2) The supervisor disagreed with him;

(3) The supervisor denied him training;

(4) The supervisor unfavorably compared minority staff members with non-minority staff members;

(5) The employee was excluded from business meetings;

(6) The employee was denied administrative support for a trip;

(7) The employee was evaluated as "Fully Meets Expectations" rather than "Fully Exceeds Expectations"; and

(8) There were race related statements made outside the employee's presence.

211 Fed. Appx. at 839.  According to the Eleventh Circuit, there was no "evidence that any of these actions were motivated by race."  Id.   See also Hooks v. Bank of America, 183 Fed. Appx. 833, 836-37 (11ᵗʰ Cir. 2006)(concluding that acts of an oral reprimand, a written reprimand, the withholding a building key, and a restriction on responsibilities did not support a claim for hostile work environment); Apodaca v. Sec. of the Dept. of Homeland Sec., 161 Fed. Appx. 897, 901-902 (11ᵗʰ Cir. 2006)(concluding that allegations that employee was treated less favorably than white counterparts, was vetoed when he made hiring selections, his authority to make selections was eliminated, he was falsely accused of not serving customers, he had to contend with another employee seeking dirt on his division, he was falsely accused of lying, he was wrongfully denied a performance award for one of his employees, he was falsely accused of not following procedures, was

41

falsely accused of not being a team player);  <u>Harbuck v. Teets</u>, 152 Fed. Appx. 846 (11th Cir. 2005)(same, allegations that room was too cold, that security procedures were violated, that another employee was allowed "flex time" when she was not, that other employees were not required to use leave, that she had been subject to heightened scrutiny, that she received the silent treatment).

In short, Brown's generalities about a "hostile work environment", her vague pleadings, and her subjective beliefs do not support a prima facie case of a hostile work environment under Title VII.   Moreover, her claimed evidence of a hostile work environment does not, in the least, infer any racial content, and even if it did, it certainly does not rise to the level of harassment that was so objectively pervasive as to alter the terms and conditions of her employment.

## <u>CONCLUSION</u>

Plaintiff Annie L. Brown cannot establish a prima facie case of discrimination and a hostile work environment.   Furthermore, Brown cannot rebut the legitimate, non-discriminatory reasons for the employment actions at the center of this lawsuit.   For these reasons, the Alabama Public Library Service is entitled to summary judgment in its favor on all claims in the Complaint.


/s/ Austin Huffaker
R. AUSTIN HUFFAKER, JR.
   (ASB-3422-F55R)

/s/ Grant Sexton
T. GRANT SEXTON, JR. (ASB-0915-S40S)

Attorneys for Defendant
Alabama Public Library Service

**OF COUNSEL:**
RUSHTON, STAKELY, JOHNSTON &
  & GARRETT, P.A.
Post Office  Box 270
Montgomery, AL 36101
(334) 206-3100 Telephone
(334) 481-0815

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Deborah H. Biggers, Esq.
113 East Rosa Parks Ave.
Tuskegee, AL 36083

/s/ Austin Huffaker
OF COUNSEL