**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ANNIE LUCAS BROWN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Case Number 2:07-cv-841-MHT** |
| | § | |
| **ALABAMA PUBLIC LIBRARY** | § | |
| **SERVICE,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT'S MOTION FOR LEAVE TO SUBMIT REPLY BRIEF

COMES NOW Defendant, the Alabama Public Library Service ("the APLS"), and hereby moves this Court for leave to file the attached brief (**Exhibit A** hereto) in response to the Plaintiff's Opposition to the Defendant's Motion for Summary Judgment. As grounds, the APLS states that this is a Title VII case which places certain burden-shifting requirements upon the parties. While the APLS attempted to address all anticipated arguments in its summary judgment motion and supporting memorandum, the Plaintiff, in her Opposition Brief, has raised additional arguments in opposition to the motion. Accordingly, the APLS requests leave to submit the attached brief which addresses those arguments.

WHEREFORE, the Alabama Public Library Service respectfully requests leave to file the attached brief.

/s/ Austin Huffaker
R. AUSTIN HUFFAKER, JR.
(ASB-3422-F55R)


Attorneys for Defendant
Alabama Public Library Service

**OF COUNSEL:**
RUSHTON, STAKELY, JOHNSTON &
   & GARRETT, P.A.
Post Office Box 270
Montgomery, AL 36101
(334) 206-3100 Telephone
(334) 481-0815


## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Deborah H. Biggers, Esq.
113 East Rosa Parks Ave.
Tuskegee, AL 36083

/s/ Austin Huffaker
OF COUNSEL



## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| ANNIE LUCAS BROWN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case Number 2:07-cv-841-MHT |
| | § | |
| ALABAMA PUBLIC LIBRARY | § | |
| SERVICE, | § | |
| | § | |
| Defendant. | § | |

### REPLY OF THE ALABAMA PUBLIC LIBRARY SERVICE

In its summary judgment motion, the Alabama Public Library Service ("the APLS") demonstrated that there is no genuine issue of material fact concerning Plaintiff Annie Lucas Brown's ("Brown") race discrimination and hostile work environment claim. In her Opposition to the APLS's motion, Brown argues that there is indeed a question of fact on her race discrimination claim. Brown's argument, however, is without legal and factual support.

As a threshold matter, Brown makes no attempt challenge the APLS's assertion that the APLS is due summary judgment in its favor on the hostile work environment claim. Accordingly, the claim for a hostile work environment based on race is due to be dismissed based upon Brown's abandonment of the claim. See, e.g., Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)("the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

However, even if Brown argued against dismissal of the claim, Brown has

submitted absolutely no evidence showing a genuine question of material fact. In this regard, there is absolutely no evidence that Brown has been subject to unwelcome harassment based on race, that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment, or that a reasonable person would also perceive the environment as racially hostile and abusive.   See, e.g., Gupta v. Fla. Bd. Of Regents, 212 F.3d 571, 583 (11th Cir. 2000).   Indeed, there is absolutely no evidence whatsoever that any racial slurs, derogatory comments or actions, or any other race-based statements were made to Brown. See Washington v. Kroger Co., 218 Fed. Appx. 822, 825 (11th Cir. 2007)("Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted."). At best, Brown advances ordinary workplace tribulations that do not rise to the level of conduct necessary to support a Title VII hostile work environment claim. See Faragher v. City of Boca Raton, 524 U.S. 775,  788 (1998)(explaining that the objective component of the "severe and pervasive" element prevents the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing from falling under Title VII's broad protections); Portera v. State Dep't of Finance, 322 F.Supp.2d 1285, 1291 (M.D. Ala. 2004), aff'd, 133 Fed. Appx. 739 (11th Cir. 2005).   In short, Brown's failure support her hostile work environment claim with any legal argument or factual evidence requires that this claim be dismissed.

Brown also fails to challenge the APLS's motion as it concerns Brown's claim that she was demoted from a "Library Operations Manager" to a "Consultant", thereby

resulting in a reduction in salary. Brown's failure to address this claim is most surprising since this claim served as the foundation for her EEOC charge. [See Ex. L to Doc. 18]. In fact, in her affidavit in opposition to the APLS's summary judgment motion, Brown confirms that she is a "Library Operations Manager", not a Consultant.[1] [See Ex. A, ¶ 1 to Doc. 18]. In short, Brown's sworn testimony, plus her failure to rebut the APLS's argument concerning Brown's job title and salary, unequivocally demonstrates that Brown has not been demoted. Therefore, Brown's race discrimination claim based upon the alleged demotion is due to be dismissed.

Instead, in her Opposition Brief, Brown focuses her argument on her Reprimand and her resulting Performance Appraisal. In particular, Brown argues that there is a question of fact as to whether the Reprimand was racially motivated because two white comparators were treated more favorably because that they did not have their supervisory responsibilities removed. Brown's argument misconstrues the law and the undisputed facts in the record.

First, to the extent Brown argues that her Reprimand was based on her race, Brown altogether ignores the fact that her two white comparators (Judy Shepard and Janet Hamilton) also received Reprimands. See Nettles v. LSG Sky Chefs, 211 Fed. Appx. 837 (11th Cir. 2006)(stating that a Title VII claimant must show as part of her prima facie case that she was "treated less favorably than a similarly situated employee outside the protected class."). Accordingly, Brown has not shown that a white

---

[1] On two occasions, Brown has taken inconsistent positions via sworn testimony. In her EEOC charge and her Interrogatory Responses, Brown verified under oath that she had been demoted from a Library Operations Manager to a Consultant, thereby suffering a reduction in salary; however, in her deposition and in her affidavit, Brown confirms that she is a Library Operations Manager.

comparator was treated more favorably than Brown in the context of her receipt of a Reprimand.

Of course, this point ignores the APLS's showing that Brown's Reprimand is not an adverse employment action, and that the APLS has numerous, legitimate non-discriminatory reasons for the Reprimand (many of which Brown does not dispute), and that the white comparators (Shepard and Hamilton) are not similarly situated to Brown. While Brown finds fault with the facts underlying her Reprimand and the severity of the punishment received, Brown nevertheless concedes that some mode of discipline was warranted. These concessions prove fatal to the claim that the Reprimand was founded upon her race.

The primary fallacy in Brown's challenge to the Reprimand is that the APLS issued the Reprimand based upon the statements of a third-party[2] who perceived Brown's phone call as offensive, unprofessional, and argumentative. See, e.g., Abel v. Dubberly, 210 F.3d 1334, 1339 n. 5 (11th Cir. 2000)(noting that an employer can discipline an employee "based on erroneous facts"). While Brown goes through great lengths to portray her call to the Governor's Office as an innocent, good-hearted attempt to find out the status of her travel reimbursement, Brown's lack of truthfulness and candor and her refusal to answer direct questions about the phone call by the Director of the APLS, amply supports the APLS's legitimate, non-discriminatory reasons for disciplining Brown. See E.E.O.C. v. Total Sys. Serv., Inc., 221 F.3d 1171, 1176 (11th

---

[2] Brown has not presented any evidence, nor argued, that the statements and testimony of Cheryl Fondon and LaTonya Moore are racially motivated.

Cir. 2000)("an employer is entitled to expect and to require truthfulness and accuracy from its employees."); Quarles v. Con-Way Freight, Inc., 2008 U.S. Dist. LEXIS 37747, at * 43 (M.D. Fla. 2008)(noting that employee's lack of truthfulness and accuracy and the failure to accept responsibility constitute a legitimate, nondiscriminatory reason for termination).

While ignoring the fact that Shepard and Hamilton also received Reprimands, Brown argues that they were in fact treated differently because they did not have their supervisory responsibilities removed as a result of their respective Reprimands. Brown's argument is easily dismissed because it is well-settled that the removal of supervisory responsibilities is not actionable under Title VII. See, e.g., Njie v. Regions Bank, 198 Fed. Appx. 878, 882 (11th Cir. 2006)(concluding that being stripped of management authority does not constitute an adverse employment action); Davis v. Town of Lake Park, Florida, 245 F.3d 1232 (11th Cir. 2001). See also Portera v. State Dep't of Finance, 322 F.Supp.2d 1285, 1294 (M.D. Ala. 2005)(Thompson)(holding that the "removal of supervision is not an adverse-employment action because it is not a serious and material change in the terms, conditions, or privileges of employment."). Thus, even if Shepard and Hamilton were treated more favorably than Brown for the same conduct (which they were not), Brown still cannot advance a Title VII claim for the removal of her supervisory responsibilities.

Similarly, to the extent Brown argues that Shepard and Hamilton were treated more favorably because they were eligible for pay raises, this claim, too, is due to be dismissed. First, this argument is unsupported by any evidence in the record. In this

5

regard, there is no evidence that Brown was ineligible for a pay raise as a result of her Reprimand, or that Shepard and Hamilton actually received pay raises despite their receipt of Reprimands. Brown's supposition and conjecture is insufficient to meet this burden.

However, even if Shepard and Hamilton received a pay raise despite their receipt of Reprimands, Brown fails to demonstrate that they are proper comparators under Title VII. Arguing that both individuals are Library Operations Managers who received Reprimands is insufficient to meet this burden. Instead, Brown must show that Shepard and Hamilton are similarly situated in all relevant respects, which requires Brown to show that they were "involved in or accused of the same or similar conduct" and that the same decision-maker issued the Reprimands. Thus, here, Brown must present white comparators who were reprimanded by the Director of the APLS (Rebecca Mitchell) for stepping outside the chain of command, criticizing the work of co-workers to an outside department, being unprofessional and argumentative with the Governor's Office, misleading the Director of the APLS, and refusing to answer questions posed by the Director of the APLS. See Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999)(the "quantity and quality of the comparator's misconduct [must] be nearly identical"). Here, neither Shepard and nor Hamilton were involved in the same or nearly identical conduct as Brown, nor were they disciplined by Rebecca Mitchell. Instead, Shepard was disciplined by another individual (Hulen Bivens) for plagiarism and the failure to include her supervisor in internal agency communications and events, while Hamilton was disciplined, also by Mr. Bivens, for putting diesel fuel in

6

a gasoline-only agency van. Simply put, neither Shepard nor Hamilton is a proper white comparator.

Brown also argues that there is a question of fact on her claim that she was discriminated against in the context of her 2005-2006 Performance Appraisal. Brown has failed to meet her burden on this claim. First, Brown has not shown how the Performance Appraisal constitutes an adverse employment action under Title VII. See Anderson v. United Parcel Serv., Inc., 248 Fed. Appx. 97, 100 (11th Cir. 1007) (employees did not suffer any adverse employment action regarding low-quality performance review scores, thus defeating their Title VII race discrimination claims; there was no evidence that the poor performance evaluations by themselves qualified as adverse employment actions, or that the evaluations were, in any way, connected to a denial of lateral transfers, promotions, or pay raises); Brown v. Snow, 440 F.3d 1259, 1265-66 (11th Cir. 2006)(holding that a "[l]ower score on [an employee's] performance evaluation, by itself, is not actionable under Title VII unless [the employee] can establish that the lower score led to a more tangible form of adverse action"); Davis v. Town of Lake Park, Florida, 245 F.3d 1232 (11th Cir. 2001)(summarizing cases and discussing adverse actions in the context of performance memoranda and appraisals).

Second, Brown has failed to show that a white comparator was treated more favorably for the same conduct upon which Brown's Performance Appraisal was based. See, e.g., Richardson v. Ala. Pine Pulp Co., 2008 U.S. App. LEXIS 10646, at *5 (11th Cir. 2008)(concluding that white comparator was not similarly situated because employer had not received the same type of customer complaints as had the Title VII plaintiff).

Indeed, Brown altogether fails to discuss any details of Shepard's Performance Appraisal and certainly fails to make any attempt to show that it was founded upon the same or nearly identical performance–related issues that resulted in Brown's Performance Appraisal score.   Moreover, as to Hamilton, Brown altogether fails to submit any evidence concerning her Performance Appraisal, thereby rendering Hamilton unqualified for any comparative purposes.  Simply put, Brown bears the burden of proof on this claim, and she simply has not met this burden.

Lastly, Brown argues that her Title VII claim should proceed because the APLS has a discriminatory policy against minorities.   In support of this assertion, Brown submits deposition testimony and letters from three current and former employees at the APLS.  A review of this testimony shows that these individuals' complaints and observations have no relevance to Annie Brown, nor do they advance any credible evidence of a discriminatory policy that has affected a term or condition of Brown's employment.   Indeed, a review of this evidence shows, at most, complaints about workplace tribulations (lifting of boxes, the use of one's last name, ignoring one another, etc.) perceived by both Caucasians and African-Americans at the APLS, none of which are actionable under Title VII.[3]

---

[3] Brown places significant weight on the deposition testimony of Judy Shepard. However, as shown by the attached Affidavit of David Farrar (**Ex. 1** hereto), Shepard and Brown have engaged in a crusade to discredit and undermine management at the APLS by making derogatory comments about APLS management and by soliciting letters to the Board of Directors at the APLS that are critical of APLS management. As shown by the attached excerpts from her deposition (**Ex. 2** hereto), Shepard's credibility is unequivocally suspect given her failure to comply with a duly issued subpoena to provide written emails and correspondence between her and Brown, and her refusal to answer questions posed by APLS counsel about her contacts with APLS clients.

## CONCLUSION

For the reasons set forth in the Alabama Public Library Service's Motion for Summary Judgment, and supporting memorandum brief, the Alabama Public Library Service is entitled to summary judgment in its favor on all claims in the Complaint.

