IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ANNIE LUCAS BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) CASE NO.: 2:07-cv-841-MHT |
| | ) |
| ALABAMA PUBLIC LIBRARY SERVICE, | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S REPLY BRIEF

### ARGUMENTS

Plaintiff, **Annie Lucas Brown**, in her Opposition to Defendant's Motion for Summary Judgment clearly proved that Defendant is not entitled to summary judgment as a matter of law.

Contrary to Defendant's meritless argument, Plaintiff can demonstrate that genuine issues of material fact exist on her claim of a hostile work environment, based on her race.

In Plaintiff's affidavit, which was described as Exhibit "A" to her opposition to summary judgment, Plaintiff describes several instances proving genuine issues of material facts exist for trial to support her claim of employment discrimination based on race.

All of the instances support that Plaintiff was the victim of a hostile work environment following the management changes which resulted in Rebecca Mitchell who is Caucasian, being the APLS Director, Hulen Bivens who is Caucasian, being the APLS Assistant Director and Harry Lensch, who is Caucasian, being the Confidential Assistant.

Rebecca Mitchell has a pattern and practice of discriminating against African American females in the workplace.

When Ms. Mitchell was the Director of the Gadsden Public Library, an African American female library bookmobile driver filed an EEOC action against Ms. Mitchell, alleging discriminatory pay.    **(See Excerpt from Mitchell's Deposition, attached as Exhibit 1, p. 16.)**

Another African American female employee, a library clerk, in the children's department of the Gadsden Public Library filed a Title VII action against Ms. Mitchell, based on race.   **(See Excerpt from Mitchell's Deposition, attached as Exhibit 1, p. 17.)**

Rebecca Mitchell brought her racist practices with her when she became Director of the Alabama Public Library Service, when she continued to perpetuate a continuous hostile work environment for Plaintiff, the only African American professional as a Library Operations Manager.   The list of racially discriminatory actions described by Plaintiff in her original opposition to Defendant's Summary Judgment Motion are many.

The first began in November of 2005, when Plaintiff was charged with collecting furniture for the Bayou La Batre Library, which was destroyed by Hurricane Katrina.  But Rebecca Mitchell had planned a trip to Bayou La Batre Library without informing Mrs. Brown.    Mrs. Brown had learned about the Monday trip from another APLS employee.  **(See attached Exhibit 2.)**

Mrs. Brown e-mailed a request to Rebecca Mitchell, dated November 10, 2005 to reschedule the trip to Wednesday, since Mrs. Brown had a new employee, Kim Owen, reporting to work on that Monday and Mrs. Brown wanted to be there to greet and orient Ms. Owen.

The rescheduling of the trip from Monday to Wednesday was acceptable to Mary, the other APLS employee who planned to travel to Bayou La Batre.  But the APLS employees intentionally left that Monday morning for Bayou La Batre, before Mrs. Brown was to report to work and failed to notify Mrs. Brown of their intentions, in a sneaky and underhanded manner.  **(See Brown's January 23, 2008 Deposition Excerpt, pp. 157-176, attached as Exhibit 3.)**

Mrs. Brown testified about other instances of her being a victim of a hostile work environment.  Mrs. Brown testified in her deposition that Amanda Daniel, a financial technician in the APLS business office, was instructed regularly by Harry Lensch not to give Mrs. Brown her travel reimbursement check until Mr. Lensch told her to.  **(See Brown's January 25, 2008 Deposition Excerpt, pp. 33-35, attached as Exhibit 4.)**

Kim Goodson, another employee, in the APLS business office also felt compassion for Mrs. Brown and expressed her sentiments to Mrs. Brown that Mrs. Brown was not being treated right or fairly because of Mrs. Brown's race. **(See Brown's January 25, 2008 Deposition Excerpt, pp. 37-38, attached as Exhibit 4.)**

Mr. Bivens, APLS Assistant Director, told Jackie Barnes, another APLS employee, to stay away from Mrs. Brown and not to go to lunch with Mrs. Brown. **(See Brown's January 25, 2008 Deposition Excerpt, pp. 39-40, attached as Exhibit 4.)** Ms. Barnes also told Mrs. Brown that she overheard Hulen Bivens, APLS Assistant Director tell another APLS employee, Bob Schremser, to spy on Mrs. Brown and to stay away from Mrs. Brown. **(See Brown's January 25, 2008 Deposition Excerpt, pp. 42-43, attached as Exhibit 4.)**

Mrs. Brown was also told by Mr. Schremser that the administration, i.e. Ms. Mitchell, Mr. Lensch and Mr. Bivens hated Mrs. Brown because she is black. **(See Brown's January 25, 2008 Deposition Excerpt, p. 45, attached as Exhibit 4.)**

Another instance of hostile work environment is when Mrs. Brown was required to multi-task or assume the additional responsibilities of three vacant positions at APLS, without receiving any additional incentive pay as was done for Caucasian employees who assumed duties of vacant positions in the past. **(See Brown's January 25, 2008 Deposition Excerpt, pp. 48–52, attached as Exhibit 4.)**

Another instance of hostile work environment is that even though Mrs. Brown is classified as the higher paying Library Operations Manager, she was

4

called and referred to in public, as a consultant, which is a lower paying job classification at APLS.  **(See Brown's January 25, 2008 Deposition Excerpt, p. 71, attached as Exhibit 4.)**

Mrs. Brown was denied essential office supplies to perform her duties and to put on workshops, when the supplies were readily available in APLS supply inventory.  **(Brown's January 25, 2008 Deposition Excerpt, p. 70, attached as Exhibit 4.)**

Another instance is when Mrs. Brown was treated differently from her two white or Caucasian  comparators, Judith Shepard and Janet Hamilton.  Defendant, in its brief, ignores the fact that these two individuals are  proper comparators, in that Annie Brown, Judith Shepard and Janet Hamilton are all Library Operations Manager and that all three received letters of reprimand for allegedly being insubordinate.  But only Mrs. Brown lost her supervisory authority.

The February 27, 2006 written reprimand to Judith Shepard was based on making intentional statements of false data in a written form and for being insubordinate for a second time.   **(See attached Exhibit 5.)**

The July 21, 2007 letter of reprimand to Janet Hamilton was based on her failure to pump gasoline, but for pumping diesel fuel in APLS's 2005 Dodge Caravan.  **(See attached Exhibit 6.)**

No supervisory responsibilities were removed from these two Caucasian APLS employees.

But the July 25, 2006 written reprimand to Annie Brown, which allegedly was for one alleged instance of insubordination, unfairly removed Mrs. Brown's supervisory authority in addition to not being in compliance with the State's Progressive Disciplinary Policy.  **(See attached Exhibit 7.)**

Mrs. Brown also was referred to publicly as a lower level consultant.  **(See attached Exhibit 8.)**

Management's continued references to Mrs. Brown as a consultant, clearly gave the intended perception that Mrs. Brown had been demoted, even though Defendant clearly did not reduce Mrs. Brown's pay.  But by issuing the meritless reprimand, management ensured that she would not receive a merit pay raise following her performance appraisal prepared in August 2006.

The hostile work environment continued when Mrs. Brown's out of state travel which was the initial prompting for her July 25, 2006 reprimand was handled cavalierly, even though  Mrs. Brown had $1,580.00 of reimbursable expense money to collect. **(See attached Exhibit 9.)**

Another instance is when Mrs. Brown as a division head requested to attend a Library Services Technology training in Washington D. C., but Rebecca Mitchell refused to respond to Mrs. Brown's request.  However, Ms. Mitchell did send a Caucasian administrative assistant, Laura Lee Braswell to the training, along with APLS employee Jim Smith, who is also not African American.

Plaintiff was also denied attendance of other requested workshops, based on her race.  **(See Brown's January 23, 2008 Deposition, pp. 181-192,**

**attached as Exhibit 3.)**

The hostility continued as recently as April 2008.  In April, Mrs. Brown received a request from Tina Nolen, Ashland City Library Director, requesting specifically for Judith Shepard and Annie Brown to attend a lecture  and book signing event at the Clay County Courthouse on  April 17, 2008.  **(See attached Exhibit 10.)**  Judith Shepard, who is Caucasian was allowed to attend, but Annie Brown, who is African American, was not allowed to attend.

Plaintiff Annie Brown has complied with each element of the four prong test creating a presumption of intentional discrimination by establishing a prima facie case:  (1) that she is a member a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action, and (4) others similarly situated but outside the protected class were treated more favorably.

Willis v. Coca Cola Centers, Inc. 445 F. 3d 413, 420 (5th Cir. 2006); Urbano v. Cont'l Airlines, Inc.  138 F. 3d 204, 206 (5th Cir. 1998.)

Defendant has failed to successfully rebut Plaintiff's prima facie case of intentional discrimination.

Reprimands have been defined as adverse employment actions by the Courts.  Alvarado v. Texas Rangers, 492 F. 3d 605, 612 (5th Cir. 2007)

Defendant has attempted to divert attention from the real issues by interjecting an unrelated  dispute between Judith Shepard and a David Farrar, both of whom are Caucasian.

This dispute is irrelevant, pursuant to the definition of relevant evidence found in *Rule 401 of the Federal Rules of Evidence.*

Furthermore, the false allegations outlined in David Farrar's affidavit, are denied by Annie Brown in her affidavit attached hereto as **Exhibit 11.**

Judith Shepard also denied the allegations in Farrar's affidavit, in her deposition.  **(See attached Exhibit 12.)**

<u>CONCLUSION</u>

**WHEREFORE,** Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied, for there is genuine issues of material fact that exist and Defendant is not entitled to summary judgment as a matter of law.

**DONE THIS 30TH  DAY OF JUNE, 2008.**

**Respectfully submitted,**


**/s/ Deborah Hill Biggers**
**DEBORAH HILL BIGGERS (ASB-4769-I70D)**
**Attorney for Plaintiff, Annie Lucas Brown**
**113 East Rosa Parks Avenue**
**Tuskegee, Alabama 36083**
**PH:  (334) 727-0092**
**FAX (334) 727-7117**
**E-MAIL:  debbig@debbig.com**


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2008, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Hon. R. Austin Huffaker, Jr.**
**Hon. T. Grant Sexton, Jr.**
**Attorneys for Defendant**
**P. O. Box 270**
**Montgomery, AL  36101**

**/s/ Deborah Hill Biggers**
**DEBORAH HILL BIGGERS**
**Attorney for  Plaintiff**

1          IN THE UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5   ANNIE LUCAS BROWN,              )
                                    )
6        Plaintiff,                 )
                                    )
7   VS.                             )   CASE NO.:
                                    )   2:07-cv-841-MHT
8   ALABAMA PUBLIC                  )
    LIBRARY SERVICE,                )   DEPOSITION OF:
9                                   )   REBECCA MITCHELL
         Defendant.                 )
10                                  )

11            S T I P U L A T I O N S

12      IT IS STIPULATED AND AGREED, by and

13   between the parties through their respective

14   counsel, that the deposition of:

15              REBECCA MITCHELL

16   may be taken before Frances P. Looney,

17   Commissioner and Notary Public, State at

18   Large, at the law offices of R. Austin

19   Huffaker, Jr., 184 Commerce Street,

20   Montgomery, Alabama 36101, on the 30th day of

21   January, 2008, commencing at approximately

22   9:15 a.m.

23

1          IT IS FURTHER STIPULATED AND AGREED that

2     the signature and the reading of the

3     deposition by the witness is waived, the

4     deposition to have the same force and effect

5     as if full compliance had been had with all

6     laws and rules of Court relating to the taking

7     of the depositions.

8          IT IS FURTHER STIPULATED AND AGREED that

9     it shall not be necessary for any objections

10    to be made by counsel to any questions, except

11    as to form or leading questions, and that

12    counsel for the parties may make objections

13    and assign grounds at the time of the trial,

14    or at the time said deposition is offered in

15    evidence, or prior thereto.

16                         ***

17                A P P E A R A N C E S

18

19    ON BEHALF OF THE PLAINTIFF:

20         Ms. Deborah Hill Biggers

21         Attorney at Law

22         113 East Rosa Parks Avenue

23         Tuskegee, Alabama  36083

```
 1 │  ON BEHALF OF THE DEFENDANT:
 2 │       Mr. R. Austin Huffaker, Jr.
 3 │       Rushton, Stakely, Johnston & Garrett
 4 │       184 Commerce Street
 5 │       Montgomery, Alabama 36104
 6 │
 7 │  ALSO PRESENT:
 8 │       Ms. Annie Lucas Brown
 9 │
10 │             E X H I B I T   L I S T
11 │  Plaintiff's Exhibit 1 - e-mail - Page 86
12 │  Plaintiff's Exhibit 2 - e-mail - Page 106
13 │  Plaintiff's Exhibit 3 - e-mail - Page 114
14 │  Plaintiff's Exhibit 4 - e-mail - Page 115
15 │  Plaintiff's Exhibit 5 - e-mail - Page 116
16 │  Plaintiff's Exhibit 6 - e-mail - Page 117
17 │  Plaintiff's Exhibit 7 - e-mail - Page 117
18 │  Plaintiff's Exhibit 8 - e-mail - Page 118
19 │  Plaintiff's Exhibit 9 - e-mail - Page 119
20 │  Plaintiff's Exhibit 10 - e-mail - Page 120
21 │  Plaintiff's Exhibit 11 - e-mail - Page 120
22 │  Plaintiff's Exhibit 12 - e-mail - Page 121
23 │  Plaintiff's Exhibit 13 - e-mail - Page 125
```

| 1 | Plaintiff's Exhibit 14 - travel - Page 135 |
| 2 | Plaintiff's Exhibit 15 - travel - Page 137 |
| 3 | Plaintiff's Exhibit 16 - memo - Page 148 |
| 4 | Plaintiff's Exhibit 17 - manual - Page 171 |
| 5 | Plaintiff's Exhibit 18 - appraisal - Page 184 |
| 6 | Plaintiff's Exhibit 19 - appraisal - Page 188 |
| 7 | Plaintiff's Exhibit 20 - appraisal - Page 189 |
| 8 | Plaintiff's Exhibit 21 - appraisal - Page 193 |
| 9 | Plaintiff's Exhibit 22 - memo - Page 193 |
| 10 | Plaintiff's Exhibit 23 - appraisal - Page 211 |
| 11 | Plaintiff's Exhibit 24 - letter - Page 211 |
| 12 | Plaintiff's Exhibit 25-28 - letters - Pg. 212 |
| 13 | Plaintiff's Exhibit 29 - letter - Page 216 |
| 14 | Plaintiff's Exhibit 30-32 - letters - Pg. 222 |
| 15 | Plaintiff's Exhibit 33 - charge - Page 223 |
| 16 | Plaintiff's Exhibit 34 - letter - Page 239 |
| 17 | |
| 18 | EXAMINATION BY MS. BIGGERS:   Page 5 |
| 19 | |
| 20 | I, Frances P. Looney, a Court Reporter of |
| 21 | Alexander City, Alabama, and a Notary Public |
| 22 | for the State of Alabama at Large, acting as |
| 23 | commissioner, certify that on this date, |

1    pursuant to the Alabama Rules of Civil

2    Procedure and the foregoing stipulation of

3    counsel, there came before me on the 30th day

4    of January, 2008, at the law office of Mr. R.