/s/ Austin Huffaker
R. AUSTIN HUFFAKER, JR. (ASB-3422-F55R)
T. GRANT SEXTON, JR. (ASB-0915-S40S)
Attorneys for Defendant
Alabama Public Library Service

**OF COUNSEL:**
RUSHTON, STAKELY, JOHNSTON &
   & GARRETT, P.A.
Post Office  Box 270
Montgomery, AL 36101
(334) 206-3100 Telephone
(334) 481-0815

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Deborah H. Biggers, Esq.
113 East Rosa Parks Ave.
Tuskegee, AL 36083

/s/ Austin Huffaker
OF COUNSEL



**AFFIDAVIT OF DAVID FARRAR**

STATE OF ALABAMA    )

COUNTY OF TALLEDEGA )

        Before me, the undersigned Notary Public in and for said state and county,

personally appeared David Farrar, who is known to me, and who being by me first duly

sworn, deposes and states as follows:

        I am David Farrar, and I am the Director of the Talladega Public Library in
Talladega, Alabama. All facts set forth herein are facts of which I have personal
knowledge. I give this Affidavit in the action styled *Annie Lucas Brown v The
Alabama Public Library Service,* pending in the United States District Court for the
Middle District of Alabama I provide this affidavit voluntarily and without coercion or
suggestion in any form

        Attached hereto as **Exhibit 1** is a true and correct copy of a letter I issued to the
Chairman of the Board of Directors for the Alabama Public Library Service ("APLS")
Attached as **Exhibit 2** is a true and correct copy of a package of materials I received
from Ms Judy Shepard, a consultant for the APLS I drafted Exhibit 1 and sent it to
Chairman Hodge because of conversations I had with Ms Shepard and Annie Brown in
February 2008 Due to what these individuals told me, I fear that the state aid for my
library is in jeopardy

        On February 20, 2008, APLS Consultant Judy Shepard visited me and informed
me that she was our new contact with the APLS For the next two hours, however, she
proceeded to talk about Director Rebecca Mitchell and several employees I told her I
would prefer not to talk about agency personnel because I know nothing about internal
issues She said she understood but stated that the things she wanted to talk about
related to the lack of services from APLS to public libraries, why this was happening,
and who was responsible. That is not what she talked about, however She said she
planned to send me several documents substantiating many of the things she was
discussing I informed her it was not necessary to send me anything She was
concerned that I did not believe her and stated that APLS employee Annie Brown had
told her that she could talk to me She further stated that Ms Brown had said that I
could be trusted and would help

        The help Ms Shepard asked me to provide was unbelievable She talked in
detail about Ms Mitchell, Mr Hulen Bivins, and Mr Harry Lensch in a manner that
was unprofessional, extremely disparaging and sexually explicit In short, I was
stunned The beginning of the conversation started out with Ms Shepard talking about
APLS The next hour was consumed with rude comments about the three
aforementioned individuals culminating in the final thirty minutes being devoted to
malicious, unprofessional and sexually derogatory comments about Ms Mitchell, Mr
Bivins and Mr Lensch

Here are a few examples  Ms Shepard started speaking of the reputation of APLS employees by asking me if I knew that Mr Bivins had questioned my sexual orientation on more than one occasion to more than one APLS employee  I stated that I had not heard that and did not believe it  She said that it was true and that I would not know because I did not work there  She stated that I should not worry because several agency employees felt he was "a closet case himself."  I told her that I was not concerned and frankly did not care because I was not a homosexual and I did not care about the private life of anyone else

Ms Shepard stated that she and Ms Mitchell had once been close friends  She then said that since the chain of command had changed that Ms Mitchell had not "talked to her as a friend like she used to."  She further stated that Ms Mitchell hides in her office protected by Mr Bivins and Mr Lensch  She said it is almost impossible to talk to Ms Mitchell because the chain of command is being enforced  She also stated that Ms Mitchell is weak and "loves for a man to protect her."  She said that Mr Bivins and Mr Lensch play this role and "Becky loves it this way."  She also asked me if I had seen Ms Mitchell recently  I told her it had been a couple of months  She then stated that Ms Mitchell had gained weight from sitting in her office all day  She stated that she felt APLS services were "dismal" because Ms Mitchell, Mr Bivins and Mr Lensch "do not care anymore" and are "out of control."  I told her that APLS services to public libraries had never been better and that I was completely satisfied  I also told her that any time I needed to talk to Ms Mitchell she was always available.  Ms Shepard informed me that I was in the minority and that working for Ms Mitchell at APLS was a completely different story

Ms Shepard then spoke of her previous friendship with Ms Mitchell and how they would go to each other's houses for parties and other social occasions  She seemed upset that her perception of their relationship had changed  She talked at length about Ms Mitchell's marriages and her problem of "needing men to protect her at home and at work."

She then moved on to talking about Mr Bivins  She went on and on about how he was trying to "get her."  She told a long story about how he would not listen about DVD services  She said he would not let her do her job  She said he transferred her to a position that he said she volunteered for but she told me she never volunteered for it  She said he forced her into the position  She stated he was trying to "run her off."  She said he had done this to many others and that morale among employees was horrible  She then turned the story to a sexual nature by stating that he thought he was "God's gift to women."  She then stated, "Getting with Hulen would be like f**king a spider monkey."  She could see I was not amused and started detailing why she thought he was out to get everyone.  She stated that he had been placed in a back office years ago where he had no authority and as a result was bitter and angry  She stated that when he was finally "brought out of the dungeon" he was ready to "get even with a lot of folks."  She said that she thought he had once liked her but that had "obviously changed."  She stated that he was a poor lawyer who had to try several times before he could pass the bar exam  She stated that "his wife wears the pants in the family" and that he became more arrogant after she became a family court judge

Ms Shepard then informed me that Ms Annie Brown was in the process of "getting them all."  She stated that she and Ms Brown had never really been close but

that had changed recently because Ms. Brown had filed federal charges against the agency. She stated that she and Ms. Brown were determined to "get them" for running a "very unfair workplace." She never detailed what she thought was unfair toward Ms. Brown or anyone else. She just talked about herself.

The only thing she stated about Mr. Lensch was that he was an "ugly bastard."

After the conversation she told me that she could tell I had a hard time believing a lot of the information because of the look on my face. She also told me that she had spoken with other librarians in the state about these things, but she did not give me names. She stated that she was going to send me a packet that proved everything. I told her it wasn't necessary. A few days later I received a large packet in the mail with several documents. This packet is attached hereto as **Exhibit 2**.

I about my library's state aid because Mr. Bivins of the APLS sent out a memo that outlined expectations for public library directors regarding attendance to administrator's meetings. In the memo it stated that assigned consultants would keep up with whether or not you had attended a function and if you had stayed long enough to get credit. Ms. Shepard is my consultant. She decides if I stay long enough at a function to get attendance credit. Attendance is tied to state aid. If I had not listened to her for two hours I was concerned that she might retaliate and falsely claim that I had not stayed at a function long enough to satisfy the requirement and cause me to not receive my state aid. She told me that if I miss a day or two at the state convention in April to just let her know and she could "make it ok." I don't miss days and I don't need her to make anything ok. I felt this was a measure to show me that she decided whether or not I get my state aid. So, because of this concern I listened to this unprofessional, rude, sexually explicit, one-sided conversation for two hours.

On Friday, February 21, 2008, the next day, I received a phone call from Ms. Brown. She stated that she hoped I believed Ms. Shepard and further stated that her lawsuit was moving forward. She said that she and I had been friends for a long time and that I could "really be helpful" to her and Ms. Shepard if I would write a letter to the APLS board and state that APLS services were all but non-existent, that Mr. Bivins was rude and ineffective and that Ms. Mitchell was no longer capable of running the agency and was not accessible. Ms. Brown also asked me if I had ever heard Ms. Mitchell or Mr. Bivins ever use a racial slur. I told her that I had never heard any such thing and that it would be difficult to help because I did not feel Mr. Bivins was rude and ineffective or that Ms. Mitchell was ineffective and inaccessible as the director of APLS. I also told her I was happy with APLS services. She told me to expect Ms. Shepard's packet in the mail and that should convince me if I were "a fair person." She said she would fax me a board list and to think about it over the weekend. She faxed the board list. I have enclosed a copy.

I feel I am being forced into a situation I know nothing about. I am fearful for my state aid. Although no one has threatened me, Ms. Shepard seems to be a very determined person. I can see what happens if someone gets on her bad side. As a consultant she can make it difficult for me to receive my state aid.

I do want to make clear that APLS and its administrators have always provided the very best in services. Mr. Lensch has always been more than helpful to me. Mr.

Bivins has helped me numerous times and is always growing the agency in a positive way. Ms Mitchell has changed the agency over the last few years in ways that allow for greater access to the agency when needs arise, more grant money for struggling libraries, and access to our legislators through the best annual public relations project I have ever seen. Finally, I know Ms Mitchell's dedication first hand. She attended my ribbon cutting for out new expansion here at the library. We're not a big, important library like Birmingham or Montgomery, but Ms Mitchell was here to congratulate us on our big day. I feel confident about her leadership. I talk to all of the directors around the state at least once a year. They are pleased with her leadership as well.

DAVID FARRAR

SWORN TO AND SUBSCRIBED before me this _21st_ day of April 2008.

Notary Public

My Commission Expires: YOLANDA WHITE BRANTLEY
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES SEPTEMBER 10, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS



*Talladega Public Library*

202 South Street, E
Talladega, AL 35160



David Farrar
Director
256-362-4211

April 14, 2008

202 South Street East
Talladega, AL 35160

Mr Robert E. Hodge, Chairman
APLS Board of Trustees
1071 Arrowhead Drive
Prattville, AL 36064

Dear Mr Hodge,

I am writing to you regarding a situation that occurred at the Talladega Public Library on Wednesday, February 20, 2008. APLS Consultant Judy Shepard visited me and informed me that she was our new contact with the agency. For the next two hours, however, she proceeded to talk about Director Rebecca Mitchell and several employees. I told her I would prefer not to talk about agency personnel because I know nothing about internal issues. She said she understood but stated that the things she wanted to talk about related to the lack of services from APLS to public libraries, why this was happening and who was responsible. That is not what she talked about, however. She said she planned to send me several documents substantiating many of the things she was discussing. I informed her it was not necessary to send me anything. She was concerned that I did not believe her and stated that APLS employee Annie Brown had told her that she could talk to me. She further stated that Ms Brown had said that I could be trusted and would help.

The help Ms. Shepard asked me to provide was unbelievable. She talked in detail about Ms Mitchell, Mr Hulen Bivins, and Mr Harry Lensch in a manner that was unprofessional, extremely disparaging and sexually explicit. In short, I was stunned. The beginning of the conversation started out with Ms. Shepard talking about APLS. The next hour was consumed with rude comments about the three aforementioned individuals culminating in the final thirty minutes being devoted to malicious, unprofessional and sexually derogatory comments about Ms Mitchell, Mr Bivins and Mr Lensch.

Here are a few examples. Ms. Shepard started speaking of the reputation of APLS employees by asking me if I knew that Mr Bivins had questioned my sexual orientation on more than one occasion to more than one APLS employee. I stated that I had not

heard that and did not believe it  She said that it was true and that I would not know
because I did not work there  She stated that I should not worry because several agency
employees felt he was "a closet case himself "  I told her that I was not concerned and
frankly did not care because I was not a homosexual and I did not care about the private
life of anyone else

Ms. Shepard stated that she and Ms Mitchell had once been close friends  She then said
that since the chain of command had changed that Ms Mitchell had not "talked to her as
a friend like she used to "  She further stated that Ms Mitchell hides in her office
protected by Mr Bivins and Mr Lensch  She said it is almost impossible to talk to Ms
Mitchell because the chain of command is being enforced  She also stated that Ms
Mitchell is weak and "loves for a man to protect her "  She said that Mr Bivins and Mr
Lensch play this role and "Becky loves it this way "  She also asked me if I had seen Ms
Mitchell recently  I told her it had been a couple of months  She then stated that Ms
Mitchell had gained weight from sitting in her office all day  She stated that she felt
APLS services were "dismal" because Ms Mitchell, Mr Bivins and Mr Lensch "do not
care anymore" and are "out of control "  I told her that APLS services to public libraries
had never been better and that I was completely satisfied  I also told her that any time I
needed to talk to Ms Mitchell she was always available  Ms Shepard informed me that I
was in the minority and that working for Ms Mitchell at APLS was a completely
different story

Ms. Shepard then spoke of her previous friendship with Ms Mitchell and how they
would go to each other's houses for parties and other social occasions  She seemed upset
that her perception of their relationship had changed  She talked at length about Ms
Mitchell's marriages and her problem of "needing men to protect her at home and at
work "

She then moved on to talking about Mr Bivins  She went on and on about how he was
trying to "get her."  She told a long story about how he would not listen about DVD
services  She said he would not let her do her job  She said he transferred her to a
position that he said she volunteered for but she told me she never volunteered for it  She
said he forced her into the position  She stated he was trying to "run her off "  She said
he had done this to many others and that morale among employees was horrible  She
then turned the story to a sexual nature by stating that he thought he was "God's gift to
women."  She then stated, "Getting with Hulen would be like f**king a spider monkey."
She could see I was not amused and started detailing why she thought he was out to get
everyone  She stated that he had been placed in a back office years ago where he had no
authority and as a result was bitter and angry  She stated that when he was finally
"brought out of the dungeon" he was ready to "get even with a lot of folks "  She said that
she thought he had once liked her but that had "obviously changed "  She stated that he
was a poor lawyer who had to try several times before he could pass the bar exam  She
stated that "his wife wears the pants in the family" and that he became more arrogant
after she became a family court judge

Ms Shepard then informed me that Ms Annie Brown was in the process of "getting them all." She stated that she and Ms Brown had never really been close but that had changed recently because Ms Brown had filed federal charges against the agency She stated that she and Ms Brown were determined to "get them" for running a "very unfair workplace." She never detailed what she thought was unfair toward Ms Brown or anyone else. She just talked about herself

The only thing she stated about Mr Lensch was that he was an "ugly bastard."

After the conversation she told me that she could tell I had a hard time believing a lot of the information because of the look on my face She stated that she was going to send me a packet that proved everything I told her it wasn't necessary A few days later I received a large packet in the mail with several documents I have only skimmed the papers because I simply do not care about anything she was talking about I have enclosed a copy of what she sent for your information

If you are wondering why I indulged her for two hours I will explain Mr Bivins sent out a memo that outlined expectations for public library directors regarding attendance to administrator's meetings. In the memo it stated that assigned consultants would keep up with whether or not you had attended a function and if you had stayed long enough to get credit. Well, Ms Shepard is my consultant She decides if I stay long enough at a function to get attendance credit Attendance is tied to state aid. If I had not listened to her for two hours I was concerned that she might retaliate and falsely claim that I had not stayed at a function long enough to satisfy the requirement and cause me to not receive my state aid. She told me that if I miss a day or two at the state convention in April to just let her know and she could "make it ok." I don't miss days and I don't need her to make anything ok. I felt this was a measure to show me that she decided whether or not I get my state aid So, because of this concern I listened to this unprofessional, rude, sexually explicit, one-sided conversation for two hours

On Friday, February 21, 2008, the next day, I received a phone call from Ms. Brown She stated that she hoped I believed Ms Shepard and further stated that her lawsuit was moving forward She said that she and I had been friends for a long time and that I could "really be helpful" to her and Ms Shepard if I would write a letter to the APLS board and state that APLS services were all but non-existent, that Mr Bivins was rude and ineffective and that Ms Mitchell was no longer capable of running the agency and was not accessible Ms Brown also asked me if I had ever heard Ms. Mitchell or Mr Bivins ever use a racial slur I told her that I had never heard any such thing and that it would be difficult to help because I did not feel Mr Bivins was rude and ineffective or that Ms. Mitchell was ineffective and inaccessible as the director of APLS I also told her I was happy with APLS services She told me to expect Ms Shepard's packet in the mail and that should convince me if I were "a fair person." She said she would fax me a board list and to think about it over the weekend She faxed the board list I have enclosed a copy

Mr Hodge, I apologize for such a lengthy, detailed letter I felt I was being forced into a situation I know nothing about After weeks of thinking about this I have decided that

you, as chair of the APLS board, must know what has been happening to me. I feel it is unfair, unwarranted and I did not ask for any of this. I am fearful for my state aid. Although no one has threatened me, Ms. Shepard seems to be a very determined person. I can see what happens if someone gets on her bad side. As a consultant she can make it difficult for me to receive my state aid. I am writing this and offering these details in the hope that Ms. Shepard will be removed as my consultant and that she and Ms. Brown cease discussion of the internal personnel issues at APLS with me.