5    Austin Huffaker, 184 Commerce Street,

6    Montgomery, Alabama 36104, commencing at

7    approximately 9:15 a.m., REBECCA MITCHELL,

8    witness in the above cause, for oral

9    examination, whereupon the following

10   proceedings were had:

11                    REBECCA MITCHELL,

12   being first duly sworn, was examined and

13   testified as follows:

14                    EXAMINATION

15   BY MS. BIGGERS:

16   Q.   Good morning.

17   A.   Good morning.

18   Q.   Would you please state your full name for

19        the record?

20   A.   Okay.  My full legal, name is Rebecca Marie

21        Sledge Manley Sledge Buckner Mitchell.  I go by

22        professionally Rebecca Sledge Mitchell.

23   Q.   Sledge, S-l-e-d-g-e?

1       Abused Women and Children in Gadsden.  Served on

2       the Board of Directors for United Way.  Was in

3       charge of government employee campaigns for

4       several years.  That's all I can remember off

5       the top of my head.

6   Q.  Now, I'm going to ask you this question.

7       It's not meant to be offensive or anything.

8   A.  Sure.

9   Q.  Have you ever been arrested for any criminal

10      offense?

11  A.  No.

12  Q.  Prior to this lawsuit, Ms. Mitchell, have

13      you ever been involved in any other lawsuits

14      as a party, either plaintiff or defendant?

15          MR. HUFFAKER:  Where you were actually a

16      name party.

17  A.  No.

18  Q.  Have you been involved in any other EEOC

19      complaints other than this one?

20  A.  In what capacity?

21  Q.  In your capacity as either your current

22      position as Director of the Alabama Public

23      Library Service or when you were a librarian

Frances P. Looney, CSR, RPR

1      in Gadsden?

2   A.  Yes.

3   Q.  Describe those.  Where?  Tell me where and

4      when.

5   A.  Gadsden Library Director of the public library.

6      I was considered a department head of the City

7      of Gadsden.  A suit was brought against the city

8      by a bookmobile driver.  It actually went before

9      a judge.

10  Q.  What was the bookmobile driver alleging as

11     far as you recall?

12  A.  Discrimination of pay.

13  Q.  Of pay, okay.  Was this driver female?

14  A.  Black female.

15  Q.  What was the disposition of that litigation?

16  A.  It went before a judge without a jury.  And the

17     trial lasted one day, and it found in favor of

18     the city.

19  Q.  Is that the only litigation you have been

20     involved in regarding employment

21     discrimination?

22       MR. HUFFAKER:  Just so we're clear, on those

23     litigations, do you mean any EEOC complaints

Frances P. Looney, CSR, RPR

```
 1        that never resulted in a lawsuit?
 2   Q.   Any, have you been involved in any EEOC
 3        complaints filed period whether they
 4        resulted in litigation or not?
 5   A.   Yes.
 6   Q.   Describe the other EEOC complaint that you
 7        have been involved in.
 8   A.   Black female employee of the Gadsden Public
 9        Library.  It was investigated.  EEOC came back
10        with no finding.
11   Q.   Did they issue a right to sue letter?
12   A.   Of course.
13   Q.   What was the black -- what was the substance
14        of the black female employee's allegation?
15        What type of employment discrimination?
16   A.   I do not remember.
17   Q.   Was it race, sex?
18   A.   She claimed race.
19   Q.   And what position -- was she employed by the
20        Gadsden library?
21   A.   Yes, ma'am.
22   Q.   In what capacity?
23   A.   As an employee in the children's department.
```

| 1 | Q. | Was she a librarian, or what was her job |
| 2 | | description? |
| 3 | A. | She was a library clerk which is |
| 4 | | para-professional. |
| 5 | Q. | How did you say -- I don't know if you did |
| 6 | | say.  How was this complaint resolved? |
| 7 | A. | It was investigated by the EEOC.  The staff was |
| 8 | | interviewed by someone from the EEOC.  And the |
| 9 | | EEOC made a ruling of no finding. |
| 10 | Q. | But they did issue a right to sue letter? |
| 11 | A. | Of course. |
| 12 | Q. | Do you know if she sued or not? |
| 13 | A. | She did not. |
| 14 | Q. | Do you remember her name? |
| 15 | A. | Lilly Mae Jones. |
| 16 | Q. | Do you remember the person's name that was |
| 17 | | involved in the litigation by the bookmobile |
| 18 | | driver? |
| 19 | A. | Marilyn Castleberry. |
| 20 | Q. | Thank you.  Any other EEOC complaints filed |
| 21 | | against you, either in Gadsden or your |
| 22 | | current position? |
| 23 | A. | No, ma'am. |

1    A.    They are to oversee payroll, to respond to
2          personnel, and being the liaison between us and
3          state personnel for training purposes, for
4          keeping personnel files up to date of the
5          current employees, for seeing that the
6          appropriate appraisals are sent to state
7          personnel for each of our employees, for
8          distributing W-2s, that type of work.
9    Q.    And was the secretary Susan Beasley -- who
10         was she a secretary for?  Everyone in the
11         business office?
12   A.    She reported directly to Mr. Lensch.
13   Q.    Did Mr. Lensch have supervisor
14         responsibilities of the business office?
15   A.    Yes.
16   Q.    Did he have any other job title other than
17         Confidential Assistant?
18   A.    Not at that time.
19   Q.    Did he have some additional duties and
20         responsibilities or an additional title at
21         some point?
22   A.    Yes.
23   Q.    What was that additional title?

| | | |
|---|---|---|
| 1 | A. | Business manager when he was hired. |
| 2 | Q. | When was he hired? |
| 3 | A. | February of '02 or early March of '02. |
| 4 | Q. | Is it your testimony when he was initially |
| 5 | | hired he was hired as business manager? |
| 6 | A. | Yes, ma'am. |
| 7 | Q. | When was the other title of Confidential |
| 8 | | Assistant added? |
| 9 | A. | I would have to look at his employment status. |
| 10 | | I don't remember the exact date. |
| 11 | Q. | What was the purpose of adding that |
| 12 | | Confidential Assistant title? |
| 13 | A. | Because he assumed the responsibilities for the |
| 14 | | building, the ground maintenance, for the staff |
| 15 | | that saw to the ground maintenance and building |
| 16 | | maintenance as well as the contracts that dealt |
| 17 | | with keeping our facility going.  And it was |
| 18 | | just a lot of things that were outside the |
| 19 | | normal classification for a business manager |
| 20 | | given the description that state personnel has |
| 21 | | for that job classification. |
| 22 | Q. | All right.  So this Confidential Assistant |
| 23 | | is not a merit position? |

Brown, Annie

EXHIBIT "2"

From:        Mitchell, Rebecca
Sent:        Thursday, November 10, 2005 3:48 PM
To:          Brown, Annie
Subject:     RE: Monday trip to Bayou LaBatre

Wed. is fine if it works for Ada.
Becky

> -----Original Message-----
> From:       Brown, Annie
> Sent:       Thursday, November 10, 2005 1:47 PM
> To:         Mitchell, Rebecca
> Subject:    Monday trip to Bayou LaBatre

Becky, Mary told me of the trip planned for Monday to Bayou LaBatre.. Just a reminder that Kim Owens is reporting to work on Monday in my division and I would very much like to be here to greet her and orientate her to the state agency....Mary says that Wednesday is also a good day for her if we do not go on Monday... Please advise because Mary want you to give her a call at home. She is leaving today at 2pm.... Thanks, Annie

Thursday 7:30 am
leaving @ To do ds to
ADA has someone - she neds to
CAT 5 Wiring - to tell them
Know - What call her"
"Mary

11-15-05
meeting Dec. 1, 2005 - Opening Bayou LaBatre

600 - Books - Ready

SenD APRil info. on "Hold"

1

# FREEDOM COURT REPORTING

1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3    NORTHERN DIVISION
4
5    CASE NUMBER: 2:07-CV-841-MHT-WC
6    ANNIE LUCAS BROWN,
7        Plaintiff,
8        vs.
9    ALABAMA PUBLIC LIBRARY SERVICE,
10       Defendant.
11
12       S T I P U L A T I O N
13       IT IS STIPULATED AND AGREED by and
14   between the parties through their respective
15   counsel, that the deposition of Annie Lucas
16   Brown may be taken before Sara Mahler, CCR,
17   at the offices of Rushton, Stakely, Johnston
18   & Garrett, at 284 Commerce Street,
19   Montgomery, Alabama 36104, on the 23rd day
20   of January, 2008.
21
22       DEPOSITION OF ANNIE LUCAS BROWN
23

3

1        * * * * * * * * * * * * *
2            I N D E X
3            EXAMINATION
4                    PAGE
5    By Mr. Huffaker ..................... 6
6        DEFENDANT'S EXHIBITS
7                    PAGE
8    Exhibit 1 - Employee performance
9        preappraisal ............ 32
10   Exhibit 2 - Step chart, library
11       consultant .............. 41
12   Exhibit 3 - Step chart, library
13       operations manager ....... 41
14   Exhibit 4 - Copy of pay stub,
15       12/31/07. .............. 42
16   Exhibit 5 - Letter by Ms. Moore,
17       12/3. ................. 91
18   Exhibit 6 - Copy of employee
19       handbook ................ 116
20   Exhibit 7 - Discovery requests .... 119
21       * * * * * * * * * * * * *
22
23

2

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20       * * * * * * * * * * * * *
21
22
23

4

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3        NORTHERN DIVISION
4
5    CASE NUMBER: 2:07-CV-841-MHT-WC
6    ANNIE LUCAS BROWN,
7        Plaintiff,
8        vs.
9    ALABAMA PUBLIC LIBRARY SERVICE,
10       Defendant.
11
12   BEFORE:
13       SARA MAHLER, Commissioner.
14
15   APPEARANCES:
16       DEBORAH HILL BIGGERS, ESQUIRE, 113
17   East Rosa Parks Avenue, Tuskegee, Alabama
18   36083, appearing on behalf of the Plaintiff.
19       R. AUSTIN HUFFAKER, JR., ESQUIRE,
20   of RUSHTON, STAKELY, JOHNSTON & GARRETT, 184
21   Commerce Street, Montgomery, Alabama 36104,
22   appearing on behalf of the Defendant.
23       ALSO PRESENT: REBECCA MITCHELL

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

5

1    I, SARA MAHLER, CCR, a Court
2  Reporter of Wetumpka, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of Rushton, Stakely, Johnston & Garrett, 284
8  Commerce Street, Montgomery, Alabama 36104,
9  beginning at 1:00 p.m., Annie Lucas Brown,
10 witness in the above cause, for oral
11 examination, whereupon the following
12 proceedings were had:
13        ANNIE LUCAS BROWN,
14 being first duly sworn, was examined and
15 testified as follows:
16        COURT REPORTER: Usual
17 stipulations?
18        MR. HUFFAKER: Yes.
19        EXAMINATION
20 BY MR. HUFFAKER:
21    Q.   Ms. Brown, would you state
22 your full name for the Record, please.
23    A.   Annie Laura Mason Lucas Brown.

6

1    Q.   Ms. Brown, I introduced myself
2  to you earlier; my name is Austin Huffaker.
3  I represent Public Library Service in a
4  lawsuit that's been filed. Have you ever
5  given a deposition before?
6    A.   No, sir.
7    Q.   Okay. What I'm going to do is
8  ask you some questions about your employment
9  there. If there are any questions that I
10 ask you that you don't understand or you
11 want me to re-ask it or rephrase it, you
12 just let me know, okay?
13    A.   Yes, sir.
14    Q.   And when I do ask a question,
15 if you can answer with a verbal response
16 instead of a nod of the head or without any
17 uh-huhs or huh-uhs, Sara can take that down,
18 okay?
19    A.   Yes, sir.
20    Q.   Okay. If I ask you a question
21 and you answer I'm going to assume that you
22 understood the question as I asked it, fair
23 enough?

7

1    A.   Yes, sir.
2    Q.   Ms. Brown, where do you
3  currently live?
4    A.   I live in Tuskegee, Alabama.
5    Q.   What's the actual address?
6    A.   2508 Brothers Drive, Tuskegee,
7  Alabama.
8    Q.   How long have you lived there?
9    A.   Fifteen years.
10    Q.   Who do you live there with?
11    A.   My husband and my
12 step-grandson.
13    Q.   What is your husband's name?
14    A.   My husband's name is John H.
15 Brown.
16    Q.   And what's your stepson's
17 name?
18    A.   Step-grandson.
19    Q.   Step-grandson, I'm sorry.
20    A.   Cortez Liggon.
21    Q.   How old is he?
22    A.   Sixteen.
23    Q.   Okay. Do you have any

8

1  children?
2    A.   Yes, sir.
3    Q.   Okay. What are their names
4  and ages and where do they live?
5    A.   The oldest one is Nino B.
6  Mason, and he lives in Auburn, Alabama; the
7  youngest is Chad D. Lucas, and he lives in
8  Tampa, Florida.
9    Q.   And you said your son, is it
10 Lino?
11    A.   Nino, N-I-N-O.
12    Q.   And he lives over in Lee
13 County?
14    A.   Yes, sir.
15    Q.   And how old is he?
16    A.   He's thirty-six.
17    Q.   What family do you have that
18 live in Montgomery, Lee, Macon, Chambers,
19 Randolph Counties, in that division, do you
20 know? Family that's over the age of
21 eighteen.
22    A.   You might have to state some
23 of those counties again.