I do want to make clear that APLS and its administrators have always provided the very best in services. Mr. Lensch has always been more than helpful to me. Mr. Bivins has helped me numerous times and is always growing the agency in a positive way. Ms. Mitchell has changed the agency over the last few years in ways that allow for greater access to the agency when needs arise, more grant money for struggling libraries, and access to our legislators through the best annual public relations project I have ever seen. Finally, I know Ms. Mitchell's dedication first hand. She attended my ribbon cutting for out new expansion here at the library. We're not a big, important library like Birmingham or Montgomery, but Ms. Mitchell was here to congratulate us on our big day. I feel confident about her leadership. I talk to all of the directors around the state at least once a year. They are pleased with her leadership as well. This is why I felt it was necessary to bring these unprofessional and disparaging comments and actions from Ms. Shepard and Ms. Brown to your attention.

Respectfully submitted,

David Farrar, Director
Talladega Public Library

EXHIBIT
2

September 7, 2007

Mrs. Donald Dickey
B. B. Comer Memorial Library
314 North Broadway Avenue
Sylacauga, AL 35150-2528

Dear Mrs. Dickey and the APLS Executive Board:

This is the most difficult letter I have ever written. I have started to write to you
numerous times and have pages of notes and drafts. I know I have the right to write to
you, but I have feared reprisal, because of the way people are now being treated at APLS.
Mrs. Mitchell and Mr. Bivins know how I feel. I have tried to talk to her. I have thought
that you would not pay any attention to my pleas since we have been led to believe that
you listen only to the administration. I have been a loyal employee of APLS for over
thirty years and have dedicated my professional life to APLS and the public libraries of
Alabama. I mean no disrespect, and I am not trying to be insubordinate, but we, the
employees, are desperate. I beg you to consider what I have to say. Please talk to the
entire staff and the people who have left to verify what I am telling you. We were very
surprised and upset when the investigators from the Office of the Attorney General did
not complete their investigation. They said they were going to talk to everyone and they
did not. The areas of concern that I wish you would examine are the following:
mistreatment of the staff, unwise use of funds, possible ethics violations, and the
reputation of APLS within state government and the library community.

STAFF
The administration puts as little as possible in writing so they can deny saying
a particular thing, or insist that they did say something that they never said. Sarcasm is
the usual response when questions arise concerning a decision and unclear instructions,
unless the questions and comments are simply ignored. The administration never accepts
responsibility for any of their decisions. If a decision is distasteful, they blame the staff,
the staff that is no longer there, each other, State Personnel, or you, the Executive Board.

The staff has never been so demoralized. Disrespect, daily belittlements, and constant
mistrust make it difficult to be productive. Since 2001 nearly 50 people have
left the agency. While some of the departures were from natural attrition, most
of the people were driven away or forced to leave. Negative comments saying an ex-
employee should not be rehired by the state have been put in at least one person's State
Personnel folder. Former staff are also blamed for things that were not their fault. Not
only are these people being hurt needlessly, the agency's reputation is being destroyed.
APLS has lost so many good people and so have the libraries APLS is charged with
serving.

Two people have been given permission to sue by EEOC. Even if these people do not sue, the very fact that EEOC sees problems at APLS is alarming to the staff and a vindication of sorts. Some staff members have gone to State Personnel, the state employees association and to private attorneys because of the way they are being treated. Responses to complaints about rude, sexist, and hateful remarks made by Mr. Bivins or Mr. Lensch have been ignored by Mrs. Mitchell, or in my case, met with the following remarks: "He is just teasing;" "He didn't mean it;" or "You have my permission to hit him." These were her responses to me in a division head meeting in the fall of 2001. Mrs. Kim Owen told me she received similar responses when she tried to talk to Mrs. Mitchell. Although I do not think we have had any EEOC training since Ms. Harris was director, it is my understanding that complaints like this should be taken seriously.

The state has spent hundreds of thousands of dollars on training supervisors to use the Progressive Discipline Program to avoid lawsuits. It has been wasted at APLS because progressive discipline guidelines are not followed consistently. The tone of my Official Reprimand and the other one I have seen is needlessly harsh and mean. Neither counseling nor warnings are given. Either you agree or you are written up. Suggestions or ideas that differ from those of the administration are considered insubordination. Personal problems of employees have been commented upon in the hearing of other staff. We are told we will be dismissed immediately if we run out of sick and annual leave, even though State Personnel has made provisions for approved leaves of absences and has a program in place to give leave to people who run out of leave in the case of emergencies. Treatment of the staff is unequal. Some employees have been let go or driven out because they have run out of leave, but ohers are allowed to work to make up time and some are allowed to work overtime to gain leave they do not have. Comp time and flex time exist for some employees but not for others.

All decisions are made with almost total disregard of the opinions and suggestions of a seasoned professional staff that could give constructive, well-thought out suggestions. This includes creating the agency budget without consulting staff for input, or even giving the staff members that need it, a final working budget. Staff does not know what kind of book budget or media budget it will have, if it will have one, and when the money can be used. Lack of planning and refusal to listen to practical suggestions from the staff has meant that computers have had to be moved and set up more than one time, and that the same thousands of books and videos have been moved several times. Federal documents have been given away by mistake because the person in charge of the correct disposal of the documents was not consulted.

Supervisors are no longer allowed to grade fairly. I have been forced to lower scores and raise scores that I did not want to change to suit Mr. Bivins. Evaluations have been given to supervisors at the last minute so they had to be returned to the Business office without sufficient time to work on them. Supervisors have not been included in the selection of people they will be supervising. Staff is given work assignments that the supervisors do not know about until after the fact. Uncalled for remarks about supervisors have been

2

made to the staff they supervise. For example, I have had staff come to me and tell me I should get a lawyer because I was accused of misusing video money!

The staff Mr. Bivins supervises is being used as common laborers. We have been told the building custodian and the warehouse workers have other jobs and cannot help us lift. The librarians and the library technicians have other jobs too, and they have not been trained to lift heavy objects such as file cabinets, desks, and shipping pallets. It is a miracle that no one has been hurt. We are the most well paid laborers in the state. This is not a matter of equality of the sexes; it is a poor use of staff time, and a shameful waste of the skills and knowledge of librarians and technicians. No one is afraid of hard work and most of us consider the assignments as suitable substitutes for a walk around the block or a trip to the gym. While these menial jobs have strengthened the strong sense of camaraderie that already existed among us, we realize these tasks are assigned are vain attempts to force unwanted, but good, employees to leave and to belittle the staff doing the work. Not only are the librarians used as laborers, they are also highly paid clerical workers who photocopy, collate, assemble workshop folders, and type letters, reports, and perform all necessary clerical tasks that have to be done as they serve the public libraries. This is time consuming work that should be done by clerical workers rather than librarians and technicians who could be spending their time working with the public libraries. The staff has a very strong sense of fairness and realizes that what the administration is doing is very wrong. They make jokes about being on a plantation or in prison. Everyone in the building knows how little the administration thinks of the staff. Mr. Lensch told Ms. Christine Bowman that an MLS stands for a master's degree in "lingering stupidity."

Safety issues are a legitimate concern. There is no updated evacuation plan. If there is a disaster plan this supervisor has not seen one since the building was rearranged. The agency cars are falling apart. During the hottest summer on record, a car with a broken air conditioner is being assigned for staff to travel to libraries. Staff is not allowed to take a car home at night in order to leave early or return late. (We have been told that this a rule of Finance but State Motor Pool guidelines allow a person to get a car after 3 in the afternoon and return it before 8:15 the day after a person returns.) No one should have to bring a car back to this agency after dark. APLS is no longer in a safe part of town. Crime reports in the local paper indicate that there are robberies and assaults on Monticello Drive. Computers have been stolen from the agency, and graffiti has been sprayed on the outside walls. Someone was killed at the Motel 6 this summer a few weeks before the Trustee Conference. The so called guard, who is supposed to be guarding us at night, has told us he is not authorized to do anything but call the police. He is a very nice guy, but what good is he? The front lights outside the library are not left on during night hours because "we don't want to compete with Montgomery Public." Worst of all, is the terrible sense the administration does not truly care what happens to the staff or to the agency.

UNWISE USE OF FUNDS

Was it really necessary to spend $80,000 on flimsy cubicles when there were enough of the older blue cubicles for each staff member to have one? They are much sturdier and a little more soundproof than the new ones. The new cubicles were set up before construction was completed so the dust from the sheet rock now permeates the fabric walls

The new conference room is supposed to seat about 400 people. Will the floor hold that many people? Will there be adequate restrooms and parking?

Thousands of dollars were spent on reference books that were sent to libraries without even asking them if they already had these specific titles or had space for them

Why purchase a genealogy database for in-house use that both Montgomery City County and the Alabama Department of Archives and History have when APLS needs to be supplying the public libraries with state-wide databases that are not on the AVL?

The night hours have not been a success. We have had very few people in during the time we have been open and most of these are neighborhood "regulars" who check their email or play. They discourage the few serious users who have come. The genealogy researchers have been few and far between. The new hours have not been advertised to state employees. The libraries are not calling. The libraries that need us do not have night hours. What we do get are get are messages on the mornings we come in late from librarians who need to talk to us. Why have 4 people and a guard working 5 to 8 two nights a week for such a small number of people? Even if state employees knew we were open, the vast majority would not come out. One of the primary responsibilities of the reference staff is to do research for state employees and officials so they will not have to come out here

There may be money for night hours and new cubicles but there is precious little for needed office supplies. At first we had to write a justification for pencils and paper clips, and then later in the year, we were told we could not have anymore because we stole them. That is why several of us were begging pencils and pens from the exhibitors at the convention.

PUBLIC LIBRARIES AND STATE AGENCIES

State government is like a small town. Almost fifty people do not leave an agency as small as APLS without something being wrong and without State Personnel and other departments realizing that there is a problem. It is embarrassing to be asked over and over by state employees, "What is going on out there?" Up until a few years ago, people were clamoring to come to work for the agency.

There has been no consistent effort or plan to alert state employees to the services APLS can provide for them. State employees are like most people now: they want the information they need immediately; they search Google and take what they get. APLS

4

needs to be exploring way to let them know about the AVL and the other available databases as well as searching for new databases they could use and exploring chat reference, 24/7 options, and e-books. So many of the state employees do not even know we exist now since it has been so long since we had a PR program. I am enclosing a brochure Julie Hare designed with my advice that was to be mailed to all state employees several years ago. I know the mailing labels were provided to administration more than one time. Only a few were ever mailed for some reason. There are 3 huge boxes remaining. This is a small thing, but it might alert a few people and their word of mouth would let more people know what we can do.

The Library World is also small and there are few secrets. We used to have a presence at SOLINET and at other library organizations. We are now discouraged from participating. Derogatory remarks have been made about OCLC, SOLINET, and Baker & Taylor. Staff has not been encouraged to participate in the Alabama Library Association or to attend any ALA meetings or any other training or national meetings. Mrs. Dickey, you were at the Alabama Library convention. You probably had more people than I did asking you about what was going on at APLS. Public librarians depended on Beverly Davis, Mary Payne, Kim Owen, and John Tran to name a few of the people who have left. They need the circuit riders. They need SOLINET workshops. Until now, the libraries have always come first at APLS. They got the new books first and their computer needs came before the needs and wants of the APLS staff. This is no longer true.

I do not know any details of what is going on with the AVL Council, but I can tell you that if the Council is being treated the way the staff is, they have valid complaints. I also know that the AVL Council is honest and professional and that they worked together for years with out any problems until recently.

ETHICAL ISSUES

The SIRSI Users Group meeting in Colorado is a working meeting for people who use SIRSI daily. When librarians and library techs who worked with the system were allowed to go, we divided up and attended as many meetings as possible, took notes and shared with the staff. We always learned so much. This year we did not find out until after the fact that the director and the business manager had gone to the meeting. They don't even have SIRSI Workflows on their computers. If this was not a "junket" why was it such a secret? How would it look to the librarians and the public? All three of the people who are in charge of APLS were in Colorado at the same time. Staff did not know they were gone. What would have happened had there been an emergency? Rumor has it that the director's husband's employer is on the APLS Board. The Ethics Commission may differentiate between Independent Contractors and employees but the newspapers may not. News reporters are looking for incidences of nepotism and misuse of funds in all areas of state government since the community college debacle. Wouldn't it be best for public libraries, you, and the Governor if the APLS administration, like Caesar's wife, remained above suspicion?

It is possible that State Personnel and the Ethics Commission will find that the actions of the present administration are within the legal guidelines of what is Allowed by agency heads, but there are moral issues that are above the law. It is not right for people to be treated the way the APLS staff has been treated since 2001. Public libraries, the library users, the Board, and the taxpayers deserve much more than they are getting now.

The APLS staff works hard and wants to do what is expected of them. Regardless of what you may have been told about the staff by Mrs. Mitchell, Mr. Bivins and Mr. Lensch, the people who work at APLS are competent, sane and honest. They are also creative and are committed to providing service to public libraries. If they received the support and respect they deserve and had strong, compassionate leadership, APLS could become a show place for state government and Alabama libraries.

I regret that I was so afraid of retaliation that I did not send you a letter like this long before now. Please do not dismiss my concerns on the say-so of the administration, but conduct your own investigation and assure the staff that you will listen to them and protect them from negative repercussions if they talk to you. I will be glad to talk to you at any time.