2  (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

157

1  out. So I didn't request any to be given
2  out.
3     Q.   Ms. Mitchell told you you
4  didn't have the authority to give out these
5  children review books?
6     A.   Yes. When I was division
7  head.
8     Q.   Who did have the authority to
9  give those out?
10    A.   She does.
11    Q.   Is that the one and only time
12 during the entire time you've been employed
13 at the Public Library Service in which
14 you've requested books?
15    A.   That I can recall at this
16 time. Maybe more.
17    Q.   Okay. You were telling me
18 earlier about the Bayou La Batre trip, and I
19 probably cut you off. So go ahead and tell
20 me about that trip.
21    A.   Well, I wasn't allowed to make
22 the trips. I was given the responsibility
23 to organize the library space, but every

158

1  time I asked to go on the trip, I never
2  got -- Every time I asked Rebecca for
3  permission to go when someone else was
4  going, I never got any feedback from her on
5  that. And when -- There was one time Mary
6  Payne and Kelyn Ralya and I were supposed to
7  be going on a Monday, and I asked if we
8  could change the trip to a Wednesday because
9  a new employee was coming in that Monday in
10 my division, and I wanted to be there to
11 greet that employee and orientate them. And
12 Rebecca agreed and said that if it was okay
13 with Mary Cale and Ada Williams -- Ada, the
14 librarian at Bayou La Batre. So I called
15 all three, and we agreed that we would go
16 down that Wednesday. Well, when I got to
17 work that next -- When I got to work that
18 Monday, Kelyn and Mary was going on that
19 trip, but nobody said anything to me that
20 they had changed the dates.
21    Q.'  Let me see if I can understand
22 this. The Bayou La Batre trip --
23    A.   That's one trip.

159

1     Q.   That's one trip. Okay. When
2  was that trip supposed to be?
3     A.   I don't have the exact dates.
4  That trip was supposed to be on a Monday.
5     Q.   Do you recall what month and
6  year?
7     A.   It was whenever Kim Owen was
8  reporting to work on that day, and she was
9  employed in my division.
10    Q.   Would it have been after
11 Hurricane Katrina?
12    A.   Beg your pardon?
13    Q.   Would it have been after
14 Hurricane Katrina?
15    A.   Yes. But that was the reason
16 for going, it was the Hurricane Katrina that
17 destroyed the library.
18    Q.   What was going on at the Bayou
19 La Batre Library?
20    A.   We were working -- The agency
21 was working with the library to get the
22 library reestablished, and we all had
23 assignments.

160

1     Q.   Okay. What was your
2  assignment with respect to this project?
3     A.   Was to coordinate the
4  furniture and to help get the library set
5  up.
6     Q.   And what did coordinating the
7  furniture and helping set up the library
8  mean?
9     A.   Coordinating the furniture was
10 that if a library called in and other
11 agencies that was donating furniture, then I
12 would make a list of it and get the needs
13 from the public library director as to how
14 much she needed and what exactly did she
15 need and to go down and set it up.
16    Q.   Now, going down and setting
17 up, what did that entail?
18    A.   Going down to the new library
19 that was assigned -- that was assigned by
20 the mayor in that town, the city council,
21 and looking at the space and assessing the
22 space and letting them know where the
23 reference table needed to be or the

40  (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

161

1  collection shelving needed to go, where the
2  computer should go, and that kind of thing.
3      Q.   Did that have anything to do
4  with setting up books and such also?
5      A.   Yes. When you say shelving,
6  that means the collections and setting up
7  the books.
8      Q.   I believe you told me earlier
9  and Mary Payne --
10     A.   -- and Cale was scheduled to
11 go down and take a look. And Mary was going
12 to look at where the wiring should go for
13 the computers and that kind of thing, she
14 was head of IT.
15     Q.   Okay. And you were supposed
16 to go down on a Monday?
17     A.   We was supposed to go down on
18 a Monday, the Monday that Kim Owen was
19 reporting to work. So I asked if we could
20 go on that Wednesday or Thursday, and
21 Rebecca said yes. She said if we could
22 coordinate and if it was okay with the
23 library director, and they agreed. But then

162

1  when I came in, they were leaving, the two
2  of them, Kelyn and Mary.
3      Q.   Leaving on Monday?
4      A.   They left on that Monday and
5  they left without me.
6      Q.   Were you present at work that
7  preceding Friday?
8      A.   No, I was not present at work
9  that Friday.
10     Q.   Where were you?
11     A.   I was on annual leave that was
12 approved by Ms. Mitchell.
13     Q.   Were you present at work that
14 previous Thursday?
15     A.   I wasn't at work that
16 Thursday.
17     Q.   How about that previous
18 Wednesday?
19     A.   I was there that Wednesday. I
20 think the Thursday and Friday I was having
21 oral surgery.
22     Q.   When did this communication
23 with Ms. Mitchell occur in which you

163

1  discussed moving it from Monday to that
2  Wednesday?
3      A.   It occurred prior to my
4  leaving.
5      Q.   Do you know whether the plans
6  had changed Thursday and Friday?
7      A.   I didn't know what changed,
8  because nobody told me about the change.
9      Q.   But when you got to work on
10 Monday, you saw that they were leaving
11 though?
12     A.   They were leaving early, yes.
13     Q.   Did you go with them that day?
14     A.   No.
15     Q.   Did you ever go down to Bayou
16 La Batre?
17     A.   No.
18     Q.   Who is Mary Payne?
19     A.   She was head of IT at APLS,
20 but she's no longer there.
21     Q.   No longer at APLS?
22     A.   Yes.
23     Q.   Do you know where she is now?

164

1      A.   No.
2      Q.   Do you know the circumstances
3  under which she left?
4      A.   No. She retired, I think.
5      Q.   Is she Caucasian or
6  African-American?
7      A.   She's Caucasian.
8      Q.   Did you ever tell Ms. Payne
9  that you didn't want to go down to Bayou La
10 Batre because you didn't want to lift any
11 books or boxes?
12     A.   No.
13     Q.   Is that the first time you
14 ever heard that?
15     A.   Yes.
16     Q.   Did Ms. Payne and Ms. Ralya
17 actually go down that Monday?
18     A.   Yes.
19     Q.   Did they come back that day,
20 too?
21     A.   I guess.
22     Q.   Did anybody else from APLS go
23 down there that day?

41  (Pages 161 to 164)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

165

1    A.    Not that I know of.
2    Q.    How about after that?
3    A.    After that, yes. After that,
4  I had talked with Rebecca about the grand
5  opening, I think that's what it was. And we
6  were going to go down and stay overnight and
7  take the consultants and put the books on
8  the shelves and help get it ready for the
9  grand opening, because they had changed the
10 dates or something like that as I can
11 remember. And so she had said that she
12 would let me know when to put our pink slips
13 in. So I told my staff to get ready because
14 we were probably going to be gone for three
15 days. And we were waiting. And I was out
16 that Friday, I think again, because I had a
17 lot of dental, oral surgery work done. And
18 when I got in that Monday, they had
19 already -- that might be a different time.
20 Wait a minute.
21         When I got in that Monday, I
22 think it was, they were all getting ready to
23 leave that Tuesday morning, I think. So I

166

1  e-mailed Mary and asked her if I was
2  supposed to go with them, and she never did
3  respond. And so I e-mailed Becky to ask her
4  if I was supposed to go on the trip.
5         MS. BIGGERS: Who is Becky?
6    A.    Rebecca Mitchell, I'm sorry,
7  the director, to see if I was supposed to be
8  on the trip. And she e-mailed me back, but
9  I only got the e-mail like three that
10 afternoon after they were already gone. And
11 it said that it was up to me, that the truck
12 was going to be leaving at 7:30. But she
13 never did say, do your pink slip and turn it
14 in, and we are going to be gone for two days
15 or three days or whatever.
16    Q.    Was this a different trip down
17 to Bayou --
18    A.    Yes.
19    Q.    -- La Batre?
20    A.    Yes. It's a different trip
21 where all of my staff went, everybody went
22 but me.
23    Q.    Here's what I need you to do:

167

1  Let me finish my question before you jump in
2  and answer. I can tell over here, we're
3  beginning to frustrate Sara a little bit on
4  talking over each other, okay? And it's
5  something we all do, so don't feel like it's
6  unique to you at all.
7         How soon after that first trip
8  was the second trip in which you were
9  supposed to go down there?
10    A.    Maybe a week after, a week or
11 two.
12    Q.    Okay. Did you -- And you
13 didn't actually go down there; is that
14 right?
15    A.    That's right.
16    Q.    Were you the coordinator for
17 that trip?
18    A.    No.
19    Q.    Who was kind of the person in
20 charge for that trip?
21    A.    Mary Payne. It seems like it
22 was Mary Payne and Rebecca Mitchell, the
23 director, and Harold Lensch.

168

1    Q.    In connection with that trip,
2  did you ever tell Ms. Payne or anyone else
3  from APLS that you did not want to go if it
4  involved lifting boxes or books?
5    A.    I've never told anybody that.
6    Q.    And you said you had sent an
7  e-mail to Ms. Mitchell asking whether you
8  should go down there; is that right?
9    A.    Yes.
10    Q.    Okay. And you did or did not
11 get a response?
12    A.    I didn't get a response in my
13 e-mail box until after three that afternoon.
14 And really it didn't show up until the next
15 day.
16    Q.    The day that you got the
17 response back, had they already left?
18    A.    Yes. They were already gone.
19    Q.    Could you have gone without
20 getting Ms. Mitchell's permission?
21    A.    No.
22    Q.    You had to get her permission
23 to go?

42 (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

169

1    A.    Yes.
2    Q.    Do you believe there's any
3  type of racial animus or reason behind that?
4    A.    Yes, I do.
5    Q.    All right.  Why is that?
6    A.    Because when she gave us
7  permission to say that we could go that
8  Wednesday -- Tuesday or Wednesday, if it was
9  okay with the library director, it appeared
10 that everybody was okay with it, that was
11 fine with Mary Cale, and it was fine with
12 Rebecca Mitchell.  But when Mr. Lensch
13 showed up, I don't know what happened or
14 what transpired after I left work, and I
15 wasn't at work that Thursday or Friday.
16 They left that Monday.
17    Q.    Why couldn't you have driven
18 down there that Tuesday?
19    A.    Because Ms. Mitchell didn't
20 give me permission.
21    Q.    Did you follow-up with her
22 that Monday when you got there as to whether
23 you could drive on down there?

170

1    A.    She was there that Monday when
2  I got back to work, and I had e-mailed and
3  asked her about if I was supposed to go on
4  the trip.
5    Q.    Is this the first trip or the
6  second trip?
7    A.    I don't know.  This is the
8  second trip, I think.
9         MS. BIGGERS:  When you say
10 there, where are you talking about?
11        THE WITNESS:  Bayou La Batre.
12    A.    Bayou La Batre.  And it might
13 have been the third time.
14    Q.    For the first trip, when you
15 had left that previous Wednesday, it was
16 your understanding they were going to make
17 that trip that Wednesday and not that
18 Monday; is that right?
19    A.    Right.
20    Q.    And then you get to work that
21 Monday and you see that they're already on
22 their way down there?
23    A.    They were right at the car,

171

1  they were ready to leave.
2    Q.    Did you ask Ms. Mitchell or
3  anybody else there at the Public Library
4  Service as to why the plans had changed?
5    A.    No.
6    Q.    All right.  Why not?
7    A.    Because they had told me that
8  we were going that Wednesday.
9    Q.    You never sent an e-mail to
10 Ms. Mitchell about that?
11    A.    Not that I can remember.
12    Q.    Did you -- Do you think that
13 that change in plans had any type of racial
14 animus behind it?
15    A.    I do.
16    Q.    Okay.  Why is that exactly?
17    A.    Well, I think because of my
18 race, that they did not want me to be a part
19 of the project and they had no intentions
20 from the very beginning.
21    Q.    Did you ever voice a complaint
22 to anybody about that?
23    A.    I think in a rebuttal, in a

172

1  letter to Ms. Mitchell.
2    Q.    In a rebuttal to a
3  preappraisal?
4    A.    It wasn't a preappraisal.  It
5  was just a letter to Ms. Mitchell.
6    Q.    What did the letter say and
7  when was it sent?
8    A.    I think you have a copy in
9  your packet.
10    Q.    Did you ever speak with
11 Ms. Brown and Ms. Ralya about why the plans
12 had been changed again?
13    A.    You mean Mary Payne?
14    Q.    Yes, ma'am.  I'm sorry.
15    A.    That's okay.  I think I asked
16 Mary about what happened, and she said that
17 Harry and them told them to go on.
18    Q.    Did anybody else go down there
19 other than Ms. Payne and Ms. Ralya?
20    A.    Just -- That trip, just those
21 two.
22    Q.    The second trip, that's where
23 you sent the e-mail to Ms. Mitchell?

43  (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

173

1    A.    Uh-huh.
2    Q.    And what did she say to you in
3    response as to whether you should go or not?
4    A.    It's up to you. I think
5    that's what it said, that the truck would be
6    leaving at 7:30 the next morning, Tuesday
7    morning.
8    Q.    Okay. And did you decide to
9    go?
10   A.    No. I couldn't go, I didn't
11   have permission. My pink slip wasn't done.
12   She said the truck was leaving. I didn't
13   know who I was going to be riding with.
14   Q.    What is a pink slip?
15   A.    It's a request, travel request
16   form, that you have to complete.
17   Q.    Who completes the pink slip?
18   A.    The employee have to complete
19   it and submit it.
20   Q.    In connection with the second
21   trip, did you complete and submit a pink
22   slip?
23   A.    No. Because she was going to

174

1    inform me as to whether or not me and my
2    staff was going to be going, and then we
3    were going to submit our pink slips.
4    Q.    She did give you the option of
5    going, did she not?
6    A.    The option of going to Bayou
7    La Batre, by saying it's up to you?
8    Q.    Yes, ma'am.
9    A.    I'm not sure how to answer
10   that, sir.
11   Q.    Did any of your staff members
12   go?
13   A.    No.
14   Q.    Were any pink slips submitted
15   for your staff members?
16   A.    No.
17   Q.    Do you have to have a pink
18   slip filled out in order to go on a trip?
19   A.    Yes, sir.
20   Q..    Is that a travel slip?
21   A.    Travel request form.
22   Q.    And then on that travel
23   request, there is a line for your signature;

175

1    is that right?
2    A.    That's right.
3    Q.    And then there's one for the
4    director; is that right?
5    A.    Yes.
6    Q.    Is it then submitted to the
7    governor for approval?
8    A.    That's for out-of-state
9    travel.
10   Q.    This is just for in-state
11   travel?
12   A.    For in-state.
13   Q.    And you never filled out and
14   submitted any pink slips for your employees,
15   those in your division?
16   A.    For the Bayou La Batre trip?
17   Q.    Yes, ma'am.
18   A.    No, sir.
19   Q.    Do you believe there was any
20   racial animus, or hostility behind that
21   trip, in Ms. Mitchell's actions as it
22   concerns you?
23   A.    Yes.