A copy of my official reprimand is included so you can see the tone of current administrative communication with the staff. I also have notes from meetings and conversations.

Please help us,

*Judith R Shepard*

Judith R. Shepard, Head
Information Services
Alabama Public Library Service
6030 Monticello Drive
Montgomery, AL 36130

(Home: 30 Tecumseh Drive
Montgomery, AL 36117/
Phone: 334-271-3871)

Cc: Members of the APLS Executive Board

Cc: Governor Bob Riley

6

February 27, 2006

To:        Judith Shepard

From:     Hulen E. Bivins

Re:       Employee Reprimand

This memo to your attention is with regard to two items of employee conduct that are unacceptable. One item is intentional statements of false data in a written form (See: <u>Alabama Administrative Code</u>, Chapter 670-X-19-.01(a)(4), (5), and (7)). The second item is insubordination. (See: <u>Alabama Administrative Code</u>, Chapter 670-X-19-.01(b)(2)

1. In a written communication from you concerning the topic of "Videos and DVDs" (see attachment) issued on February 24, 2006 to the attention of Rebecca Mitchell, State Librarian, and myself, you conclude with a suggested action that you claim to have proposed in the past. Such a statement is false and without basis. Rather, it is Ms. Mitchell who, as State Librarian, has suggested for the past two years the action that you now claim as your thought. Indeed, it is fact, confirmed by several APLS employees including Ms. Mitchell herself, that not only did you not propose the action for which you credit yourself, what you did do is delay the implementation of any action regarding the matter of videos and DVDs that was suggested by the State Librarian. Your statement therefore shows an inattention to your job tasks resulting in a failure to perform your job properly thus causing a disruptive influence. (See: <u>Code</u>, items (a)(4), (5) and (7))

Furthermore, your communication of February 24, suggest, "We need to notify these patrons that we are no longer purchasing videos and that we are going to stop circulating them." You present such as a statement of fact. This is not true. APLS has in the past month, placed an order for new video titles in the DVD format and plan to add additional titles in the hope that increased circulation, through and including FY '07, will indicate a usefulness of this library circulation service. To incorrectly imply any other decision has been made by the agency, certainly to the public, has a disruptive effect showing an inattention to your specific job and its inherent duties resulting in a failure to perform your job properly. (See: <u>Code</u>, items (a)(4), (5) and (7))

As you are aware following many years of service as a professionally trained librarian, honesty is an integral part of the profession of librarianship. For example, issues such as plagiarism have been and continue to be of great importance. Personal honesty is of no less importance. Diligence must be

1

exercised to preserve the truth and you are directed to conform to this standard Certainly, to appropriate the words, thoughts and the directives of the State Librarian as your own is not acceptable

2     Under the reorganization of APLS as announced in January of this year, I am now designated as your immediate supervisor  Your memo of February 24 (cited above) was given to Ms  Mitchell prior to any discussion with me  You did not even have the courtesy to inform me personally of the memo but rather sent an email after already insuring the delivery of your comments to Ms  Mitchell Your conduct in this matter is disrespectfully, hurtful and mean-spirited  It is simply an act of insubordination  (See: Code, item (b)(2))  Such will not be tolerated   .

Further, this is the second time, in recent days, of conduct of insubordination on your part, the former time being when you discussed, in January (2006), a wedding celebration party for APLS employee Beverly Davis Again, you talked with Ms  Mitchell prior to me  To make the matter of greater disrespect, you then scheduled the function of honor for Ms  Davis on a date that you, for more than two weeks prior, knew was a date on which I would not be at APLS  Further compounding the disrespect, the date and time you selected to honor Ms  Davis was a date on which Ms  Mitchell, the State Librarian, could not be present  (See: Code, item (b)(2))

Everyone at APLS is participating in a period of great change designed to assure that the agency fulfills the charge placed before it via the Code of Alabama  In so doing, the status quo of the past is being left behind as APLS molds itself into an agency prepared to fulfill its charge in the future  You, as a member of the APLS staff, must participate in these changes and you must be supportive of said changes  Anything less in your words, conduct, or countenance, shall not be appreciated, shall not be rewarded, and will not be acceptable

You are encouraged to make positive change so as not to allow a recurrence of the problems outlined herein  A copy of this employee reprimand as directed to your attention this day shall be placed in the APLS Personnel File  You may provide a written explanation of your actions as cited in this reprimand and/or you may provide in writing any factors which you believe mitigate your responsibility for your actions as cited  You are requested to provide said writing within a period of three (3) working days, from the date of this reprimand

Hulen E  Bivins
Assistant Director
Alabama Public Library Service

Received _27th_ day of February, 2006

Judith Shepard

2

February 24, 2006

From:  Judith Shepard, Head Information Services

To:  Rebecca Mitchell
       Hulen Bivins

Recommendation: Videos and DVDs

We have libraries and state employees who still use APLS videos. Some of them book in advance. We need to notify these patrons that we are no longer purchasing videos and that we are going to stop circulating them.

Our patrons need to be given a date and they need to have time to purchase DVD players. I think abruptly stopping the circulation of videos, if that is what is planned, will upset the patrons who are using them.

I suggest what I have proposed in the past: we phase out the videos and weed them as we get replacement DVDs or new DVDs.

*Received 3/3/06* (illegible)

March 1, 2006

To:    Hulen Bivins

From:  Judith Shepard  *Judith Shepard*

Re:    Employee Reprimand

A response to the employee reprimand I received from Hulen Bivins on Feb 27, 2006
I would like to explain the misunderstandings that generated this document

"suggested action that you claimed to have proposed in the past"
Mrs Mitchell and I have discussed videos in the VHS format and the DVD format
numerous times since she became state librarian. Mrs Mitchell and I both talked about
phasing in the DVD format. It was not an idea to steal but suggestions that we both made
and both assumed. I have never intentionally delayed the implementation of the DVD
format. Until I received this reprimand I never had any indication that Mrs Mitchell was
not satisfied with my work. My evaluations indicate that she has been more than pleased.

"we need to notify these patrons"
At the full staff meeting held on January 11, 2006, Mrs Mitchell said we would stop
purchasing and cataloging videos. This reprimand is the first time you have told me that
videos in the DVD format were being purchased. I am supervisor of the Video
Department yet I had to hear from the Video staff and the Head of Technical Services
that you were purchasing DVDs. Not all of our public libraries and state agencies that use
APLS videos have switched to the DVD format so they need to be informed if the VHS
format is being phased out.

On February 22, 2006 in a staff meeting, Mrs Mitchell said she wanted the staff to make
suggestions, share ideas and make recommendations. She has asked that these
recommendations be put in writing and sent to her. She did not say to give them to
supervisors. I put a copy of the recommendation in your mail box and then walked
across the hall and put a copy in her mail box. I have been working at APLS since 1976,
and I have always felt free to send suggestions, ideas and recommendations to the
director with a copy to my supervisor and I have never received a reprimand for this. In
fact, I was usually thanked.

"wedding celebration party"
I was under the impression that the director was the person who approved parties. I did
not select the date for the party. Mrs. Davis/Benson's husband lives out of state, and they
take turns commuting, so I asked her to select the date that was most convenient for her.
We had the party on that date.

I have told Mrs. Mitchell that I support her, her plans and the agency and I will continue to do so. I have devoted my professional life to APLS and its goals. Any delay in implementation of any plans has not been intentional. I have prioritized my activities and kept Mrs. Mitchell informed of them. I will work with you also even though the tone of your reprimand has shocked me and hurt me and makes me think you are trying to force me out of my position. I would gladly answer any questions that you may have about my actions. I ask you to please keep me informed of the changes you make in the departments I supervise.

October 3, 2007

Mrs. Donna Dickey, President
APLS Executive Board
B.B. Memorial Library
314 North Broadway Avenue
Sylacauga, AL 35150-2528

Dear Mrs. Dickey:

Thank you for your recent letter telling me that because of the letter I sent to you conditions at APLS would be investigated. In that letter I mentioned two times that I had hesitated to write because I feared retaliation. That concern has become a reality. I am sending you the memo I received from Mr. Bivins forcing me into a position for which I am not qualified nor do I want. I had hoped that you would prevent something like this from happening. I would appreciate any help you and the Board can give me

Sincerely yours,

Judith R. Shepard
Head Information Services
Alabama Public Library Service

Home address:
30 Tecumseh Drive
Montgomery, AL 36117
Telephone: 334/271-3871

October 1, 2007

MEMORANDUM

To:        Judy Shepard

From:      Hulen E Bivins

Re:        Temporary Change of Duties

First, I would like to express on behalf of APLS thanks for your willingness to step forward and volunteer to fill a void as to the training of public library staff throughout the state in the use of databases provided by APLS and databases contained in the offerings of the Alabama Virtual Library. Your oral expression of commitment to such training at the staff meeting of Tuesday, September 4, 2007 is indeed commendable. Such professional training is a great need with the continual influx of new public library staff in Alabama.

In the weeks following your offer of assistance in database training, considered thought has been given to your talents and how they might best be used for the benefit of APLS and the state's public libraries. Therefore, in additional to providing statewide training in the usage of databases, you shall be temporarily assigned to the APLS Consultant staff with an assigned public library district to work with and to aid. The assigned district shall be #4 which includes the public libraries in the counties of: Blount; Jackson; DeKalb; Etowah; Marshall; as well as the Cheaha Regional System (Clay, Cherokee, Cleburne, Randolph, Talladega); and the independent public libraries in the towns of Talladega and Sylacauga.

As you are aware from comments and discussions at past monthly staff meetings, APLS has had, due to myriad reasons, difficulty in obtaining qualified librarians to serve on the Consultant staff. With more than 25 years experience at APLS and with your knowledge of both the libraries and the librarians in the assigned district of the state, it is anticipated that you will do an outstanding job and fulfill this temporary assignment in the exemplary manner of which you are capable.

This temporary change of duties shall be effective beginning Monday, October 15, 2007. To enable and maintain a spirit of cooperation with the present Consultant staff and to maintain the easy exchange of information and ideas among all APLS Consultants, you shall relocate your office area to the Consultant office area prior to October 15.

So as not to press you with an unreasonable amount of duties, effective October 15, 2007, your personnel supervision duties as to Reference, ILL, and Video are removed and shall be reassigned to another APLS employee

As a member of the APLS Consultant staff, your work schedule shall conform to that of the other members of the Consultant staff (normally 8 AM to 5 PM, Monday thru Friday)  Therefore, you will not have a regular work schedule that embraces your present assignment of Tuesday evening work at APLS after October 15, 2007  Rather you, like all Consultants presently, shall have random evening work duties as may be needed to serve the needs of the agency and the agency's patrons

This temporary work assignment will not alter in any manner the monetary compensation that you receive as a member of the APLS staff  As you are presently, you shall continue to work in the same personnel class

It is anticipated that you shall embrace this new temporary opportunity of professional growth with the zeal that it is believed that you feel for APLS and the profession of librarianship as a whole

On behalf of the agency, I thank you for your volunteer spirit and your willingness to aid the public libraries of Alabama in the best manner possible

Hulen E  Bivins
Assistant Director, APLS

cc:  Rebecca Mitchell, Director, APLS
      APLS Personnel Files

October 4, 2007

To: Hulen Bivins

From: Judith R Shepard

Re: "Temporary Change of Duties"
A Response to your memo dated October 1, 2007
And comments on the emails you sent to the APLS staff and to the APLS Adm
Listserv

"..willingness to step forward and volunteer    training of the public library staff
throughout the state .." **Every consultant in the meeting heard me say that I would
*help them learn to train. I did not volunteer to be the only trainer.***

**As I told you when you gave me this assignment, the AVL trainers group is very
good and very active. They are more than willing to train library personnel as well
as users. APLS needs to let the public librarians know about this service and
encourage them to use these gifted trainers since you do not have enough
consultants. That is the type of thing I volunteered to.**

"You shall be temporarily assigned to the APLS Consultant staff with the assigned
duties .." **My expertise is in reference, interlibrary loan, collection development
and training in these fields. I have had no experience in grant writing, library
building and construction, library law, public library administration, e-rate or any
other topics that one needs to know to be a consultant. You are moving me to a
position for which I am not qualified.**

**I have worked at APLS since 1976 and I am the only staff member who has ever
been forced to be a consultant. I was not even asked. You know nothing about my
personal situation and did not even consider that that I might have issues that will
make extensive travel difficult. You *asked* Ruth Evans, Al Craig, Katie Ray and
Tammy Lowery to get on the register, you did not force them to apply.**

"  difficulty in obtaining qualified librarians to serve on the consultant staff   " **As I said
before I am not qualified for the position of consultant. APLS has two consultants
who are highly qualified: Ms. Kelyn Ralya and Ms. Annie Brown. Ms. Ralya could
be given a district and Ms. Brown could keep the district that she has instead of
being pulled out of the field to work on "special projects." The other libraries could
be divided up with those 4 people and you to give you a consultant staff of 5, six if
Ms. Mitchell helped out.**

All staff memo and memo to public librarians: **Volunteering to *help* the existing staff
provide AVL training has absolutely nothing to do with being a consultant. You
implied to my staff that I volunteered to become a consultant. That is not true and**

never will be true. You did not even show me the professional courtesy of allowing me to tell my own staff that I would be leaving them. Fortunately they did not believe your memo. Nor have you had the decently to tell them who will be their supervisor. You also implied in the e-mail to the APLS Listerv that I volunteered to be a consultant. Again this is not true and many of the librarians in the state who know you and me are also questioning this action.