176

1    Q.    Why is that?
2    A.    Because even in the meetings,
3    and that wasn't the first time I had asked
4    in meetings, that when someone was going I
5    would like to go and take a look at the
6    library, at the building.
7    Q.    At the meetings, you told --
8    A.    We had meetings, Hurricane
9    Katrina meetings about the Bayou La Batre
10   project. And two times I know of that
11   she -- We discussed in the meeting that
12   someone was going down, and I asked if I
13   could go, that I would like to go so I could
14   get a look at the building to give me an
15   idea as to how it needed to be set up.
16   Q.    Who did you ask this of?
17   A.    Ms. Mitchell.
18   Q.    Did she tell you no?
19   A.    No. She didn't say anything.
20   Q.    Did she ever tell you that you
21   could not go to Bayou La Batre?
22   A.    No.
23   Q.    Did anyone at the Public

44 (Pages 173 to 176)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

181

1    Q.    Did you follow that procedure
2    in the context of reporting your concerns or
3    issues that you may have had with respect to
4    the request for supplies?
5        A.    No, I didn't --
6        Q.    Okay. Why not?
7        A.    -- notify the board about the
8    supplies.
9        Q.    Why not?
10        A.    I don't know why at this time.
11        Q.    You were telling me earlier
12    about LSTA training that you requested?
13        A.    Yes.
14        Q.    What is LSTA?
15        A.    Library Services Technology
16    Act.
17        Q.    What exactly were you
18    requesting?
19        A.    To go to training in
20    Washington, D.C.
21        Q.    When did you make that
22    request?
23        A.    It's been some time ago, years

182

1    ago, now. May have been '05, '04 maybe.
2        Q.    Okay. Who did you make that
3    request of?
4        A.    To Rebecca Mitchell, my
5    director.
6        Q.    And what was the result of
7    that request?
8        A.    I never got any feedback.
9        Q.    How did you make the request?
10        A.    Through e-mail.
11        Q.    What did the e-mail say?
12        A.    As I recall, I think it just
13    asked if I could attend LSTA training in
14    Washington. Something on that same line,
15    I'm not really -- I can't quote it
16    word-for-word.
17        Q.    Do you know for sure whether
18    she received that e-mail?
19        A.    I didn't get anything that
20    said bounced back, but . . .
21        Q.    Well, some e-mails you can
22    send out -- you can put some sort of
23    attachment with it so when the person

183

1    receives it or opens it, it will send you an
2    e-mail back.
3        A.    It will send you a receipt
4    back.
5        Q.    Right. Did you send one of
6    those type of e-mails to her?
7        A.    No.
8        Q.    Is that the normal protocol
9    for requesting out-of-state training?
10        A.    When you -- Yes, you can ask.
11    And if you get permission, then you can
12    complete your pink slip.
13        Q.    How do you go about obtaining
14    permission to go to a training session like
15    this?
16        A.    I ask Ms. Mitchell if I can
17    attend training, or either I e-mail her and
18    ask if I can attend training. And if she
19    looks at it, then she will make her
20    decision, and she will respond.
21        Q.    Have you asked her to go on
22    other types of training?
23        A.    Yes.

184

1        Q.    Okay. Have those been
2    accepted or approved?
3        A.    Recently, since I've been
4    E-Rate coordinator.
5        Q.    What training have you asked
6    for and been granted?
7        A.    Well, I've gone to E-Rate
8    training in '07, after I was assigned the
9    E-Rate coordinator's responsibility.
10        Q.    Where was that training?
11        A.    One was in Minnesota and one
12    was in Virginia.
13        Q.    So you went to both Minnesota
14    and Virginia?
15        A.    Yes.
16        Q.    Who approved that training?
17        A.    Ms. Mitchell.
18        Q.    Okay. What other training
19    have you been to?
20        A.    That's all I've been to
21    lately.
22        Q.    Well, how about since you've
23    been there at the Public Library Service and

46 (Pages 181 to 184)

## FREEDOM COURT REPORTING

185

1 during the same time in which Ms. Mitchell's
2 been the director?
3      A.   I have attended training --
4 the workshops that I coordinated.
5      Q.   Okay. What workshops are
6 those?
7      A.   Was the different Solinet
8 workshops for the public libraries.
9      Q.   Any of those out-of-state
10 workshops?
11      A.   No. They were at APLS mostly.
12      Q.   What other out-of-state trips
13 has Ms. Mitchell approved for you?
14      A.   She approved the New Orleans
15 trip.
16      Q.   Okay. Any others?
17      A.   Not that I can recall at this
18 time.
19      Q.   Are there any in-state trips
20 that you've requested that she's denied?
21      A.   I'm thinking. I'm trying to
22 recall, to make sure I get it correctly.
23 But I can't recall them at this time.

186

1      Q.   Okay. Her denial or failure
2 to respond to your requests for the LSTA
3 trip to D.C., do you believe that was based
4 upon your race?
5      A.   Yes.
6      Q.   All right. Why is that
7 exactly?
8      A.   Well, they sent an
9 administrative assistant to the workshop.
10      Q.   Did anybody from Public
11 Library Service go to that trip?
12      A.   Yes. The administrative
13 assistant went and Jim Smith went.
14      Q.   Who was the administrative
15 assistant?
16      A.   I think Laura Lee Braswell.
17      Q.   How soon before that trip did
18 you actually send that e-mail to
19 Ms. Mitchell?
20      A.   Well, I can't recall. But as
21 soon as we got the notice, IMLS, which is
22 the Institute of Museum and Library
23 Services, they always send you a notice out

187

1 about the dates of the trip.
2      Q.   When you didn't receive a
3 response back from Ms. Mitchell, did you go
4 talk to her about it?
5      A.   No.
6      Q.   Why not?
7      A.   I just -- I didn't go talk to
8 her, I just don't. Because I knew then
9 that Laura Lee was going to be attending and
10 she was -- she was Caucasian.
11      Q.   Could the Public Library
12 Service only send two individuals to that
13 trip?
14      A.   It's my understanding, you can
15 send as many as you like.
16      Q.   Was that your understanding
17 back then when you submitted the e-mail?
18      A.   Yes.
19      Q.   All right. What difference
20 would it make then whether you found out
21 that Laura Lee was going on that trip?
22      A.   Well, I was asking to go on
23 the trip because I was division head, and we

188

1 were working with the grant -- the federal
2 grants, and that was a good opportunity to
3 go and to learn more.
4      Q.   Do you know how Laura Lee and
5 Jim Smith got approved for that trip?
6      A.   Well, Jim was reporting
7 directly to Rebecca at that time, I think.
8 I think.
9      Q.   Did they submit e-mails making
10 requests?
11      A.   I don't know how they got
12 their requests submitted.
13      Q.   All right. How many weeks
14 after that request that you made via e-mail,
15 did that trip actually take place?
16      A.   I think the workshop was in
17 like November, I believe.
18      Q.   And when did you actually
19 send --
20      A.   Whenever IMLS sent the
21 information out about the workshop.
22      Q.   Okay. At that time, was
23 Ms. Mitchell your direct supervisor?

47  (Pages 185 to 188)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

189

1    A.    Yes.
2    Q.    Okay.  You were a Library
3 Operations Manager at that time?
4    A.    Yes.
5    Q.    Is the customary procedure at
6 the Public Library Service to make requests
7 via e-mail?
8    A.    I don't know of a customary
9 procedure.  You can do it verbally or you
10 can do it in writing.
11    Q.    Is it fair to say that you
12 never received any e-mails or documentation
13 from Ms. Mitchell rejecting that request to
14 go on that trip?
15    A.    I didn't receive any feedback
16 from Ms. Mitchell at all.
17    Q.    Have you been approved for all
18 of the courses and training that you've
19 requested that's been performed by the State
20 of Alabama and its various agencies?
21    A.    No, I have not been approved
22 for all of them.
23    Q.    Okay.  Are there any courses

190

1 or training that you've requested to go on
2 or to take that you've been denied that you
3 base upon race?
4    A.    I think it was racial, but
5 there were some state workshops, as you
6 said, that I asked to attend.
7    Q.    And were denied?
8    A.    Yes.
9    Q.    All right.  What workshops
10 were those?
11    A.    I have to go back and look on
12 the sheet to make sure.
13    Q.    Do you have any idea what
14 those were?
15    A.    I do.  I can't think of the
16 name of the workshop, and I don't want to
17 give anything that's inaccurate.
18    Q.    All right.  Can you tell me
19 when those were?
20    A.    Maybe in '04 or '05.
21    Q.    Are you aware of any other
22 employees at the Alabama Public Library
23 Service who have made requests to attend

191

1 state workshops in which those requests were
2 denied?
3    A.    No, I don't know.
4    Q.    Are you the only person that
5 you're aware of?
6    A.    That's all I know about.
7    Q.    How about requests to attend
8 out-of-state conferences, are you aware of
9 any other employees at the Public Library
10 Service who have made such requests and were
11 denied?
12    A.    I don't know about them.
13    Q.    All right.  Any other
14 workshops, education classes, training that
15 you can think of that you made requests to
16 attend but that those requests were denied?
17    A.    I can recall now, I did make a
18 request for a grant writing workshop, and I
19 have a pink slip where Mr. Bivens denied a
20 training workshop here in Montgomery.
21    Q.    All right.  Mr. Bivens has
22 denied a request for a grant writing?
23    A.    He didn't deny that,

192

1 Ms. Mitchell did that one.  Mr. Bivens
2 denied the one in Montgomery.
3    Q.    The workshop that Mr. Bivens
4 denied, when was that?
5    A.    '06.  I want to say December
6 of '06.  It was '06.
7    Q.    And the training workshop that
8 Ms. Mitchell denied, when was that?
9    A.    I can't remember when that
10 grant writing workshop dates -- what the
11 dates were on that one.
12    Q.    Is it your testimony in this
13 case that every request for attendance of
14 workshops and conferences in which you were
15 denied that request was based upon your
16 race?
17    A.    Yes.
18    Q.    Mr. Bivens, is he Caucasian or
19 African American?
20    A.    He's Caucasian.
21    Q.    Do you know if he's married?
22    A.    Yes.
23    Q.    Do you know who he's married

48 (Pages 189 to 192)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3             NORTHERN DIVISION
 4
 5   CASE NUMBER:  2:07-CV-841-MHT-WC
 6   ANNIE LUCAS BROWN,
 7        Plaintiff,
 8        vs.
 9   ALABAMA PUBLIC LIBRARY SERVICE,
10        Defendant.
11
12        S T I P U L A T I O N
13        IT IS STIPULATED AND AGREED by and
14   between the parties through their respective
15   counsel, that the deposition of Annie Lucas
16   Brown may be taken before Sara Mahler, CCR,
17   at the offices of Rushton, Stakely, Johnston
18   & Garrett, at 284 Commerce Street,
19   Montgomery, Alabama 36104, on the 25th day
20   of January, 2008.
21
22        DEPOSITION OF ANNIE LUCAS BROWN
23
```

2

```
 1        IT IS FURTHER STIPULATED AND
 2   AGREED that the signature to and the reading
 3   of the deposition by the witness is waived,
 4   the deposition to have the same force and
 5   effect as if full compliance had been had
 6   with all laws and rules of Court relating to
 7   the taking of depositions.
 8        IT IS FURTHER STIPULATED AND
 9   AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17        IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21        * * * * * * * * * * * * *
22
23
```

3

```
 1        * * * * * * * * * * * * *
 2             I N D E X
 3            EXAMINATION
 4                      PAGE
 5   By Ms. Biggers ................... 274
 6        EXAMINATION CONTINUED
 7                      PAGE
 8   By Mr. Huffaker .................... 7
 9   By Mr. Huffaker ................... 276
10   By Ms. Biggers ................... 278
11   By Mr. Huffaker ................... 279
12        DEFENDANT'S EXHIBITS
13                      PAGE
14   Exhibit 8 - Packet received from
15        Schremser ............... 7
16   Exhibit 9 - Ms. Brown's
17        application ............. 97
18   Exhibit 10 - Document sent to
19        APLS executive board  ... 101
20   Exhibit 11 - Amended travel
21        request ............... 154
22   Exhibit 12 - Request for
23        out-of-state travel  .... 158
```

4

```
 1   Exhibit 13 - Amended travel
 2        request, state car  ..... 159
 3   Exhibit 14 - Statement of
 4        official travel  ........ 160
 5   Exhibit 15 - Request for
 6        authorization for
 7        travel  ................. 162
 8   Exhibit 16 - July 12, 2006
 9        document.  ............. 165
10   Exhibit 17 - Memo from Tonya
11        Moore  ................. 166
12   Exhibit 18 - Memo by Cheryl
13        Fondon  ................ 174
14   Exhibit 19 - State of Alabama
15        travel form  ............ 178
16   Exhibit 20 - Memo by LaTonya
17        Moore  ................. 179
18   Exhibit 21 - Reprimand  ........... 182
19   Exhibit 22 - Progressive
20        discipline policy  ....... 194
21   Exhibit 23 - Performance
22        appraisal  ............. 202
23   Exhibit 24 - EEOC charge  ......... 215
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