This temporary assignment is a flagrant act of retaliation in response to the letter I sent to the APLS Executive Board describing the intolerable working condition at APLS, the disrespect shown to the staff, the unwise use of staff, and the reputation of the agency in the library community. Your action and the accompanying memo is a perfect illustration of the current conditions at APLS

I would like to have a copy of this response placed in the APLS Personnel Files


Judith R. Shepard
Head Information Services
Alabama Public Library Service


cc: Rebecca Mitchell, Director, APLS
    APLS Executive Board members
    Governor Bob Riley
    State of Alabama Personnel Office

Helen Phillips
PO Box 977
106 E. College Street
Columbiana AL 35051

Donna L. Dickey
211 Primrose Path
Sylacauga AL 35150-3530

Bobbie Lou Leigh
102 Woodridge Drive
Sheffield AL 35660

Ronald A Snider
Miller, Hamilton, Snider & Odom
PO Box 46
254 State Street
Mobile AL 36601

Mack Butler
3518 Montrose Ave
Rainbow City AL 35906

Robert E. Hodge
1071 Arrowhead Drive
Prattville AL 36064

Geroge T. Washburn
410 West DeKalb Street
Marion AL 36756  /Resigned/

Helen Phillips
PO Box 977
106 E. College Street
Columbiana AL 35051

Donna L. Dickey
211 Primrose Path
Sylacauga AL 35150-3530

Bobbie Lou Leigh
102 Woodridge Drive
Sheffield AL 35660

Ronald A. Snider
Miller, Hamilton, Snider & Odom
PO Box 46
254 State Street
Mobile AL 36601

Mack Butler
3518 Montrose Ave
Rainbow City AL 35906

Robert E. Hodge
1071 Arrowhead Drive
Prattville AL 36064

Gerbge T. Washburn    New One
410 West DeKalb Street
Marion AL 36756   Resigned

THOMAS RALSTON LONG IV
>P.O. Box. 429
UNIONTOWN, AL            ——>334- 628-4787
36786 · 0429



IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:07-CV-841-MHT-WC


ANNIE LUCAS BROWN,

      Plaintiff(s),

      vs.

ALABAMA PUBLIC LIBRARY SERVICE,

      Defendant(s).


S T I P U L A T I O N

      IT IS STIPULATED AND AGREED by
and between the parties through their
respective counsel, that the deposition
of JUDITH SHEPARD may be taken before
TAMIE J. STORY, Commissioner, at the
offices of RUSHTON, STAKELY, JOHNSTON &
GARRETT, 184 Commerce Street, Montgomery,
Alabama, on the 16th day of May, 2008.

      IT IS FURTHER STIPULATED AND
AGREED that the signature to and the

Page 2

1  reading of the deposition by the witness
2  is waived, the deposition to have the
3  same force and effect as if full
4  compliance had been had with all laws and
5  rules of Court relating to the taking of
6  depositions.
7      IT IS FURTHER STIPULATED AND
8  AGREED that it shall not be necessary for
9  any objections to be made by counsel to
10  any questions except as to form or
11  leading questions, and that counsel for
12  the parties may make objections and
13  assign grounds at the time of the trial,
14  or at the time said deposition is offered
15  in evidence, or prior thereto.
16      IT IS FURTHER STIPULATED AND
17  AGREED that the notice of filing of the
18  deposition by the Commissioner is waived.
19
20
21
22
23

Page 3

1          INDEX
2  EXAMINATION BY:        PAGE NUMBER:
3  Mr. Huffaker        6, 239
4  Ms. Biggers        198, 242
5  EXHIBITS:
6  Defendant's 1 -        13
7   Subpoena
8  Defendant's 2 -        61
9   Notice of Suspension
10  Defendant's 3 -        71
11   Letter
12  Defendant's 4 -        173
13   Letter
14  Defendant's 5 -        178
15   Letter
16  Defendant's 6 -        185
17   Letter
18  Defendant's 7 -        192
19   Letter
20  Defendant's 8 -        195
21   Letter
22  Plaintiff's 1 -        200
23   Letter

Page 4

1      IN THE UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF ALABAMA
3          NORTHERN DIVISION
4
5  CASE NUMBER: 2:07-CV-841-MHT-WC
6
7  ANNIE LUCAS BROWN,
8      Plaintiff(s),
9      vs
10  ALABAMA PUBLIC LIBRARY SERVICE,
11      Defendant(s).
12
13  BEFORE:
14      TAMIE J. STORY, Commissioner
15  APPEARANCES:
16      MS. DEBORAH HILL BIGGERS,
17  Attorney at Law, 113 East Rosa Parks
18  Avenue, Tuskegee, Alabama 36083,
19  appearing on behalf of the Plaintiff.
20      RUSHTON, STAKELY, JOHNSTON &
21  GARRETT, by Mr. Austin Huffaker and Mr.
22  T. Grant Sexton, 184 Commerce Street,
23  Montgomery, Alabama 36195, appearing on

Page 5

1  behalf of the Defendant.
2      HASKELL, SLAUGHTER, YOUNG &
3  REDIKER, LLC, by Mr. C. McDowell Crook,
4  Jr., 305 South Lawrence Street,
5  Montgomery, Alabama 36014, appearing on
6  behalf of Judith Shepard.
7  ALSO PRESENT:
8      Annie Lucas Brown
9
10      **************
11
12      I, TAMIE J. STORY, a Court
13  Reporter of Birmingham, Alabama, acting
14  as Commissioner, certify that on this
15  date, as provided by the Federal Rules
16  of Civil Procedure and the foregoing
17  stipulation of counsel, there came
18  before me at the offices of RUSHTON,
19  STAKELY, JOHNSTON & GARRETT, 184
20  Commerce Street, Montgomery, Alabama,
21  beginning at 9:35 a.m., JUDITH SHEPARD,
22  in the above cause, for oral
23  examination, whereupon the following

Page 34

1    A.    I told --
2    Q.    Hold on. First off, I'm
3 asking the details question, so --
4    A.    Well, I can tell --
5    Q.    Hold on, let me say this.
6 Okay? The question is: I want to know
7 everything that was said during this
8 telephone conversation between you and
9 Mr. Schremser. Mr. Crook is here, he's
10 saying don't go into details.
11        MR. HUFFAKER:  Well, if
12 that's an instruction for her not to --
13 to give some information, not to give
14 others, I think we need to be very
15 clear on the record about what the
16 instruction is.
17    Q.    The question on the table
18 is I want you to tell me everything
19 said by you to Mr. Schremser and that
20 was said by Mr. Schremser to you during
21 that telephone conversation in the last
22 three or four weeks.
23    A.    It was concerning the

Page 35

1 nature of the suspension; one
2 paragraph, the initial paragraph on --
3 concerning the suspension.
4    Q.    And that's all that you
5 discussed?
6    A.    That is it.
7    Q.    So this phone call lasted
8 twenty seconds?
9    A.    No, you don't talk to Bob
10 for twenty seconds.
11    Q.    Well, tell me exactly what
12 you told him about this.
13    A.    Well, I told him what had
14 happened, he said he was sorry, I said
15 I might need you as a witness, he said
16 I'll be glad to be a witness, and we
17 discussed the nature of that paragraph.
18    Q.    What did you tell him about
19 what happened?
20    A.    Well, I didn't -- I told
21 him that I wanted him to be at my
22 hearing to tell what he knew about the
23 situation and that what I was being

Page 36

1 accused of was not true.
2    Q.    Did you tell him what you
3 were being accused of?
4    A.    I'm sure I did. I had to
5 because --
6    Q.    Tell me what you told him.
7        MR. CROOK:  (Shaking head).
8    A.    No, I can't.
9    Q.    Why can't you?
10    A.    Because my lawyer says I
11 cannot.
12    Q.    Well, your lawyer needs to
13 say it on the record if he's telling
14 you not to answer that question.
15        MR. CROOK:  She's not going
16 to talk about any of the details of the
17 events that led to her suspension.
18        MR. HUFFAKER:  So are you
19 instructing Mrs. Shepard not to tell me
20 what she told Mr. Schremser during this
21 telephone call about her suspension and
22 the reasons for it?
23        MR. CROOK:  Yes.

Page 37

1        MR. HUFFAKER:  Tell us for
2 the record the reasoning for that.
3        MR. CROOK:  Judy has a
4 hearing on July 17th -- June 17th,
5 excuse me, concerning the issues and
6 the event that led up to her
7 suspension, and we do not want her to
8 say anything that might prejudice her
9 at that suspension hearing.
10    Q.    When you were talking with
11 Mr. Schremser --
12    A.    Uh-huh (nodding head).
13    Q.    -- did you tell him that
14 you could not answer any questions
15 about your suspension?
16    A.    No.
17    Q.    Did you withhold any
18 information from Mr. Schremser about
19 your suspension because of your intent
20 to file an appeal or challenge the
21 basis for it?
22    A.    I only talked to Mr.
23 Schremser about one particular instance

1  in the letter of the suspension. I did
2  not talk to him about the entire letter
3  of suspension.
4       Q.   What was that instance in
5  the letter that you told Mr. Schremser
6  about?
7       A.   My lawyer says I'm not
8  supposed to talk about that.
9       Q.   So you're not going to tell
10  me what you spoke with Mr. Schremser
11  about concerning your suspension; is
12  that correct --
13      A.   That's right.
14      Q.   -- based on the advice of
15  your counsel; is that correct?
16      A.   That's correct.
17           MR. CROOK:  (Nodding head).
18      Q.   What did Mr. Schremser tell
19  you?
20      A.   That he would be there to
21  help me.
22      Q.   That's all he told you?
23      A.   Uh-huh (nodding head).

1       Q.   How long was this telephone
2  call with Mr. Schremser?
3       A.   Five minutes. I don't
4  know.
5       Q.   Has Mr. Schremser sent you
6  any letters in the mail?
7       A.   No.
8       Q.   Has he sent you any
9  E-mails?
10      A.   No.
11      Q.   Have you sent him any
12  E-mails?
13      A.   I sent him a letter in the
14  mail asking him to call me because I
15  did not get a response from the
16  telephone numbers that I had for him.
17      Q.   When did you send him a
18  letter?
19      A.   Right after the -- probably
20  the day or next day after the
21  suspension.
22      Q.   What were the dates of your
23  suspension?

1       A.   April 22nd to May 6th.
2       Q.   Your conversation with Mr.
3  Schremser, was that during the period
4  of time in which you were suspended?
5       A.   Yes, it was.
6       Q.   And you sent him a letter
7  during that period of time?
8       A.   Yes, I did.
9       Q.   Do you still have a copy of
10  that letter?
11      A.   No, I don't.
12      Q.   You didn't keep a copy for
13  your records?
14      A.   I would have to go back and
15  see. All it said was " Bob, please
16  call me."
17      Q.   Do you keep a file at your
18  home concerning your employment at the
19  APLS?
20      A.   Yes, I do.
21      Q.   Is there a reason you
22  didn't bring that here today?
23      A.   Because it was not related

1  to Annie; it was related to me.
2       Q.   Does it concern the Alabama
3  Public Library Service?
4       A.   It concerns me and, yes, if
5  you -- my employment is the Alabama
6  Public Library Service.
7       Q.   It does concern the Alabama
8  Public Library Service?
9       A.   Uh-huh (nodding head).
10      Q.   Let me show you what I
11  asked in the subpoena. Topic 3, "Bring
12  with you any and all documents
13  concerning or relating to the Alabama
14  Public Library Service including
15  correspondence, memos, letters,
16  complaints, E-mails, reprimands,
17  affidavits, et cetera."
18      A.   They're my notes, my
19  personal notes.
20      Q.   You did not bring those
21  with you?
22      A.   No, I did not.
23      Q.   Do you have E-mails though?

Page 42

1    A.   Only the E-mails that I
2    sent from work to my own E-mail that
3    were sent to the entire staff.
4    Q.   Other than the letter to
5    Mr. Schremser, do you have any other
6    documents concerning Mr. Schremser?
7    A.   No.
8    Q.   Do you have any documents
9    concerning Tonya Moore?
10   A.   No.
11   Q.   Do you know who she is?
12   A.   Yes, I do.
13   Q.   Do you know why Mr.
14   Schremser was terminated from the APLS?
15   A.   Not -- I don't know the
16   specifics.
17   Q.   Do you have any idea?
18   A.   Um, he was bipolar, and he
19   -- his meds were messed up, and he was
20   boisterous and loud.
21   Q.   Do you know whether he got
22   issued a death warrant?
23   A.   Bob? No, I don't know

Page 43

1    anything about a death warrant.
2    Q.   Did you ever see his
3    rebuttal to a reprimand he received?
4    A.   Huh-uh (shaking head), no,
5    I'm sorry.
6    Q.   Do you have any documents
7    concerning Kim Owens?
8    A.   Huh-uh (shaking head), no.
9    Q.   Would that include any
10   E-mails?
11   A.   No.
12   Q.   E-mails that you received
13   from current and former employees at
14   the APLS, do you save those on your
15   computer?
16   A.   No, I don't.
17   Q.   Do you print those out?
18   A.   I don't even print them out
19   most of the time.
20   Q.   Do you have any documents
21   concerning David Farrar out of
22   Talladega?
23   A.   No, I don't.

Page 44

1    Q.   Do you know who that
2    individual is?
3    A.   Yes, I do.
4    Q.   Have you sent him any
5    letters or documents?
6    A.   I don't think so.
7    Q.   You don't think so?
8    A.   Huh-uh (shaking head).
9    Q.   You've never sent him
10   anything in the mail?
11   A.   I don't want to answer that
12   question.
13   Q.   Why not?
14   A.   Because I think it may
15   relate to my future hearing.
16   Q.   So are you refusing to
17   answer the question of whether you sent
18   any documents to David Farrar in
19   Talladega?
20   A.   Yes, because of my future
21   suspension hearing.
22   Q.   Does your future suspension
23   hearing concern Mr. Farrar?

Page 45

1    A.   Yes, it does.
2    Q.   Who is he?
3    A.   He is the director of the
4    Talladega Public Library.
5    Q.   Did you send him any
6    documents concerning the Alabama Public
7    Library Service?
8    A.   I'm not sure; I honestly am
9    not sure. I may have.
10   Q.   Did you send him any
11   documents concerning your employment at
12   the Alabama Public Library Service?
13   A.   I'm not sure. I may have.
14   Q.   Did you send him any
15   documents concerning Annie Brown?
16   A.   No.
17   Q.   Nothing that related to
18   Annie Brown?
19   A.   No.
20   Q.   Did you ask Mr. Farrar to
21   write a letter to the Board of
22   Directors complaining about management
23   at the APLS?