5

1　Exhibit 25 - Rebuttal to
2　　　appraisal ............. 218
3　Exhibit 26 - Memo concerning
4　　　position change. ...... 222
5　Exhibit 27 - Letter from attorney　224
6　Exhibit 28 - Letter to board
7　　　members. .............. 225
8　Exhibit 29 - Prohibition of
9　　　Discrimination document　226
10　Exhibit 30 - Letter from
11　　　Mrs. Nordis J. Smith . . 227
12　Exhibit 31 - Memo regarding Bayou
13　　　La Batre trip .......... 228
14　Exhibit 32 - Memo from Rebecca
15　　　Mitchell ................ 234
16　Exhibit 33 - E-mail from Jody
17　　　Douglas ................ 238
18　Exhibit 34 - E-mail from
19　　　Ms. Taylor ............. 245
20　Exhibit 35 - Memo regarding
21　　　continuing education
22　　　subcommittee meeting ... 247
23　Exhibit 36 - Most recent

6

1　　　appraisal ............... 249
2　Exhibit 37 - Interrogatory
3　　　responses ............... 250
4　　　* * * * * * * * * * * * *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

7

1　　　IN THE UNITED STATES DISTRICT COURT
2　　　FOR THE MIDDLE DISTRICT OF ALABAMA
3　　　　　NORTHERN DIVISION
4
5　CASE NUMBER:　2:07-CV-841-MHT-WC
6　ANNIE LUCAS BROWN,
7　　　Plaintiff,
8　　　vs.
9　ALABAMA PUBLIC LIBRARY SERVICE,
10　　　Defendant.
11
12　BEFORE:
13　　　SARA MAHLER, Commissioner.
14
15　APPEARANCES:
16　　　DEBORAH HILL BIGGERS, ESQUIRE, 113
17　East Rosa Parks Avenue, Tuskegee, Alabama
18　36083, appearing on behalf of the Plaintiff.
19　　　R. AUSTIN HUFFAKER, JR., ESQUIRE,
20　of RUSHTON, STAKELY, JOHNSTON & GARRETT, 184
21　Commerce Street, Montgomery, Alabama 36104,
22　appearing on behalf of the Defendant.
23　　　ALSO PRESENT: REBECCA MITCHELL

8

1　　　I, SARA MAHLER, CCR, a Court
2　Reporter of Wetumpka, Alabama, acting as
3　Commissioner, certify that on this date, as
4　provided by the Federal Rules of Civil
5　Procedure and the foregoing stipulation of
6　counsel, there came before me at the offices
7　of Rushton, Stakely, Johnston & Garrett, 284
8　Commerce Street, Montgomery, Alabama 36104,
9　beginning at 9:00 a.m., Annie Lucas Brown,
10　witness in the above cause, for oral
11　examination, whereupon the following
12　proceedings were had:
13　BY MR. HUFFAKER:
14　　Q.　Ms. Brown, we're here Friday
15　for the continuation of your deposition.
16　You still understand that you're still under
17　oath; correct?
18　　A.　Yes, sir.
19　　　(Whereupon, Defendant's
20　　　Exhibit No. 8 was marked
21　　　for identification.)
22　　Q.　What you've brought with you
23　today is a copy of the package you received

2　(Pages 5 to 8)

# FREEDOM COURT REPORTING

33

1    Q.   Has Bob Schremser complained
2  about a hostile work environment?
3    A.   Yes. Bob Schremser complained
4  about the hostile work environment and how
5  he was treated. But he is a -- And Bob
6  Schremser is a white male.
7    Q.   Who is Jackie Barnes?
8    A.   Jackie Barnes -- And she was
9  transferred because of hostile work
10  environment, as well. I forgot about Jackie
11  Barnes.
12    Q.   Is she black or white?
13    A.   She's black.
14    Q.   Who is Amanda Daniel?
15    A.   Amanda Daniel was a financial
16  technician in the business office.
17    Q.   Has she complained about
18  hostile work environment?
19    A.   She complained about the way
20  that I was being treated and said that she
21  didn't like it.
22    Q.   How about a hostile work
23  environment as it concerns her?

34

1    A.   She never said anything to me
2  about a hostile work environment as it
3  relates to her. She always just talked
4  about how I was being treated.
5    Q.   What has she seen with respect
6  to you?
7    A.   Well for one thing, she said
8  that Mr. Lynch told her not to give me my
9  travel checks until he said so when they
10  would come in, so that was holding my travel
11  checks; and how he would holdup signing for
12  me to receive my travel expense back once I
13  submitted my travel reports.
14    Q.   Mr. Lynch told her to hold
15  your travel checks until he got in?
16    A.   Until he told her to give them
17  to me.
18    Q.   Did she work under Mr. Lynch?
19    A.   Yes.
20    Q.   What was Mr. Lynch's position
21  at the time?
22    A.   Confidential assistant,
23  business manager, and human resource

35

1  manager.
2    Q.   When did Ms. Daniel tell you
3  about this?
4    A.   Some months ago.
5    Q.   Within the past twelve months?
6    A.   Yes.
7    Q.   When you found out about this,
8  what did you do?
9    A.   I didn't do anything but
10  documented it.
11    Q.   Where did you document it?
12    A.   In my portfolio.
13    Q.   What is your portfolio?
14    A.   My portfolio I keep on my desk
15  every day of where I make the schedules and
16  talk to librarians.
17    Q.   What do you keep in that
18  portfolio?
19    A.   I keep a record of everything
20  I do at work every day. Because at the end
21  of the month, I have to do a monthly report
22  and submit it to my director, Rebecca
23  Mitchell.

36

1    Q.   So what Ms. Daniel told you
2  about Mr. Lynch, there's notes in your
3  portfolio about that?
4    A.   Yes, it is.
5    Q.   Is that portfolio still at
6  work?
7    A.   I keep my portfolio with me.
8    Q.   Do you have that portfolio
9  with you today?
10    A.   Not in here.
11    Q.   How far back does that
12  portfolio go?
13    A.   I only have just January and
14  February of this year in there now, '08.
15    Q.   What happened to the '07?
16    A.   I took it out.
17    Q.   But where is it?
18    A.   It's at home.
19    Q.   How far back do they go?
20    A.   Probably, maybe from 2003 up
21  until now.
22    Q.   And the portfolio does contain
23  notes about your work at APLS?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

37

1  A.  It does.
2  Q.  Schedules you've had, contacts
3  you've had; correct?
4  A.  That's correct.
5  Q.  Does it also contain notes
6  about any type of conversations you've had
7  or observations you've had about being
8  treated differently or in a hostile or rude
9  manner?
10  A.  It does.
11  Q.  What I'd ask is that you
12  gather all of these portfolios and give
13  those to Ms. Biggers, okay?
14  A.  Yes, sir.
15  Q.  Has Ms. Daniel told you about
16  any other observations that she's made?
17  A.  No. That was just the one she
18  told me.
19  Q.  Who is Kim Goodson?
20  A.  Kim Goodson worked in the
21  business office.
22  Q.  Has she complained to you
23  about a hostile work environment?

38

1  A.  Well, she too has observed how
2  I've been treated, and she has empathy for
3  me.
4  Q.  What has she told you about?
5  A.  She just said that -- she
6  doesn't give me specifics. She just says
7  things that she knows are not right and
8  unfair.
9  And she is one of the ones
10  that I submitted the paperwork to for the
11  supplies, for the notebooks.
12  Q.  She's never told you exactly
13  what she thinks is not right or not fair?
14  A.  No, sir.
15  Q.  Anything else she's told you
16  about observations she's made?
17  A.  No, sir.
18  Q.  Is she black or white?
19  A.  Kim is white.
20  Q.  Did she have any complaints
21  herself, about how she was treated at APLS?
22  A.  Just -- I don't know if they
23  were considered complaints of just moving

39

1  around in positions and different positions
2  of change.
3  Q.  She's complained about the
4  change in positions and responsibilities?
5  A.  Yes.
6  Q.  Any other categories or
7  complaints?
8  A.  No.
9  Q.  Ms. Barnes, what exactly has
10  she complained about?
11  A.  You mean Jackie Barnes?
12  Q.  Yes, ma'am.
13  A.  She complained about all of
14  the derogatory remarks that Mr. Bivens was
15  making in her presence and the threats of
16  firing her, or she could be fired if she did
17  certain things, or whatever and not to go to
18  lunch with me and to stay away from around
19  me and those kind of things.
20  Q.  You said a lot right there.
21  Let me see if I can go back over that.
22  She's told you about
23  derogatory remarks that Mr. Bivens has made?

40

1  A.  Yes. And threatening her
2  about her job, that he could fire her and
3  how he loved to fire people.
4  Q.  What remarks exactly?
5  A.  Remarks about staying away
6  from around me and not to go to lunch with
7  me, don't help me with any work.
8  Q.  Did Mr. Bivens tell her why
9  that was, why she should stay away from you?
10  A.  No.
11  MS. BIGGERS:  If you know.
12  Q.  Right. To the extent you
13  know.
14  A.  No. She just said he said to
15  stay away from around me and not to go to
16  lunch with me and not to help me with any
17  work.
18  Q.  Do you know when this remark
19  or comment was made?
20  A.  I don't know exactly when it
21  was made.
22  Q.  Was it before or after this
23  lawsuit was filed?

10  (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

41

1    A.    It was -- I can't really tell
2    if it was before or after, because I can't
3    remember how long she really stayed out
4    there.
5    Q.    Is she no longer out there?
6    A.    No, she's not there. She
7    transferred out.
8    Q.    Do you remember when that was
9    she transferred out?
10    A.    Sometime last year.
11    Q.    When you found out about what
12    Mr. Bivens had said, did you do anything
13    about it?
14    A.    No, sir.
15    Q.    Did you complain to
16    Ms. Mitchell?
17    A.    I didn't complain to
18    Ms. Mitchell. And I didn't make any
19    complaints to the executive board, because
20    in the past the board has already have --
21    the board already have correspondence of
22    many of my complaints and I haven't -- and
23    nothing has been done by any of them. So I

42

1    felt that I don't have anybody to report
2    anything to.
3    Q.    Did the board have this
4    particular complaint?
5    A.    No, they didn't have this
6    particular one.
7    Q.    All right. What else has
8    Ms. Barnes told you? Stay away from Annie
9    is one of them.
10    A.    Yes.
11    Q.    And what else?
12    A.    And then she told me that she
13    heard Hulen when he told Bob Schremser to
14    spy on me and to stay away from around me.
15    And, as a matter of fact I remember that,
16    she said that Hulen told her that I had
17    filed a lawsuit against the agency.
18    Q.    So she heard Hulen tell
19    Mr. Schremser to spy on you?
20    A.    Yes.
21    Q.    Was she present when that
22    conversation took place?
23    A.    She was the secretary right

43

1    outside his door. She said she asked him to
2    close his door, but he wouldn't close it.
3    Q.    And what else has Ms. Barnes
4    told you?
5    A.    That's basically all that I
6    can remember at this time.
7    Q.    Okay. The two statements:
8    One, stay away from Annie; the other one
9    about telling Mr. Schremser to spy on you?
10    A.    Don't help her with her work,
11    don't go to lunch with her.
12    Q.    When Ms. Barnes told you this,
13    she was still employed with APLS?
14    A.    No. This has been since she
15    left.
16    Q.    All right. Tell me exactly
17    when it was she told you this after she
18    left.
19    A.    Let's see. When did we have
20    lunch? I can't recall exactly when it was.
21    It might have been just before she left when
22    we took her out to lunch.
23    Q.    Who took her out to lunch?

44

1    A.    The staff.
2    Q.    What staff?
3    A.    Staff at APLS. Do you want
4    names?
5    Q.    Please.
6    A.    Kim Goodson; Anthony Dukes;
7    LaTonya Moore; I went, myself; Christine
8    Bowman; and I can't think of the others, but
9    there seem to be others.
10    Q.    What has Mr. Schremser told
11    you about his observations or complaints at
12    APLS? We've got this package, but anything
13    that he's told you?
14    A.    Well, he told me what I have
15    already said earlier about spying on me and
16    to stay away from me, from around me.
17    Q.    Somebody told him to stay away
18    from you?
19    A.    Mr. Bivens, Hulen Bivens, the
20    assistant director.
21    Q.    What else has he told you
22    about specific conversations or statements
23    or acts as it concerns you?

11 (Pages 41 to 44)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

45

1     A.   Well, he just said that they
2 hate you and that you're a good librarian
3 and how I help the libraries and how I've
4 helped him some with his work. And then he
5 said he did ask him did he want him to
6 continue to spy on me after he didn't have
7 anything to tell him.
8     Q.   He said they hate you, who is
9 they?
10     A.   Administration.
11     Q.   Who is administration?
12     A.   Ms. Mitchell, Mr. Lynch, and
13 Mr. Bivens.
14     Q.   Do you think Ms. Mitchell
15 hates you?
16     A.   I don't think she hates me,
17 but I think she dislikes me.
18     Q.   And why do you think she
19 dislikes you?
20     A.   Because I'm black and because
21 of the position that I have at the agency.
22     Q.   Do you think Mr. Lynch and
23 Mr. Bivens hate you?

46

1     A.   Yes.
2     Q.   And why is that?
3     A.   Because of the way they treat
4 me at the agency.
5     Q.   Do you believe that Mr. Bivens
6 is a racist?
7     A.   Yes, I do.
8     Q.   Do you believe that Mr. Lynch
9 is a racist?
10     A.   Yes, I do.
11     Q.   Do you believe that
12 Ms. Mitchell is a racist?
13     A.   Yes, I do.
14     Q.   Why is that?
15     A.   Because I don't think she
16 likes black Americans around her because of
17 the way -- because of the actions and the
18 way things have been handled at work.
19     Q.   Is there anybody else at APLS
20 that you think is a racist?
21     A.   No.
22     Q.   Do you think you're a racist?
23     A.   No.