Page 46

```
 1    A.  No.
 2    Q.  Did you make a visit to Mr.
 3  Farrar in Talladega?
 4    A.  Yes, I did.
 5    Q.  When did you go up there?
 6    A.  February 20th.
 7    Q.  Of which year?
 8    A.  This year, 2008.
 9    Q.  What was the purpose for
10  you going up there?
11    A.  I was named consultant for
12  that area, so it was a standard visit.
13    Q.  And what does a standard
14  visit entail?
15    A.  You go and you sit and you
16  talk to them and you listen to them and
17  you ask them if there's anything you
18  can do to help them and how -- anything
19  the agency can do.
20    Q.  Does a standard visit
21  include discussing any internal
22  performance issues at the APLS?
23    A.  I -- (shrugging shoulders).
```

Page 47

```
 1    Q.  When you went --
 2    A.  No.  Like I said, I really
 3  never thought of it in those terms.
 4    Q.  When you went up to talk to
 5  Mr. Farrar, were you on the clock at
 6  the APLS?
 7    A.  Yes, I was.
 8    Q.  Were you using an APLS
 9  vehicle or state vehicle?
10    A.  Yes, I was.
11    Q.  Does your suspension
12  involve this meeting you had with Mr.
13  Farrar?
14    A.  Yes.
15    Q.  Did Ms. Brown know that you
16  were going up to talk to Mr. Farrar?
17    A.  I don't know.  I don't
18  think so.  She knew I was going --
19  that was one of several visits while I
20  was gone.  That was the last visit of
21  three or four libraries.
22    Q.  What other libraries did
23  you visit that particular day?
```

Page 48

```
 1    A.  The library in -- gosh, I
 2  can't remember.  Where the grist mill
 3  is up there, and then I went to
 4  Ohatchee, and then I went to Oxford.
 5    Q.  How long did you meet with
 6  Mr. Farrar up there?
 7    A.  Forever it seemed like.  A
 8  lot longer than I wanted to.
 9    Q.  Why was that?
10    A.  Because he kept me there.
11    Q.  How did he keep you there?
12    A.  Talking.
13    Q.  Was he doing most of the
14  talking or were you?
15      MR. CROOK:  That's okay.
16    A.  Yeah, he was.
17    Q.  Was anybody up there with
18  you on that trip?
19    A.  No.
20    Q.  Did you discuss with Mr.
21  Farrar the Annie Brown lawsuit?
22    A.  I don't think so, no.
23    Q.  Did you tell Mr. Farrar
```

Page 49

```
 1  that Annie Brown had a federal lawsuit
 2  against the Alabama Public Library
 3  Service?
 4    A.  No.
 5    Q.  Did you tell Mr. Farrar
 6  that you and Annie Brown were in the
 7  process of "getting them all"?
 8    A.  No.
 9    Q.  You never told him that?
10    A.  No, I never used that term.
11    Q.  What term did you use?
12    A.  I didn't use any term.
13    Q.  You used nothing to that
14  effect?
15    A.  No.
16    Q.  You're sure about that?
17    A.  I am positive (nodding
18  head).
19    Q.  Did you tell Mr. Farrar
20  that you and Ms. Brown had never been
21  close but that had changed recently
22  because Ms. Brown had filed federal
23  charges against the APLS?
```

Page 50

1   A.  I most certainly did not.
2   Q.  You said nothing to that
3 effect?
4   A.  No.
5   Q.  You're sure about that?
6   A.  I'm positive.
7   Q.  Did you tell Mr. Farrar
8 that you and Ms. Brown were "determined"
9 to get them for running a very unfair
10 work place"?
11   A.  No.
12   Q.  Nothing to that effect?
13   A.  No.
14   Q.  After meeting with Mr.
15 Farrar, did you tell Ms. Brown that you
16 had talked to him?
17   A.  I think that I talked to
18 Annie about all of the libraries that I
19 visited.
20   Q.  Did you tell Ms. Brown that
21 she should call Mr. Farrar also?
22   A.  No.
23   Q.  Did Ms. Brown tell you that

Page 51

1 she called Mr. Farrar after your visit?
2   A.  I don't remember.  That was
3 back in February.
4   Q.  Did Ms. Brown ever tell you
5 that she has called Mr. Farrar?
6   A.  I don't remember.
7   Q.  Did you tell Mr. Farrar
8 that Ms. Brown had told you that he
9 could be trusted and would help?
10   A.  I don't remember.  I don't
11 think so.
12   Q.  Did you tell Mr. Farrar
13 that you would send him some documents
14 about what was going on at the
15 APLS?
16      MR. CROOK:  That's okay.
17   A.  I don't remember; I really
18 honestly don't.
19   Q.  What do you remember
20 discussing with Mr. Farrar?
21   A.  Well, obviously, I can't
22 discuss that, but I remember that the
23 meeting was very long, that he did most

Page 52

1 of the talking, and that I was anxious
2 to get back because I was in the old
3 car, and I wanted to get back to APLS
4 before dark.
5   Q.  So it's your testimony that
6 he kept you there?
7   A.  Yes.
8   Q.  So are you going to tell us
9 about what you discussed with Mr.
10 Farrar up there?
11   A.  No, because my lawyer will
12 not let me.
13   Q.  Okay.
14   A.  And I didn't discuss it, he
15 was discussing it.
16   Q.  Well, your lawyer has yet
17 to say that.
18      MR. HUFFAKER:  Is the
19 instruction to Mrs. Shepard that she is
20 not to tell us or answer any questions
21 about what she told Mr. Farrar during
22 this trip?
23      MR. CROOK:  Yes.  The

Page 53

1 details of her conversation with David
2 are related to her suspension hearing,
3 so we're not going to go into that at
4 this time.
5      MR. HUFFAKER:  Okay.  As
6 I've told you, I'm going to go ahead
7 and ask some of these questions.
8   Q.  Mrs. Shepard, did you tell
9 Mr. Farrar during your meeting in
10 Talladega that Hulen Bivins was a
11 closet case himself?
12      MR. CROOK:  Don't answer
13 that.
14   A.  I cannot answer that.
15   Q.  Did you tell Mr. Farrar
16 during this trip or during this meeting
17 in Talladega that Mr. Bivins had
18 questioned his sexual orientation?
19   A.  I can't answer that.
20   Q.  Would that be an
21 appropriate discussion to have with a
22 client or a public library?
23   A.  I did not open a discussion

Page 54

1   with the client, with Mr. Farrar.
2       Q.    Would it be proper to
3   discuss with a client or public library
4   internal agency personnel issues?
5           MR. CROOK:  Don't answer
6   that.
7       A.    I cannot answer that.
8       Q.    Why can you not answer
9   that?
10      A.    Because it's part of my
11  suit, my hearing.
12      Q.    Did you tell Mr. Farrar
13  that Ms. Mitchell did not talk to you
14  as a friend like she used to?
15      A.    I cannot answer that.
16      Q.    On the instruction of your
17  attorney?
18      A.    Yes.
19      Q.    And just so that we're
20  clear, when you tell me that you cannot
21  answer that, it's because of an
22  instruction given by your attorney?
23      A.    It's because of what I've

Page 55

1   been told I can tell you and what I've
2   been told not to tell you.
3       Q.    Did you tell Mr. Farrar
4   during this trip that Ms. Mitchell
5   hides in her office protected by Mr.
6   Bivins and Mr. Lensch?
7           MR. CROOK:  Don't answer
8   that.
9       A.    I cannot answer that.
10      Q.    Did you tell Mr. Farrar
11  that Ms. Mitchell is weak and loves for
12  a man to protect her?
13      A.    I cannot answer that.
14      Q.    Did you tell Mr. Farrar
15  that Becky loves it this way?
16          MR. CROOK:  Don't answer
17  that.
18      A.    I cannot answer that.
19      Q.    Did you tell Mr. Farrar
20  that Ms. Mitchell had gained weight
21  from sitting in her office all day?
22      A.    Lord --
23          MR. CROOK:  Don't answer

Page 56

1   that.
2       A.    -- I cannot answer that
3   (laughing).
4       Q.    Did you tell Mr. Farrar
5   that the APLS services were dismal?
6       A.    I cannot answer that.
7       Q.    Did you tell Mr. Farrar
8   that Ms. Mitchell, Mr. Bivins and Mr.
9   Lensch were out of control?
10          MR. CROOK:  Don't answer
11  that.
12      A.    I cannot answer that.
13      Q.    Did Mr. Farrar tell you
14  that the APLS services to public
15  libraries had never been better?
16          MR. CROOK:  You can answer
17  that.
18      A.    No.
19      Q.    He never told you about
20  that?
21      A.    No.
22      Q.    Did he have any complaints
23  at all about APLS services?

Page 57

1           MR. CROOK:  That's fine.
2       A.    Yeah.
3       Q.    What did he tell you?
4           MR. CROOK:  You can talk
5   about his complaints.
6       A.    He was -- did not think
7   that grants were -- he felt like the
8   grants were being given out to favored
9   people.
10      Q.    What kind of grant?
11      A.    LSTA grants.  That is a
12  Library Services and Technology Act
13  grant.  Those are the federal monies
14  that come into the agency and are given
15  to libraries in the form of grants.
16      Q.    Are those grant tied at all
17  to attendance at conferences and
18  workshops that APLS puts on?
19      A.    That's state aid.  That's
20  another -- that's state money.
21      Q.    And is state aid tied to
22  attendance at conferences and workshops?
23      A.    Yes.

Page 58

1    Q.   How is it tied -- how exactly
2  is it tied to those things?
3          MR. CROOK:  You can tell him
4  about that.
5    A.   They have to attend
6  X-number of meetings.  That's one of
7  the requirements to get state aid, they
8  have to meet requirements to get the
9  amount of -- their state aid.
10    Q.   And when they attend a
11  meeting, do they have to attend all of
12  the meeting?
13    A.   No.
14    Q.   Are there -- what exactly are
15  the attendance requirements?
16    A.   It's one or two meetings.
17    Q.   Who makes the decision as
18  to whether they fulfill their
19  attendance requirements for a meeting?
20    A.   Ms. Mitchell and Mr. Bivins.
21    Q.   Did you have any say over
22  that as a consultant?
23    A.   No, I do not.

Page 59

1    Q.   When you had this discussion
2  with Mr. Farrar in Talladega, did you
3  tell him that you had influence over
4  whether he could receive state aid?
5          MR. CROOK:  Don't answer
6  that.
7    A.   I can't answer that because
8  my attorney tells me not to.
9    Q.   Did you tell Mr. Farrar that
10  if he missed a day or two at a state
11  convention in April, to let you know and
12  you could make it okay?
13          MR. CROOK:  Don't answer
14  that.
15    A.   I can't answer that
16  (laughing) -- I can't answer that.
17    Q.   You laughed.  Is there a
18  reason you're laughing?
19    A.   Ludicrous.
20    Q.   Why is it ludicrous?
21    A.   Because I never said that.
22    Q.   Did you say any of these
23  things that I'm asking you about?

Page 60

1          MR. CROOK:  Don't answer
2  that.
3    Q.   Did you discuss Ms.
4  Mitchell's marriages with Mr. Farrar?
5          MR. CROOK:  Don't answer
6  that.
7    A.   I can't answer that.
8    Q.   Did you discuss with Mr.
9  Farrar some issues about DVD services?
10          MR. CROOK:  Don't answer
11  that.
12    A.   I can't answer that.
13    Q.   Did you tell Mr. Farrar that
14  Hulen Bivins thought he was God's gift to
15  women?
16          MR. CROOK:  Don't answer
17  that.
18    A.   No, I swear I did not.  I
19  can't answer that.
20    Q.   Do you believe your
21  suspension was unwarranted and
22  unjustified?
23    A.   Yes.

Page 61

1    Q.   Do you believe it was based
2  upon false information?
3    A.   Yes.
4    Q.   What information was false?
5    A.   Just about everything in
6  the letter.
7    Q.   Exactly what?
8    A.   I can't --
9          MR. CROOK:  Don't answer.
10    A.   -- answer that.
11    Q.   And when you say the letter,
12  are you talking about the suspension
13  notice?
14    A.   Yes, the suspension notice.
15
16    (Whereupon, Defendant's Exhibit 2
17    was marked for identification and
18    same is attached hereto.)
19
20    Q.   Is Defendant's Exhibit 2 a
21  copy of the suspension notice?
22    A.   Yes, it is.
23    Q.   Is it correct that you're not

Page 62

1  going to be answering any questions about
2  the contents --
3      A.   Yes --
4      Q.   -- of that suspension notice?
5      A.   -- it is.
6      Q.   Why is that?
7      A.   Because I've been ordered
8  to by my attorney -- not to answer by
9  my attorney.
10         MR. CROOK: Again, because
11 of her pending suspension hearing, the
12 suspension letter is not available for
13 discussion at this point.
14     Q.   It's your testimony the
15 contents of that suspension are
16 incorrect?
17     A.   Yes.
18     Q.   Did you tell Mr. Farrar
19 that getting with Hulen would be like
20 -- I'm not going to use the word --
21 having sex with a spider monkey?
22         MR. CROOK: Don't answer
23 that.

Page 63

1      A.   I can't answer that.
2      Q.   Did you tell Mr. Farrar that
3  when Mr. Bivins was brought out of the
4  dungeon, he was ready to get even with a
5  lot of folks?
6          MR. CROOK: Don't answer.
7      A.   I can't answer that.
8      Q.   Did you tell Mr. Farrar
9  that Mr. Bivins was a poor lawyer who
10 had to try several times before he
11 could pass the bar exam?
12         MR. CROOK: Don't answer
13 that.
14     Q.   On the advice of counsel,
15 you're not going to answer that question?
16     A.   Yes, uh-huh (nodding head).
17     Q.   Did you tell Mr. Farrar that
18 Mr. Bivins' wife wears the pants in the
19 family?
20         MR. CROOK: Don't answer
21 that.
22     Q.   On the advice of your -- or
23 instruction of your counsel, are you

Page 64

1  going to answer that one?
2      A.   No, I'm not going to answer
3  that.
4      Q.   Do you deny telling Mr.
5  Farrar that you and Annie Brown were in
6  the process of "getting them all"?
7          MR. CROOK: Don't answer
8  that.
9      A.   I can't answer that.
10     Q.   Did you discuss with Mr.
11 Farrar at all Ms. Brown's lawsuit?
12     A.   I can't answer that.
13     Q.   Did you make any mention
14 about her federal lawsuit at all?
15     A.   I can't answer that.
16     Q.   Did you tell Mr. Farrar that
17 Mr. Lensch was an ugly bastard?
18         MR. CROOK: Don't answer
19 that.
20     A.   No, I can't answer that.
21     Q.   Did you tell Mr. Farrar that
22 you had spoken with other librarians in
23 the state about these things?