47

1     Q.   Any other complaints that
2 Mr. Schremser has made?
3     A.   Not to me.
4     Q.   All right. Any other things
5 that Mr. Schremser has told you about with
6 respect to conversations and observations as
7 it concerns you?
8     A.   That's all he's told me
9 concerning me.
10     Q.   Ms. Ralya, has she voiced to
11 you any complaints she has specific to her
12 employment?
13     A.   No.
14     Q.   Has she voiced to you any
15 observations she has with respect to your
16 employment, and being treated unfairly,
17 hostile work environment?
18     A.   She encouraged me to seek
19 employment in other places when -- during
20 all this time I was going through all this
21 hostile and I was being mistreated at --
22 differently and unfairly at the agency.
23     Q.   Now, we've gone through a lot

48

1 of things including supplies and such. Tell
2 me all the instances in which you've been
3 treated differently. And when I say treated
4 differently, that is treated differently
5 from white employees there.
6     A.   For one thing to start with,
7 when I multitask vacant positions. I was
8 not given any incentive for those extra
9 responsibilities. Now, when white
10 consultants have taken on -- or other
11 division heads have taken on the
12 responsibility of a vacancy in their
13 division, they've been given incentives.
14 And I did ask and I was denied.
15     Q.   What additional
16 responsibilities have you undertaken that
17 you have not received additional
18 compensation for?
19     A.   When there were consultant --
20 a vacant consultant position in my division,
21 before we hired the two consultants in '03,
22 when I was multitasking three other
23 positions, as well as my new position as

12 (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

49

1   Library Operations Manager.
2       Q.   So who was it that left in
3   '03?
4       A.   Maureen Womack left in '03.
5   She was a youth service consultant.
6       Q.   And then you had to assume her
7   responsibilities?
8       A.   Yes.  And coordinate the
9   statewide summer reading program.  I left
10  the position of Library Administration in
11  Management and became Library Operations
12  Manager, so I had that position to
13  multitask.  And then Theresa Trawick as the
14  technology consultant that was working with
15  E-Rate, so I had to assist in that area as
16  well.
17      Q.   Was Ms. Trawick also in the
18  network division?
19      A.   Yes.  In that time it was
20  Network Development and Planning.
21      Q.   Is there a short form for that
22  division?
23      A.   NDP.

50

1       Q.   NDP.  So Ms. Trawick worked in
2   the NDP division; is that right?
3       A.   Yes.
4       Q.   And Ms. Womack worked in the
5   NDP division?
6       A.   Yes.
7       Q.   Were they both consultants in
8   that division?
9       A.   Yes.
10      Q.   And you were the head of that
11  division; right?
12      A.   Yes.
13      Q.   And when Ms. Womack left, then
14  you had to take on her responsibilities?
15      A.   On her responsibility of
16  getting the statewide summer reading program
17  coordinated.
18      Q.   And then when Ms. Trawick
19  left, you had to take her responsibilities
20  as well?
21      A.   Right.  Of getting information
22  to the librarians on E-Rate.  And I've
23  always been the technology planner approval

51

1   for E-Rate.
2       Q.   And at the same time, you
3   undertook these additional responsibilities,
4   you were the operations manager for that
5   division; is that right?
6       A.   Yes.
7       Q.   Well, if you didn't take over
8   those responsibilities, who was?  Who was
9   there to do it?
10      A.   There was nobody there to do
11  it.
12      Q.   Were they hiring for those two
13  open positions?
14      A.   Yes, they were trying to hire.
15      Q.   Had those positions been
16  filled?
17      A.   We hired two that next year;
18  we hired Christine Bowman and Kelyn Ralya.
19      Q.   When Ms. Bowman and Ms. Ralya
20  were hired, did they assume those positions?
21      A.   Ms. Bowman assumed the
22  position of youth services consultant and
23  Kelyn Ralya assumed the responsibility of

52

1   library administration and management.
2       Q.   So the additional
3   responsibilities that you're talking about,
4   is during the period of time in which those
5   two consultant positions were unfilled?
6       A.   Yes.  Three was unfilled.
7       Q.   Is it not the responsibility
8   of the head of a division to assist her
9   division -- his or her division if the need
10  to do or perform that work is there?
11      A.   I never said that I shouldn't
12  have done the work.  I said I never did
13  receive any incentive for taking on the
14  extra responsibility.  It is the head of a
15  division to see to it that the work in your
16  division is done.  But if those incentives
17  are there, and they're paying the whites,
18  then why did I not -- why did I not get
19  mine?
20      Q.   All right.  Who did you
21  request additional compensation or
22  incentives for?
23      A.   Who did I request it for?

13 (Pages 49 to 52)

## FREEDOM COURT REPORTING

69

1    Q.    And let me back up. You said
2    Janet Hamilton was one person who had
3    received additional incentives. Do you know
4    what incentives those were?
5        A.    I don't know what they are.
6        Q.    Okay. Tell me about other
7    instances where you've been treated
8    differently than white employees there.
9        A.    For -- Another instance is
10   actually with the reprimand.
11       Q.    We'll go over that in a
12   second. Other than the reprimand, what
13   else?
14       A.    And the rating on my
15   evaluation.
16       Q.    Which evaluation?
17       A.    The one where I received a
18   thirteen.
19       Q.    Is that the evaluation
20   following the reprimand?
21       A.    Yes.
22       Q.    And we'll talk about that in a
23   second.

71

1        Q.    Is that an instance where you
2    believe you've been treated differently than
3    white employees?
4        A.    I do believe I have been
5    treated differently. But I read the travel
6    policy, and I do see where there's a rare
7    situation. And I didn't ask for the
8    pretravel, but then no one tells you what's
9    available to you as an employee.
10       Q.    Isn't that one of the purposes
11   of the employee handbook, is to tell you
12   what's available?
13       A.    Yes.
14       Q.    And Wednesday we talked about
15   how you're now a consultant and not a
16   Library Operations Manager; is that right?
17       A.    I'm called a consultant all
18   the time.
19       Q.    And do you believe you've been
20   treated differently than other white
21   individuals under that scenario?
22       A.    Initially, yes, I do. Because
23   initially, all of my supervisory

70

1        What else can you point me to
2    as to where you've been treated differently
3    than white employees?
4        MS. BIGGERS: Other than the
5    supplies she already mentioned?
6        Q.    Other than supplies. Let's
7    just do this so we're clear: We've talked
8    about the supplies; right?
9        A.    Right.
10       Q.    And that's an instance where
11   you say you've been treated differently than
12   white employees; is that right?
13       A.    That's right.
14       Q.    Can you tell me about what
15   white employees -- Do you know whether any
16   white employees have ever been denied any
17   requests for supplies?
18       A.    I don't know whether they have
19   been or not.
20       Q.    And we talked Wednesday about
21   payment of advance expenses for travel; is
22   that right?
23       A.    Right.

72

1    responsibilities were taken away as Library
2    Operations Manager, and the others that's
3    called consultants, they still have their
4    responsibility of -- they still have their
5    staff.
6        Q.    Are you aware of any white
7    employees there at APLS who have had their
8    supervisory responsibilities removed?
9        A.    I know Judy Shepard have
10   recently, but that was after the filing of
11   this EEOC.
12       Q.    What significance do you see
13   in the fact that they were removed after the
14   EEOC complaint was filed?
15       A.    I think that that was done
16   just to -- so that they would have some
17   leverage or some witnesses to say that the
18   white employee has the same responsibilities
19   as Annie Brown's responsibility.
20       Q.    Okay. So that we're clear,
21   it's your position that APLS removed
22   Ms. Shepard's supervisory responsibilities
23   because of the claims you've made here in

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

February 27, 2006

To:         Judith Shepard

From:       Hulen E. Bivins

Re:         Employee Reprimand

    This memo to your attention is with regard to two items of employee conduct that are unacceptable. One item is intentional statements of false data in a written form. (See: <u>Alabama Administrative Code</u>, Chapter 670-X-19-.01(a)(4), (5), and (7)). The second item is insubordination. (See: <u>Alabama Administrative Code</u>, Chapter 670-X-19-.01(b)(2)

    1.   In a written communication from you concerning the topic of "Videos and DVDs" (see attachment) issued on February 24, 2006 to the attention of Rebecca Mitchell, State Librarian, and myself, you conclude with a suggested action that you claim to have proposed in the past. Such a statement is false and without basis. Rather, it is Ms. Mitchell who, as State Librarian, has suggested for the past two years the action that you now claim as your thought. Indeed, it is fact, confirmed by several APLS employees including Ms. Mitchell herself, that not only did you not propose the action for which you credit yourself, what you did do is delay the implementation of any action regarding the matter of videos and DVDs that was suggested by the State Librarian. Your statement therefore shows an inattention to your job tasks resulting in a failure to perform your job properly thus causing a disruptive influence. (See: <u>Code</u>, items (a)(4), (5) and (7)).

    Furthermore, your communication of February 24, suggest, "We need to notify these patrons that we are no longer purchasing videos and that we are going to stop circulating them." You present such as a statement of fact. This is not true. APLS has in the past month, placed an order for new video titles in the DVD format and plan to add additional titles in the hope that increased circulation, through and including FY '07, will indicate a usefulness of this library circulation service. To incorrectly imply any other decision has been made by the agency, certainly to the public, has a disruptive effect showing an inattention to your specific job and its inherent duties resulting in a failure to perform your job properly. (See: <u>Code</u>, items (a)(4), (5) and (7)).

    As you are aware following many years of service as a professionally trained librarian, honesty is an integral part of the profession of librarianship. For example, issues such as plagiarism have been and continue to be of great importance. Personal honesty is of no less importance. Diligence must be

1

exercised to preserve the truth and you are directed to conform to this standard. Certainly, to appropriate the words, thoughts and the directives of the State Librarian as your own is not acceptable.

2.    Under the reorganization of APLS as announced in January of this year, I am now designated as your immediate supervisor. Your memo of February 24 (cited above) was given to Ms. Mitchell prior to any discussion with me. You did not even have the courtesy to inform me personally of the memo but rather sent an email after already insuring the delivery of your comments to Ms. Mitchell. Your conduct in this matter is disrespectfully, hurtful and mean-spirited. It is simply an act of insubordination. (See: Code, item (b)(2)). Such will not be tolerated.

Further, this is the second time, in recent days, of conduct of insubordination on your part, the former time being when you discussed, in January (2006), a wedding celebration party for APLS employee Beverly Davis. Again, you talked with Ms. Mitchell prior to me. To make the matter of greater disrespect, you then scheduled the function of honor for Ms. Davis on a date that you, for more than two weeks prior, knew was a date on which I would not be at APLS. Further compounding the disrespect, the date and time you selected to honor Ms. Davis was a date on which Ms. Mitchell, the State Librarian, could not be present. (See: Code, item (b)(2)).

Everyone at APLS is participating in a period of great change designed to assure that the agency fulfills the charge placed before it via the Code of Alabama. In so doing, the status quo of the past is being left behind as APLS molds itself into an agency prepared to fulfill its charge in the future. You, as a member of the APLS staff, must participate in these changes and you must be supportive of said changes. Anything less in your words, conduct, or countenance, shall not be appreciated, shall not be rewarded, and will not be acceptable.

You are encouraged to make positive change so as not to allow a recurrence of the problems outlined herein. A copy of this employee reprimand as directed to your attention this day shall be placed in the APLS Personnel File. You may provide a written explanation of your actions as cited in this reprimand and/or you may provide in writing any factors which you believe mitigate your responsibility for your actions as cited. You are requested to provide said writing within a period of three (3) working days from the date of this reprimand.

_____                                     Received 27th day of February, 2006
Hulen E. Bivins
Assistant Director                                          _____
Alabama Public Library Service                              Judith Shepard

2

February 24, 2006

From:  Judith Shepard, Head Information Services

To:  Rebecca Mitchell
     Hulen Bivins

Recommendation: Videos and DVDs

We have libraries and state employees who still use APLS videos. Some of them book in advance. We need to notify these patrons that we are no longer purchasing videos and that we are going to stop circulating them.

Our patrons need to be given a date and they need to have time to purchase DVD players. I think abruptly stopping the circulation of videos, if that is what is planned, will upset the patrons who are using them.

I suggest what I have proposed in the past: we phase out the videos and weed them as we get replacement DVDs or new DVDs.

EXHIBIT "6"

July 21, 2007

To:      Janet Hamilton
From:   Hulen E. Bivins
Re:      Agency Vehicle

This notice to your attention is a written reprimand as to your negligence in the usage of an agency vehicle on June 19, 2007.

The facts of negligence are based in your return trip from Athens, AL on June 19, 2007 in the agency's 2005 Dodge Caravan. By your own admission, at a fuel stop in Prattville/Autauga County, you fueled the van with diesel fuel rather than gasoline. This error of negligence has caused damage to the vehicle, the extent of which is still being determined. Such negligence cannot be deemed acceptable or excused. Whether or not financial penalties for the repair of the vehicle will be charged to you personally are yet to be determined.

Your admission of negligence is commended. However, upon recognition of your negligence, you further compounded this negligence by driving the agency vehicle which should have been parked immediately and the agency notified to best determine what, if any, corrective action could have been undertaken. An example of such corrective action would have been to immediately park the vehicle, tow the vehicle to a repair facility, and drain the fuel tank prior to driving the vehicle any distance. Had this simple procedure been completed, it is unlikely any damage would have been done to the vehicle.

As this is a written reprimand, you are offered the opportunity to respond in writing noting any circumstances that mitigate your actions. Your written comments should be given to me within 5 working days. You are especially encouraged to note any special circumstances that impacted your actions at the time of your negligent act that directly affected your decision to use diesel rather than gasoline and then drive the vehicle after taking note of the fact that incorrect fuel had been used.

This reprimand regarding your negligence will be placed in the agency personnel files and will be a consideration in your next personal evaluation.

Hulen E. Bivins
Assistant Director
Alabama Public Library Service
6030 Monticello Dr.
Montgomery, AL 36130
(334)213-3974
(800)723-8459
(334)213-3993 FAX


Employee acknowledges receipt of this Reprimand on June 21, 2007.
Employee's signature does not necessarily acknowledge agreement.


_____

Janet Hamilton

EXHIBIT "7"

# MEMORANDUM

July 25, 2006

**TO:**       Annie Brown

**FROM:**    Rebecca S. Mitchell, Director

**Subject:**    Written Reprimand

Ms. Brown,

I am informing you that effectively immediately, you are removed from any and all supervisory responsibilities of your current position.

You refused to accept that my Executive Secretary was working on your travel problem with the Governor's office and took matters into your own hands by contacting Joan, a secretary in the Speaker of the House's office, who then contacted Cheryl Fondon head of the Governor's travel office. These actions were taken without notice to me, or my Executive Secretary and I consider them to be a gross breach of trust, management responsibility, and professional courtesy to the point of insubordination.