Page 65

1          MR. CROOK: Don't answer.
2      A.   I can't answer that.
3      Q.   Who else -- What other
4  librarians in the state have you
5  discussed the Annie Brown lawsuit with?
6      A.   I can't answer that.
7          MR. CROOK: You can answer
8  that.
9      A.   Okay. I don't know that I
10 have discussed it with anybody. I
11 don't know enough details to discuss
12 it.
13     Q.   What other librarians in the
14 state have you discussed the inner-
15 personnel issues at the APLS?
16     A.   I sent that letter to the
17 board. The letter that I sent to the
18 board, there were librarians there, and
19 they apparently heard some of the
20 discussion of the letter.
21     Q.   In connection with your
22 consultant duties in which you've had
23 to travel to libraries throughout the

Page 66

1  state, have you discussed at all any of
2  your concerns or complaints about the
3  APLS?
4      A.  No.
5      Q.  Was the trip to Mr. Farrar's
6  library the only time you discussed those
7  types of things with him?
8      A.  I can't answer that.
9          MR. CROOK:  You can answer
10 that.  It's okay.
11     A.  Mr. Farrar led the
12 conversation, and it -- whatever was
13 discussed were things that he brought up.
14     Q.  How long have you known Mr.
15 Farrar?
16     A.  Not very long.
17     Q.  Did you tell Mr. Farrar that
18 it would really be helpful to Ms. Brown
19 and you if he would write a letter to the
20 APLS board and state that APLS services
21 were all but non-existent?
22         MR. CROOK:  You can answer
23 that.

Page 67

1      A.  No.
2      Q.  Did you ask Mr. Farrar and
3  tell him that it would be really helpful
4  to Ms. Brown and you if he would write a
5  letter stating that Mr. Bivins was rude
6  and ineffective and that Ms. Mitchell was
7  no longer capable of running the agency
8  and was non-accessible?
9          MR. CROOK:  Don't answer.
10     A.  I can't answer that.
11     Q.  Can you not answer that
12 because it didn't happen or because of
13 the instruction of your attorney?
14         MR. CROOK:  I've advised her
15 not to answer that question.
16     Q.  Did you ask Mr. Farrar if
17 he had ever heard Ms. Mitchell and Mr.
18 Bivins use a racial slur?
19         MR. CROOK:  Don't answer
20 that.
21     Q.  Did Ms. Brown ever tell you
22 about a phone call she made with Mr.
23 Farrar right after your meeting?

Page 68

1          MR. CROOK:  That's fine.
2      A.  I don't -- I don't
3  remember.
4      Q.  Did you fax anything to Mr.
5  Farrar?
6      A.  No.
7      Q.  Do you know whether Annie
8  Brown faxed anything to Mr. Farrar?
9      A.  No.
10     Q.  Ms. Brown has never told you
11 that she's faxed some documents to Mr.
12 Farrar?
13     A.  No.
14     Q.  Have you talked with Mr.
15 Farrar since that February 20, 2008
16 meeting?
17     A.  No.
18     Q.  Did you send a -- are you
19 aware of any letters that Mr. Farrar has
20 written to the Board of Trustees at the
21 APLS?
22     A.  I am not.
23     Q.  Did you send Mr. Farrar a

Page 69

1  copy of your reprimand?
2      A.  I did not.
3      Q.  Did you send Mr. Farrar a
4  copy of the reprimand Hulen Bivins gave
5  to you?
6          MR. CROOK:  You can answer
7  that.
8      A.  I don't think so.
9      Q.  Did you send Mr. Farrar a
10 copy of your September 7, 2007 letter to
11 Donald Dickey -- Mrs. Donald Dickey?
12     A.  I honestly do not remember.
13     Q.  Did you write a letter to
14 Mrs. Donald Dickey on September 7, 2007?
15         MR. CROOK:  That's fine.
16     A.  Yes.
17     Q.  Are you prepared to answer
18 all the questions I have about that
19 particular letter, or are there certain
20 topics that are going to be off limits?
21         MR. CROOK:  The only topics
22 available for discussion that concern
23 the September letter is the mention of

Page 70

1  the EEOC claims on Page 2.
2      Q.   Did you bring a copy of that
3  letter with you today?
4      A.   It's in the car.
5      Q.   What else do you have in
6  the car?
7      A.   My art supplies, my stuff
8  from the church.
9      Q.   Well, do you have any other
10  letters in your car?
11      A.   That's the only one I
12  brought.
13      Q.   Here's the problem I'm
14  having, Mrs. Shepard: I put a subpoena
15  on you for documents that I think are
16  very clearly set out in that subpoena,
17  and it is very clear that you didn't
18  bring them all with you.
19      A.   I have the letter that I
20  wrote to Mrs. Dickey. I did not bring it
21  because you have a copy of it. And my
22  lawyer told me this was what to bring
23  right here (indicating).

Page 71

1      Q.   And this right here is this
2  two-page document, and it's a fax, an
3  April 16, 2008 fax --
4      A.   Right.
5      Q.   -- from Ashland City Library;
6  is that right?
7      A.   Right.
8
9      (Whereupon, Defendant's Exhibit 3
10      was marked for identification and
11      same is attached hereto.)
12
13      Q.   Exhibit 3, can you identify
14  that for me?
15      A.   That's the letter I faxed
16  -- I sent to the entire board.
17      Q.   Why did you send that
18  letter to the entire board?
19      A.   Because I'm so upset about
20  the things that are going on at APLS
21  because I have worked there thirty years
22  with libraries all over this state and
23  those people at that agency, and I was --

Page 72

1  I wanted something done, because at the
2  time I wrote this letter, fifty people
3  had left that agency, and there are under
4  fifty people employed there.
5      Q.   Over what period of time
6  have fifty people left the agency?
7      A.   Well, it's fifty-five now
8  since Ms. Mitchell became director.
9      Q.   And how long has that been?
10      A.   I do not know.
11      Q.   What's going on at the
12  agency?
13          MR. CROOK: You can talk
14  about that.
15      A.   Everything. The staff is
16  demoralized, they are treated terribly,
17  we're not doing the work we used to do,
18  there's no communication, we aren't
19  allowed to have help with moving heavy
20  equipment or heavy things, we aren't --
21  people have been mistreated, lied
22  about, several people have been forced
23  to retire, numerous people have left,

Page 73

1  we have no presence to speak of in the
2  state association now, the southeastern
3  association or on the national level.
4      Q.   Anything else?
5      A.   And I feel like because of
6  the way the staff has been treated and
7  mistreated, I felt something had to be
8  done. I mean, I was trying to do what I
9  feel is right.
10      Q.   So what exactly did you put
11  in this letter?
12      A.   I discussed what was going
13  on. I discussed why the staff -- how the
14  staff had been treated. I voiced some of
15  my concerns about the way the money was
16  being spent, I think. Can I look at the
17  letter?
18      Q.   Sure. Here's what I'm
19  getting at --
20      A.   Okay.
21      Q.   -- okay? The letter is six
22  pages long, and it has a variety of
23  complaints in it; correct?

1    A.   Right.
2    Q.   Are there any complaints in
3  this letter that you had -- strike that.
4    Are there any complaints that
5  you had that are not set forth in this
6  letter or is that everything that was
7  existing as of that time?
8    A.   As of that time, that's
9  correct.
10    Q.   Since that time, what new
11  complaints do you have?
12    A.   Well, I have been concerned
13  about me, the way I've been treated.
14    Q.   How have you been treated?
15    THE WITNESS:  Can I talk
16  about it?
17    MR. CROOK:  Just only in
18  general.
19    Q.   Let me stop you right
20  there.  That's a specific question, and
21  the question is:  Since September 7,
22  2007, tell me each and every instance
23  in   which you feel you've been

1  mistreated, treated badly, in-
2  appropriately, rudely; basically any
3  complaints you've had since that date.
4  It's a very specific question.
5    MR. CROOK:  Those incidents
6  are the basis of the suspension, and we
7  will not be talking about those today.
8    MR. HUFFAKER:  So we will not
9  be talking about any complaints that Mrs.
10  Shepard has that have occurred since
11  September 7, 2007; is that right?
12    MR. CROOK:  If they are
13  directly related or in any way related
14  to her being suspended, that's correct.
15    MR. HUFFAKER:  Well, what
16  is your understanding as to why she was
17  suspended?  Because you've carved out a
18  certain category of complaints that I'm
19  not real sure what the category is.
20    MR. CROOK:  Well, to the
21  extent we won't know that until we have
22  the hearing, so at this point, I'm
23  assuming that any disagreements she has

1  with personnel on the APLS board are
2  related to that suspension.
3    MR. HUFFAKER:  I'm going to
4  ask the question again.
5    Q.   Tell me each and every
6  instance of each and every complaint that
7  you have about the APLS that has arisen
8  or occurred since September 7, 2007.
9    A.   My lawyer says I am not to
10  answer that question.
11    Q.   Okay.  So you're not going to
12  tell me about any complaints that have
13  arisen since then?
14    A.   You can come to the
15  suspension hearing and hear them.
16    Q.   Are you going to tell me
17  about any complaints since then?
18    A.   No.
19    MR. CROOK:  Are you referring
20  to official complaints?
21    MR. HUFFAKER:  I'm talking
22  about Judy Shepard's complaints, whether
23  they're official or unofficial.

1    MR. CROOK:  Okay.
2    Q.   So the question is, so
3  that I'm clear:  You're not going to
4  answer any questions about any
5  complaints you have whether it's
6  officially, un- officially about the
7  APLS, its management or anybody else
8  there that have occurred or arisen
9  since September 7, 2007?
10    A.   That is correct.
11    Q.   And that's because of the
12  suspension you received --
13    A.   Yes, it is.
14    Q.   -- in April -- hold on --
15  that's because of the suspension you
16  received in April, 2008?
17    A.   Yes.
18    Q.   Do you have your letter in
19  front of you?
20    A.   Yes, I do.
21    Q.   Well, let me ask it this
22  way:  Tell me each and every instance
23  of any complaints that you would have

Page 86

1    A.   I think I overheard Ms.
2  Brown talking about it. I'm not sure
3  she told me directly.
4    Q.   Who was she talking with?
5    A.   Probably one of the other
6  consultants. There's a sort of open
7  space where we work.
8    Q.   Do you know when she had
9  made the request for the notebooks?
10    A.   No.
11    Q.   Do you know when the
12  conference was?
13    A.   No.
14    Q.   Did she tell you or did you
15  overhear her saying the reason given
16  for denying the request for notebooks?
17    A.   No.
18    Q.   Do you know whether she's
19  ever made any other requests during her
20  employment history at the APLS for
21  notebooks?
22    A.   No.
23    Q.   Has anybody else at the

Page 87

1  APLS, to your knowledge, been denied a
2  request for supplies?
3    A.   Yes.
4    Q.   Who else?
5    A.   We were told by Mr. Bivins'
6  secretary that we were not to request
7  supplies; pens and pencils, but notebooks
8  never have come up.
9    Q.   Who was his secretary?
10    A.   Jackie Barnes.
11    Q.   Who exactly was this told
12  to? You said "we," but who is "we"?
13    A.   I think I asked her about
14  pencils or pens -- probably pens, and she
15  told me that we weren't -- we didn't have
16  anymore. And since I was formerly in the
17  other department, then I was used to
18  getting my supplies from the woman
19  there, and I think she told me the same
20  thing.
21    Q.   Did they tell you why?
22    A.   Because we stole them.
23    Q.   You keep saying "we." Who is

Page 88

1  "we"?
2    A.   When I asked about getting
3  some pens, I feel like that's what it
4  was. And I don't remember. I was --
5  they -- we means the entire staff could
6  not have supplies because we stole
7  supplies. Now by "we," I'm assuming that
8  means the people that Mr. -- at that time
9  Mr. Bivins was supervising.
10    Q.   Who would those individuals
11  be?
12    A.   That would be the staff of
13  reference. Do you want me to name all
14  the individual names?
15    Q.   Well, how many folks?
16    A.   I don't know. It would be
17  the staff of reference, circulation,
18  inter-library loan, video, and tech
19  services.
20    Q.   Do you have any idea how
21  many people total?
22    A.   I could sit and count them up
23  if you want to wait.

Page 89

1    Q.   You've been denied a request
2  for supplies; is that fair?
3    A.   It was not a formal request,
4  I just asked if I could have a pen or
5  pencil -- pens, pens.
6    Q.   And that request was denied?
7    A.   Yes.
8    Q.   Have you ever made any
9  other requests for supplies that have
10  been denied?
11    A.   I don't think I've made any
12  requests for supplies. I've bought my
13  own.
14    Q.   Any other complaints about
15  Ms. Brown during that period?
16    A.   Not that I can remember.
17    Q.   Pull that September 7, 2007
18  letter out.
19    A.   (Witness complies).
20    Q.   I'm just going to go through
21  this letter. Okay?
22    A.   Okay.
23    Q.   The second sentence says "I

Page 146

1  certain percentage of government
2  federal documents. Ms. Mitchell
3  decided we did not need to be a federal
4  depository anymore, so she contacted
5  the superintendent of documents, told
6  him we were relinquishing our
7  depository status. Therefore, all of
8  these documents that we had since they
9  were technically not ours, they were
10  technically documents of the federal
11  government, had to be disposed of
12  according to rules and regulations of
13  the superintendent of documents. And
14  there were some maps that were given
15  away as -- given away to libraries
16  without even asking Ms. Hamilton if --
17  what they were and if they could be
18  given away. And we're responsible for
19  those documents.
20      Q.   The last paragraph, Page 2
21  says "Supervisors are no longer allowed
22  to grade fairly."
23      A.   I've already talked about

Page 147

1  that.
2      Q.   We've already talked about
3  that. Anything else you can add to that?
4      A.   Well, I was in the stacks
5  one day, and I didn't hear all the
6  conversation, but I did hear Mr. Bivins
7  say to Ms. Ray, "And I want your
8  opinion, I don't want you to tell
9  Judy."
10      Q.   "Uncalled for remarks about
11  supervisors have been made to staff,"
12  have we already talked about that?
13      A.   I mean, really, you don't go
14  to somebody --
15      Q.   The question is: Have we
16  already talked about that?
17      A.   Yes, yes.
18      Q.   What staff has come to you
19  and told you that you should get a
20  lawyer?
21      A.   Beverly Davis.
22      Q.   Because you were accused of
23  misusing video money?