I have since contacted the Governor's travel office and discovered that you did in fact contact another individual, who along with you contacted the Governor's office and she stayed on the phone line while you talked to the Governor's representative. Ms. Fondon was unaware until part of the way into the conversation that Joan was still on the line. She felt this was not professional on your part not to let her know that Joan was staying on the phone. Then I emailed you that you could pick up the amended travel form from the Capital, but you replied that you never agreed or asked to pick up the form. Ms. Fondon emphasized to me in a conversation I had with her that you did tell her you wanted to pick up the form. In effect, you have misled, evaded, and lied to me on this matter.

I am taking this action as a direct result of your gross insubordination, and disruptive conduct undermining my authority. Your actions have shown that you have a problem submitting to authority, have intentionally made a false accusation on staff competency, and through your demeanor and words created an environment of personal and professional embarrassment for this agency and me. As Director of this agency, I have strived hard to develop goodwill and a positive working relationship with the Governor's office and members of the legislature and I will not allow you to harm that any farther. Additionally, you have also created a serious breach of trust both within and outside of this agency. I cannot, nor will I, condone your behavior and as a senior management official working under my direction since I can no longer rely upon your judgment, leadership, or loyalty.

I am also informing you that I am continuing to investigate this incident and there is the possibility of more serious disciplinary actions that may be taken up to and including termination of employment with the this agency and the State of Alabama.

*Rebecca S. Mitchell*

Rebecca S. Mitchell
Director

Pursuant to ALA. CODE § 36-26-27.1 (2000 CUM. SUPP.), you are being notified that this reprimand and accompanying information will be placed in your personnel file. You have a right to file a written response to this reprimand which will also be placed in your personnel file.

_Employee_

_7-26-06_

Date

_Witness_

_7/26/06_

Date

Signature denotes receipt of notification that reprimand will be placed in the employee's disciplinary file and that there is a right to file a written response to same.



EXHIBIT "8"

MEMORANDUM
June 14, 2006

To:    Annie Brown, Jim Smith, Kim Owen, Chris Bowman, Hulen Bivins, Kelyn Ralya
From: Rebecca Mitchell
Subj:   Consultant assignment by district and duty

Attached is a copy of the division of the state into library districts and duties for each
consultant and reporting format. We will begin this process on July 1, 2006 will official
kickoff on October 1, 2006. This is both an old and new concept. It is new in that many
of you were not a part of APLS when this method was used back in the 80's. It is old in
that it is a process that has been used before both here and in other states. The purpose is
to provide closer ties between our role as the state library and the role of the public
libraries in their communities.

The reports will be due to me by the 10th of each month.



**ALABAMA
PUBLIC LIBRARY
SERVICE**



EXHIBIT "9"

REBECCA S. MITCHELL
DIRECTOR

## REQUEST FOR OUT-OF-STATE TRAVEL

Honorable Bob Riley                                    Date:  May 16, 2006
Governor of Alabama
Montgomery, AL  36130

Dear Governor Riley:

Request is respectfully made for authorization of travel to New Orleans, LA, to attend the American
Library Association (ALA) Annual Conference, June 23-27, 2006.

## TRAVEL WILL BE PAID FROM GATES FOUNDATION GRANT.

     Mode of Transportation:                          Personal Vehicle
     Date of Departure:                               June 23, 2006
     Date of Return to Home Base:                     June 30, 2006**

## ESTIMATED COST:

| | | |
|---|---|---|
| Transportation: | $ 160.00 | Signature: *Annie L. Brown* |
| Conference: | $ 000.00 | Annie L. Brown |
| Registration Fee: | $ 170.00 | |
| Room: | $ 900.00 | |
| Meals: | $ 250.00 | |
| In City Transportation: | | APPROVED: *Annie Brown* |
|   Taxi: | $   00.00 | Division Head |
|   Car Rental: | $ | APPROVED: *Rebecca S. Mitchell* |
|   Parking: | $ 100.00 | Director |
| **TOTAL** | **$1580.00** | APPROVED: *Bob Riley* |

Expenses will be paid from:
   (0394)                                              Governor

Charge to Organization:  (0210)

**Mrs. Brown will be on Annual Leave from the evening of Tuesday, June27 through Friday, June 30,
and all expenses incurred during these dates will be personal expenses.

6030 MONTICELLO DRIVE • MONTGOMERY, ALABAMA 36130-6000 • 334/213-3900 • 800/723-8459 • FAX 334/213-3993
REGIONAL LIBRARY FOR THE BLIND AND PHYSICALLY HANDICAPPED 800/392-5671

**EXHIBIT "10"**

## Brown, Annie

From:    Brown, Annie
Sent:    Wednesday, April 16, 2008 12:36 PM
To:      Mitchell, Rebecca
Subject: Ashland City Library

Hello Becky, I received a copy of the request from Tina Nolen in reference to an event taking place tomorrow with the Writer of Nothing but the People and former Governor Patterson; She is asking for us to assist her.    I would like your permission to attend; I have completed my assignment for the convention and will assist Crystal on Friday. Thanks, Annie

*Annie L. Brown*

Alabama Public Library Service
Library Consultant
6030 Monticello Drive
Montgomery, Alabama 36130
(334) 213-3917 Voice
(800) 723-8459 Ext: 917
(334) 213-3961 Fax

Rebecca Never responded +
Hulen Porivias went to the event.
Initially when Judy Shepard asked
Hulen for permission to attend; according
to Judy Shepard, Hulen said that she
Could go but Annie can't —
" This happen on 4/16/08

FROM : ASHLANDCITYLIBRARY                FAX NO. : 2563543427              Apr. 16 2008 10:30AM  P1

Attn: Rebecca Mitchell, Alabama Public Library Service
From : Tina Nolen, Ashland City Library


Rebecca,

Good morning, We have an event tomorrow at our Courthouse with the writer of
Nothing but the People and Former Governor Patterson. I know this is late notice.
I would love for Judy my consultant and Annie Brown to help if they could with
this event.  It begins at ten. Here is the flyer on the event attached.

Thanks
Tina Nolen
Ashland City Library



April 17, 10 am

Lecture and Book Signing with Warren Trest and John Patterson

Clay County Courthouse

Warren Trest and former Alabama Governor John Patterson will appear at the Clay County
Courthouse to speak about Trest's recent biography of the former governor, Nobody But the
People. E-mail or phone for more information.

*Free opened to public*

Contact: Ashland City Library

354-3427

Link to http://www.authorwarrentrest.com for more information on the book.

STATE OF ALABAMA )
)
COUNTY OF MACON )

## AFFIDAVIT OF ANNIE LUCAS BROWN

Before me, the undersigned Notary Public in and for said state and county, personally appeared **ANNIE LUCAS BROWN**, who is known to me, and who being by me first duly sworn, deposes and states the following:

1.  I am Annie Lucas Brown, an African American who is the Plaintiff in this cause styled *Annie Lucas Brown vs. Alabama Public Library Service*, Case No.: 2:07-cv-841-MHT, pending in the U.S. District Court for the Middle District of Alabama. All facts set forth herein are facts of which I have personal knowledge.

2.  My Charge of Discrimination against the Alabama Public Library Service is (APLS) dated August 28, 2006, alleging employment discrimination, based on my race, i.e. black, based on an unreasonable reprimand which resulted in an adverse employment action.

3.  The July 25, 2006 written reprimand given by APLS Director, Rebecca Mitchell, was the first disciplinary action ever imposed against me during my tenure with APLS, which commenced in 1997. I was a Library Operations Managers, with supervisory responsibilities when I

received the reprimand. The July 25, 2006 reprimand was without merit because it was based on erroneous facts and was given contrary to the State of Alabama Progressive Discipline Manual. A written reprimand, according to the said manual, should be used for the second offense and a corresponding corrective plan should always be developed. A properly issued reprimand letter, according to the manual, should contain the reprimand and the corrective plan. The July 25, 2006 letter of reprimand issued by Rebecca Mitchell is deficient for it was improperly issued, in both procedure and merits, nor did it include a corrective plan.

4.  My charge of employment discrimination also included the factual allegation, which is undisputed by APLS, that as the only professional African American employed at APLS, my supervisory responsibilities were removed in the July 25, 2006 letter of reprimand.

5.  Neither Judith Shepard, who is Caucasian nor Janet Hamilton, who is also Caucasian, who both are Library Operation Managers, who also received letters of reprimand for being insubordinate or for not following instructions, did not have their respective supervisory duties removed.

6.  The July 25, 2006 letter of reprimand was an adverse employment action because the reprimand prevented me from being eligible to

receive a merit pay raise, following my Performance Appraisal dated August 31, 2006.

7.  The removal of my supervisory responsibility is an adverse employment action.

8.  My initial charge of employment discrimination dated August 28, 2006, also contained an allegation of hostile work environment.

9.  The minute statements pertaining to me in Defendant's submitted four page affidavit of David Farrar are merely three. The first is an alleged statement of Judith Shepard that "Annie Brown was in the process of getting them all." I have never had any conversation nor conspired in any way with Judith Shepard to "get" anyone.

10. Nor is the second allegation in David Farrar's affidavit true, where he alleges that I asked him if he overheard any racial slurs used by Rebecca Mitchell or Mr. Bivens.

11. I never asked David Farrar to write a letter, complaining about APLS services, to APLS board members. However, David Farrar did request that I provide him with the names and addresses of APLS board members for his own personal use. His request for this information was not prompted by me for his request was for his own unrelated reasons, which did not involve me nor my claims.

12.    I am unfamiliar with the other allegations contained in the four page affidavit of David Farrar, for the focus of his affidavit is about Judith Shepard and not me.

13.    I neither initiated, nor instigated nor conspired with Judith Shepard in any way, regarding the allegations, which I believe to be false, outlined in David Farrar's affidavit.

Done this __26th__ day of June, 2008.

**ANNIE LUCAS BROWN**

**STATE OF ALABAMA**          )
                                               )
**COUNTY OF MACON**          )

Sworn to and subscribed before me this __26th__ day of June, 2008.

**NOTARY PUBLIC**

**MY COMMISSION EXPIRES:  6/08/09**

# FREEDOM COURT REPORTING

**1**

```
 1   IN THE UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF ALABAMA
 3          NORTHERN DIVISION
 4
 5   CASE NUMBER: 2:07-CV-841-MHT-WC
 6
 7   ANNIE LUCAS BROWN,
 8       Plaintiff(s),
 9       vs.
10   ALABAMA PUBLIC LIBRARY SERVICE,
11       Defendant(s).
12
13      S T I P U L A T I O N
14       IT IS STIPULATED AND AGREED by
15   and between the parties through their
16   respective counsel, that the deposition
17   of JUDITH SHEPARD may be taken before
18   TAMIE J. STORY, Commissioner, at the
19   offices of RUSHTON, STAKELY, JOHNSTON &
20   GARRETT, 184 Commerce Street, Montgomery,
21   Alabama, on the 16th day of May, 2008.
22       IT IS FURTHER STIPULATED AND
23   AGREED that the signature to and the
```

**3**

```
 1            INDEX
 2   EXAMINATION BY:        PAGE NUMBER
 3   Mr. Huffaker          6, 239
 4   Ms. Biggers           198, 242
 5   EXHIBITS:
 6   Defendant's 1 -        13
 7    Subpoena
 8   Defendant's 2 -        61
 9    Notice of Suspension
10   Defendant's 3 -        71
11    Letter
12   Defendant's 4 -        173
13    Letter
14   Defendant's 5 -        178
15    Letter
16   Defendant's 6 -        185
17    Letter
18   Defendant's 7 -        192
19    Letter
20   Defendant's 8 -        195
21    Letter
22   Plaintiff's 1 -        200
23    Letter
```

**2**

```
 1   reading of the deposition by the witness
 2   is waived, the deposition to have the
 3   same force and effect as if full
 4   compliance had been had with all laws and
 5   rules of Court relating to the taking of
 6   depositions.
 7       IT IS FURTHER STIPULATED AND
 8   AGREED that it shall not be necessary for
 9   any objections to be made by counsel to
10   any questions except as to form or
11   leading questions, and that counsel for
12   the parties may make objections and
13   assign grounds at the time of the trial,
14   or at the time said deposition is offered
15   in evidence, or prior thereto.
16       IT IS FURTHER STIPULATED AND
17   AGREED that the notice of filing of the
18   deposition by the Commissioner is waived.
19
20
21
22
23
```