Page 148

1      A.   Yes.
2      Q.   Who accused you?
3      A.   Mr. Bivins.
4      Q.   How did you use the video
5  money?
6      A.   I have no idea. Why would
7  he even say that?
8      Q.   What did you do when you
9  heard about that?
10      A.   I laughed. I added it to my
11  list. I was appalled. I mean, I don't
12  know how you get money. You issue -- you
13  tell the business office you want to
14  spend money and they spend it.
15      Q.   Have you been keeping a
16  list of complaints?
17      A.   I've been keeping a list of
18  what's been happening to me.
19      Q.   Have you been keeping a
20  written list?
21      A.   Yes.
22      Q.   Where is that written list?
23      A.   It's in pieces all over my

Page 149

1  little office at home.
2      Q.   Move to Page 3. It says
3  "The staff Mr. Bivins supervises is
4  being used as common laborers."
5      A.   Uh-huh (nodding head).
6      Q.   What do you mean by that?
7      A.   I mean, we have been asked to
8  lift and move file cabinets, desks, all
9  sorts of equipment and things.
10      Q.   Who is "we"?
11      A.   I mean, the staff of
12  information services, Beverly, Dorothy,
13  me, Janet, Ruth, Al, G.K.
14      Q.   Is it your opinion that
15  librarians should not be used to pick up
16  and move things?
17      A.   I think there's not a
18  librarian in that building who has not
19  moved books or lifted things that
20  perhaps they shouldn't have done, but I
21  don't think librarians should be used
22  in place of convict labor. I think
23  that's a very poor use of funds to pay

Page 150

1  somebody to be a librarian and then
2  have them moving books or pallets or
3  whatever.
4      Q.    Are those duties that are
5  more appropriate for somebody at a lower
6  pay grade or pay scale?
7      A.    I would think so (nodding
8  head). I mean, I'm the highest paid book
9  mover in the state probably.
10     Q.    And you make a statement in
11  there about jokes being made about
12  plantation or in prison. Is that in the
13  context of being used as common laborers?
14     A.    Yeah. People were laughing
15  when we were moving books and stuff like
16  that.
17     Q.    Was there a specific event in
18  which books were moved and file cabinets
19  were moved, or has this just been
20  ongoing?
21     A.    It was ongoing, but the
22  specific event that actually -- the
23  specific event that prompted me to

Page 151

1  write this letter -- well, no, that
2  encouraged me to write the letter, we
3  had been -- after Hurricane Katrina,
4  Ms. Mitchell sent word out that APLS
5  would be a depository for books to
6  replace the books that were lost in
7  Mississippi for Hurricane Katrina. So
8  we had books coming in from all over
9  the country. And one of my jobs was to
10  go through the books and decide which
11  ones were suitable for -- to keep and
12  which ones were to be given away.
13  There were several pallets of books
14  that we had gathered. I don't have a
15  clue of how many, but they were on
16  pallets upstairs. One pallet full of
17  books was downstairs and had been
18  wrapped in some kind of cellophane or
19  paper or heavy clear stuff, and Mr.
20  Bivins told me and Janet that we would
21  be responsible -- Hamilton, would be
22  responsible for moving the boxes of
23  books and the pallets downstairs. So

Page 152

1  we go and look at the situation and
2  realize that the books -- the boxes are
3  too heavy for us to move, that we will
4  have to empty the boxes, take -- and
5  then take the books and the boxes
6  downstairs and then refill the boxes.
7  And we were in the process of doing
8  this and trying to figure out the best
9  way to do this when the superintendent
10  of the prisoners who were there working
11  came up and said "Y'all can't do this,"
12  and I said, "Well, this is our
13  assignment. We're going to do it." We
14  kept doing it. And he said "That's
15  stupid, y'all shouldn't have to do
16  this," and I said, "Well, we've been
17  assigned to do it, we've got to do it."
18  I said, "We'll get in trouble if we
19  don't do it, and you'll get in trouble
20  if you do it for us." And he kept on
21  and on, "Y'all can't do this, you
22  shouldn't have to do this, let us do
23  it."

Page 153

1          Mr. Bivins was not there,
2  so I finally said "If you can get
3  permission from Ms. Mitchell to move
4  these boxes and these pallets," which I
5  don't think I could have lifted by
6  myself, "then fine." So he found Ms.
7  Mitchell, and Ms. Mitchell told him
8  that he could do that, so they -- I
9  don't know how many convicts were
10  there, prisoners, whatever you call
11  them, and they did it in probably -- it
12  would have probably taken us days to do
13  that, and they did it within half a
14  day, I would say.
15     Q.    So did you move any of the
16  books --
17     A.    Yes.
18     Q.    -- or did the convicts move
19  them all?
20     A.    No. I moved some of them.
21     Q.    Who else helped you?
22     A.    Janet.
23     Q.    Anybody else?

Page 170

```
 1   use state funds or state resources for
 2   purposes other than the best interest of
 3   the APLS?
 4      A.  I think so.
 5      Q.  I've pretty much covered
 6   everything in this letter. Are there any
 7   other complaints, criticisms,
 8   observations about the APLS and its
 9   management that we have not already
10   discussed?
11      A.  Nothing except everything I
12   did, I did because I think the world of
13   that agency and the public libraries in
14   this state, and that's what this is all
15   about, the public libraries.
16      Q.  What have you done?
17      A.  I've tried to do something
18   with this letter.
19      Q.  Okay. Are you aware or do
20   you have any personal knowledge of any
21   racial slurs that have been used about
22   Ms. Brown?
23      A.  Not racial slurs, no.
```

Page 171

```
 1      Q.  What then?
 2      A   I know that -- just like
 3   those notebooks, I don't know why she
 4   wasn't allowed to have those notebooks.
 5   I got those -- Jim and I got those
 6   notebooks for something we were doing.
 7   I mean, they were free notebooks, it's
 8   not like they were costing anything.
 9      Q.  How about any race
10   discrimination in the context of Ms.
11   Brown, do you have any personal
12   knowledge of any?
13      A.  No, just that I think she's
14   -- I think it was tacky and probably
15   discriminatory for him not to let her go
16   to that thing that Tina was having, you
17   know.
18      Q.  Why do you think that was
19   discriminatory?
20      A.  He didn't want her going. I
21   mean, he immediately said -- he didn't
22   say one thing about me. He said, "Annie
23   Brown can't go."
```

Page 172

```
 1      Q.  Anything else you can point
 2   me to, any other examples you can give
 3   me?
 4      A.  I don't think so.
 5      MR. HUFFAKER:  Off the
 6   record.
 7
 8      (Whereupon, a discussion was held
 9      off the record.)
10
11      Q.  Mrs. Shepard, you did
12   receive a reprimand during the course of
13   your employment at the APLS?
14      MR. CROOK:  (Nodding head).
15      A.  Yes.
16      Q.  Why were you reprimanded?
17      MR. CROOK:  (Shaking head)
18      A.  No, I'm not supposed to
19   say, according to my lawyer.
20      Q.  Well, your lawyer has not
21   given an official position on that yet,
22   so the question is why were you
23   reprimanded?
```

Page 173

```
 1      MR. CROOK:  She's not going
 2   to talk about the details of that
 3   reprimand. That's related to her
 4   suspension hearing that's coming up on
 5   the 17th.
 6
 7      (Whereupon, Defendant's Exhibit 4
 8      was marked for identification and
 9      same is attached hereto.)
10
11      Q.  Can you tell me what
12   Defendant's Exhibit 4 is?
13      A.  Employee reprimand.
14      Q.  When was that reprimand
15   issued?
16      A.  February 22, 2006.
17      Q.  How was that related to your
18   suspension that occurred in April of
19   2008?
20      MR. CROOK:  (Nodding head).
21      A.  It's just an ongoing -- I
22   mean, this is just one thing after
23   another that's happened to me since Mr.
```

Page 174

1  Bivins has been in charge.
2      Q.   Are you going to answer any
3  questions that I ask about the
4  reprimand?
5          MR. CROOK:  No.
6      A.  No.
7      Q.   Who gave you the reprimand?
8      A.  Mr. Bivins.
9      Q.   Were you accused of
10  plagiarism?
11     A.   That's in the reprimand.
12     Q.   Were you accused of an idea
13  that was, in fact, somebody else's?
14         MR. CROOK:  You can answer
15  that.
16     A.   Yes, I was accused.
17     Q.   Were you accused of
18  inattention to your job tasks?
19     A.   I don't know.  If that's in
20  there, then I was.
21         MR. CROOK:  You can answer
22  that.
23     A.   (Witness reviews document).

Page 175

1      Q.   Tell me about this written
2  communication from you to whomever
3  concerning the topic of videos and
4  DVD's.
5      A    I really can't -- I can't --
6      Q.   And I'm just reading the
7  reprimand.
8      A.   Well, it's right here
9  (indicating)  It's what -- I sent this
10  to Becky, and Hulen got mad because I
11  didn't give it to him first  I mean,
12  Becky, up until shortly after this, she
13  always said her door was open.  I handed
14  it to Becky and Hulen just about the same
15  time.  I don't see anything wrong with
16  this
17     Q.   Had Ms. Mitchell in the years
18  previous made suggestions about videos
19  and DVD's?
20         MR. CROOK:  You can answer
21     A.   We both talked about them.
22     Q.   What did she say?
23     A.   I don't really remember.  I

Page 176

1  mean, it was just general discussions.
2      Q.   You don't remember what she
3  had said in years past about that?
4      A.   I mean, it was more or less
5  yes, we probably -- I mean, I can only
6  assume, trying to think back, that it
7  was like, well, you know, VHS's are
8  going out and we really need to start
9  thinking about DVD's  It was just a
10  general conversation.
11     Q.   Did she convey the same idea
12  that you later did to Ms. Mitchell in
13  this February 24th, 2006 memo?
14     A.   Did I?
15         MR. CROOK:  The question is
16  did she?
17     A.   Did she?  As far as I -- I
18  mean, like I said, I really -- it was
19  just a general conversation about it.  No
20  decisions were ever made that I know of.
21     Q.   The reprimand references a
22  reorganization of the APLS?
23     A.   Uh-huh (nodding head).

Page 177

1      Q.   What was reorganized?
2      A.   Mr. Bivins was put in charge
3  of me and Janet Hamilton.
4      Q.   Any other reorganization?
5      A.   Not right -- not by the --
6  not at this time (indicating) that I
7  know of.
8      Q.   When you issued this memo --
9      A.   Uh-huh (nodding head).
10     Q.   -- was Mr. Bivins your
11  supervisor?
12     A.   Yes.
13     Q.   Why didn't you give it to Mr.
14  Bivins?
15     A.   I did; I did give it to him.
16     Q.   I'm sorry.  Don't get upset
17  with me about it.
18     A.   That's stupid
19     Q.   What's this issue about a
20  party for Beverly Davis?
21     A.   Oh, Lord, Beverly told me
22  in January that she had gotten married.
23  As is usual, I suppose, in like any

AO88 (Rev. 1/94) Subpoena in a Civil Case

### Issued by the

# UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA



**DEFENDANT'S EXHIBIT**

15hepard

Annie Lucas Brown

v.

Alabama Public Library Service

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] cv-07-841-MHT

TO:  Judith R. Shepard
30 Tecumseh Dr
Montgomery, AL 36117

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Rushton, Stakely, Johnston & Garrett; 184 commerce St., Montgomery, AL | May 16, 2008; 9:00 a.m. |

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attached Exhibit A

| PLACE | DATE AND TIME |
|---|---|
| | |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6)

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _(signature)_   Attorney for Defendant | 04/25/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

R. Austin Huffaker, Jr.; Rushton, Stakely, Johnston & Garrett, P.A.; P.O. Box 270, Montgomery, AL 36101-0270; (334) 206-3126

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number

AO88 (Rev. 1/94) Subpoena in a Civil Case

30 TECUMSEH DR.

5/1/08                    PROOF OF SERVICE    PERSONAL
        DATE                              PLACE

SERVED  JUDITH R. ShEPARD    PERSONAL
SERVED ON (PRINT NAME)                    MANNER OF SERVICE

Billy Smith          PRIVATE INVESTIGATOR
SERVED BY (PRINT NAME)                    TITLE

_____

                    DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on  5/1/08          Billy J Smith
              DATE           SIGNATURE OF SERVER

                             207 Montgomery St
                             ADDRESS OF SERVER

                             Montgomery Ala

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production  Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim

EXHIBIT A

1. Any and all documents concerning or relating to Annie L. Brown, including any correspondence, emails, memos, reports, reprimands, affidavits, etc.

2. Any and all documents concerning or relating to any lawsuit filed by Annie L. Brown.

3. Any and all documents concerning or relating to the Alabama Public Library Service, including correspondence, memos, letters, complaints, emails, reprimands, affidavits, etc.

4. Any and all documents concerning or relating to Robert Schremsher, including any correspondence, emails, memos, reports, reprimands, affidavits, etc.

5. Any and all documents concerning or relating to Robert Tonya Moore, including any correspondence, emails, memos, reports, reprimands, affidavits, etc.

6. Any and all documents concerning or relating to Kim Owens, including any correspondence, emails, memos, reports, reprimands, affidavits, etc.

7. Any and all documents concerning or relating to David Ferrer, including any correspondence, emails, memos, reports, reprimands, affidavits, etc.

8. Any and all documents concerning or relating to Rebecca Mitchell, Hulen Bivens and/or Harry Lensch, including any correspondence, emails, memos, reports, reprimands, affidavits, etc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ANNIE LUCAS BROWN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Case Number 2:07-cv-841-MHT** |
| | § | |
| **ALABAMA PUBLIC LIBRARY** | § | |
| **SERVICE,** | § | |
| | § | |
| **Defendant.** | § | |

## NOTICE OF DEPOSITION

**TO:**   Deborah H. Biggers, Esq.
113 East Rosa Parks Ave.
Tuskegee, AL 36083

Please take notice that pursuant to the Federal Rules of Civil Procedure, Defendant, Alabama Public Library Service will take the deposition of **Judith R. Shepard; Friday, May 16, 2008, beginning at 9:00 a.m. at law offices of Rushton, Stakely, Johnston & Garrett, 184 Commerce St., Montgomery, AL 36104.**

The deposition will be taken upon oral examination before a notary public, or before some other officer authorized by law to administer oath. Said deposition will continue from day to day until completed.

R. AUSTIN HUFFAKER, JR. (ASB-3422-F55R)
T. GRANT SEXTON (ASB-0915-S40S)
Attorneys for Defendant
Alabama Public Library Service

1

**OF COUNSEL:**
RUSHTON, STAKELY, JOHNSTON &
   & GARRETT, P.A.
Post Office  Box 270
Montgomery, AL 36101
(334) 206-3100 Telephone
(334) 481-0815

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon the following by placing a copy thereof in the United States Mail, postage prepaid and properly addressed on this the 25th day of April, 2008:

Deborah H. Biggers, Esq.
113 East Rosa Parks Ave.
Tuskegee, AL 36083

OF COUNSEL

2