**4**

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         NORTHERN DISTRICT OF ALABAMA
 3             NORTHERN DIVISION
 4
 5   CASE NUMBER: 2:07-CV-841-MHT-WC
 6
 7   ANNIE LUCAS BROWN,
 8       Plaintiff(s),
 9       vs.
10   ALABAMA PUBLIC LIBRARY SERVICE,
11       Defendant(s).
12
13   BEFORE:
14       TAMIE J. STORY, Commissioner
15   APPEARANCES:
16       MS. DEBORAH HILL BIGGERS,
17   Attorney at Law, 113 East Rosa Parks
18   Avenue, Tuskegee, Alabama 36083,
19   appearing on behalf of the Plaintiff.
20       RUSHTON, STAKELY, JOHNSTON &
21   GARRETT, by Mr. Austin Huffaker and Mr.
22   T. Grant Sexton, 184 Commerce Street,
23   Montgomery, Alabama 36195, appearing on
```

1 (Pages 1 to 4)

## FREEDOM COURT REPORTING

5

1  behalf of the Defendant.
2      HASKELL, SLAUGHTER, YOUNG &
3  REDIKER, LLC, by Mr. C. McDowell Crook,
4  Jr., 305 South Lawrence Street,
5  Montgomery, Alabama 36014, appearing on
6  behalf of Judith Shepard.
7  ALSO PRESENT:
8      Annie Lucas Brown
9
10      ***************
11
12      I, TAMIE J. STORY, a Court
13  Reporter of Birmingham, Alabama, acting
14  as Commissioner, certify that on this
15  date, as provided by the Federal Rules
16  of Civil Procedure and the foregoing
17  stipulation of counsel, there came
18  before me at the offices of RUSHTON,
19  STAKELY, JOHNSTON & GARRETT, 184
20  Commerce Street, Montgomery, Alabama,
21  beginning at 9:35 a.m., JUDITH SHEPARD,
22  in the above cause, for oral
23  examination, whereupon the following

6

1  proceedings were had:
2
3          JUDITH SHEPARD,
4  being first duly sworn, was examined
5  and testified as follows:
6
7      THE REPORTER: Usual
8  stipulations?
9      MR. HUFFAKER: Yes.
10     MS. BIGGERS: Yes.
11     MR. CROOK: Yes.
12
13     Q.  Would you state your full
14  name for the record, please, ma'am?
15     A.  Judith R. Shepard.
16     Q.  Mrs. Shepard, I know I've
17  met you before. My name is Austin
18  Huffaker. I represent the Alabama
19  Public Library Service in connection
20  with the lawsuit that Ms. Annie Brown
21  has filed. You do understand that;
22  correct?
23     A.  Yes.

7

1      Q.  And is it also correct that
2  you are a current employee of the APLS?
3      A.  Yes.
4      Q.  And you are here today
5  represented by counsel; is that
6  correct?
7      A.  Yes.
8      Q.  And that's due to an
9  ongoing employment dispute that you
10  have with the APLS of your recent
11  suspension; is that right?
12     A.  Yes.
13     Q.  And it's my understanding
14  that that dispute is going to be before
15  a hearing officer in mid June; is that
16  right?
17     A.  Yes.
18     Q.  And you intend to be
19  represented by counsel then; is that
20  correct?
21     A.  Yes.
22     Q.  Have you ever given a
23  deposition before?

8

1      A.  No.
2      Q.  I'm going to ask you some
3  questions today about Ms. Brown and
4  your employment at the APLS, her
5  employment at the APLS. It is my
6  understanding that there are going to
7  be certain topics that are going to be
8  off the table today, and we will just
9  have to address those as we get there.
10  Okay?
11     A.  Uh-huh (nodding head).
12     Q.  Some of the questions, if I
13  ask a question that you don't
14  understand or you want me to re-ask it
15  or rephrase it, you please let me know.
16  Okay?
17     A.  Uh-huh (nodding head).
18     Q.  And when you answer a
19  question, if you can answer it verbally
20  with a "Yes" or "No" instead of a nod
21  of the head --
22     A.  Instead of a nod or using
23  my hands --

2  (Pages 5 to 8)

## FREEDOM COURT REPORTING

45

1    A.  Yes, it does.
2    Q.  Who is he?
3    A.  He is the director of the
4  Talladega Public Library.
5    Q.  Did you send him any
6  documents concerning the Alabama Public
7  Library Service?
8    A.  I'm not sure; I honestly am
9  not sure. I may have.
10    Q.  Did you send him any
11  documents concerning your employment at
12  the Alabama Public Library Service?
13    A.  I'm not sure. I may have.
14    Q.  Did you send him any
15  documents concerning Annie Brown?
16    A.  No.
17    Q.  Nothing that related to
18  Annie Brown?
19    A.  No.
20    Q.  Did you ask Mr. Farrar to
21  write a letter to the Board of
22  Directors complaining about management
23  at the APLS?

46

1    A.  No.
2    Q.  Did you make a visit to Mr.
3  Farrar in Talladega?
4    A.  Yes, I did.
5    Q.  When did you go up there?
6    A.  February 20th.
7    Q.  Of which year?
8    A.  This year, 2008.
9    Q.  What was the purpose for
10  you going up there?
11    A.  I was named consultant for
12  that area, so it was a standard visit.
13    Q.  And what does a standard
14  visit entail?
15    A.  You go and you sit and you
16  talk to them and you listen to them and
17  you ask them if there's anything you
18  can do to help them and how -- anything
19  the agency can do.
20    Q.  Does a standard visit
21  include discussing any internal
22  performance issues at the APLS?
23    A.  I -- (shrugging shoulders).

47

1    Q.  When you went --
2    A.  No. Like I said, I really
3  never thought of it in those terms.
4    Q.  When you went up to talk to
5  Mr. Farrar, were you on the clock at
6  the APLS?
7    A.  Yes, I was.
8    Q.  Were you using an APLS
9  vehicle or state vehicle?
10    A.  Yes, I was.
11    Q.  Does your suspension
12  involve this meeting you had with Mr.
13  Farrar?
14    A.  Yes.
15    Q.  Did Ms. Brown know that you
16  were going up to talk to Mr. Farrar?
17    A.  I don't know. I don't
18  think so. She knew I was going --
19  that was one of several visits while I
20  was gone. That was the last visit of
21  three or four libraries.
22    Q.  What other libraries did
23  you visit that particular day?

48

1    A.  The library in -- gosh, I
2  can't remember. Where the grist mill
3  is up there, and then I went to
4  Ohatchee, and then I went to Oxford.
5    Q.  How long did you meet with
6  Mr. Farrar up there?
7    A.  Forever it seemed like. A
8  lot longer than I wanted to.
9    Q.  Why was that?
10    A.  Because he kept me there.
11    Q.  How did he keep you there?
12    A.  Talking.
13    Q.  Was he doing most of the
14  talking or were you?
15        MR. CROOK:  That's okay.
16    A.  Yeah, he was.
17    Q.  Was anybody up there with
18  you on that trip?
19    A.  No.
20    Q.  Did you discuss with Mr.
21  Farrar the Annie Brown lawsuit?
22    A.  I don't think so, no.
23    Q.  Did you tell Mr. Farrar

12 (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

49

1  that Annie Brown had a federal lawsuit
2  against the Alabama Public Library
3  Service?
4      A.  No.
5      Q.  Did you tell Mr. Farrar
6  that you and Annie Brown were in the
7  process of "getting them all"?
8      A.  No.
9      Q.  You never told him that?
10     A.  No, I never used that term.
11     Q.  What term did you use?
12     A.  I didn't use any term.
13     Q.  You used nothing to that
14 effect?
15     A.  No.
16     Q.  You're sure about that?
17     A.  I am positive (nodding
18 head).
19     Q.  Did you tell Mr. Farrar
20 that you and Ms. Brown had never been
21 close but that had changed recently
22 because Ms. Brown had filed federal
23 charges against the APLS?

51

1  she called Mr. Farrar after your visit?
2      A.  I don't remember.  That was
3  back in February.
4      Q.  Did Ms. Brown ever tell you
5  that she has called Mr. Farrar?
6      A.  I don't remember.
7      Q.  Did you tell Mr. Farrar
8  that Ms. Brown had told you that he
9  could be trusted and would help?
10     A.  I don't remember.  I don't
11 think so.
12     Q.  Did you tell Mr. Farrar
13 that you would send him some documents
14 about what was going on at the
15 APLS?
16         MR. CROOK:  That's okay.
17     A.  I don't remember; I really
18 honestly don't.
19     Q.  What do you remember
20 discussing with Mr. Farrar?
21     A.  Well, obviously, I can't
22 discuss that, but I remember that the
23 meeting was very long, that he did most

50

1      A.  I most certainly did not.
2      Q.  You said nothing to that
3  effect?
4      A.  No.
5      Q.  You're sure about that?
6      A.  I'm positive.
7      Q.  Did you tell Mr. Farrar
8  that you and Ms. Brown were "determined
9  to get them for running a very unfair
10 work place"?
11     A.  No.
12     Q.  Nothing to that effect?
13     A.  No.
14     Q.  After meeting with Mr.
15 Farrar, did you tell Ms. Brown that you
16 had talked to him?
17     A.  I think that I talked to
18 Annie about all of the libraries that I
19 visited.
20     Q.  Did you tell Ms. Brown that
21 she should call Mr. Farrar also?
22     A.  No.
23     Q.  Did Ms. Brown tell you that

52

1  of the talking, and that I was anxious
2  to get back because I was in the old
3  car, and I wanted to get back to APLS
4  before dark.
5      Q.  So it's your testimony that
6  he kept you there?
7      A.  Yes.
8      Q.  So are you going to tell us
9  about what you discussed with Mr.
10 Farrar up there?
11     A.  No, because my lawyer will
12 not let me.
13     Q.  Okay.
14     A.  And I didn't discuss it, he
15 was discussing it.
16     Q.  Well, your lawyer has yet
17 to say that.
18         MR. HUFFAKER:  Is the
19 instruction to Mrs. Shepard that she is
20 not to tell us or answer any questions
21 about what she told Mr. Farrar during
22 this trip?
23         MR. CROOK:  Yes.  The

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

81

1   Q.   You said that Ms. Brown was
2   in charge of consultants and then she was
3   not?
4       A.   Uh-huh (nodding head), yes.
5       Q.   Do you mean her supervisory
6   responsibilities were removed?
7       A.   Yes.
8       Q.   Do you know the circumstances
9   under which those were removed?
10      A.   No.
11      Q.   How do you know that her
12  supervisory responsibilities were
13  removed?
14      A.   Because they had a full staff
15  meeting and announced that she -- that
16  Hulen Bivins would be in charge of the
17  consultants.
18      Q.   What happened exactly at the
19  staff meeting?
20      A.   They made that announcement,
21  and I don't remember what else, but that
22  Hulen Bivins would be in charge of the
23  consultants.

82

1       Q.   Nothing else was said during
2   that staff meeting about that?
3       A.   It could have been, but I
4   don't remember.
5       Q.   What other complaints can
6   you tell me about concerning Annie
7   Brown since September 7, 2007?
8       A.   I have watched Mr. Bivins
9   ignore her, just come in and walk right
10  past her and exclude her from things.
11      Q.   And how exactly has he
12  ignored her?
13      A.   By walking right past her and
14  not speaking or telling her things.
15      Q.   Like what?
16      A.   Things that the people who
17  work with public libraries in the state
18  need to know.
19      Q.   Like what?
20      A.   Like the dates or when
21  there's going to be a -- the legislative
22  meeting or what programs that we need to
23  be planning or that sort of thing.

83

1       Q.   Has he ignored you?
2       A.   Well, it's sort of hard to
3   say whether I'm ignoring him or he's
4   ignoring me.
5       Q.   In your mind, has he ignored
6   you?
7       A.   Yes.
8       Q.   Has he ignored other
9   individuals there at the APLS?
10      A.   I don't know.
11      Q.   Anybody else complain to you
12  about him ignoring them?
13      A.   People don't -- nobody has
14  complained to me about him ignoring
15  them.
16      Q.   Has anyone else at the APLS
17  had their supervisory responsibilities
18  removed?
19      A.   Not that I know of.
20      Q   Have you ever had your
21  supervisory responsibilities removed?
22      A.   Yes.
23      Q.   Do you know when that was?

84

1       A.   Yes.  Two weeks after I wrote
2   this letter.
3       Q.   Do you know why that was?
4       A.   I know the reason that was
5   given and I know the reason why I
6   think.
7       Q.   What was the reason that
8   was given?
9       A.   That I volunteered to be a
10  consultant, that I -- and that I would be
11  in charge of state-wide training.
12      Q.   What is the reason that you
13  think?
14      A.   Because that's a complete
15  lie.  I did not volunteer to be a
16  consultant.
17      Q.   Any other complaints about
18  Ms. Brown for that time period?
19      A.   Not that I can remember
20  -- wait a minute.  I don't know if it was
21  this time period, but she was doing a
22  workshop for E-rate and she needed some
23  notebooks to put the E-rate material in,

21  (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

1  and Mr. Bivins said she couldn't have
2  them.
3      Q.  When was that?
4      A.  I don't really know when it
5  was.  The notebooks were a big --
6  stupid.
7      Q.  Is this something that you
8  overheard Mr. Bivins say or is this
9  something that Ms. Brown told you about?
10     A.  Ms. Brown was trying to get
11  her workshop up on E-rate.  It's a very
12  complicated procedure that I hope I
13  never have to understand.  And she had
14  a lot of material that she wanted to
15  give to the librarians, and she asked
16  for these black notebooks.  And she had
17  to use big clips bigger than that
18  (indicating), I think, because she was
19  denied the notebooks.
20     Q.  Again, my question is:  Is
21  this something you overheard Mr. Bivins
22  say or was this something Ms. Brown told
23  you?

86

1      A.  I think I overheard Ms.
2  Brown talking about it.  I'm not sure
3  she told me directly.
4      Q.  Who was she talking with?
5      A.  Probably one of the other
6  consultants.  There's a sort of open
7  space where we work.
8      Q.  Do you know when she had
9  made the request for the notebooks?
10     A.  No.
11     Q.  Do you know when the
12  conference was?
13     A.  No.
14     Q.  Did she tell you or did you
15  overhear her saying the reason given
16  for denying the request for notebooks?
17     A.  No.
18     Q.  Do you know whether she's
19  ever made any other requests during her
20  employment history at the APLS for
21  notebooks?
22     A.  No.
23     Q.  Has anybody else at the

87

1  APLS, to your knowledge, been denied a
2  request for supplies?
3      A.  Yes.
4      Q.  Who else?
5      A.  We were told by Mr. Bivins'
6  secretary that we were not to request
7  supplies; pens and pencils, but notebooks
8  never have come up.
9      Q.  Who was his secretary?
10     A.  Jackie Barnes.
11     Q.  Who exactly was this told
12  to?  You said "we," but who is "we"?
13     A.  I think I asked her about
14  pencils or pens -- probably pens, and she
15  told me that we weren't -- we didn't have
16  anymore.  And since I was formerly in the
17  other department, then I was used to
18  getting my supplies from the woman
19  there, and I think she told me the same
20  thing.
21     Q.  Did they tell you why?
22     A.  Because we stole them.
23     Q.  You keep saying "we."  Who is

88

1  "we"?
2      A.  When I asked about getting
3  some pens, I feel like that's what it
4  was.  And I don't remember.  I was --
5  they -- we means the entire staff could
6  not have supplies because we stole
7  supplies.  Now by "we," I'm assuming that
8  means the people that Mr. -- at that time
9  Mr. Bivins was supervising.
10     Q.  Who would those individuals
11  be?
12     A.  That would be the staff of
13  reference.  Do you want me to name all
14  the individual names?
15     Q.  Well, how many folks?
16     A.  I don't know.  It would be
17  the staff of reference, circulation,
18  inter-library loan, video, and tech
19  services.
20     Q.  Do you have any idea how
21  many people total?
22     A.  I could sit and count them up
23  if you want to wait.

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660